IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) ) ) |
| WOLVERINE TUBE, INC., *et al.*, | ) Case No. 10-13522 (PJW) ) (Jointly Administered) |
| Debtors. | ) ) Hearing Date: December 21 @ 9:30 a.m. ) Responses Due: December 14 @ 4:00 p.m. |

**PBGC'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING DISCLOSURE STATEMENT; (B) ESTABLISHING VOTING RECORD DATE, VOTING DEADLINE, AND OTHER DATES; (C) APPROVING PROCEDURES FOR SOLICITING, RECEIVING, AND TABULATING VOTES ON PLAN AND FOR FILING OBJECTIONS TO PLAN; AND (D) APPROVING MANNER AND FORMS OF NOTICE AND OTHER RELATED DOCUMENTS**

The Pension Benefit Guaranty Corporation ("PBGC"), on its own and on behalf of the Wolverine Tube, Inc. Retirement Plan ("Pension Plan"), hereby objects to the proposed Disclosure Statement, Docket No. 94. The proposed Disclosure Statement should not be approved because it fails to provide "adequate information" as that term is defined under 11 U.S.C. §1125(a) with regard to: (1) the proposed discharge, injunction and release provisions; (2) the proposed substantive consolidation of the Debtors' estates; (3) the proposed treatment of the claims of the PBGC and the Pension Plan; and (4) the proposed classification and treatment of the Subsidiary Equity Interests.

## BACKGROUND

**A. PBGC and the Employee Retirement Income Security Act.**

1. PBGC is the United States government agency that administers the pension insurance program under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461 (2006), which covers most private defined-benefit pension

1

plans. The program guarantees a secure, predictable retirement for approximately 44 million American workers.[1] When a pension plan covered by Title IV terminates without sufficient assets to pay promised benefits, PBGC typically becomes the statutory trustee of the plan and pays covered benefits up to the limits established by Title IV.[2]

2. Pursuant to ERISA, a sponsor of a pension plan covered by Title IV and the sponsor's controlled group members must satisfy certain financial obligations to the plan.[3] The responsibilities of the plan sponsor and controlled-group members to an ongoing pension plan include, *inter alia*: (1) paying the statutorily required minimum funding contributions to the pension plan;[4] and (2) paying insurance premiums to PBGC.[5]

3. Upon termination of a pension plan, the contributing sponsor and each member of the controlled group are liable to PBGC for unfunded benefit liabilities of the pension plan. 29 U.S.C. § 1362(a), (b). In addition, the contributing sponsor and its controlled group are each liable for a termination premium at the rate of $1,250 per plan participant per year for three years.[6] If the plan termination occurs while the plan sponsor and any controlled group members are attempting to reorganize in Chapter 11, their obligation to PBGC for termination premiums does not exist until after the Chapter 11 plan is completed.[7]

---

[1] PBGC 2009 Annual Management Report at 1, http://www.pbgc.gov/docs/2009amr.pdf.
[2] *See* 29 U.S.C. §§ 1321, 1322, and 1361.
[3] A group of trades or business under common control, referred to as a "controlled group," includes, for example, a parent and its 80% owned subsidiaries. Another example includes brother-sister groups of trades or business under common control. *See* 29 U.S.C. § 1301(14)(A), (B); 26 U.S.C. § 414(b), (c); 26 C.F.R. §§ 1.414(b)-1, 1.414(c)-1, 1.414(c)-2.
[4] 26 U.S.C.§ 412(c)(11) (2007) (effective for pension plan years beginning on or before Dec. 31, 2007); 29 U.S.C.A. § 1082(c)(11) (2007) (same); *see also* 26 U.S.C. § 412(b)(1), (2) (2009) (effective for pension plan years beginning after Dec. 31, 2007); 29 U.S.C.A. § 1082(b)(1), (2) (2009) (same).
[5] 29 U.S.C. §§ 1306, 1307(e)(2).
[6] *See* 29 U.S.C. § 1306(a)(7), as amended by § 8101(b) the Deficit Reduction Act of 2005 (Pub. L. 109-B171) and by §§ 401(b) and 402(g)(2)(B) of the Pension Protection Act of 2006 (Pub. L. 109-B280).
[7] *See* 29 U.S.C. § 1306(a)(7)(B).

4. The liabilities of the plan sponsor and controlled-group members to a pension plan and to the PBGC with regard to the pension plan are joint and several.[8]

5. ERISA provides the exclusive means for a plan sponsor to terminate a pension plan -- a standard termination or a distress termination. *See* 29 U.S.C. § 1341(a)(1); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999). A standard termination requires sufficient assets to pay all of the pension plan's promised benefits. *See* 29 U.S.C. § 1341(b)(2)(A)(i)(III). A distress termination requires a showing, among other things, that each plan sponsor and controlled group member satisfies one of the statutory financial distress criteria. *See* 29 U.S.C. § 1341(c)(2)(B).[9]

6. As the statutory trustee of a terminated pension plan, PBGC has authority to collect all amounts owed to the plan, including any unpaid minimum funding contributions. *See* 29 U.S.C. §§ 1082(c), 1342(d), 1362(a), (c); 26 U.S.C. § 412(c).

### B. Debtors' Bankruptcy Proceedings

7. On November 1, 2010, Wolverine Tube, Inc. ("WTI") and four affiliates (collectively, the "Debtors") filed for chapter 11 bankruptcy protection in this Court. This Court ordered joint administration of the Debtors' chapter 11 cases for procedural purposes under Case No. 10-13522 (PJW). Debtors' proposed Joint Plan of Reorganization ("Joint Plan") and the Debtors' proposed Disclosure Statement were filed on November 15, 2010.

8. WTI and the other Debtors own, directly and indirectly, interests in business entities that have not filed for bankruptcy protection (the "Non-Debtors").[10]

---

[8] 29 U.S.C. §§ 1082(c)(11)(B), 1307(e)(2), 1362.
[9] PBGC itself can initiate termination of a pension plan pursuant to section 4042 of ERISA ("PBGC-initiated termination") if it finds that the applicable statutory criteria are met. 29 U.S.C. § 1342.
[10] Exhibit C to proposed Disclosure Statement

### C. Debtors and the Pension Plan.

9. WTI is the contributing sponsor of the Pension Plan within the meaning of 29 U.S.C. § 1301(a)(13). The Pension Plan is a single-employer defined benefit pension plan covered by Title IV of ERISA. *See* 29 U.S.C. § 1321. The other Debtors and the Non-Debtors are members of WTI's controlled group for purposes of ERISA.

10. The Pension Plan provides retirement benefits to approximately 2,367 employees, former employees or retirees of the Debtors and their beneficiaries. On June 15, 2010, the ERISA Administrator of the Pension Plan filed an application for a distress termination pursuant to 29 U.S.C. §1341(c)(2)(B)(iii)(I). According to information provided to PBGC from WTI, the Pension Plan is underfunded by about $76 million.

11. If the Pension Plan terminates, WTI and all members of its controlled group, including the other Debtors, would be jointly and severally liable to PBGC for the Pension Plan's unfunded benefit liability, unpaid premiums, and any unpaid minimum funding contributions. *See* 29 U.S.C §§ 1301(a)(18), 1306(a)(7), 1362(a)-(c). In addition, the Reorganized Debtors may be liable for a termination premium of about $3 million per year for three years.

12. Whenever there is a failure to make a required contribution to a pension plan by the due date and the unpaid balance of the missed contributions exceeds $1,000,000, a lien arises by operation of law in favor of the plan against all property and rights belonging to the contributing sponsor and each member of its controlled group. 26 U.S.C § 430(k), 29 U.S.C. § 1083(k). PBGC is authorized to perfect and enforce the lien. 26 U.S.C § 430(k)(5).

13. By operation of law, 26 U.S.C. 430(k) liens arose on all of the property and rights to property of WTI and each member of its controlled group, including the Non-Debtors. On

behalf of the Pension Plan, PBGC timely perfected 26 U.S.C 430(k) liens in the amount of $2,019,250 against the Debtors and certain non-debtor entities.

**OBJECTIONS**

PBGC, on its own behalf and on behalf of the Pension Plan, objects to the proposed Disclosure Statement because it fails to inform creditors of facts and circumstances that may affect the value of their claims and the confirmability of the Joint Plan. It therefore does not provide "adequate information," as required by 11 U.S.C. § 1125(a). A disclosure statement contains "adequate information" if it provides:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor . . . that would enable a hypothetical reasonable investor . . . to make an informed judgment about the plan.[11]

The Disclosure Statement submitted by the Debtors fails to meet this threshold in the following respects:

1. The Disclosure Statement fails to provide adequate information to creditors regarding the proposed, overly broad discharge, release, exculpation and injunction provisions (collectively, the "Release Provisions") proposed in the Joint Plan. *See* Disclosure Statement, Section V.I. In particular, the proposed Joint Plan includes in the definition of "Released Party", "the shareholders of the Debtors and their direct and indirect parent companies." It then defines "Third Party Releases" to include "the Debtors, the Reorganized Debtors and the Released Parties." Section 10.2 of the proposed Joint Plan requires "each Holder of a Claim against the Debtors…[to release and discharge] the Third Party Releasees" from a broad range of claims.

The Disclosure Statement does not indicate what circumstances exist, if any, to warrant the non-debtor relief requested in the Release Provisions. Moreover, if such circumstances exist,

---

[11] 11 U.S.C. § 1125(a)(1).

the Disclosure Statement is inadequate because it fails to inform creditors that to the extent the releases of non-debtors is a necessary element of the Debtors' proposed Joint Plan, the Joint Plan may not be confirmable.[12]

The Disclosure Statement also should, but does not inform creditors that the Release Provisions directly contradict 11 U.S.C. §524(e), which states that a Debtor's discharge of debt does not affect the liability of any other entity or that entity's property for that debt.[13]  Because the Release Provisions improperly provide protection to non-debtors, it is a violation of §524(e) of the Bankruptcy Code.

Finally, the Disclosure Statement should inform creditors that under ERISA, a blanket release of fiduciary breach claims relating to a pension plan is "void as against public policy." 29 U.S.C. § 1110(a).  Accordingly, the potential release of non-debtors for breach of fiduciary duty under ERISA, 29 U.S.C. §§ 1101-1114, with respect to the Pension Plan are outside the scope of the relief that can be granted in this proceeding.

2.  Debtors are proposing substantive consolidation of the estates, "solely for voting and distribution purposes only." *See* Disclosure Statement, V.D., p. 37.  However, the proposed Disclosure Statement fails to provide information to creditors sufficient to enable them to determine whether substantive consolidation of the Debtors' estates is necessary and appropriate.

Substantive consolidation must be "used sparingly," with "extreme caution," and "granted in only extraordinary situations."[14]  Here, the Debtors have not provided any proof that extraordinary circumstances exist.  In addition to acknowledging the unanimous consensus

---

[12] There are also numerous provisions in the Joint Plan that seek to invoke this Court's power in an attempt to preserve for the Reorganized Debtors the value residing in the Debtors' non-debtor affiliates.  PBGC anticipates that it will object to these provisions at confirmation in order to preserve this value for creditors of the Non-Debtors.
[13] The Debtors proposed ballots specifically reference the Release Provisions in the proposed Joint Plan in an attempt to bind creditors to the improper releases.  This does not meet the standard for a knowing and voluntary release and should not be permitted.
[14] *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 618-19 (Bank. D. Del. 2001); *see also, In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2d Cir. 1988).

among courts that substantive consolidation is a remedy to be used sparingly, the Third Circuit, in *In re Owens Corning*, clarified the legal test to apply in substantive consolidation cases.[15] Adopting the test of the Second Circuit from *In re Augie/Restovo*, the Third Circuit noted that the proponent for substantive consolidation must demonstrate that "(i) prepetition [the debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."[16] In addition to its adoption of the two-pronged test, the Third Circuit provided five principles for a court evaluating whether to substantively consolidate debtors. Among the principles was that "[m]ere benefit to the administration of the case . . . is hardly a harm calling substantive consolidation into play."[17]

The PBGC is not aware of any facts or circumstances that would justify substantive consolidation of the Debtors' estates in this case. In light of the requirements recognized by the Third Circuit, the proposed Disclosure Statement falls well short of establishing the necessary predicate for substantive consolidation.[18]

3. The proposed Disclosure Statement fails to provide adequate information to creditors regarding the proposed treatment of the claims of the PBGC and the Pension Plan.

First, there is not adequate information regarding the classification of PBGC's claims. The Disclosure Statement proposes that Class 1 consisting of Non-Tax Priority Claims, Class 2 consisting of Other Secured Creditor Claims, and Class 4 consisting of General Unsecured Claims are Unimpaired. However, Class 5 consisting of the PBGC claim, which includes claims

---

[15] *In re Owens Corning*, 419 F.3d 195, 209-11 (3d Cir. 2005).
[16] *Id.* at 211 (internal citations omitted).
[17] *Id.*
[18] The Debtors' proposed Disclosure Statement indicates that one of the Debtors, WT Holding Company, Inc., is not a guarantor of the 15% Senior Secured Notes that were issued by WTI. Based on this, the substantive consolidation of WT Holding Company with the other Debtors is not proper under any circumstance. *See* Disclosure Statement, II.C., p.18.

that fall into Classes 1, 2, and 4, are impaired. *See* Disclosure Statement, V.C., p. 27. The PBGC has not agreed to this arbitrary, unfair and disparate treatment. Moreover, the proposed Disclosure Statement provides no explanation for it. Consequently, the Disclosure Statement should inform creditors that the Joint Plan may not be confirmable over the PBGC's objection.

Second, the proposed Disclosure Statement fails to provide adequate information regarding the settlement of PBGC's claims. The settlement of PBGC's claims is a condition to confirmation of the Joint Plan. Currently, there is not an agreement between the Debtors and PBGC. Thus creditors should be aware that it not clear the Joint Plan is confirmable.

4. The proposed Disclosure Statement fails to provide adequate information to creditors regarding Class 9 – Subsidiary Equity Interests. Class 9 appears to be comprised of assets of the Debtors and Non-Debtors rather than a class of creditors. The Disclosure Statement should provide adequate information regarding why Subsidiary Equity Interests should be treated as a creditor class and what the impact of the proposed treatment of these assets, if any, would be on creditors such as the PBGC and the Pension Plan that have claims against non-debtor affiliates of the Debtors. *See* Disclosure Statement, V.C.2.(d), p. 30.[19]

---

[19] *See also,* Joint Plan, p. 10 – "Subsidiary Equity Interest" means any Interest of the Debtors in subsidiaries or Affiliates.

## **CONCLUSION**

For the forgoing reasons, PBGC objects to Debtors' proposed Disclosure Statement and requests that it be modified as stated above to provide adequate information to creditors.

Dated: December 14, 2010　　　　　　　　　　　Respectfully submitted,
　　　　　Washington, D.C.

　　　　　　　　　　　　　　　　　　　　　　　/s/ Stephen D. Schreiber
　　　　　　　　　　　　　　　　　　　　　　　ISRAEL GOLDOWITZ
　　　　　　　　　　　　　　　　　　　　　　　Chief Counsel
　　　　　　　　　　　　　　　　　　　　　　　CHARLES L. FINKE
　　　　　　　　　　　　　　　　　　　　　　　Deputy Chief Counsel
　　　　　　　　　　　　　　　　　　　　　　　STEPHEN D. SCHREIBER
　　　　　　　　　　　　　　　　　　　　　　　Assistant Chief Counsel
　　　　　　　　　　　　　　　　　　　　　　　JON M. CHATALIAN
　　　　　　　　　　　　　　　　　　　　　　　Attorney

　　　　　　　　　　　　　　　　　　　　　　　PENSION BENEFIT GUARANTY
　　　　　　　　　　　　　　　　　　　　　　　CORPORATION
　　　　　　　　　　　　　　　　　　　　　　　Office of the General Counsel
　　　　　　　　　　　　　　　　　　　　　　　1200 K Street, N.W., Suite 340
　　　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20005-4026
　　　　　　　　　　　　　　　　　　　　　　　Telephone: (202) 326-4020, ext. 3045
　　　　　　　　　　　　　　　　　　　　　　　Facsimile: (202) 326-4112