# EXHIBIT A

## Purchase Agreement

ASSET PURCHASE AND SALE AGREEMENT

BETWEEN

TUBE FORMING, L.P.

(as the Seller)

and

OVERSTREET-HUGHES CO., INC.

(as the Buyer)

and

Others

November 8, 2010

# TABLE OF CONTENTS

ARTICLE I ASSET PURCHASE ........................................................................................2

    1.1        Purchase and Sale of Assets; Assumption of Certain Liabilities. .........2
    1.2        Purchase Price and Related Matters. ...................................................3
    1.4        Post-Closing Adjustment. ....................................................................6
    1.5        Consents to Assignment........................................................................8
    1.6        Further Assurances. .............................................................................8

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE SELLER ..........................9

    2.1        Organization, Qualification and Power ................................................9
    2.2        Non-Contravention. ............................................................................10
    2.3        Financial Statements..........................................................................10
    2.4        Absence of Certain Changes ..............................................................11
    2.5        Undisclosed Liabilities........................................................................11
    2.6        Tax Matters. ......................................................................................11
    2.7        Tangible Personal Property/Inventory. ...............................................11
    2.8        Real Property......................................................................................12
    2.9        Intellectual Property...........................................................................12
    2.10      Contracts. ..........................................................................................13
    2.11      Entire Business. .................................................................................15
    2.12      Litigation...........................................................................................15
    2.13      Employment Matters...........................................................................15
    2.14      Employee Benefits..............................................................................17
    2.15      Environmental Matters........................................................................19
    2.16      Legal Compliance..............................................................................20
    2.17      Permits ..............................................................................................20
    2.18      Certain Payments..............................................................................20
    2.19      Brokers' Fees.....................................................................................20
    2.20      Product Warranty and Quality............................................................20
    2.21      Customers and Suppliers....................................................................21
    2.22      Insurance ...........................................................................................21
    2.23      Affiliated Transactions.......................................................................21
    2.24      Accuracy of Information......................................................................22
    2.25      Books and Records ............................................................................22

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE BUYER ......................22

    3.1        Organization ......................................................................................22
    3.2        Authority ............................................................................................22
    3.3        No contravention ...............................................................................23
    3.4        Litigation. ..........................................................................................23

i

| 3.5 | Broker Fees | .................................................................................... | 24 |
| 3.6 | Product Liability Insurance. | .............................................................. | 24 |

**ARTICLE IV PRE-CLOSING COVENANTS** ................................................... 24

| 4.1 | Bankruptcy Covenants | .................................................................... | 24 |
| 4.2 | Closing Efforts | ................................................................................. | 26 |
| 4.3 | Operation of Business | ...................................................................... | 26 |
| 4.4 | Disclosure Schedule | ......................................................................... | 29 |
| 4.5 | Elimination of Intercompany Items | ................................................. | 29 |
| 4.6 | Access | .............................................................................................. | 29 |
| 4.7 | Sufficiency of Funds | ........................................................................ | 29 |

**ARTICLE V CONDITIONS PRECEDENT TO CLOSING** ................................. 30

| 5.1 | Conditions to Obligations of the Buyer | .......................................... | 30 |
| 5.2 | Conditions to Obligations of the Seller | ........................................... | 31 |
| 5.3 | Deemed Waiver. | ............................................................................... | 32 |
| 5.4 | Frustration of Closing Conditions | ................................................... | 32 |

**ARTICLE VI INDEMNIFICATION** ................................................................. 32

| 6.1 | Indemnification by the Seller. | .......................................................... | 32 |
| 6.2 | Indemnification by the Buyer. | ......................................................... | 33 |
| 6.3 | Claims for Indemnification. | ............................................................. | 34 |
| 6.4 | Indemnification Period | ..................................................................... | 35 |
| 6.5 | Exclusive Remedy. | ........................................................................... | 35 |
| 6.6 | Escrow | .............................................................................................. | 36 |
| 6.7 | Limitations. | ...................................................................................... | 36 |

**ARTICLE VII TAX MATTERS** ...................................................................... 37

| 7.1 | Payment of Taxes. | ............................................................................ | 37 |
| 7.2 | Intentionally omitted | ........................................................................ | 38 |

**ARTICLE VIII TERMINATION** ..................................................................... 38

| 8.1 | Termination of Agreement | ................................................................ | 38 |
| 8.2 | Effect of Termination | ....................................................................... | 39 |
| 8.3 | Fees and Expenses | ............................................................................ | 39 |

**ARTICLE IX EMPLOYEE MATTERS** ............................................................ 40

| 9.1 | Employment | ...................................................................................... | 40 |
| 9.2 | Employee Benefits | ............................................................................ | 41 |
| 9.3 | U.S. WARN Act. | ................................................................................ | 41 |

ii

**ARTICLE X OTHER POST-CLOSING COVENANTS** ...........................................................41

    10.1       Non-Compete/Non-Solicitation Agreements. ...................................41
    10.2       Use of Names. ..........................................................................................42
    10.3       Confidentiality by the Seller and Affiliates. .....................................43
    10.4       Post-Closing Access and Cooperation. ..............................................44

**ARTICLE XI DEFINITIONS** .....................................................................................44

**ARTICLE XII GENERAL TERMS** ...........................................................................59

    12.1       Press Releases and Announcements ...............................................59
    12.2       No Third Party Beneficiaries........................................................60
    12.3       Entire Agreement.............................................................................60
    12.4       Succession and Assignment ...........................................................60
    12.5       Notices ...............................................................................................60
    12.6       Amendments and Waivers ..............................................................61
    12.7       Severability ......................................................................................61
    12.8       Expenses............................................................................................61
    12.9       Specific Performance .......................................................................61
    12.10     Governing Law .................................................................................61
    12.11     Submission to Jurisdiction ..............................................................62
    12.13     Construction .....................................................................................62
    12.14     Intentionally omitted........................................................................63
    12.15     Incorporation of Exhibits and Schedules ......................................63
    12.16     Further Representations ...................................................................63
    12.17     Counterparts and Facsimile Signature .........................................63

**ARTICLE XIII**...........................................................................................................63

**CERTAIN AGREEMENTS RELATING TO SECTION 363 OF THE BANKRUPTCY CODE**
..................................................................................................................................63

    13.1       Bidding Procedures ..........................................................................64
    13.2       "As Is, Where Is"..............................................................................64
    13.3       Free Of Any And All Claims And Interests......................................64
    13.4       Participation Requirements ..............................................................64
    13.5       Due Diligence....................................................................................65
    13.6       Bid Deadline......................................................................................65
    13.7       Qualified Bid Requirements.............................................................66
    13.8       No Qualified Bids .............................................................................67
    13.9       Auction...............................................................................................68
    13.10     The Sale Hearing ..............................................................................69
    13.11     Reservation of Rights........................................................................70

Disclosure Schedule

Schedules:

| | |
|---|---|
| Schedule 1.1(d) | Cure Costs |
| Schedule 1.2(b) | Net Book Value of Fixed Assets |
| Schedule 1.2(c) | Inventory Purchase Price Methodology |
| Schedule 1.4(b) | Closing Statement |
| Schedule 1.5 | Required Consents |
| Schedule 2.2 | Non-Contravention |
| Schedule 2.3 | Financial Statements |
| Schedule 2.4 | Absence of Certain Changes |
| Schedule 2.5 | Undisclosed Liabilities |
| Schedule 2.7 | Leased Tangible Personal Property |
| Schedule 2.8 | Business Properties |
| Schedule 2.9 | Intellectual Property |
| Schedule 2.10 | Contracts |
| Schedule 2.11 | Entire Business |
| Schedule 2.12 | Litigation/Judgments, etc. |
| Schedule 2.13(a) | Business Employees |
| Schedule 2.14 | Employee Benefits Plans |
| Schedule 2.15 | Environmental Matters |
| Schedule 2.17 | Permits |
| Schedule 2.20 | Product Warranty and Quality |
| Schedule 2.21 | Customers and Suppliers |
| Schedule 2.22 | Insurance |
| Schedule 2.23 | Affiliated Transactions |
| Schedule 3.6 | Product Liability Insurance |
| Schedule D-1 | Assumed Liabilities |
| Schedule D-2 | Excluded Assets |
| Schedule D-3 | Seller Knowledge Persons |
| Schedule D-4 | Buyer Knowledge Persons |
| Schedule D-5 | Business Properties |
| Schedule D-6 | Security Interests |
| Schedule D-7 | Mexican Designated Contracts |

Exhibits:

| | | |
|---|---|---|
| Exhibit A | - | Form of Bill of Sale and Assignment |
| Exhibit B | - | Form of Assignment and Assumption Agreement |
| Exhibit C | - | Form of Escrow Agreement |
| Exhibit D | - | Form of Transition Services Agreement—to be attached |
| Exhibit E | - | Form of Supply Agreements |
| Exhibit F | - | Form of Carrollton Lease |
| Exhibit G | | Form of Bidding Procedures Order |
| Exhibit H | | Form of Bankruptcy Sale Order |

3/242953.6

## ASSET PURCHASE AND SALE AGREEMENT

This ASSET PURCHASE AND SALE AGREEMENT (the "Agreement") is entered into as of November 8, 2010 by and between **Tube Forming, L.P.**, a Delaware limited partnership (the "Seller"), and **Overstreet-Hughes Co., Inc.**, a Tennessee corporation (the "the Buyer"). The Seller and the Buyer are direct or indirectly, wholly-owned subsidiaries of Wolverine Tube, Inc., a Delaware corporation, ("Wolverine") and Mueller Industries, Inc., a Delaware corporation, ("Mueller"), respectively. WLVN de **Latinoamerica, S. de R.L. de C.V.**, a Mexican *sociedad de responsabilidad limitada de capital variable* (variable capital limited liability company) which is a wholly-owned subsidiary of Wolverine ("Latinoamerica"), is a party to this Agreement for the purpose of the transfer and assignment of certain Mexico Designated Contracts related to its business operations in Mexico to **Mueller Comercial de Mexico, S. de R.L. de C.V.**, a Mexican *sociedad de responsabilidad limitada de capital variable* (variable capital limited liability company) ("Mueller Mexican Affiliate"), which is also a party to this Agreement for such purpose. The Seller and the Buyer are each individually referred to herein as a "Party" and are collectively referred to herein as the "Parties."

### INTRODUCTION

1.      The Seller is engaged in the Business and the Seller, together with Latinoamerica, owns all of the Acquired Assets.  With respect to the Business Property located at Monterrey, Mexico, Latinoamerica is the sole beneficiary of the Maquila Program and has entered into the WLVN Maquila Agreement and is a party to the Mexican Real Estate Lease, the Mexican Designated Contracts, and other operating agreements (collectively, the "Mexican Facility Contracts").

2.      On October 31, 2010 (the "Petition Date"), Wolverine, Seller, and other Affiliates commenced a voluntary case (the "Bankruptcy Case") under Chapter 11 of Title 11, United States Code, 11 U.S.C. 1010 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

3.      Wolverine (and Seller) continues to operate its business and manage its properties as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.      The Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer, the Acquired Assets (excluding the Mexican Designated Contracts) upon the terms and subject to the conditions set forth herein. In addition, Mueller Mexican Affiliate desires to assume from Latinoamerica, and Latinoamerica desires to transfer and assign to Mueller Mexican Affiliate, the Mexican Designated Contracts.

5.      Mueller is a party to this Agreement solely as provided in **Section 4.8 and Article VI**, and Wolverine is a party to this Agreement solely as provided in **Sections 1.1(d), 1.3(b), and 4.1, and Article VI, and Article X.**

6.      Each capitalized term used in this Agreement shall have the meaning ascribed to it in **Article XI**.

NOW, THEREFORE, in consideration of the premises and the representations, warranties, and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1

# ARTICLE I
## ASSET PURCHASE

1.1     Purchase and Sale of Assets; Assumption of Certain Liabilities.

(a)     Sale and Transfer of Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing Date, (i) the Seller shall sell, convey, assign, transfer, and deliver to the Buyer all of the Acquired Assets (excluding the Mexican Designated Contracts) and the Buyer shall purchase, assume and acquire from the Seller, all of the Seller's right, title and interest in and to the Acquired Assets (excluding the Mexican Designated Contracts); and (ii) Latinoamerica shall transfer, assign, and convey to Mueller Mexican Affiliate all of Latinoamerica's right, title, and interest in and to the Mexican Designated Contracts; and (iii) the Buyer shall cause Mueller Mexican Affiliate to assume from Latinoamerica all of Latinoamerica's right, title, and interest in and to the Mexican Designated Contracts.

(b)     Assumed Liabilities. Upon the terms and conditions set forth in this Agreement, at the Closing Date, (i) the Seller shall convey, assign, transfer, and deliver to the Buyer and the Buyer shall assume and agree to pay, perform, and discharge when due the Assumed Liabilities (excluding those relating to the Mexican Designated Contracts) and (ii) Latinoamerica shall assign, transfer, and convey to Mueller Mexican Affiliate, and the Mueller Mexican Affiliate shall assume, acquire, and perform the Mexican Designated Contracts.

(c)     Excluded Liabilities. Notwithstanding anything in this Agreement or any other writing to the contrary, the Buyer shall assume only the Assumed Liabilities (excluding those relating to the Mexican Designated Contract) and shall not assume any Excluded Liability, and Mueller Mexican Affiliate shall assume only the Mexican Designated Contracts and shall not assume any Excluded Liability, in each event whether any such Excluded Liability is presently in existence or arises hereafter. All Excluded Liabilities shall be retained by and remain obligations and liabilities of the Seller, Latinoamerica, or WLV Mexico, as applicable.

(d)     Assignment and Assumption of Contracts.

(i)     At Closing, pursuant to the Bankruptcy Sale Order and the Assignment and Assumption Agreement and other transfer and assignment documents reasonably requested by the Buyer, the Seller shall assign to the Buyer (the consideration for which is included in the Purchase Price) and Buyer shall assume and agree to perform and discharge the liabilities under the Designated Contracts.

(ii)     With respect to each Designated Contract to be assigned to the Buyer, the Seller will cure all defaults, or provide adequate assurance of prompt cure, and the Buyer will provide adequate assurance of future performance after the Closing, as required under Section 365 of the Bankruptcy Code with respect to each such Designated Contract, if requested by a nondebtor party to such Designated Contract. The Buyer and the Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court order finding that all defaults have been cured or adequately reserved for and there has been an adequate demonstration of adequate assurance of future performance under the Designated Contracts to be assigned to the Buyer, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making the Buyer's and Sellers' employees and representatives available to testify before the Bankruptcy Court.

2

(iii)     With respect to any contract or other agreement to which Wolverine or the Seller are a party and which is necessary for Wolverine or the Seller to meet their obligations under the Transition Services Agreement, Wolverine or the Seller, as applicable, will perform their obligations in the ordinary course of their business with respect to each such contract or other agreement. Wolverine or the Seller, as applicable, will promptly take all actions reasonably required to maintain any such contracts or other agreements for the term of the Transition Services Agreement.

(iv)     Set forth on **Schedule 1.1(d)** is a list of the Cure Costs of which the Seller has Knowledge. Prior to the Closing, the Seller shall cooperate to resolve any disputes with the nondebtor party to any of (A) the Designated Contracts to be assigned to the Buyer or (B) any contract or other agreement to which Wolverine and the Seller are a party and which is necessary for Wolverine and the Seller to meet their obligations under the Transition Services Agreement regarding the amount of Cure Costs, or otherwise, and Wolverine or the Seller, as applicable, shall pay or reserve for all Cure Costs owed to any such nondebtor party on or prior to the Closing Date.

(v)     From and after the date hereof, Wolverine or the Seller, as applicable, shall not reject any Designated Contracts or any contract or other agreement to which Wolverine or the Seller is a party and which is necessary for Wolverine or the Seller to meet their obligations under the Transition Services Agreement, unless otherwise agreed to in writing by the Buyer.  The Seller shall provide timely and proper written notice of the motion seeking entry of the Bankruptcy Sale Order to all parties to the Designated Contracts and take all other actions necessary to cause such Designated Contracts to be assumed by the Seller and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code, and the Buyer shall, at or prior to Closing, comply with all requirements under Section 365 necessary to assign to the Buyer the Designated Contracts.

1.2     Purchase Price and Related Matters.

(a)     Purchase Price. In consideration for the sale and transfer of the Acquired Assets, at the Closing (i) the Buyer shall assume the Assumed Liabilities (excluding those relating to the Mexican Designated Contracts) and shall pay to the Seller the Purchase Price and (ii) Mueller Mexican Affiliate shall assume the Mexican Designated Contracts. The "Purchase Price" shall be the sum of (X) Fixed Assets Purchase Price, plus (Y) the Inventory Purchase Price, plus or minus (as applicable) (Z) any Proration Adjustment. The Purchase Price is subject to adjustment as provided in **Section 1.4**.

(b)     Fixed Assets Purchase Price. The purchase price for the Fixed Assets shall equal the net book value of the Fixed Assets as reflected in the Seller's records, kept on a consistent basis in accordance with GAAP, as of the Closing Date (the "Fixed Assets Purchase Price"), which shall be deemed to be the fair value of the Fixed Assets. The net book value of the Fixed Assets as of October 31, 2010 is One Million, Six Hundred Fifty Eight Thousand, Two Hundred and Forty Five Dollars (US$1,658,245.00), as described in detail on **Schedule 1.2(b)**; and such amount shall be adjusted as of the Closing Date, in the manner provided in the Settlement Statement, to determine the Fixed Assets Purchase Price, based on the additional depreciation accrued from the date of this Agreement up to the Closing Date and any additions or subtractions of assets from the Fixed Assets that have been approved by the Buyer in writing up to the Closing Date in accordance with **Section 4.3**.

(c)     Inventory Purchase Price.

(i)     The purchase price for the Inventory shall be the aggregate of the following amounts (the "Inventory Purchase Price"):

3

(A)    Copper Tube, which shall be purchased at the Copper Tube Price;

(B)    Component Parts, which shall be purchased at the Component Price;

(C)    Work in Process, which shall be purchased at a price equal to (1) the Copper Tube Price, plus (2) the Component Price (if applicable), and plus (3) fifty percent (50%) of the L&OH Rate;

(D)    Finished Goods, which shall be purchased at a price equal to (1) the Copper Tube Price, plus (2) the Component Price (if applicable), and plus (3) one hundred percent (100%) of the L&OH Rate;

(E)    Copper Scrap, which shall be purchased at a price equal to (1) the average price per pound of copper as reported by COMEX on the first Business Day immediately preceding the Closing Date, less (2) the prevailing market copper scrap dealer discounts depending on the scrap grade, using as the prevailing market copper scrap dealer discounts the average of the two (2) written copper scrap dealer discount quotes which the Seller and the Buyer agree upon in writing before the Closing and which quotes shall be obtained by the Seller and the Buyer from two (2) third party copper scrap dealers that are typically or historically used by the Seller, which discount quotes shall be obtained in as close proximity to the Closing Date as reasonably possible; **provided, however,** that prior to the Closing Date, the Seller shall have the right to sell a portion or all Copper Scrap as it shall solely and exclusively determine notwithstanding the limitations set forth in **Section 4.3;**

(F)    Goods in Transit which the Seller has paid for before the Closing Date, which shall be valued at the Copper Tube Price or the Component Price, as the case may be.

(ii)    In no case shall the Inventory Purchase Price paid by the Buyer for any Inventory include any anti-dumping duties, which anti-dumping duties, if any, shall be promptly paid by the Seller when such are due.

(iii)    The Inventory Purchase Price shall be estimated as of the Closing Date (the "Estimated Inventory Purchase Price") based on (1) the quantities of each category of the Inventory reflected in the Seller's Inventory records as of the Closing Date (consistent with the Seller's historical and customary practice in maintaining and generating such records) less an allowance for Excess, Obsolete, or Damaged Inventory within each such category and (2) the method of establishing the Inventory Purchase Price set out in **Section 1.2(c)(i).** The Seller and the Buyer shall agree to the Estimated Inventory Purchase Price in the Settlement Statement on or prior to the Closing Date. **Schedule 1.2(c)** sets forth in more detail the methodology for calculating each of the respective components of the Inventory Purchase Price consistent with this **Section 1.2(c)(iii).**

(d)    Proration of Operating Items and Liabilities. The Seller shall be responsible for and shall pay promptly (or reduce the Purchase Price or credit the Buyer) for all operating expenses or liabilities with respect to the Business (including, without limitation, all utilities and real property, personal property, and sales and use taxes) which accrue with respect to the Business for all periods prior to the Closing Date, and the Buyer shall be responsible for and shall pay promptly all operating expenses and liabilities with respect to the Business (including, without limitation, all utilities and real property, personal property, and sales and use taxes) which accrue with respect to the Business for all periods on or after the Closing Date. All operating expenses, liabilities and other items with respect to the Business

4

customarily prorated in business acquisitions shall be adjusted and prorated between the Seller and the Buyer as of Closing Date, based upon a 365 day year, and the net amount thereof (the "Proration Adjustment") shall be added to (if such net amount is in the Seller's favor) or deducted from (if such net amount is in the Buyer's favor) the Purchase Price payable at Closing. The Proration Adjustment shall be estimated by the Parties and included in the Settlement Statement as of the Closing Date (the "Estimated Proration Adjustment").

(e)     Allocation of Purchase Price. The Seller and the Buyer agree that the Purchase Price shall be allocated among the Acquired Assets consistent with the valuation methodology provided above in this **Section 1.2** and as otherwise determined by written agreement of the Parties (the "Tax Allocation") prior to the Closing for federal, state and local tax purposes in accordance with Section 1060 of the Code. Upon reaching an agreement on the Tax Allocation, the Buyer and the Seller shall (i) cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Tax Allocation as finally resolved, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price, and (ii) shall file all federal, state and local tax returns and related tax documents consistent with such Tax Allocation, as the same may be adjusted pursuant to this Agreement. Notwithstanding the foregoing, if the Parties hereto are unable to agree on a mutually satisfactory Tax Allocation, each of the Buyer and the Seller shall use its own allocation for purposes of this **Section 1.2(e)**. Any reduction or increase in the Purchase Price shall also adjust the Tax Allocation in the same manner and subject to the same terms as set forth in this **Section 1.2**. Notwithstanding the foregoing, the allocations contemplated by this **Section 1.2(e)** shall not be binding on any third party or for any purpose unrelated to Tax reporting, including without limitation, for any purpose relating to the determination of value of particular assets of the Seller or the proceeds attributable to such assets in the Bankruptcy Case. The provisions of this Section shall survive the Closing.

1.3     The Closing.

(a)     Time and Location. On the terms and subject to the conditions contained in this Agreement, the Closing shall take place on the Closing Date at the offices of Wyatt, Tarrant & Combs, 1715 Aaron Brenner Drive, Suite 800, Memphis, Tennessee 38120 (or remotely by electronic exchange of documents and signatures, with originals to follow), commencing at 10:00 a.m. central time on or within three (3) Business Days after the Bankruptcy Sale Order becomes a Final Order and all other conditions in this Agreement have been satisfied (excluding the delivery of any documents or payment to be delivered at the Closing Date by any of the parties, it being understood that the occurrence of the Closing shall remain subject to the delivery of such documents or payment) or effectively waived, or at such other place or time as the Buyer and the Seller may agree upon in writing. The date on which the Closing occurs is referred to as the "Closing Date."

(b)     Actions at the Closing.

At the Closing:

(i)     on the Closing Date, the Buyer and the Seller (and if required to transfer any of the Acquired Assets or the Assumed Liabilities, Wolverine) shall execute and deliver a Bill of Sale and Assignment in substantially the form attached hereto as **Exhibit A**;

(ii)     on the Closing Date, the Buyer and the Seller (and if required to transfer any of the Acquired Assets or the Assumed Liabilities, Wolverine) shall execute and deliver an Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit B**;

5

(iii)     on the Closing Date, Latinoamerica shall execute and deliver one or more assignment and assumption agreements (or other comparable agreements or instruments which are appropriate under applicable Law) for the purpose of transferring, assigning, and conveying the Mexican Designated Contracts to Mueller Mexican Affiliate, which assignment and assumption agreements (or other comparable agreements or instructions) shall be in form and content reasonably acceptable to Latinoamerica and the Buyer (and Mueller Mexican Affiliate);

(iv)     on the Closing Date, the Seller (and Wolverine, as applicable) and the Buyer shall execute and deliver (or cause to be executed and delivered) the Escrow Agreement, the Transition Services Agreement, the Supply Agreement, and the Carrollton Lease Agreement;

(v)     on or prior to the Closing Date, Latinoamerica or WLV Mexico, as applicable, shall have terminated at its (or the Seller's) sole cost and expense all of the Mexican Facility Contracts and WLV Mexico Contracts which are designated as "to be terminated" or "not to be assumed" on **Schedule 2.10**; and Latinoamerica shall have delivered evidence to the Buyer and to Mueller Mexican Affiliate that Latinoamerica has filed before the Mexican Ministry of Economy the cancellation of the Maquila Program, and all documents that are necessary to evidence that any and all Acquired Assets located in Mexico have been legally transferred to the Buyer or Mueller Mexican Affiliate, as applicable, shall have been executed and delivered (*pedimentos virtuales*).

(vi)     on the Closing Date, the Buyer shall pay the Purchase Price as determined in accordance with **Section 1.2** as follows: (A) the amount of $800,000 (the "Escrow Amount", which also shall include any interest earned thereon and any amounts paid to the Escrow Agent pursuant to **Section 1.4(f)** and shall be held pursuant to **Section 6.6**) to the Escrow Agent, and (B) the remaining amount of the Purchase Price to the Seller; the Buyer shall make all such payments in cash, in US Dollars, by wire transfer of immediately available funds in accordance with the wire transfer instructions delivered to the Buyer by the Seller and the Escrow Agent; and

(vii)     on or prior to the Closing Date, the Seller shall have removed or caused to be removed all tichloroethylene stored or used at the Business Property located in Carrollton, Texas.

(viii)     the Parties, Latinoamerica, and Mueller Mexican Affiliate shall take such further acts and execute and deliver such additional documents as shall reasonably be required to carry out the purposes of this Agreement (including, without limitation, entering into the Settlement Statement), and shall execute and deliver to each other such cross-receipts evidencing all the transactions referred to in this **Section 1.3** as they may reasonably agree upon.

1.4     Post-Closing Adjustment. The Purchase Price set forth in **Section 1.2(a)** shall be subject to adjustment after the Closing Date as follows:

(a)     The Buyer shall conduct a physical inventory (the "Inventory Inspection") of the Inventory included in the Acquired Assets at a time and date mutually agreed to in writing between the Parties, which date shall be in reasonable proximity to the Closing Date and representatives of the Seller shall be present during such Inventory Inspection.

(b)     Within sixty (60) days after the Closing Date, the Buyer shall prepare and deliver the Closing Statement to the Seller in substantially the form attached as **Schedule 1.4(b)**. The Closing Statement shall include (i) a schedule in reasonable detail of the Inventory included in the Acquired Assets (which Inventory shall be based on the Inventory Inspection) and a calculation of the Final

6

Inventory Purchase Price, based on the final determination of Excess, Obsolete, and Damaged Inventory, if any, the PMA Adjustment, and a determination of the value of the Goods in Transit owned by the Seller on the Closing Date and (ii) a schedule in reasonable detail setting forth any actual prorations for expenses, liabilities or other amounts subject to proration under this Agreement as of the Closing Date and a calculation of the Final Proration Adjustment. Within five (5) Business Days following the Seller's written request, the Buyer shall also provide to the Seller all supporting documentation reasonably requested by the Seller for the Closing Statement and the Final Inventory Purchase Price, the PMA Adjustment, the Goods in Transit analysis, and the Final Proration Adjustment contained in the Closing Statement.

(c)     The Seller shall deliver to the Buyer, within thirty (30) days after delivery by the Buyer to the Seller of the Closing Statement, either a notice indicating that the Seller accepts the Closing Statement or a statement describing the Seller's objections to the Closing Statement, which statement of objections shall describe in reasonable detail the nature and amount of the Seller's objections and include the supporting documentation for the Seller's proposed corrections to the Closing Statement. If the Seller does not object to the Closing Statement delivered by the Buyer within such time period, the Closing Statement shall be final and binding on the Parties.

(d)     If the Seller objects in writing to the Closing Statement and any such objections are not resolved by the Seller and the Buyer within forty-five (45) days after delivery to the Seller of the Closing Statement, the Buyer and the Seller shall (i) jointly prepare and sign a statement setting forth (A) those objections (if any) that the Buyer and the Seller have resolved and the resolution of such objections and (B) those objections that remain unresolved and (ii) engage the Neutral Accountant to resolve such unresolved objections. Each of the Buyer and the Seller promptly shall provide to the Neutral Accountant in legible form, true, complete and correct copies of any information of such Party that the Neutral Accountant reasonably requests for purposes of resolving such unresolved objections. The Buyer and the Seller shall deliver joint written instructions to the Neutral Accountant that (X) the scope of its review and authority shall be limited to resolving such unresolved objections, (Y) the Neutral Accountant shall act as an expert and not as an arbitrator, and (Z) the Neutral Accountant shall issue a written ruling which sets forth in reasonable detail the resolution of each such unresolved objection and the Neutral Accountant's reasons for such resolution and includes a statement setting forth the amounts of the Final Inventory Purchase Price and the Final Proration Adjustment, each as determined in accordance with the Neutral Accountant's resolution of such unresolved objections. The resolution by the Neutral Accountant of such unresolved objections and of the Final Inventory Purchase Price and Final Proration Adjustment, each as determined in accordance with the Neutral Accountant giving effect thereto, shall be conclusive and binding upon the Buyer and the Seller. The Buyer and the Seller agree that, absent clear and convincing error, the procedures set forth in this **Section 1.4(d)** for resolving disputes with respect to the Closing Statement shall be the sole and exclusive method for resolving any such disputes; **provided; however,** that this **Section 1.4(d)** shall not prohibit any Party from instituting litigation to enforce the determination of the Closing Statement and the Final Inventory Purchase Price and Final Proration Adjustment by the Neutral Accountant in a court of competent jurisdiction determined in accordance with **Section 12.11**. The Buyer and the Seller, each shall pay one-half of the fees and expenses of the Neutral Accountant for its services under this **Section 1.4(d).**

(e)     If the Estimated Inventory Purchase Price exceeds the Final Inventory Purchase Price as shown on the Final Closing Statement, the Purchase Price shall be reduced by an amount equal to the difference between the Estimated Inventory Purchase Price and the Final Inventory Purchase Price. If the Final Inventory Purchase Price as shown on the Final Closing Statement exceeds the Estimated Inventory Purchase Price, the Purchase Price shall be increased by an amount equal to the difference between the Final Inventory Purchase Price and the Estimated Inventory Purchase Price. If the Estimated

7

Proration Adjustment exceeds or is less than the Final Proration Adjustment as shown on the Final Closing Statement, the Purchase Price shall be reduced or increased, as appropriate, by an amount equal to the difference between the Final Proration Adjustment and the Estimated Proration Adjustment.

(f)     In the event of any adjustment to the Purchase Price as described in **Section 1.4(e)** and in the case of a net increase (after taking into account all adjustments) in the Purchase Price, the Buyer shall pay to the Seller the entire amount of such increase in the Purchase Price. In the event of any adjustment to the Purchase Price as described in **Section 1.4(e)** and in the case of a net decrease (after taking into account all adjustments) in the Purchase Price, the Seller shall pay to the Buyer an amount equal to such decrease in the Purchase Price. All payments hereunder shall be made in US Dollars by wire transfer or other delivery of immediately available funds, within three (3) Business Days after the date on which the Final Closing Statement is finally determined pursuant to this **Section 1.4**.

1.5     <u>Consents to Assignment</u>. Anything in this Agreement to the contrary notwithstanding, and except with respect to the assignment of Designated Contracts under **Section 1.1(d)**, this Agreement shall not constitute an agreement to assign or transfer any contract, lease, authorization, license or permit, or any claim, right or benefit arising thereunder or resulting therefrom, if (a) an attempted assignment or transfer thereof, without the consent of a third party thereto or of the issuing Governmental Entity, as the case may be, would constitute a breach thereof and (b) such consent is not obtained. In such case, and except for such consents to assign or transfer the Acquired Assets or Assumed Liabilities or the Mexican Designated Contracts as listed on **Schedule 1.5** ("<u>Required Consents</u>"), (x) such item shall be withheld from sale pursuant to this Agreement without any reduction in the Purchase Price; (y) from and after the Closing, the Seller and the Buyer or Latinoamerica and Mueller Mexican Affiliate, as appropriate, will cooperate, in all reasonable respects, to obtain such consent as soon as practicable after the Closing Date; and (z) until such consent is obtained, the Seller and the Buyer or Latinoamerica and Mueller Mexican Affiliate, as appropriate, will cooperate, in all reasonable respects, to provide to the Buyer or Mueller Mexican Affiliate, as applicable, the benefits under such item (with the Buyer or Mueller Mexican Affiliate, as applicable, being entitled to all the gains and responsible for all the losses, Taxes, liabilities and/or obligations thereunder). In particular, in the event that any such consent is not obtained prior to the Closing Date, then the Buyer and the Seller or Latinoamerica and Mueller Mexican Affiliate, as appropriate, shall enter into such arrangements (including, without limitation, subleasing or subcontracting, if permitted under the applicable Law or agreement) to provide to the Seller and the Buyer or Latinoamerica and Mueller Mexican Affiliate, as appropriate, the economic and operational equivalent of obtaining such consent and assigning or transferring such item, including, without limitation, enforcement for the benefit of the Buyer or the Mueller Mexican Affiliate, as applicable, of all claims or rights arising thereunder, and the performance by the Buyer or the Mueller Mexican Affiliate, as applicable, of the obligations thereunder on a prompt and punctual basis.

1.6     <u>Further Assurances</u>. At any time and from time to time after the Closing Date, as and when requested by either Party hereto, the other Party shall promptly execute and deliver, or cause to be executed and delivered (including without limitation by Latinoamerica, WLV Mexico (solely with respect to its employees), or Mueller Mexican Affiliate, as applicable), all such documents, instruments and certificates and shall take, or cause to be taken, all such further actions as are reasonably necessary to evidence and effectuate the transactions contemplated by this Agreement.

8

# ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer that the statements contained in this **Article II** are true and correct as of the date hereof and as of the Closing Date, except to the extent any warranty or representation speaks as of an earlier date. The inclusion of any information in the Disclosure Schedule shall not be deemed to be an admission or acknowledgment, in and of itself, that such information is required by the terms hereof to be disclosed, is material to the Business, has resulted in or would result in a Business Material Adverse Effect, or is outside the ordinary course of business. The inclusion of any information on any part of the Disclosure Schedule shall be deemed to be the inclusion of such information for the purpose of the Disclosure Schedule for other Schedules to the extent that it is readily apparent on the face of such information why such information should be included in such other Schedules. The specification of any dollar amount in any representation or warranty contained in this **Article II** is not intended to imply that such amount, or higher or lower amounts, are or are not material for purposes of this Agreement, and no Party shall use the fact of the setting forth of any such amount in any dispute or controversy between or among the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not material for purposes of this Agreement.

2.1    Organization, Qualification and Power.

(a)    Seller. The Seller is a limited partnership, duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation and is duly qualified to conduct business under the Laws of each jurisdiction in the United States of America where the character of the properties owned, leased or operated by it or the nature of its activities, makes such qualification necessary. The Seller has all requisite power and authority to carry on the business in which it is now engaged and to own and use the properties now owned and used by it. Wolverine is the general partner of the Seller.

(b)    Latinoamerica. Each of Latinoamerica and WLV Mexico is a *sociedad de responsabilidad limitada de capital variable* (variable capital limited liability company) duly organized and validly existing under the laws of Mexico, and is duly qualified to conduct business under the Laws of each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its activities, makes such qualification necessary. Each of Latinoamerica and WLV Mexico has all requisite power and authority to carry on the business in which it is now engaged and to own and use the properties now owned and used by it. Latinoamerica and WLV Mexico are indirect wholly-owned subsidiaries of Wolverine.

(c)    Authority. Each of the Seller, Wolverine, and Latinoamerica has the requisite power and authority to execute and deliver this Agreement and, subject to entry of the Bankruptcy Sale Order becoming a Final Order, the Ancillary Agreements to which it will be a party and, subject to entry of the Bankruptcy Sale Order becoming a Final Order, to perform its obligations hereunder and thereunder. The execution and delivery by the Seller, Wolverine, and Latinoamerica of this Agreement and such Ancillary Agreements and the consummation by the Seller, Wolverine, and Latinoamerica of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of the Seller, Wolverine, and Latinoamerica, as applicable, and, subject to the entry of the Bankruptcy Sale Order becoming a Final Order, as is necessary to authorize this Agreement and the Ancillary Agreements or the transactions contemplated hereby and thereby. This Agreement and each Ancillary Agreement delivered (or to be delivered) by the Seller, Wolverine, and Latinoamerica, as

9

applicable, have been (or will be) duly executed and delivered by such parties, as applicable, and, assuming due authorization, execution and delivery by the Buyer, Mueller, and Mueller Mexican Affiliate, as applicable, will constitute the binding obligation of the Seller, Wolverine, and Latinoamerica, as applicable, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting creditors' rights generally, and by principles of equity. The actions contemplated by this Agreement which are to be taken by WLV Mexico on or prior to the Closing and the consummation by WLV Mexico of any such actions have been, or will be prior to the Closing, be duly and validly authorized by all action on the part of WLV Mexico that is necessary to authorize any such actions.

2.2    Non-Contravention.  Except as set forth on **Schedule 2.2**, neither the execution and delivery by any of the Seller, Wolverine, or Latinoamerica of this Agreement or the Ancillary Agreements to which the Seller, Wolverine, or Latinoamerica will be a party, nor the consummation by the Seller or Latinoamerica of the transactions contemplated hereby or thereby, will:

(a)    conflict with or violate any provision of the articles of incorporation, articles of limited partnership, bylaws, partnership agreement or other comparable governing document, as applicable, of the Seller, Wolverine, or Latinoamerica;

(b)    require on the part of the Seller, Wolverine, or Latinoamerica any filing or registration with, notification to, or any permit, authorization, consent or approval of, any Governmental Entity, other than as contemplated by this Agreement with respect to the Bankruptcy Case or as otherwise contemplated by this Agreement, including the filing described in **Section 1.3(b)(v)**;

(c)    conflict with, result in a breach of, constitute (with or without due notice, or passage of time, or both) a default under, result in the loss of benefit under, result in the acceleration of obligations under, create in any party the right to terminate or modify, or require any notice, consent or waiver under, any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of indebtedness or Security Interest to which the Seller, Wolverine, or Latinoamerica is a party or by which the Seller, Wolverine, or Latinoamerica is bound or to which any of its assets is subject, except for (i) any conflict, breach, default, acceleration or right to terminate or modify that would not reasonably be expected to result in a Business Material Adverse Effect or (ii) any notice, consent or waiver the absence of which would not reasonably be expected to result in a Business Material Adverse Effect; or

(d)    violate any applicable Law, order, writ, injunction, judgment, charge, decree or other restriction, or statute, rule or regulation applicable to the Acquired Assets or the Assumed Liabilities.

2.3    Financial Statements.  **Schedule 2.3** includes copies of the Financial Statements. The Financial Statements have been prepared in accordance with GAAP throughout the periods covered thereby and present fairly the results of operations and the balance sheet of the Seller as of such dates and for such periods, are correct and complete in all material respects, and are consistent with the books and records of Seller (which books and records are correct and complete in all material respects); **provided, however,** that the Financial Statements lack footnotes and other presentation items and the Interim

10

Financial Statements are subject to normal year-end adjustments and accruals, the taking of a physical inventory and the lack of footnote disclosures (including without limitation, footnote disclosures regarding the impact of the Bankruptcy Case on the Seller's operations).

2.4     Absence of Certain Changes.    Except for the Bankruptcy Case or as otherwise contemplated by this Agreement or described on **Schedule 2.4**, since the date of the Interim Financial Statements, (i) each of the Seller and Latinoamerica has conducted the Business only in the ordinary course of business consistent with historical custom and practice, (ii) there has not occurred a Business Material Adverse Effect, and (iii) neither the Seller nor Latinoamerica has taken any action which, if taken between the date hereof and the Closing Date, would be prohibited or otherwise require the consent of the Buyer pursuant to **Section 4.3.**

2.5     Undisclosed Liabilities.    Except for the Bankruptcy Case or as described on **Schedule 2.5**, the Seller does not have any liability (and, to the Knowledge of the Seller, there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against the Seller giving rise to any liability), except for (i) liabilities set forth on the face of the Interim Financial Statements and (ii) liabilities that have arisen after the date of the Interim Financial Statements in the ordinary course of business consistent with past custom and practice (none of that results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of applicable Law).

2.6     Tax Matters.

(a)     Each of the Seller and Latinoamerica has filed or had filed on its behalf all Tax Returns that it was required to file (separately or as part of a consolidated, combined or unitary group) and all such Tax Returns were correct and complete in all material respects.

(b)     Each of the Seller and Latinoamerica has paid (or had paid on its behalf) all Taxes that are shown to be due and payable on any such filed Tax Returns.

(c)     Each of the Seller and Latinoamerica has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor (including without limitation WLV Mexico), creditor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto, if applicable, have been properly completed and timely filed.

2.7     Tangible Personal Property/Inventory.

a)     The Seller has good and valid title to, a valid leasehold interest in, or a valid license or right to use all of the material tangible personal property which is included in the Acquired Assets.  Except as set forth on **Schedule 2.7**, all tangible personal property included in the Acquired Assets that is leased or licensed is covered by the leases or license agreements described on **Schedule 2.7**.  At the Closing, the Seller shall deliver the Acquired Assets to the Buyer, free and clear of all Security Interests, with any Security Interests attaching to the proceeds of the sale contemplated hereby in accordance with the Bankruptcy Code and other applicable Law.  Except as set forth on **Schedule 2.7**,

11

each such item of material tangible personal property (other than the Inventory) included in the Acquired Assets is free from material defects (patent and latent), has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear), and is suitable for the purposes for which the Seller presently uses such item of property.

(b)     The Inventory consists of raw materials and supplies, manufactured and purchased parts, goods-in-process, and finished goods. Such raw material and supplies, manufactured and purchased parts, and good-in-process are, to the Knowledge of the Seller, fit for the purposes for which they were procured or manufactured and such finished goods are fit for the purposes for which they were manufactured. The Finished Goods are saleable in the ordinary course of the Business as the Seller presently conducts the Business; and except as described in the Financial Statements, none of the Finished Goods are Excess. The only Obsolete or Damaged Inventory is as identified on the books and records of the Seller and is subject to the reserve for inventory write-down set forth on the face of the Interim Financial Statements, as adjusted for the passage of time up to the Closing Date in accordance with the past custom and practice of Seller.

(c)     None of Latinoamerica, WLV Mexico, Wolverine or any other Affiliate of the Seller own any material tangible personal property included in the Acquired Assets or used in the Business, except that Latinoamerica and WLV Mexico have, with respect to the Business, the rights derived from the Mexican Facility Contracts and the WLV Mexico Contracts, respectively, and Wolverine owns the Licensed Marks and owns or has license rights to certain information technology and computer software which it provides to the Seller, Latinoamerica, and WLV Wolverine, as Affiliates of Wolverine.

2.8     Real Property.

(a)     Schedule 2.8 contains the complete and accurate street addresses and legal descriptions of each Business Property.  The Seller is the record owner of the Business Property located in Carrollton, Texas; Latinoamerica does not own any real property.  The Seller is not a party to any Lease; and, other than the Mexican Real Estate Lease, there are no Leases with respect to the Business as the Seller and Latinoamerica presently conduct the Business. At the Closing, pursuant to the Bidding Procedures Order, the Seller shall lease to the Buyer the Business Property located in Carrollton, Texas pursuant to the Carrollton Lease.

(b)     Intentionally Omitted.

2.9     Intellectual Property.  Except as would not reasonably be expected to have a Business Material Adverse Effect or as set forth on Schedule 2.9:

(a)     No person other than the Seller has an ownership interest in, or a right to receive a royalty or similar payment with respect to, any of the Intellectual Property.

(b)     To the Knowledge of the Seller, the Seller owns or otherwise holds valid rights to use all Intellectual Property and all data and information used in the Business.  The Seller has the right to use the Licensed Marks as an Affiliate of Wolverine.

12

(c)    All Intellectual Property (except trade secrets) is valid, subsisting, and enforceable; to the Knowledge of the Seller, all Intellectual Property which is comprised of trade secrets is valid, subsisting, and enforceable. None of the Intellectual Property has been canceled, adjudicated invalid, or abandoned (excepting any expirations in the ordinary course), or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting any of the Seller's rights thereto. None of the Intellectual Property has been licensed or used by the Seller in such a way as could reasonably be expected to have a Material Adverse Effect on the value, enforceability, or validity of such Intellectual Property or result in the dedication of same to the public.

(d)    The Seller has received no written notice that any lawsuit, action, claim, reissue, reexamination, public protest, interference, arbitration, mediation, opposition, cancellation or other proceeding (collectively, "Suit") is pending concerning any claim or position that the Seller has violated any intellectual property rights in conducting the Business as presently conducted. No Suit has been asserted in writing or, to the Knowledge of the Seller, threatened against the Seller for violation or infringement of any intellectual property rights of a third party in conducting the Business. To the Knowledge of the Seller, the Seller is not violating or infringing upon and has not violated or infringed upon any intellectual property rights in conducting the Business as presently conducted. Without limiting the generality of the foregoing, to the Knowledge of the Seller, no Licensed Mark is the subject of a Suit that the use of such Licensed Mark infringes, violates or dilutes the trademark of any other Person.

(e)    No Suit is pending or, to the Knowledge of the Seller, threatened against, the Seller concerning the Intellectual Property, including any Suit concerning a claim or position that the Intellectual Property has been violated or infringed upon or is invalid, unenforceable, unpatentable, unregisterable, cancelable, or not owned exclusively by the Seller.

(f)    To the Knowledge of the Seller, no Person is violating or infringing upon any Intellectual Property.

(g)    The Seller does not own any registered Intellectual Property. To the Knowledge of the Seller, all filings and payments with the appropriate agencies required to maintain in subsistence the Licensed Marks have been timely made.

(h)    Each item of Intellectual Property which is material to operation of the Business immediately prior to the Closing Date will be owned or available for use by the Buyer on identical terms and conditions immediately subsequent to the Closing Date, except with respect to the Licensed Marks or as otherwise provided for in the Transition Services Agreement.

2.10    Contracts.

(a)    **Schedule 2.10** lists all of the Designated Contracts included in the Acquired Assets or the Assumed Liabilities and lists all of the Mexican Facility Contracts; **provided, however,** that any Designated Contracts or Mexican Facility Contracts which are designated as "to be terminated" or "not to be assumed" on **Schedule 2.10** shall not be included in the Acquired Assets or the Assumed Liabilities and shall instead be included in the Excluded Assets and Excluded Liabilities. No Designated Contract or Mexican Facility Contract has been rejected under Section 365 of the Bankruptcy Code. Except with respect to the Licensed Marks or as otherwise provided in the Transition Services Agreement or on **Schedule D-2**, the Seller and Latinoamerica hold all of the assets used by the Seller in its operation of the Business and WLV employs the Mexican Employees for the operation of the Business in Mexico, as the Business is presently conducted. Except as described on **Schedule 2.10** or with respect to the

13

information technology services provided by Wolverine to the Seller and Latinoamerica, the Designated Contracts and the Mexican Facility Contracts include, without limitation, the following contracts relating to the Business as it is conducted by the Seller on the date of this Agreement:

(i)      any agreement, purchase order or other commitment (or group of related agreements, purchase orders or commitments) for the purchase or sale of products or services with respect to the Business;

(ii)      any agreement, purchase order or other commitment (or group of related agreements, purchase orders or commitments) for the lease of personal property from or to any third party with respect to the Business;

(iii)      any agreement relating to the ownership of investments in or loans and advances to any Person (other than advances to Business Employees in the ordinary course of business), including investments in partnerships, joint ventures and minority equity investments;

(iv)      any agreement creating, incurring, assuming or guaranteeing indebtedness or under which a Security Interest has been imposed on any material Acquired Asset, in either case tangible or intangible, or any letter of credit arrangements, or any guarantee thereof or any trade payables;

(v)      any agreement that prohibits the Seller from freely engaging in business or with any Person anywhere in the world;

(vi)      any written agreement between the Seller and the Business Employees or with respect to the Mexican Business Employees;

(vii)      any change in control, retention, severance or termination agreement between the Seller and any Business Employees, independent contractor or consultant or with respect to the Mexican Business Employees;

(viii)      any employment, severance, independent contractor or consulting agreement;

(ix)      any option, franchise or similar arrangement;

(x)      any agreement with or for the benefit of the Seller or its Affiliates or any of their officers, directors or employees;

(xi)      any agency, dealer, sales representative, marketing or similar agreement;

14

(xii)  any collective bargaining agreement, union contract or similar agreement;

(xiii)  each agreement involving the settlement of any lawsuit with respect to which the conditions precedent to the settlement thereof have not been satisfied; and

(xiv)  any agreement pursuant to which the Business is obligated to indemnify any other Person for any Taxes;

(b)  The Seller has made available to the Buyer a complete and accurate copy of each Designated Contract and Mexican Facility Contract. Each Designated Contract and Mexican Facility Contract is a valid, binding and enforceable obligation of the Seller or Latinoamerica, as applicable, and, to the Knowledge of the Seller, of each other party thereto, except as otherwise provided under applicable provisions of the Bankruptcy Code.

(c)  Except as set forth on **Schedule 2.10**, the Seller or Latinoamerica, as applicable, has performed all material obligations required to be performed by it and is not in material default under, or in material breach of nor in receipt of any claim of default or breach under, any Designated Contract or Mexican Facility Contract, as applicable; and, to the Knowledge of the Seller, no event has occurred which, with the passage of time or the giving of notice or both, would result in a material default, breach or event of noncompliance by the Seller or Latinoamerica under any Designated Contract or Mexican Facility Contract. Except as set forth in **Schedule 2.10**, to the Knowledge of the Seller, there has been no breach or cancellation or anticipated breach or cancellation by the other parties to any Designated Contract or Mexican Facility Contract.

2.11  **Entire Business.** Except for the Excluded Assets, the services and licenses to be provided to the Buyer pursuant to the Transition Services Agreement, and as set forth on **Schedule 2.11**, the Acquired Assets constitute substantially all of the assets, whether tangible or intangible, necessary to operate the Business in the manner as currently conducted by the Seller and includes all of the operating assets of the Seller.

2.12  **Litigation.** Except as set forth in **Schedule 2.12**, there is no litigation, arbitration, or investigation or proceeding administered by any Governmental Entity or other arbitrator pending or (to the Knowledge of the Seller) threatened against or involving the Seller, Latinoamerica, WLV Mexico, the Business, or any Acquired Asset or Assumed Liability or the Mexican Facility Contracts or the WLV Mexico Contracts. Except as set forth in **Schedule 2.12** or as contemplated by this Agreement or the Bankruptcy Case, none of the Seller, Latinoamerica, WLV Mexico, or the Business is subject to any judgment, decree, injunction, rule or order of any court, Governmental Entity or other arbitrator.

2.13  **Employment Matters.**

(a)  **Schedule 2.13** sets forth a true and complete list of (i) all Business Employees and the hire date, position and the annual rate of compensation of each such Business Employee and (ii) all Mexican Business Employees and the hire date, position, the annual rate of compensation of each such

15

Mexican Business Employee. In addition, **Schedule 2.13** sets forth the amount of Taxes generated in connection with each such Business Employee's and Mexican Business Employee's payroll, and all the agreements executed with, and the compensation practices relating to each such Business Employee and each such Mexican Business Employee, including without limitation, all salaries, bonuses, compensation incentives, commissions, profit sharing, pensions, vacations, collective insurances, social security and extra-salary benefit plans of any nature whatsoever, which are currently payable to or for the benefit of each such Business Employee or Mexican Business Employee. There are no Business Employees or Mexican Business Employees currently on any kind of leave, short term disability, long term disability, or worker's compensation disability or on layoff status with any expectation of returning to work. WLV Mexico is a party to the collective bargaining contract which is identified on **Schedule 2.13**, a copy of which has been provided to the Buyer. WLV Mexico has not established nor made any distinction among the Mexican Business Employees by reason of their race, gender, age, religious belief, political doctrine and/or social condition; and WLV Mexico provides the Mexican Business Employees equal salaries for equal work.

(b)     The Seller is not a party to, or bound by, any collective bargaining agreement or other union contract with any union or labor organization with respect to any of the Business Employees. The Seller has not experienced in the last five (5) years, in connection with the Business Employees, any strikes, claims of unfair labor practices under any applicable Law, or other labor disputes with any union or organized labor. To the Knowledge of the Seller, there been no labor organizing activities within the last five (5) years with respect to the Business Employees. WLV Mexico has not experienced in the last five (5) years, in connection with the Mexican Business Employees, any strikes, claims of unfair labor practices under any applicable Law, or other labor disputes with any union or organized labor.

(c)     There are no Business Employees whose principal designated workplace is outside of the United States.

(d)     There are no Business Employees or Mexican Business Employees who hold any visa or visa-related work permit authorization (including without limitation H-1B, L-1, F-1, J-1, or FM3 or FM2 visas) or work authorizations sponsored by the Seller, Latinoamerica, or WLV Mexico, as applicable, on behalf of such Business Employees or the Mexican Business Employees, as applicable. Upon the execution of this Agreement, the Seller will provide to the Buyer the Form I-9's of all Business Employees. To the Knowledge of the Seller, all such Form I-9's have been completed and maintained in accordance with the Immigration Reform and Control Act of 1986, as amended ("IRCA"). All Business Employees employed by Seller as of the date of this Agreement are, to Knowledge of the Seller, authorized to work in the United States. Once the Seller provides the Form I-9's of the Business Employees to the Buyer, it is the Buyer's responsibility to determine whether a provided Form I9 is sufficient for purposes of verifying the work authorization of any Business Employee hired by the Buyer or whether the work authorization of such Business Employee should be independently verified by the Buyer. There are no pending or, to the Knowledge of the Seller, threatened claims, lawsuits, actions, arbitrations, administrative or other proceedings, or governmental investigations against the Seller relating to the Seller's compliance with IRCA or with any other applicable immigration Laws.

(e)     Within the last five (5) years, the Seller has received no letters from the Social Security Administration ("SSA") regarding the failure of any Business Employee's Social Security number to match his or her name in the SSA database. Within the last five (5) years, the Seller has received no letters or other correspondence received from any Governmental Entity questioning the

16

employment authorization of any Business Employees. WLV Mexico has complied with the obligations to which it is subject arising from the Mexican Social Security Law and towards the Workers' Housing National Fund Institute and the Retirement Savings System, and there are no amounts due and unpaid by WLV Mexico based on such obligations or derived from any Law.

(f)     WLV Mexico has, with respect to the Mexican Business Employees, substantially complied with the material obligations contained in the applicable Laws referring to labor rules and employer/employee relationships, employment terms and conditions, collective bargaining agreements, salaries and working days and benefit plans; and there are no amounts due and unpaid by WLV Mexico based on such obligations or derived from any such Law with respect to the Mexican Business Employees. WLV Mexico has not received written notification from any Governmental Authority of any investigation that affects or may affect WLV Mexico, and, to the Knowledge of the Seller, no such investigations are in process. As and when applicable, WLV Mexico has paid to the Mexican Business Employees the amounts corresponding to profit sharing of WLV Mexico corresponding to the last five (5) years, including, in its case, the payment corresponding to the profit sharing of WLV Mexico for the year 2010.

　　2.14　　Employee Benefits.

(a)     **Schedule 2.14** sets forth a correct and complete list of each Employee Benefit Plan. The Mexican Business Employees receive the employee benefits which are described in the collective bargaining contract identified on **Schedule 2.13(a)** or, with respect to those Mexican Business Employees not covered by the collective bargaining contract, in their corresponding individual labor agreements included in the WLV Mexico Contracts.

(b)     With respect to each Employee Benefit Plan, the Seller has made available to the Buyer a current, accurate and complete copy thereof (or, if a plan is not written, a written description thereof) and, to the extent applicable, (i) any related trust or custodial agreement or other funding instrument, (ii) the most recent determination or notification letter, if any, received from the IRS, (iii) any current summary plan description or employee handbook, (iv) for the most recent year (A) the Form 5500 and attached schedules. (B) the audited financial statements, if any, and (C) actuarial valuation reports, if any, (v) copies of any correspondence from any Governmental Entity relating to any compliance issues with respect to any Employee Benefit Plan, and (vi) a complete copy of any nonqualified deferred compensation plans.

(c)     Except as otherwise set forth in **Schedule 2.14**, and except as would not, individually or in the aggregate, reasonably be expected to result in a Business Material Adverse Effect, each Employee Benefit Plan has been established and is being administered in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code, and other Law.

(d)     Except as otherwise set forth in **Schedule 2.14**, no Employee Benefit Plan is a Multiemployer Plan, and neither the Seller nor any ERISA Affiliate has within the past six years sponsored or contributed to, or has or had any liability or obligation in respect of, any Multiemployer Plan with respect to the Business or the Business Employees.

3/242953.6

(e)     Except as otherwise set forth in **Schedule 2.14**, and except as would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect, no actions (other than routine claims for benefits in the ordinary course) are pending or, to the Knowledge of the Seller, threatened with respect to any Employee Benefit Plan.

(f)     Except as otherwise set forth in **Schedule 2.14**, with respect to the Business or the Business Employees, the Seller has not incurred any liability under Title IV of ERISA with respect to any Employee Benefit Plan.

(g)     Except as otherwise set forth in **Schedule 2.14**, and except as would not reasonably be expected to have, individually or in the aggregate, a Business Material Adverse Effect, (i) each Employee Benefit Plan which is intended to be qualified under Section 401(a) of the Code is so qualified and, no circumstances exist which would reasonably be expected to materially adversely affect such qualification; (ii) with respect to the Business or the Business Employees, no event has occurred and no condition exists that would subject the Seller, either directly or by reason of its affiliation with any of its ERISA Affiliates to any tax, fine, lien, penalty or other liability imposed by ERISA, the Code or other Law, rules or regulations with respect to any Employee Benefit Plan; and (iii) no "prohibited transaction" (as such term is defined in Section 406 of ERISA and Section 4975 of the Code) or "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA and Section 412 of the Code (whether or not waived)) has occurred with respect to any Employee Benefit Plan.

(h)     Except as otherwise set forth in **Schedule 2.14**, no Employee Benefit Plan exists that, as a result of the execution of this Agreement or the transactions contemplated by this Agreement (whether alone or in connection with any subsequent event(s)), could result in (i) the payment to any employee of the Seller of any money or other property; (ii) the provision of any benefits or other rights to any employee of the Seller; or (iii) the increase, acceleration or provision of any payments, benefits or other rights to any employee of the Seller that could result in the Seller's loss of a deduction under Section 280G of the Code with respect to any such payment, benefit or other right.

(i)     Except as otherwise set forth in **Schedule 2.14**, with respect to the Business or the Business Employees, the Seller has no obligation to provide postemployment health, life insurance or other welfare benefits other than as required under Section 4980B of the Code or any similar applicable law.

(j)     The consummation of the transactions contemplated by this Agreement will not accelerate the time of the payment or vesting of, increase the amount of, or result in the forfeiture of compensation or benefits under any Employee Benefit Plan to any Business Employee, except that the consummation of the transactions contemplated by this Agreement will accelerate vesting under the Wolverine Tube, Inc. Savings Plan for Business Employees which Employee Benefit Plan has been fully funded by the Seller (or its Affiliates).

(k)     Except as otherwise set forth in **Schedule 2.14**, with respect to the Business or the Business Employees, each Employee Benefit Plan that constitutes a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) has been maintained in good-faith

18

compliance with Section 409A of the Code and the regulations thereunder as it relates to any Employee Benefit Plan and, to the Knowledge of the Seller, no amounts under any such Employee Benefit Plan are or have been subject to the interest and additional tax to any Business Employee set forth under Section 409A(a)(1)(B) of the Code.

2.15    Environmental Matters. Except as set forth in Schedule 2.15:

(a)    to the Knowledge of the Seller, the Business as currently conducted by the Seller is in compliance in all material respects with all applicable Environmental Laws;

(b)    there is no pending or, to the Knowledge of the Seller, threatened civil or criminal litigation, written notice of violation or formal administrative proceeding, investigation or claim or any request for information received from any Governmental Entity relating to any Environmental Law involving the Business or any Acquired Asset;

(c)    to the Knowledge of the Seller, each of the Seller and Latinoamerica, as applicable, has those permits, licenses and approvals required under Environmental Law to operate the Business and occupy the Business Property in Carrollton, Texas and the Business Property in Monterrey, Mexico as currently operated and occupied by the Seller and Latinoamerica, as applicable, and, to the Knowledge of the Seller, neither the Seller nor Latinoamerica has received any notice of any deficiency with respect to such permits, licenses or approvals. Except at set forth on Schedule 2.15, to the Knowledge of the Seller, no filing with regard to this transaction is required by any of the permits, licenses or approvals under any Environmental Law, and all such permits, licenses and approvals are transferrable to the Buyer;

(d)    there is no litigation, arbitration, or, to the Knowledge of the Seller, investigation or proceeding, pending against or relating to the Business or any Acquired Asset pursuant to any Environmental Law and none of the Business or the Acquired Assets are subject to any judgment, injunction, order, decree, rule or restriction of any court, Governmental Entity or arbitrator pursuant to Environmental Law;

(e)    no Materials of Environmental Concern have been Released by the Business and, to the Knowledge of the Seller, no Acquired Asset is contaminated by Materials of Environmental Concern in violation of, or as would give rise to liabilities under, any applicable Environmental Law, except as described on Schedule 2.15;

(f)    to the Knowledge of the Seller, the Fixed Assets contain no friable asbestos, polychlorinated biphenyls or other Materials of Environmental Concern which would give rise to liability under any applicable Environmental Law;

(g)    none of the Acquired Assets has been used to manufacture, distribute, or sell any products or items containing Materials of Environmental Concern so as would give rise to liability under any applicable Environmental Law which would be material to the Business; and

19

(h)     neither the Seller nor Latinoamerica has assumed, undertaken, provided a written indemnity with respect to the conduct of the Business or the Acquired Assets as such pertains to Environmental Matters, Materials of Environmental Concern or Environmental Law.

2.16    <u>Legal Compliance</u>. Each of the Seller, Latinoamerica, and WLV Mexico is in compliance in all material respects with all applicable Laws (including rules and regulations thereunder) with respect to the Business. There is no pending or, to the Knowledge of the Seller, threatened action, suit, proceeding or claim relating to the Business alleging any failure to so comply.

2.17    <u>Permits</u>. **Schedule 2.17** lists all Permits required for the operation of the Business as presently conducted by the Seller and Latinoamerica. Each Permit listed on **Schedule 2.17** is in full force and effect and neither the Seller nor Latinoamerica is in violation of or default under any Permit and no suspension or cancellation of any such Permit has been threatened in writing delivered to the Seller, or Latinoamerica.

2.18    <u>Certain Payments</u>. Neither Seller nor any of its respective officers, employees, agents and representatives, when acting for or on behalf of the Seller has violated the FCPA, and there is no pending or, to the Knowledge of the Seller, threatened action, suit, proceeding or claim alleging any such violation by the Seller or any of its respective officers, employees, agents and representatives.

2.19    <u>Brokers' Fees</u>. Seller has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement that would constitute an Assumed Liability or a liability of the Buyer. Seller shall pay any such fees or commissions for a broker, finder or agent which it has engaged related to the transactions contemplated by this Agreement.

2.20    <u>Product Warranty and Quality</u>.

(a)     Except as otherwise described on **Schedule 2.20**, (i) since January 1, 2005, each product manufactured, sold, leased, or delivered by the Seller with respect to the Business has been in conformity with applicable contractual commitments and express and implied warranties, and (ii) the Seller has no material liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against it giving rise to any material liability) for replacement or repair thereof or other Damages in connection therewith, subject only to the reserve for product warranty claims set forth on the face of the Interim Financial Statements (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Seller.

(b)     **Schedule 2.20** includes copies of the standard terms and conditions of sale for the Seller (containing applicable guaranty, warranty, and indemnity provisions) used in the Business. Except as otherwise described on **Schedule 2.20**, no product manufactured, sold, or delivered in connection with the Business is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale or lease set forth in **Schedule 2.20**.

20

(c)     To the Knowledge of Seller, the Seller has no Liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of it giving rise to any liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by the Seller with respect to the Business.

2.21    Customers and Suppliers.

(a)     Schedule 2.21 lists each customer of the Seller with respect to the Business for each of the two (2) most recent fiscal years and the current fiscal year to date and sets forth opposite the name of each such customer the percentage of consolidated net sales attributable to such customer.

(b)     Except as otherwise described on Schedule 2.21, since the date of the Interim Financial Statements, (i) no material supplier of the Seller with respect to the Business has indicated that it shall stop, or materially decrease the rate of, supplying materials, products or services to the Seller, and (ii) no customer listed on Schedule 2.21 has indicated that it shall stop, or materially decrease the rate of, buying materials, products or services from the Seller.

(c)     Except as otherwise described on Schedule 2.21, Latinoamerica has not entered into any legal or commercial relationship which could be deemed as a *submaquila* arrangement under applicable Law.

2.22    Insurance. Each of the Seller, Latinoamerica, and WLV Mexico, as applicable, has at all times since January 1, 2005 maintained (or caused to be maintained) insurance relating to the Business and covering property, fire, flood, casualty, liability, product liability, workers' compensation, employment practices liability, and all other forms of insurance customarily obtained by businesses in the same industry. Such insurance (i) is in full force and effect, (ii) is sufficient for compliance with all requirements of Law applicable to the Seller, Latinoamerica, and WLV Mexico, as applicable, and under any Designated Contract, Mexican Facility Contract, or WLV Mexico Contract, (iii) is valid and enforceable, and (iv) to the Knowledge of the Seller, provides adequate insurance coverage for the activities of the Seller, Latinoamerica, and WLV Mexico, as applicable, with respect to the Business, as presently conducted. Schedule 2.22 lists each policy of insurance in effect, including the name of the carrier, policy limits, and date of expiration and includes a five (5) year claims history for any product liability and warranty claims.

2.23    Affiliated Transactions. Except as otherwise listed on Schedule 2.23, no partner, officer or Affiliate of the Seller has any contract or agreement of any type with the Seller (other than employment not represented by a written agreement and terminable at will), any loan to or from the Seller, or any interest in any Acquired Assets. Except as otherwise described on Schedule 2.23, to the Knowledge of the Seller, no partner, officer or Affiliate of the Seller has any direct or indirect interest in any competitor, supplier, or customer of the Business or in any Person from whom or to whom the Seller with respect to the Business leases any property, or in any other Person with whom the Seller otherwise transacts business of any nature with respect to the Business.

21

2.24     Accuracy of Information. The representations and warranties contained in this Agreement do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make any of them, in light of the circumstances in which it was made, not misleading.

2.25     Books and Records. The Seller has made available for review by the Buyer all of the Seller's, Latinoamerica's, and WLV Mexico's books of account, records, files and invoices, accounting records, sales and sales promotional data, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, quality control records and manuals, research and development files, correspondence and any other corporate records and operating data to the extent related primarily to or used primarily in connection with the Business, except as required by applicable Law or as the result of the lack of a required third party consent.

2.26     Disclaimer of other Representations and Warranties. EXCEPT AS EXPRESSLY SET FORTH IN THIS **ARTICLE II**, THE SELLER AND LATINOAMERICA MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR RESPECTIVE ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES, OR OPERATIONS, INCLUDING NUMBER, QUANTITY, QUALITY OR CONDITION OR WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. The Buyer hereby acknowledges and agrees that, except to the extent specifically set forth in this Agreement, the Buyer is purchasing the Acquired Assets on an "AS-IS, WHERE-IS" basis. Without limiting the generality of the foregoing and except to the extent specifically set forth in this Agreement, the Seller makes no representation or warranty, and none shall be implied at law or in equity, regarding: any assets other than the Acquired Assets; any projections, estimates or budgets heretofore delivered or made available to the Buyer of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business; any other information or documents made available to the Buyer or its agents and representatives with respect to the Seller, any of the Acquired Assets, Latinoamerica, or WLV Mexico; or the value of the Business or any of the Acquired Assets.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller that the statements contained in this **Article III** are true and correct as of the date hereof.

3.1     Organization. Each of the Buyer, Mueller, and Mueller Mexican Affiliate is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation. Each of the Buyer, Mueller, and Mueller Mexican Affiliate has all requisite power and authority to carry on the business in which it is now engaged and to own and use the properties now owned and used by it.

3.2     Authority. Each of the Buyer, Mueller, and Mueller Mexican Affiliate has all requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it will be a party and to perform its obligations hereunder and thereunder. The execution and delivery by each of the Buyer, Mueller, and Mueller Mexican Affiliate of this Agreement and such

22

Ancillary Agreements and the consummation by the Buyer, Mueller, and Mueller Mexican Affiliate of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of the Buyer, Mueller and Mueller Mexican Affiliate; and this Agreement has been, and such Ancillary Agreements will be, validly executed and delivered by the Buyer, Mueller, and Mueller Mexican Affiliate, as applicable, and, assuming this Agreement and each such Ancillary Agreement constitute the valid and binding obligation of the Seller, Wolverine, and Latinoamerica, as applicable, constitutes or will constitute a valid and binding obligation of the Buyer, Mueller, and Mueller Mexican Affiliate, as applicable, enforceable against the Buyer, Mueller, and Mueller Mexican Affiliate in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to or affecting the rights of creditors generally and by equitable principles, including, without limitation, those limiting the availability of specific performance, injunctive relief and other equitable remedies and those providing for equitable defenses.

3.3     No contravention. Neither the execution and delivery by the Buyer, Mueller, and Mueller Mexican Affiliate, as applicable, of this Agreement or the Ancillary Agreements to which the Buyer, Mueller, and Mueller Mexican Affiliate, as applicable, will be a party, nor the consummation by the Buyer, Mueller, and Mueller Mexican Affiliate of the transactions contemplated hereby or thereby, will:

(a)     conflict with or violate any provision of the charter or bylaws, or other comparable governing document, of the Buyer, Mueller, or Mueller Mexican Affiliate;

(b)     require on the part of the Buyer, Mueller, or Mueller Mexican Affiliate any filing or registration with, or notification to, or permit, authorization, consent or approval of, any Governmental Entity;

(c)     conflict with, result in a breach of, constitute (with or without due notice, or passage of time, or both) a default under, result in the loss of benefit under, result in the acceleration of obligations under, create in any party any right to terminate or modify, or require any notice, consent or waiver under, any contract or agreement to which the Buyer, Mueller, or Mueller Mexican Affiliate is a party or by which the Buyer, Mueller, or Mueller Mexican Affiliate is bound, except for (i) any conflict, breach, default, acceleration or right to terminate or modify that would not reasonably be expected to result in a the Buyer Material Adverse Effect or (ii) any notice, consent or waiver the absence of which would not reasonably be expected to result in a the Buyer Material Adverse Effect; or

(d)     violate any applicable Law, order, writ, injunction, judgment, charge, or decree or other restriction, or statute, rule or regulation applicable to, the Buyer, Mueller, or Mueller Mexican Affiliate or any of their properties or assets.

3.4     Litigation. There are no actions, suits, claims or legal, administrative or arbitratrial proceedings pending against or, to the Knowledge of the Buyer, threatened against, the Buyer, Mueller, or Mueller Mexican Affiliate which would adversely affect the Buyer's, Mueller's, or Mueller Mexican Affiliate's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

23

3.5     Broker Fees. The Buyer has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement that would constitute a liability of the Seller. The Buyer shall pay any such fees or commissions for a broker, finder or agent which it has engaged related to the transactions contemplated by this Agreement.

3.6     Product Liability Insurance. The Buyer has and shall maintain product liability insurance relating to its business (including, without limitation, after the Closing Date, the Acquired Assets and the Business), that insures against product liability risks of the kind customarily insured against by businesses similarly situated. The Buyer shall have in effect on the Closing Date the product liability insurance which is described on **Schedule 3.6**, and such insurance as of the Closing Date (i) shall be in full force and effect, (ii) shall be sufficient for compliance with all requirements of Law applicable to the Buyer or under any Designated Contract, (iii) shall be valid and enforceable, and (iv) to the Knowledge of the Buyer, shall provide adequate insurance coverage for the business activities of the Buyer, including without limitation, to ownership and operation of the Acquired Assets or the Business as proposed to be conducted by the Buyer on and after the Closing Date.

**ARTICLE IV**
**PRE-CLOSING COVENANTS**

4.1     Bankruptcy Covenants.

(a)     Approval of Break-Up Fee and Reimbursable Expenses. Seller acknowledges and agrees that Buyer has expended consider time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller. In consideration therefor, the Seller (or Wolverine) shall file with and seek the approval of the Bankruptcy Court of the Approval Motion, including without limitation the Break-Up Fee and Reimbursable Expenses, and the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Break-Up Fee and the Reimbursable Expenses in accordance with **Section 8.3** hereof and deeming the Break-Up Fee and the Reimbursable Expenses as administrative priority expenses under sections 503(b) and 507(a)(1) of the Bankruptcy Code.

(b)     Bidding Procedures. Not later than the date that is two (2) Business Days following the date hereof, the Seller (or Wolverine) shall file a motion seeking entry of the Bidding Procedures Order with the Bankruptcy Court (the "Approval Motion"). The Seller (and Wolverine) shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order (with such changes thereto as Buyer shall approve or request in its reasonable discretion) within ten (10) days after the date of this Agreement. The Seller (and Wolverine) shall comply with all of the terms and conditions contained in the Bidding Procedures, including the occurrence of the events by the dates and times listed therein.

(c)     Non-Solicitation.

(i)     From the time of execution and delivery by the Seller and the Buyer of this Agreement until the Bankruptcy Court's entry of the Bidding Procedures Order (the "Non-Solicitation Period"), neither the Seller nor Wolverine shall, nor shall it authorize or permit any of its

24

respective Affiliates to, nor shall it authorize or permit any officer, director, manager or employee of, or any investment banker, attorney or other advisor, agent or representative of, Seller or Wolverine or any of their respective Affiliates (each of the foregoing, collectively the "Seller Representatives") to directly or indirectly solicit or otherwise encourage any Person with respect to any inquiries or the submission of an Alternative Transaction or engage in any negotiations concerning the terms of an Alternative Transaction or provide any information or data to or have any discussions with any Person relating to an Alternative Transaction, or otherwise facilitate any effort or attempt to make or implement an Alternative Transaction or enter into any agreement or understanding with any other Person with the intent to effect an Alternative Transaction; provided that the Seller and the Seller Representatives shall be authorized and permitted to (x) provide and continue to provide information or data to any Person that, as of the date of this Agreement, has already expressed, or during the Non-Solicitation Period expresses, interest to the Seller or the Seller Representatives that such Person is interested in potentially proposing an Alternative Transaction or Restructuring Transaction and (y) execute a confidentiality agreement with such interested Person; provided further that during the Non-Solicitation Period, the Seller and the Seller Representative shall not be authorized or permitted to engage in any negotiations concerning the terms of an Alternative Transaction with any such Person. Seller shall not execute any definitive documents (other than confidentially agreements) relating to any Alternative Transaction during the Non-Solicitation Period.

(ii)     Following the Non-Solicitation Period, the Seller and Seller Representatives shall not be subject to any restrictions with respect to the solicitation or encouragement of any Person concerning an Alternative Transaction solely to the extent done in accordance with the Bidding Procedures; **provided, however,** that within forty-eight (48) hours after the Seller's receipt of any written offer for an Alternative Transaction in accordance with the Bidding Procedures, the Seller must deliver to Buyer by email transmission, facsimile transmission, or same day courier service (with a copy to be sent by next day delivery with a reputable national overnight delivery service, in the event provided by email or facsimile transmission) true and complete copies of all documents related to any such offer.

(d)     Bankruptcy Court Approval.

(i)     Wolverine and the Seller shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bankruptcy Sale Order no later than forty-five (45) days after the date hereof.

(ii)     If the Bidding Procedures Order or Bankruptcy Sale Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), Wolverine and the Seller shall diligently defend against such appeal, petition or motion and shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion; provided that the Seller shall consult with the Buyer regarding the status of any such proceeding or actions.

(iii)     Wolverine and the Seller shall use commercially reasonable efforts to consult with the Buyer and its representatives concerning the Bidding Procedures Order, the Bankruptcy Sale Order, any other orders of the Bankruptcy Court, and the bankruptcy proceedings in connection

25

therewith and provide the Buyer with copies of requested applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. Wolverine and the Seller further covenant and agree that, after the Closing, the terms of any reorganization plan it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including, without limitation, any transaction contemplated by or approved pursuant to the Bidding Procedures Order or the Bankruptcy Sale Order.

4.2     Closing Efforts.     Subject to the terms of this Agreement, each of the Parties, Latinoamerica, and Mueller Mexican Affiliate shall use commercially reasonable efforts to take all actions and to do all things reasonably necessary or advisable to consummate the transactions contemplated by this Agreement, including, without limitation, using commercially reasonable efforts to: (i) effect all applicable Governmental Filings, (ii) otherwise comply in all material respects with all applicable Laws and regulations in connection with the consummation of the transactions contemplated by this Agreement, (iii) obtain the Required Consents and estoppel certificates, in forms reasonably acceptable to the Buyer and the Seller, with respect to any Leases, Designated Contracts, or Mexican Designated Contracts to be assumed by the Buyer or Mueller Mexican Affiliate, and (iv) obtain entry of the Bidding Procedures Order and the Bankruptcy Sale Order. Each of the Parties shall promptly notify the other Party of any fact, condition or event known to it that would reasonably be expected to prohibit, make unlawful, or delay the consummation of the transactions contemplated by this Agreement. Notwithstanding the foregoing, the Parties do not contemplate the necessity for any filings or compliance described under <u>Sections 4.1(i) or (ii)</u>.

4.3     <u>Operation of Business</u>.

(a)     Except as contemplated by this Agreement, during the period from the date of this Agreement until the Closing Date, the Seller and Latinoamerica shall use commercially reasonable efforts to conduct (and cause to be conducted) the operations of the Business in the ordinary course of business consistent with past practice.

(b)     Without limiting the generality of <u>Section 4.3(a)</u>, during the period from the date of this Agreement until the Closing Date, the Seller and Latinoamerica shall use (and cause to be used) commercially reasonable efforts to, in a manner and to the extent consistent with the conduct of the Business in the ordinary course of business consistent with past practice:

(i)     preserve intact the business operations, organization and goodwill of the Business;

(ii)     keep available the services of the employees of the Business;

(iii)     maintain existing material business relations with third parties relating to the Business;

(iv)     pay all expenses and accounts payable and similar obligations, bill customers, collect receivables, and purchase inventory with respect to the Business;

(v)     maintain its books, accounts and records and its current pricing policies and terms and conditions of sales with respect to the Business;

(vi)     perform all maintenance and service necessary to maintain the Acquired Assets, including without limitation any facilities and equipment with respect to the Business, in good operating condition and repair, normal wear and tear excepted and maintain a commercially reasonable level of insurance;

(vii)     pay all Taxes as such Taxes become due and payable;

(viii)     maintain the Intellectual Property; and

(ix)     comply with the terms of all Designated Contracts, Mexican Facility Contracts, and WLV Mexico Contracts.

(c)     Without limiting the generality of **Section 4.3(a)**, during the period from the date of this Agreement until the Closing Date, the Seller and Latinoamerica will not (and will not allow any Affiliate to), without the prior written consent of the Buyer (such consent to be promptly provided in writing and not to be unreasonably withheld, conditioned or delayed) solely with respect to the Business:

(i)     engage in any new line of business;

(ii)     incur or permit to be incurred any obligation or other liability (absolute, accrued or contingent) in excess of $20,000.00 in any way affecting the Business or the Acquired Assets, except in the ordinary course of business consistent with past practice;

(iii)     acquire any properties or assets or sell, assign, lease, license, transfer, convey or otherwise dispose of any Acquired Assets (except for acquisitions or dispositions for fair consideration in the ordinary course of business and otherwise consistent with past practice);

(iv)     increase the compensation or benefits payable or provided, or to become payable or provided, to any of the Business Employees or the Mexican Business Employees (unless required under the terms of the WLV Mexico Contracts), including any such increase pursuant to any option, bonus, stock purchase, pension, profit-sharing, deferred compensation, retirement or other plan, arrangement, contract or commitment or otherwise enter into, alter or extend in any manner the terms of any employment, severance, consulting or service agreement, or enter into any retention agreements or agreements for enhanced or extraordinary severance with any Business Employee or Mexican Business Employee;

27

(v)     create, incur or assume any indebtedness (other than trade payables in the ordinary course of business) secured by any Acquired Asset or grant, create, incur, or suffer to exist any Security Interest on any Acquired Asset that did not exist on the date hereof;

(vi)     remove any equipment comprising any portion of the Acquired Assets from the manufacturing facilities at the Business Properties; or

(vii)     except to the extent required by applicable Law or GAAP, make any material change to its cash management practices (including with respect to accounts receivable and Inventory) or any of its methods of accounting or methods of reporting revenue and expenses or accounting practices or make any write down in the value of its Inventory, in each case which would affect in any material manner the Business;

(viii)     terminate, modify, amend any Designated Contract, Mexican Facility Contract, or WLV Mexico Contract, except as contemplated by this Agreement or in the ordinary course of business consistent with past practice, or enter into any new contracts or agreements related to the Business, except contracts or agreements made in the ordinary course of business consistent with past practice;

(ix)     engage in any promotional sales or discount or other activity with customers that has or would reasonably be expected to have the effect of materially accelerating to pre-Closing periods sales of the Business that would otherwise be expected to occur in post- Closing periods;

(x)     directly or indirectly engage in any material transaction or enter into any loan or material arrangement with any officer, partner, relative of any such officer or partner, or Affiliate of the Seller;

(xi)     settle any proceeding (including any civil, criminal, administrative, investigate or appellate proceeding and any informal proceeding), audit or similar examination against, relating to or affecting the Business; or

(xii)     agree or commit to do any of the actions described in **Sections 4.3(c)(i) through (xi)**.

(d)     Notwithstanding anything to contrary in **Sections 4.3(a) through (c)**, the Seller shall be permitted to (i) accept capital and loans from any of the Seller's Affiliates, (ii) use any and all cash, cash equivalents, and other short-term liquid investments of the Business to make dividends, distributions, or other payments to the Seller or any Affiliate of the Seller, and (iii) transfer or dispose of any asset, property, or right described in the definition of "Excluded Assets" (other than the Business Property located at Carrollton, Texas which shall not be transferred or disposed of without the Buyer's prior written consent). For the avoidance of doubt, the taking of any action described in any of **Sections 4.3(d)(i) through (iii)** shall not constitute a breach of any representation, warranty, covenant, or agreement in this Agreement, the Seller Certificate, or any Ancillary Agreement.

28

4.4    Disclosure Schedule.  From time to time between the date hereof and the Closing Date, the Seller shall provide to the Buyer written updates to the Disclosure Schedule, disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date. The Seller's representations and warranties contained in this Agreement shall be construed for all purposes of this Agreement as being qualified and limited by the Disclosure Schedule, as so updated or amended.

4.5    Elimination of Intercompany Items.  Effective as of the Closing, all payables, receivables, liabilities and other obligations between the Business or the Seller, on the one hand, and Wolverine or any of the Seller's other Affiliates, on the other hand, shall be eliminated except to the extent (a) expressly provided for in this Agreement or a document executed and delivered by both Parties on or before the Closing or (b) such payables to Wolverine which represent consideration paid for Inventory acquired by the Buyer at Closing without any other payment of any Inventory Purchase Price to the Seller for such Inventory, which payables the Buyer shall pay within thirty (30) days after the Closing Date.

4.6    Access.

(a)    During the period between the date of this Agreement and the Closing Date, the Seller and Latinoamerica shall permit representatives of the Buyer to have access (at reasonable times, on reasonable prior written notice and in a manner so as not to interfere with the normal business operations of the Business) to the premises, properties, financial and accounting records, contracts, and other records and documents, of or pertaining to the Business. Prior to the Closing, the Buyer and its representatives shall not contact or communicate with the employees, customers, or suppliers of the Seller in connection with the transactions contemplated by this Agreement, except with the express prior written consent of the Seller, which consent shall be promptly provided in writing and shall not be unreasonably withheld, conditioned or delayed; **provided, however,** that the Buyer or its representatives shall be permitted to contact the Business Employees and Mexican Business Employees for purposes of conducting interviews or otherwise determining whether such employees meet the criteria set forth in **Section 9.1(a)** for hiring, on the condition that the Buyer provides reasonable prior written notice to the Seller and allows the Seller or its representatives to participate in any such discussions or meetings.

(b)    Notwithstanding anything to the contrary in any other provision of this Agreement or the Confidentiality Agreement, the Buyer and the Seller agree that the Confidentiality Agreement shall remain in full force and effect in accordance with its terms, that the Confidentiality Agreement shall survive any termination of this Agreement and that any information provided by or on behalf of the Seller or any of the Seller's Affiliates to the Buyer pursuant to this Agreement or in connection with the transactions contemplated by this Agreement shall be deemed confidential information and treated in accordance with the Confidentiality Agreement; **provided, however,** if the Closing occurs, the Confidentiality Agreement shall terminate effective as of the Closing Date.

4.7    Sufficiency of Funds.  The Buyer has unencumbered cash on hand or credit arrangements with financially responsible third parties, or a combination thereof, in an aggregate amount sufficient to enable it to pay the Purchase Price and all other amounts payable by it in connection with this Agreement and transactions contemplated hereby.

29