4.8    Mueller Guaranty.  The Buyer is an indirect wholly-owned subsidiary of Mueller and, therefore, Mueller will obtain a tangible benefit from the consummation of the transactions contemplated in this Agreement.  Accordingly, and in order to induce the Seller to enter into this Agreement with the Buyer, Mueller hereby guarantees the full and timely payment and performance of all of the obligations of the Buyer contained in this Agreement (including, without limitation, the Buyer's obligation to consummate the transactions contemplated in this Agreement after the satisfaction or effective waiver of all conditions precedent set forth in this Agreement, as well as all obligations of the Buyer contained in Article I, Article IV, and Article IX) with respect to the payment of any and all adjustments to the Purchase Price and prorated amounts determined to be due to the Seller in accordance with Article I.  In the event that the Buyer fails to pay or perform any such obligations hereunder, the Seller shall be entitled to give written notice to Mueller of such failure, and Mueller hereby agrees to pay or perform, on behalf of the Buyer, any and all such obligations, promptly upon receipt of such notice.

## ARTICLE V
## CONDITIONS PRECEDENT TO CLOSING

5.1    Conditions to Obligations of the Buyer.  The obligation of the Buyer and Mueller Mexican Affiliate to consummate the transactions to be consummated at the Closing is subject to the satisfaction (or waiver in writing by the Buyer) of the following conditions:

(a)    the representations and warranties of the Seller set forth in Article II shall be true and correct in all material respects (except for those representations and warranties qualified by any materiality or Business Material Adverse Effect qualifications, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as if made on the Closing Date, except for those representations and warranties that address matters only as of a particular date (which shall be true and correct as of such date), in each case;

(b)    Wolverine, the Seller, and Latinoamerica shall have performed or complied in all material respects with the agreements and covenants required to be performed or complied with by it under this Agreement as of or prior to the Closing;

(c)    no judgment, order, decree, stipulation or injunction enjoining or preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and no action, suit or proceeding before any court or governmental authority shall be pending or, to the Knowledge of the Seller, threatened, wherein an unfavorable judgment, order, decree, stipulation or injunction would enjoin or prevent the consummation of the transactions contemplated by this Agreement;

(d)    the Seller shall have executed and delivered to the Buyer the Seller Certificate;

(e)    all Required Consents, in forms reasonably acceptable to the Buyer and the Seller, shall have been obtained;

30

(f)     there shall not have occurred since the date of this Agreement any Business Material Adverse Effect or any physical damage to the Acquired Assets that would have a material adverse effect to the Business which damage has either not been repaired or replaced or for which there is not reasonably adequate insurance proceeds (which the Seller agrees to assign to the Buyer upon Closing) to repair or replace such damaged Acquired Assets;

(g)     there shall not have been disclosed in any written update to the Disclosure Schedule made pursuant to Section 4.4 hereof any Business Material Adverse Effect;

(h)     each deliverable of Wolverine, the Seller, and Latinoamerica under Section 1.3(b) shall have been delivered to the Buyer;

(i)     the Seller shall have delivered to the Buyer a true and complete updates to the Disclosure Schedule, if any, pursuant to Section 4.4.

(j)     the Bankruptcy Sale Order shall have been entered in a form reasonably acceptable to Buyer and Seller consistent with the terms of this Agreement and shall have become a Final Order and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement.

5.2     Conditions to Obligations of the Seller. The obligation of the Seller or Latinoamerica to consummate the transactions to be consummated at the Closing are subject to the satisfaction (or waiver in writing by the Seller) of the following conditions:

(a)     the representations and warranties of the Buyer set forth in Article III shall be true and correct in all material respects (except for those representations and warranties qualified by any materiality or the Buyer Material Adverse Effect qualifications, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as if made on the Closing Date, except for those representations and warranties that address matters only as of a particular date (which shall be true and correct as of such date);

(b)     the Buyer and Mueller Mexican Affiliate shall have performed or complied in all material respects with its agreements and covenants required to be performed or complied with by it under this Agreement as of or prior to the Closing;

(c)     no judgment, order, decree, stipulation or injunction enjoining or preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and no action, suit or proceeding before any court or governmental authority shall be pending or, to the Knowledge of the Buyer, threatened, wherein an unfavorable judgment, order, decree, stipulation or injunction would enjoin or prevent the consummation of the transactions contemplated by this Agreement;

(d)     the Buyer shall have executed and delivered to the Seller the Buyer Certificate;

31

(e)     all Required Consents shall have been obtained;

(f)     each deliverable of the Buyer and Mueller Mexican Affiliate under **Section 1.3(b)** shall have been delivered to the Seller; and

(g)     the Bankruptcy Sale Order shall have been entered in a form reasonably acceptable to Buyer and Seller consistent with the terms of this Agreement and shall have become a Final Order and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement

5.3     Deemed Waiver. If either Party is not obligated at the Closing to perform pursuant to this Agreement, the Party not so obligated may terminate this Agreement by delivering to the other Party notice of termination in writing in accordance with **Section 8.1(c)**; **provided, however,** if either Party is not obligated to perform pursuant to this Agreement, but nevertheless elects to perform, and the other Party is obligated to perform, the Parties shall proceed with the consummation of this Agreement as if all Parties were obligated to do so, and the Party who is not obligated to proceed but elects to do so (the "Waiving Party") shall be deemed to have specifically waived, and as provided in **Sections 5.1 and 5.2**, as the case may be, the fulfillment of the condition or conditions, the non-fulfillment of which excused the obligation of the Waiving Party to perform pursuant to this Agreement as contemplated by **Sections 5.1 and 5.2**, as the case may be. For all legal purposes which may arise, (i) if the Buyer is not obligated to perform pursuant to this Agreement and delivers to the Seller a notice of termination in writing in accordance with **Section 8.1(c)**, such notice of termination shall be deemed delivered to Wolverine and Latinoamerica, and (ii) if the Seller is not obligated to perform pursuant to this Agreement and delivers to the Buyer a notice of termination in writing in accordance with **Section 8.1(c)**, such notice of termination shall be deemed delivered to Mueller and Mueller Mexican Affiliate.

5.4     Frustration of Closing Conditions. Neither the Seller nor the Buyer may rely on the failure of any condition set forth in **Sections 5.1 and 5.2**, as the case may be, to be satisfied if such failure was caused by such Party's failure to act in good faith or to use its commercially reasonable efforts to cause the Closing to occur, as required by Section 4.1.

## ARTICLE VI
## INDEMNIFICATION

6.1     Indemnification by the Seller. Subject to the terms and conditions of this **Article VI**, from and after the Closing, the Seller and Wolverine shall, jointly and severally, indemnify the Buyer and Mueller Mexican Affiliate and their respective successors and assigns, and their Affiliates, stockholders, agents, representatives, officers, directors, or employees (each, a "Buyer Party") and save and hold each Buyer Party harmless from and against, Damages incurred or suffered by such Buyer Party resulting from or constituting:

(a)     any breach of a Surviving Representation of the Seller, Wolverine, or Latinoamerica contained in this Agreement or the Seller Certificate;

32

(b)     any failure by the Seller, Latinoamerica, or Wolverine to perform any covenant or agreement contained in this Agreement;

(c)     any Excluded Liabilities or Excluded Assets and any liabilities and obligations arising or accruing from the operation of the Business by Seller or Latinoamerica or the Acquired Assets prior to the Closing Date, except to the extent that the Buyer has received a credit therefor against the Purchase Price (including through the Proration Adjustment);

(d)     any liabilities arising under any Employee Benefit Plans or with respect to any of the Business Employees with respect to their employment prior to the Closing Date (except as otherwise provided in **Section 9.3**) or with respect to any of the Mexican Business Employees with respect to their employment prior to the Closing Date;

(e)     any warranty or product liability claims for any products manufactured by the Seller or Latinoamerica prior to the Closing Date; and

(f)     any Environmental Matter that existed or arose prior to the Closing Date with respect to the Business or any of the Acquired Assets.

6.2     Indemnification by the Buyer. Subject to the terms and conditions of this **Article VI**, from and after the Closing, the Buyer and Mueller shall indemnify the Seller, Wolverine, Latinoamerica, and WLV Mexico, and their respective successors and assigns, and their Affiliates, equity owners, agents, representatives, officers, directors, or employees (each, a "**Seller Party**") and save and hold each Seller Party harmless against, Damages incurred or suffered by such Seller Party resulting from or constituting:

(a)     any breach of a Surviving Representation of the Buyer or Mueller Mexican Affiliate contained in this Agreement, or the Buyer Certificate;

(b)     any failure by the Buyer, Mueller Mexican Affiliate, or Mueller to perform any covenant or agreement contained in this Agreement;

(c)     any Assumed Liabilities and any liabilities and obligations arising or accruing from the operation of the Business by the Buyer (or its Affiliates) or with respect to the Acquired Assets or the Mexican Designated Contracts assumed by Mueller Mexican Affiliate as of or after the Closing Date;

(c)     any warranty or product liability claims for any products manufactured by the Buyer or Mueller Mexican Affiliate on or after the Closing Date;

(d)     any liabilities arising under any employee benefit plans or with respect to any of the Business Employees with respect to his or her employment on or after to the Closing Date (except as

33

otherwise provided in <u>Section 9.3</u>) or with respect to any of the Mexican Business Employees with respect to his or her employment on or after Closing Date; and

     (e)     any Environmental Matter with respect to the Business or any of the Acquired Assets that arises on or after the Closing Date.

     6.3     <u>Claims for Indemnification</u>.

     (a)     <u>Third-Party Claims</u>. All claims for indemnification made under this Agreement resulting from, related to, or arising out of a third-party claim against an Indemnified Party shall be made in accordance with the following procedures:

     (i)     An Indemnified Party shall give prompt written notification (not more than sixty (60) days after becoming aware of any third-party claim) to the Indemnifying Party upon the assertion of any such claim by a third party, or, if later, of the commencement of any action, suit, or proceeding relating to a third-party claim for which indemnification may be sought; <u>provided, however</u>, that the failure to so notify an Indemnifying Party within such sixty (60) day period shall relieve the Indemnifying Party of its obligations of this <u>Article VI</u> with respect to such claim or matter.

     (ii)     Such notification shall include a description in reasonable detail, to the extent known or on hand at the time of such notice, of the facts constituting the basis for such third-party claim, all relevant documentation with respect to such third-party claim (including any written demand, summons, compliant, pleading, or other document or instrument) and the amount of the Damages claimed.

     (iii)     Promptly after delivery of such notification, the Indemnifying Party may, upon written notice thereof to the Indemnified Party, assume control of the defense of such claim, action, suit, or proceeding by acknowledging its indemnification obligations as provided in this <u>Article VI</u> in writing to the Indemnified Party and assuming all liability for such claim for indemnification.

     (iv)     If the Indemnifying Party promptly does not assume control of such defense or handling of a claim, the Indemnified Party shall control such defense or handling of a claim. The Party not controlling such defense or handling of a claim may participate therein at its own expense. The Indemnified Party shall cooperate fully with the Indemnifying Party and at the cost of the Indemnifying Party shall make available such records, information, and personnel as the Indemnifying Party may request in connection with its defense or handling of such claim.

     (v)     The Party controlling such defense shall keep the other Party advised of the status of such claim, action, suit, or proceeding and the defense thereof and shall have the right to settle such claim, action, suit, or proceeding; <u>provided, however</u>, (A) the Indemnified Party shall not agree to any settlement of such action, suit, proceeding or claim without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed), and (B) the Indemnifying Party shall not agree to any settlement of such action, suit, proceeding or claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld,

conditioned or delayed), unless such settlement does not impose injunctive or equitable relief on the Indemnified Party or its Affiliates and includes a complete release of the Indemnified Party and its Affiliates without prejudice.

(b)    Non-Third Party Claims. An Indemnified Party wishing to assert a claim for indemnification under this **Article VI** which does not involve a third-party claim shall deliver to the Indemnifying Party a Claim Notice within sixty (60) days after becoming aware of such claim to the Indemnifying Party; **provided, however,** that the failure to so notify an Indemnifying Party within such sixty (60) day period shall relieve the Indemnifying Party of its obligations of this **Article VI** with respect to such claim or matter. Except to the extent otherwise expressly stated in a written notice, if any, delivered by the Indemnifying Party within sixty (60) days following receipt of the Claim Notice, the Indemnifying Party shall be deemed to have not contested that the Indemnified Party is entitled to receive any portion or all of the Damages claimed in such Claim Notice or is otherwise entitled to indemnification with respect to the matter described in the Claim Notice. If a dispute relating to a Claim Notice is not resolved on or before one hundred twenty (120) days following the delivery of such Claim Notice, the Indemnifying Party and the Indemnified Party shall each have the right to submit such dispute to a court of competent jurisdiction in accordance with the provisions of **Section 12.11**, and, in the event that such Claim Notice is determined to have been validly and timely given, such claim shall survive and continue until, but only for the purpose of, the resolution of such dispute.

6.4    Indemnification Period.

(a)    Each of the Surviving Representations, whether by the Seller, the Buyer or any other party, shall survive the Closing and the consummation of the transactions contemplated hereby and shall continue until the six (6) month anniversary of the Closing Date, at which time the Surviving Representations will terminate. The Non-Surviving Representations shall terminate as of the Closing Date. Neither the Seller, the Buyer, nor any other party shall have any liability (whether for indemnification or otherwise) with respect to any Non-Surviving Representation following the Closing Date or any Surviving Representation following the six (6) month anniversary of the Closing Date, except in the event of willful or intentional fraud.. Each claim for indemnification under this Agreement which is not an Unrestricted Claim, including without limitation any failure to perform any covenant or agreement contained in this Agreement or any express agreement for indemnification described in **Section 6.1, 6.2, or 9.3**, shall survive the Closing and the consummation of the transactions contemplated hereby and shall continue until the six (6) month anniversary of the Closing Date.

(b)    Notwithstanding the provisions of **Section 6.4(a)**, if an indemnification claim is properly asserted in writing pursuant to **Section 6.3**, then any Surviving Representation, any failure to perform any covenant or agreement contained in this Agreement, or any express agreement for indemnification described in **Section 6.1, 6.2, or 9.3,** which is the basis for any such claim, shall survive and continue until, but only for the purpose of, the resolution of such claim. All representations and warranties of the parties made in this Agreement or as provided herein are material and have been relied upon by the parties hereto.

6.5    Exclusive Remedy. From and after the Closing, except with respect to (i) claims for equitable relief (including, without limitation, specific performance) made with respect to breaches of any

35

Surviving Representation or of a covenant or agreement contained in this Agreement, (ii) claims subject to resolution in accordance with the procedures set forth in **Section 1.4**, or (iii) willful or intentional fraud, the rights provided to the Parties under this **Article VI** shall be the sole and exclusive remedies of the parties and their respective Affiliates with respect to claims under this Agreement or otherwise relating to the transactions contemplated hereby.

     6.6    <u>Escrow</u>.

     (a)    <u>Purposes</u>. The Escrow Amount shall be held in an interest-bearing account for the uses and purposes and distributed as provided for in the Escrow Agreement, the provisions of which shall be consistent with the requirement that, on that date which is six (6) months after the Closing Date, there shall be paid to the Seller any remaining Escrow Amount; **provided, however**, there shall be withheld from such distribution, to the extent available, an amount which, pursuant to the Escrow Agreement, is required to be retained due to the application of the indemnification provision set forth in **Section 6.1** of this Agreement. In pursuing the collection of any indemnifiable Damages from the Seller or Wolverine, the Buyer shall proceed first against the Escrow Amount prior to pursuing any other right or remedy available to the Buyer Party under this Agreement (except for specific performance or any other non-monetary relief or in the event of willful or intentional fraud).

     (b)    <u>Escrow Fees</u>. The costs and expenses of the Escrow Agent under the Escrow Agreement shall be paid one-half by the Seller and one-half by the Buyer.

     (c)    <u>Agreement to Control</u>. All matters relating to the Escrow Amount, to the extent not referred to in this Agreement, shall be governed by the Escrow Agreement; **provided, however**, in the event of any conflict between the terms of this Agreement and the Escrow Agreement, the terms of this Agreement shall be controlling as between the Seller and the Buyer. The Escrow Agent shall hold, invest, reinvest and disburse the Escrow Amount in accordance with the Escrow Agreement, and the Escrow Amount shall not be used for any other purpose.

     6.7    <u>Limitations</u>.

     (a)    Notwithstanding anything set forth in this Agreement to the contrary, (i) the aggregate liability of the Seller and Wolverine for indemnification of claims under this Agreement shall not exceed Eight Hundred Thousand Dollars ($800,000) (the "<u>Indemnification Cap</u>") and (ii) the aggregate liability of the Buyer and Mueller for indemnification of claims under this Agreement shall not exceed the Indemnification Cap; **provided, however**, the foregoing Indemnification Caps shall not apply to:

     (X)    claims for indemnification with respect to willful or intentional fraud; or

     (Y)    claims for indemnification with respect to failure to perform any covenant or agreement under **Article VII or Article X**; or

36

(Z)      claims for indemnification pursuant to <u>Section 6.1(e), Section 6.1 (f), Section 6.2(c), and Section 6.2(e)</u>, in each event to the extent such claim is not covered by insurance.

The claims described in this <u>Section 6.7(a)(X), (Y), and (Z)</u> shall be referred to, collectively, from time to time as the "<u>Unrestricted Claims</u>". The Unrestricted Claims shall not be subject to any survival limitations set forth in <u>Section 6.4</u> and each claim for indemnification with respect to an Unrestricted Claim shall survive for the relevant period of the statute of limitations under applicable Law.

(b)      <u>Intentionally omitted.</u>

(c)      Notwithstanding the other provisions of this <u>Article VI</u>, except in the event of willful or intentional fraud, the Parties agree that the indemnification and hold harmless obligations of the Seller and Wolverine with respect to <u>Section 6.1</u> and of the Buyer and Mueller with respect to <u>Section 6.2(a)</u> shall become operative and effective, only if and when all Damages for which an Indemnified Party is entitled to receive indemnification under this <u>Article VI</u> exceed, in the aggregate an amount equal to One Hundred Thousand Dollars ($100,000) (the "<u>Damages Threshold Amount</u>"). Further, it is understood and agreed that all such Damages shall accumulate until such time as they exceed the Damages Threshold Amount, at which time the Indemnifying Party shall be obligated to indemnify the Party seeking indemnification for the aggregate amount of such Indemnified Party's Damages, instead of the amount in excess of the Damages Threshold Amount. The Damages Threshold Amount shall be the materiality standard solely for purposes of determining the amount of any Damages that are the subject matter of a claim for indemnification under <u>Section 6.1(a)</u> or <u>Section 6.2(a)</u>, and, therefore (and solely for purposes of such determination), each Surviving Representation shall be read without regard and without giving effect to any materiality standard contained in such Surviving Representation (that is, as if such standard were deleted from such Surviving Representation). Each party to this Agreement expressly agrees that no party to this Agreement shall have the right to seek or obtain any punitive, special, or consequential damages or any damages for loss of opportunity or loss of profit or economic benefit or any similar type of damages with respect to matters under, arising out of, or in connection with or relating to this Agreement or the activities or transactions contemplated by this Agreement, unless (i) such damages are expressly required by applicable Law, (ii) such damages are payable by an Indemnified Party to a third party, or (ii) such damages arise as a result of willful or intentional fraud.

(d)      The Parties further agree that with respect to a claim for indemnification or for Damages by a Party (i) the calculation of Damages for the purposes of such claim shall be on a net tax basis, and (ii) the liability of any Indemnifying Party under this Agreement shall be reduced by the amount of any insurance proceeds which the Indemnified Party actually receives from any insurance carrier of the Indemnifying Party.

**ARTICLE VII**
**TAX MATTERS**

7.1      <u>Payment of Taxes.</u>

(a)      The Seller and Latinoamerica shall pay all Taxes with respect to the Acquired Assets and the Business which are attributable to periods ending prior to the Closing Date. The Buyer or Mueller Mexican Affiliate, as applicable, shall pay all taxes with respect to the Acquired Assets and the

37

Business which are attributable to periods ending on or after the Closing Date. All sales, use, real estate, excise, personal property, ad valorem or any other similar Taxes with respect to the Acquired Assets or the Business which are attributable to periods commencing prior to the Closing Date and ending thereafter shall be prorated between the Seller or Latinoamerica, as applicable, and the Buyer or Mueller Mexican Affiliate, as applicable, as of the Closing Date, such pro ration to be included in the calculation of the Proration Adjustment.

(b)     All sales, use, excise, value-added and similar Taxes payable in connection with the transfers contemplated hereby and any recording and filing fees and any stamp or similar Tax due, imposed, levied or assessed by reason of the recordation of any transfer document shall be paid by the Seller.

7.2     Intentionally omitted.

## ARTICLE VIII
## TERMINATION

8.1     Termination of Agreement. The parties to this Agreement agree that, subject in all events to the provisions of Article XIII and the Bankruptcy Code, the Parties may terminate this Agreement prior to the Closing as follows:

(a)     the Parties may terminate this Agreement by mutual written consent;

(b)     either the Buyer or the Seller may terminate this Agreement by giving written notice to the other in the event that the Seller (in the case of a termination by the Buyer) or the Buyer (in the case of a termination by the Seller) is in material breach of any representation, warranty, covenant or agreement contained in this Agreement that would cause (or would be reasonably expected to cause) the conditions set forth in Section 5.1(a) or Section 5.1(b) (in the case of a material breach by the Seller) or the conditions set forth in Section 5.2(a) or Section 5.2(b) (in the case of a material breach by the Buyer) not to be satisfied and such breach is not cured within ten (10) days following delivery of written notice of such breach by the Buyer (in the case of a material breach by the Seller) or the Seller (in the case of a material breach by the Buyer) to the other; and

(c)     the Buyer or the Seller may terminate this Agreement by giving written notice to the other if the Closing shall not have occurred on or before one hundred and twenty (120) days after the date of this Agreement by reason of the failure of (i) in the case of a termination by the Buyer, any condition precedent under Section 5.1 (unless the failure results from a material breach by the Buyer of any representation, warranty, covenant or agreement contained in this Agreement) or (ii) in the case of a termination by the Seller, any condition precedent under Section 5.2 (unless the failure results from a material breach by the Seller of any representation, warranty, covenant or agreement contained in this Agreement).

(d)     by Buyer or Seller upon the Bankruptcy Court approving Seller's entry into an Alternative Transaction; provided, however, that, notwithstanding anything to the contrary set forth in this Agreement, including without limitation, this Section 8.1(d), if Buyer is the Alternate Bidder (as

38

defined in the Bidding Procedures), Buyer cannot terminate this Agreement until the Alternate Bid Expiration Date (as defined in the Bidding Procedures);

(e)     by Buyer, if the Bankruptcy Case (i) shall have been dismissed or withdrawn for any reason or (ii) is converted to a case under chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed pursuant to the Bankruptcy Code or the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material portion of the Acquired Assets;

(f)     by Buyer, if the Bidding Procedures Order has not been entered by the Bankruptcy Court within twenty (20) days after the date of this Agreement

(g)     by Buyer, if the Bankruptcy Sale Order has not been entered by the Bankruptcy Court within sixty-five (65) days after the date of this Agreement; or

(h)     by Buyer, if the Bidding Procedures Order (including the Bidding Procedures and Bidding Incentives) or the Bankruptcy Sale Order is modified in any respect without the consent of Buyer; **provided, however**, Buyer shall exercise its reasonable discretion; and **provided, further**, that no such modification shall be adverse to Buyer.

8.2     Effect of Termination. If any Party terminates this Agreement pursuant to **Section 8.1**, all obligations of the Parties to this Agreement (except for this **Section 8.2**, **Article XI**, and **Sections 4.1(a), 4.6(b), 8.3, 12.1, 12.8, 12.10, and 12.11**, which provisions shall survive any such termination) shall terminate without any liability of any party to this Agreement to any other such party. Notwithstanding the foregoing, termination of this Agreement shall not relieve any Party from liability for any Damages resulting from any breach which occurs prior to such termination. For all legal purposes which may arise, if the Buyer or the Seller terminates this Agreement pursuant to the terms of **Section 8.1**, such termination shall be effective with respect to all parties to this Agreement.

8.3     Fees and Expenses.

(a)     Intentionally omitted.

(b)     The Bidding Incentives shall be payable by the Seller if (i) the Buyer or the Seller terminates this Agreement pursuant to **Section 8.1(d)**, or (ii) the Buyer or the Seller terminates this Agreement pursuant to any of **Sections 8.1(e), 8.1(f), 8.1(g), or 8.1(h)**, provided that (1) at the time of such termination an Alternative Transaction (including, any other transaction or series of transactions involving the sale, license, or other disposition of substantially all of the Acquired Assets) has been proposed in writing or announced, (2) the value offered to the Seller is at least as great as the value under this Agreement after providing for the Bidding Incentives, and (3) such Alternative Transaction closes within three (3) months following the date of termination of this Agreement. In this event, the Bidding Incentives shall be payable to the Buyer (less any amounts previously paid by the Seller to the Buyer pursuant to **Section 8.3(a)**), provided that such Bidding Incentives shall be paid to the

39

Buyer solely upon the consummation of such Alternative Transaction (or any other transaction or series of transactions involving the sale, license or other disposition of substantially all the Acquired Assets). Any obligation to pay the Break-Up Fee and/or Reimbursable Expenses hereunder shall constitute an administrative expense of Wolverine's and Seller's estates under section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be payable as specified herein. The Seller and the Buyer agree that the Bidding Incentives were a material inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby and shall be payable to the Buyer as specified herein and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.

(c)     Except as set forth above in this **Section 8.3**, all fees and expenses incurred in connection with this Agreement shall be paid by the party incurring such expenses, whether or not the transactions contemplated by this Agreement are consummated.

(d)     This **Section 8.3**, and the rights and obligations created hereunder, shall survive termination of this Agreement.

**ARTICLE IX**
**EMPLOYEE MATTERS**

9.1     Employment.

(a)     The Seller shall terminate the employment of the Business Employees immediately prior to the Closing Date. The Buyer shall offer employment in substantially the same job position and at the same rate of pay to all Business Employees who (i) meet the Buyer's standard employment criteria with respect to drug and background testing, (ii) have a valid authorization to work in the United States, and (iii) agree to comply with all policies and procedures required of the Buyer's other employees, which policies and procedures shall not be materially different from those of the Seller for the first sixty (60) days following the Closing Date. The Buyer shall retain all such Business Employees who accept such employment and who comply with such policies and procedures for a period of at least sixty (60) days following the Effective Date, unless any such Business Employees are otherwise terminated for cause. In the event that the Buyer has not verified with respect to any Business Employee that any or all of the conditions in **Section 9.1(a)(i), (ii) and (iii)** are true or in effect, as applicable, prior to the Closing Date, the Buyer will hire such Business Employee as of the Closing Date, conditioned upon the Buyer's right to terminate such Business Employee subsequently in the event that any of such conditions of this **Section 9.1(a)** are not true.

(b)     Latinoamerica and the Seller shall cause WLV Mexico to terminate the employment of the Mexican Business Employees on or prior to the Closing Date. Mueller Mexican Affiliate shall (or shall cause an Affiliate to) offer employment in substantially the same job position and at the same rate of pay to all Mexican Business Employees who as of the Closing (i) meet Mueller Mexican Affiliate's (or its Affiliate's) standard employment criteria with respect to drug and background testing, (ii) have a valid authorization to work in Mexico, and (iii) agree to comply with all policies and procedures required of Mueller Mexican Affiliate's (or its Affiliate's) other employees. In the event that Mueller Mexican Affiliate (or its Affiliate) has not verified with respect to any Mexican Business

40

Employee that any or all of the conditions in **Section 9.1(b)(i), (ii) and (iii)** are true, Mueller Mexican Affiliate (or its Affiliate) will hire such Mexican Business Employee as of the Closing Date, conditioned upon Mueller Mexican Affiliate's (or its Affiliate's) right to terminate such Mexican Business Employee subsequently in the event that any of such conditions of this **Section 9.1(b)** are not true.

9.2     **Employee Benefits**. Except as otherwise provided in **Section 9.3**, neither the Buyer nor Mueller Mexican Affiliate shall assume any liability for any amount (including, without limitation, any compensation or benefits, or any severance or retention payments) to which any Business Employee or Mexican Business Employee is or becomes entitled under any agreement relating to employment or union contract, Employee Benefit Plan, or applicable Law with respect to the employment of such Business Employee by the Seller or of such Mexican Business Employee by WLV Mexico that exists or arises (or may be deemed to exist or arise) as a result of (i) the sale of the Business hereunder, (ii) the failure of such Business Employee or Mexican Business Employee to accept employment with the Buyer or Mueller Mexican Affiliate (or their Affiliate) or to meet all of criteria set forth in **Section 9.1**, or (iii) the employment of any Business Employee or Mexican Business Employee prior to the Closing Date. The Buyer shall provide coverage under a group health plan to the Business Employees who are hired by the Buyer (and their qualified beneficiaries) commencing immediately after the Closing.

9.3     **U.S. WARN Act**. On the condition that the Buyer complies with **Section 9.1(a)**, the Seller assumes responsibility for any liabilities or obligations arising under WARN or other similar applicable Law with respect to any "plant closing" or "mass layoff" (as defined under WARN) with respect to the Business Employees resulting from the Seller's sale of assets to the Buyer and the Seller's termination of employment of the Business Employees and the Seller shall indemnify, defend, and hold the Buyer harmless from all Damages arising from or related to any such liabilities or obligations. If any liabilities or obligations under WARN or other similar applicable Law with respect to any "plant closing" or "mass layoff" (i) arise out of, result from, or are directly attributable to, the Buyer's failure or refusal to comply with the Buyer's obligations under **Section 9.1(a)** or (ii) arise after the Business Employees commence their employment with the Buyer (except in the event arising as a result of their employment being terminated consistent with the provisions of **Section 9.1(a)**), all such liabilities and obligations shall be and shall be deemed to be assumed by the Buyer and the Buyer shall indemnify, defend, and hold the Seller harmless from all Damages arising from or related to any such liabilities or obligations.

## ARTICLE X
## OTHER POST-CLOSING COVENANTS

10.1     Non-Compete/Non-Solicitation Agreements.

(a)     Each of the Seller, Wolverine, and Latinoamerica hereby agrees that from and after the Closing Date and continuing for five (5) years from and after the Closing Date (the "Restriction Term"), it shall not, directly or indirectly, (i) as an owner, agent, consultant, manager, partner or in any other capacity, without the prior written consent of the Buyer, operate, manage, control, engage in, invest in, or participate in any manner in the Business, or (ii) act as an advisor to, or render services to any Person that engages in, owns, operates, manages, or controls any venture or enterprise that directly or indirectly engages in, or, to the Knowledge of the Seller, Wolverine, or Latinoamerica, as applicable, proposes to engage in, the Business, in any of Mexico, the United States of America, or Canada (collectively, the "Restricted Territory"); **provided, however,** that nothing contained in this **Section 10.1(a)** shall be construed to prevent the Seller, Wolverine, or Latinoamerica from investing in the securities of any such Person so long as such party is not involved in the business of such Person and such

41

party does not own more than five percent (5%) of the securities of such Person. Notwithstanding the other provisions of **Section 10.1(a)**, the parties to this Agreement recognize and agree that Wolverine is in the copper tube manufacturing and distribution business and will continue doing such business with its customers and suppliers or with potential customers or suppliers, any of which also (A) may engage in business activities that are similar to those of the Business or (B) may be customers, clients or suppliers or potential customers, clients or suppliers of third parties that engage in business activities that are similar to those of the Business after the Closing Date, and that nothing in the forgoing provisions of this **Section 10.1(a)** is intended to prohibit Wolverine from engaging in its copper tube manufacturing and distribution business so long as Wolverine does not engage in the Business in the Restricted Territory or own, operate, manage, control, invest in (except as permitted by this **Section 10.1(a)**), or provide consulting or advisory services with respect to the Business, to a third party that engages in, or, to the Knowledge of Wolverine, proposes to engage in, the Business in the Restricted Territory.

(b)       During the Restriction Term, none of the Seller, Wolverine, or Latinoamerica (or any of the Affiliates of Wolverine) shall, directly or indirectly, as an owner, agent, consultant, manager, partner or in any other capacity without the prior written consent of the Buyer, employ, engage, recruit or solicit for employment or engagement, any Business Employee or Mexican Business Employee (except as otherwise provided for in the Transition Services Agreement), or otherwise seek to influence or alter any such Business Employee's or Mexican Business Employee's relationship with the Buyer or Mueller Mexican Affiliate (or any of their respective Affiliates) during the period in which such Business Employee or such Mexican Business Employee is employed by any of the Buyer or Mueller Mexican Affiliate (or their respective Affiliates); **provided, however**, for the purposes of this **Section 10.1(b)**, the phrase "employ, engage, recruit or solicit for employment or engagement" (or any one of such terms individually) shall not include or be deemed to mean the public announcement or distribution of information regarding job openings or positions to be filled or the offer of employment to or employment of any Business Employee or Mexican Business Employee who independently responds to such publicly announced or distributed information.

(c)       Each of the Seller, Wolverine, and Latinoamerica acknowledges that the Buyer has required that the Seller, Wolverine, and Latinoamerica make the agreements in this **Section 10.1** as a condition to the Buyer's consummation of the transactions contemplated by this Agreement. Each of the Seller, Wolverine, and Latinoamerica acknowledges that the agreements contained in this **Section 10.1** are reasonable (including with respect to duration, geographical area and scope) and necessary to protect the legitimate interests of the Buyer, including the preservation of the Business, and that any violation or breach of this **Section 10.1** will result in substantial and irreparable harm to the Buyer for which no adequate remedy would exist at law. Accordingly, in addition to any relief at law that may be available to the Buyer for such violation or breach and regardless of any other provision contained in this Agreement, the Buyer will be entitled to injunctive and other equitable relief restraining such violation or breach.

10.2   Use of Names.

(a)       The Buyer and its Affiliates shall have a non-exclusive, non-transferable, fully-paid, and royalty-free license (without the right to sublicense such rights) to use the Licensed Marks solely in connection with the conduct of the Business in the ordinary course and consistent with past practice upon the terms and conditions set forth in the Transition Services Agreement.

42

(b)     Notwithstanding anything to the contrary in this **Section 10.2**, from and after the Closing, the Buyer shall, and shall cause each of its Affiliates to, make legible and prominently clear in all correspondence, communications or other dissemination of information regarding the Business made by the Buyer or any of its Affiliates that the Business is no longer affiliated with the Seller or Wolverine.

10.3     <u>Confidentiality by the Seller and Affiliates.</u>

(a)     During the Restricted Period, each of the Seller, Wolverine, and Latinoamerica will keep confidential and will not divulge the following information relating to the Business: (i) any Intellectual Property, (ii) historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, personnel training and techniques and materials, however documented, (iii) any other proprietary information with respect to the Business, including without limitation customer lists, and (iii) any and all notes, analyses, compilations, studies, summaries and other material containing or based, in whole or in part, on any information included in the foregoing ("<u>Confidential Information</u>"). Each of the Seller, Wolverine, and Latinoamerica acknowledges that any disclosure of such Confidential Information during the Restricted Period (other than (A) as permitted in this Agreement or (B) following the Closing, for the sole benefit of the Buyer or its Affiliates) would be wrongful and would cause irreparable harm to the Buyer. During the Restricted Period, each of the Seller, Wolverine, and Latinoamerica will use reasonable precautions to protect all tangible embodiments of the Confidential Information in its possession from unauthorized persons or disclosure. The foregoing obligations of confidentiality will not apply to any Confidential Information that is or subsequently becomes generally known or available to the public, industry, or trade, other than as a direct or indirect result of the breach of this Agreement by the Seller, or, subject to the provisions of **Section 10.3(c)**, is required to be disclosed under Law or by a Governmental Entity (including, without limitation, the Bankruptcy Court).

(b)     Notwithstanding the provisions of **Section 10.3(a)**, and recognizing that each of the Seller, Wolverine, and Latinoamerica are in the manufacturing and distribution business and may continue doing business with their respective customers, clients and suppliers or potential customers, clients or suppliers which also may be customers, clients and suppliers or potential customers, clients or suppliers of the Business after the Closing Date, nothing in the forgoing provisions of this **Section 10.3** is intended to prohibit the ability of the Seller, Wolverine, Latinoamerica or any of their respective Affiliates from using and applying their respective knowledge, expertise and experience in the Business or the Confidential Information in a manner which is not prohibited under **Section 10.1 or Section 10.3(a).**

(c)     In the event that the Seller, Wolverine, or Latinoamerica is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, the Seller will notify the Buyer promptly of the request or requirement so that the Buyer may seek an appropriate protective order or waive compliance with the provisions of **Section 10.3(a)**. If, in the absence of a protective order or the receipt of a waiver from the Buyer, the Seller, Wolverine, or Latinoamerica is, on the advice of counsel, compelled or required to disclose any Confidential Information, the Seller, Wolverine, or Latinoamerica, as applicable, may disclose the Confidential Information.

43

10.4   Post-Closing Access and Cooperation.

(a)      After the Closing Date, each Party shall provide (and shall cause its respective Affiliates to provide) the other Party with such reasonable assistance as may be requested by the other Party in connection with any matter, dispute, claim or audit of any kind or nature whatsoever or the preparation of any response, demand, inquiry, filing, disclosure or the like (including, but not limited to, any tax return or form) relating to the Acquired Assets, the Mexican Facility Contracts, the WLV Mexico Contracts, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities, or the Business. Such assistance shall include, but not be limited to, permitting the Party requesting assistance to have reasonable access to the employees, books and records of the other party (or its Affiliates). Subject to the terms of the Transition Services Agreement, the reasonable cost of any such assistance shall be paid by the requesting Party.

(b)      After the Closing, the Seller shall be entitled to retain copies of any or all of the books and records of the Business following the Closing and to use the information contained therein solely for the purposes relating, directly or indirectly, to the Bankruptcy Case and the winding down of its affairs. In addition to the foregoing, the Buyer shall afford the Seller reasonable access, upon reasonable notice during normal business hours or at other reasonable times to books and records included within the Acquired Assets and to former employees of the Seller or of WLV Mexico who are employed by the Buyer as contemplated by **Section 9.1** solely for the Seller to administer and wind down the estate of the Seller and its Affiliates.

(c)      In addition to the other terms and conditions of this Agreement, the parties hereby agree that, at or following the Closing, the Seller shall promptly remit to the Buyer any mail or other communications, including, without limitation, any written or e-mail inquiries and payments received by the Seller relating to the Business or the Acquired Assets and any invoices received by the Seller relating to the Assumed Liabilities. Following the Closing, the Buyer shall promptly remit to the Seller any mail or other communications, including, without limitation, any written or e-mail inquiries and payments received by the Buyer relating to the Excluded Assets and any invoices received by the Buyer relating to any liabilities or obligations other than the Assumed Liabilities.

## ARTICLE XI
## DEFINITIONS

For purposes of this Agreement, each of the following terms shall have the meaning set forth below.

"Acquired Assets" shall mean, solely to the extent not specifically included in the definition of Excluded Assets, all assets, properties and rights of the Seller or its Affiliates of every kind, nature, character and description, tangible and intangible, real, personal or mixed, wherever located, existing as of the Closing which are utilized in and necessary for the continued operation of the Business, including the following assets, in each case to the extent owned by the Seller or its Affiliates:

(a)      all Fixed Assets;

(b)     all Inventory and other inventory of office supplies, maintenance supplies and packaging materials, together with spare parts, supplies, and promotional materials;

(c)     all Intellectual Property (other than the Licensed Marks and the information technology and computer software which is owned or licensed by Wolverine and which is made available to the Seller, Latinoamerica, and WLV Mexico as Affiliates of Wolverine);

(d)     all Designated Contracts and Mexican Designated Contracts, except those designated as "to be terminated" or "not to be assumed" on **Schedule 2.10**;

(e)     all technical information, quality control data, and other confidential business information, including, without limitation, customer lists and vendor lists;

(f)     to the extent transferable, all licenses, permits, authorizations or franchises issued by any Governmental Entity;

(g)     all goods and services and all other economic benefits to be received subsequent to the Closing arising out of prepayments and payments by the Seller prior to the Closing, to the extent that the Seller has otherwise received a credit for any such prepayment or payment pursuant to the calculation of the Purchase Price (either through payment of the Inventory Purchase Price or the Proration Adjustment);

(h)     all books (other than equity ownership record books and minute books of the Seller, or its Affiliates), records, listing of telephone numbers (and related listing arrangements), customer and supplier lists, pricing and cost information, and business and marketing plans and proposals, confidential business information, advertising and promotional materials, advertising and promotional materials, accounts, ledgers, files, documents, correspondence, studies, reports and other printed or written materials, and employee files, in all events subject to any restrictions imposed by or any consent which must be obtained in accordance with applicable Law;

(i)     all goodwill other than the goodwill associated with the Licensed Marks.

"Affiliate" shall mean, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with any such Person and any officer, director or controlling Person of such Person.  For purposes of this definition, "control" (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the preliminary statement of this Agreement.

45

"Alternate Bid" shall have the meaning set forth in **Section 13.10(b)**.

"Alternative Bidder" shall have the meaning set forth in **Section 13.10(b)**.

"Alternate Bid Expiration Date" shall have the meaning set forth in **Section 13.10(b)**.

"Alternative Transaction" means (a) the sale (whether by stock sale, merger, consolidation or otherwise) of a controlling (as defined in the definition of Affiliate) portion of the equity interests of the Seller or Wolverine, (b) the sale of all or a substantial portion of the Acquired Assets pursuant to the Bidding Procedures to any Person other than Buyer or its Affiliates, or (c) a transaction or series of transactions independent of and not in compliance with the Bidding Procedures involving the sale or transfer of all or a substantial portion of the Acquired Assets to a person other than Buyer or its Affiliates, excluding the sale of Inventory in the ordinary course of business consistent with past practice.

"Ancillary Agreements" shall mean the agreements and instruments referred to in **Section 1.3(b)**.

"Approval Motion" shall have the meaning set forth in **Section 4.1(b)**.

"Assumed Liabilities" shall mean and be specifically limited to the following:

       (a)     all liabilities and obligations under the Designated Contracts and the Mexican Designated Contracts (excluding those designated as "to be terminated" or "not to be assumed" on **Schedule 2.10**) accruing on or after the Closing Date;

       (b)     all liabilities and obligations set forth on **Schedule D-1** (including, without limitation, all customer purchase orders and all orders for goods and supplies which have been ordered by the Seller or Latinoamerica in the ordinary course of business, subject to the restrictions set forth in **Section 4.3** and which are not owned by the Seller or Latinoamerica on the Closing Date; **provided, however**, that the Seller shall update such **Schedule D-1** to include any such orders); and

       (c)     any liabilities for which the Seller receives a credit (to the extent of such credit only) pursuant to the Proration Adjustment.

"Auction" shall have the meaning set forth in **Section 13.9(a)**.

"Bankruptcy Case" shall have the meaning set forth in the second recital paragraph under the Introduction section of this Agreement.

"Bankruptcy Code" shall have the meaning set forth in the second recital paragraph under the Introduction section of this Agreement.

"Bankruptcy Court" shall have the meaning set forth in the second recital paragraph under the Introduction section of this Agreement.

"Bankruptcy Sale Order" means the order of the Bankruptcy Court substantially in the form of **Exhibit H** (with only such material changes as are approved by the Buyer and the Seller, which approval shall not be unreasonably withheld), to be issued by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code (i) approving this Agreement and the transactions contemplated under this Agreement, (ii) approving the sale of the Acquired Assets to the Buyer free and clear of all Security Interests pursuant to Section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to the Buyer of any Designated Contracts to be assigned to the Buyer, effective upon the Closing and subject to the Buyer's rights in **Section 1.1(d)**, and finding that all Cure Costs have been satisfied, (iv) finding that the Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, (v) finding that the Buyer is relying on having, immediately after Closing, ownership of the Acquired Assets free and clear of all Security Interests, and that the Buyer would not pay the Purchase Price if it were not receiving for such consideration all of the Acquired Assets free and clear of all Security Interests, and (vi) finding that if the Acquired Assets are not free and clear of all Security Interests upon Closing, then the consideration for the Closing will fail, and the Purchase Price, if paid, will be returned to the Buyer.

"Bid" shall mean a proposal received from a Potential Bidder pursuant to the Bidding Process.

"Bid Deadline" shall have the meaning set forth in **Section 13.6(a)**.

"Bidding Incentives" means, collectively, the Break-Up Fee and the Reimbursable Expenses.

"Bidding Process" shall have the meaning set forth in **Section 13.1(a)**.

"Bidding Procedures" means those bidding procedures described in **Article XIII**.

"Bidding Procedures Order" shall mean an order of the Bankruptcy Court approving, among other things, (a) the Bidding Procedures; (b) the Bidding Incentives as obligations of Wolverine and the Seller having administrative expenses under Section 364(c)(1) of the Bankruptcy Code in the Bankruptcy Case; (c) the Buyer's designation as the stalking horse bidder; (d) the setting of a deadline for the filing of objections to the entry of the Bankruptcy Sale Order; (e) the scheduling the Auction; (f) the scheduling the Sale Hearing; and (g) the implementation of the provisions of **Section 4.1,** substantially in the form attached hereto as **Exhibit G**.

"Break-Up Fee" means Two Hundred and Fifty Thousand Dollars ($250,000).

3/242953.6

"**Business**" shall mean all of the business activities and operations with respect to the manufacture, distribution, or sale of return bends and fabricated assemblies used primarily in the heating, ventilation, air conditioning and refrigeration businesses, as conducted by the Seller or Latinoamerica at or from its Business Properties as of the date of this Agreement.

"**Business Day**" shall mean any day other than a Saturday or a Sunday or a day that is a federal holiday of the United States Government.

"**Business Employees**" shall mean all employees of the Seller with respect to the Business as listed on **Schedule 2.13**.

"**Business Material Adverse Effect**" shall mean any change, effect, event, condition or circumstance that (i) is, or could be reasonably expected to be, materially adverse to the business, assets, liabilities, financial condition or results of operations of the Business (other than changes, effects, events, conditions or circumstances that are the result of economic factors affecting the economy as a whole or that are the result of factors affecting the industry or specific markets in which the Business competes, so long as the Business is not disproportionately affected thereby), or (ii) materially impairs the ability of Wolverine, the Seller, or Latinoamerica to consummate the transactions contemplated by this Agreement; **provided, however,** that a "Business Material Adverse Effect" shall not include any adverse change, effect or circumstance arising out of, resulting from or attributable to (A) actions contemplated by the Parties in connection with this Agreement, (B) the announcement or performance of this Agreement or the transactions contemplated by this Agreement, (C) any change in accounting requirements or principles or any change in applicable Laws or the interpretation thereof occurring after the date of this Agreement, or (D) national or international political or social conditions, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack, in each case so long as the Business is not disproportionately affected thereby.

"**Business Properties**" shall mean the facilities used in the conduct of the Business located on the real estate leased (or to be leased) pursuant to the Mexican Real Estate Lease and the Carrollton Lease and which are described in more detail on **Schedule D-5**.

"**Buyer**" shall have the meaning set forth in the first paragraph of this Agreement.

"**Buyer Certificate**" shall mean a certificate to the effect that each of the conditions specified in **Sections 5.2(a) through (c)** (insofar as clause (c) relates to a judgment, order, decree, stipulation or injection against the Buyer) is satisfied.

"**Buyer Material Adverse Effect**" shall mean a material adverse effect on the ability of the Buyer to consummate the transactions contemplated by this Agreement.

"**Buyer Party**" shall have the meaning set forth in **Section 6.1** of this Agreement.

48

"**Carrollton Lease**" shall mean that certain Lease Agreement, in the form attached hereto as **Exhibit F**, with respect to which the Buyer shall lease from the Seller the 166,000 square foot building located at 2101 W. Beltline Road, Carrollton, Texas.

"**Claim Notice**" shall mean a written notice which contains (i) a reasonably specific description and, to the extent known, amount of any Damages incurred by the Indemnified Party, (ii) a statement that the Indemnified Party is entitled to indemnification under **Article VI** and a reasonable explanation of the basis therefor, (iii) a demand for payment in the amount of such Damages, and (iv) if applicable and to the extent available, copies of all relevant documentation (including any summons, complaint, pleading, written demand or other document or instrument).

"**Closing**" shall mean the consummation of the transactions contemplated by this Agreement.

"**Closing Date**" shall have the meaning set forth in **Section 1.3(a)**.

"**Closing Statement**" shall mean a statement calculating the Final Inventory Purchase Price and the Final Proration Adjustment, as more fully described in **Section 1.4(b)**.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**COMEX**" shall mean the Commodities Exchange, a division of the New York Mercantile Exchange.

"**Committee**" shall have the meaning set forth in **Section 13.1(b)**.

"**Component Parts**" shall mean all component or other parts used and owned by the Seller in the conduct of its Business and in the manufacturing of the Finished Goods.

"**Component Price**" shall mean the price for any Component Parts equal to the replacement cost of such purchased Component Parts based on the Seller's most recent third party purchase order price for such Component Parts.

"**Confidential Information**" shall have the meaning set forth in **Section 10.3(a)**.

"**Confidentiality Agreement**" shall mean the confidentiality agreement dated February 8, 2010 between the Seller and the Buyer.

"**Copper Tube**" shall mean the level wound coil (LWC) and straight length copper tube acquired by the Seller in the conduct of the Business.

"**Copper Tube Price**" shall mean the price for Copper Tube equal to the sum (i) the Copper Value, plus (ii) the actual blended fabrication charges incurred by the Seller from outside suppliers for the Copper Tube in Inventory at the Closing Date, and plus (iii) any freight or import duties actually incurred by the Seller (but only to the extent not already included in (i) or (ii) above), but excluding any anti-dumping duties, which duties shall remain the responsibility of the Seller.

"**Copper Value**" shall mean the price per copper pound equal to, as applicable: (i) for the portion of the copper pounds in Inventory allocated for future sales at the prior-month-average price ("PMA") to be based on the average of the daily closing price per copper pound for the month ending as of close of

49

business on the first Business Day immediately preceding the Closing Date (subject to the PMA Adjustment), or (ii) for the remaining copper pounds in Inventory (i.e., not valued at the PMA) (subject to the PMA Adjustment), the official COMEX spot closing price of COMEX for first Business Day immediately preceding the Closing Date.

"Copper Scrap" shall mean copper discarded from the Business' manufacturing process suitable for re-sale to scrap dealers.

"Cure Costs" means all cash amounts (i) that, pursuant to Section 365 of the Bankruptcy Code, will be required to be paid as of the Closing Date to cure any defaults on the part of the Seller under the Designated Contracts to be assigned to the Buyer or under any other contracts or agreements to which Wolverine or the Seller is a party and which is necessary for Wolverine or the Seller to meet their respective obligations under the Transition Services Agreement or (ii) which must be paid to a nondebtor as a prerequisite to the assumption and assignment of a Designated Contract to be assigned to the Buyer, in each case as a prerequisite to the assumption of such Designated Contract, if applicable.

"Damaged" shall mean, with respect to any Inventory items, items that are not usable for any reason, including without limitation, quality or manufacturing defects or appearance (e.g., discolored tube).

"Damages" shall mean any and all out-of-pocket, monetary damages, fines, losses, claims, causes of action, costs, deficiencies, fees, penalties, expenses and other amounts actually paid (including, without limitation, reasonable attorneys' fees, all amounts paid in defense or settlement, and all amounts paid with respect to any breach of **Article IX**).

"Damages Threshold Amount" shall have the meaning set forth in **Section 6.7(c)**.

"Designated Contracts" shall mean all contracts and agreements to which the Seller is a party and related to the Acquired Assets or the conduct of the Business and listed on **Schedule 2.10**.

"Disclosure Schedule" shall mean the disclosure schedule provided by the Seller to the Buyer on the date hereof, including all of the Schedules hereto.

"Employee Benefit Plan" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA but excluding any plan that is a Multiemployer Plan) and each other employee plan, program, agreement or arrangement, nonqualified deferred compensation, vacation or sick pay policy, fringe benefit plan, compensation, severance or employment agreement, and bonus or other incentive compensation or salary continuation plan or policy, whether formal or informal, oral or written, contributed to, sponsored by, or maintained by the Seller (or its Affiliates, including, without limitation Wolverine) with respect to the Business or the Business Employees for the benefit of any current or former employees of the Business or the Seller with respect to which the Seller (or any of its ERISA Affiliates) has any liability (contingent or otherwise) as of the date of this Agreement, but excluding any "employee benefit plan" required to be maintained or contributed to under foreign Law.

"Environment" shall mean any surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air.

"Environmental Law" shall mean any federal, state, local or foreign statute, regulation, ordinance, rule or common law, or similar provision having the force or effect of law and all judicial and administrative orders and determinations, in effect on the date of this Agreement (and as of the Closing

50

Date with respect to the Seller's Certificate) relating to the protection of the Environment or occupational health and safety.

"Environmental Matters" shall mean any legal obligation or liability arising under any applicable Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any entity which is, or was at a relevant time, a member of (i) a controlled group of corporations (as defined in Section 414(b) of the Code), (ii) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), or (iii) an affiliated service group (as defined under Section 414(m) of the Code or the regulations under Section 414(o) of the Code), any of which includes the Seller.

"Escrow Agent" shall mean Regions Bank, an Alabama banking corporation, or its successor that is also an independent financial institution agreed upon by the Seller and the Buyer, which shall hold the Escrow Amount pursuant to the Escrow Agreement.

"Escrow Agreement" shall mean the Escrow Agreement between the Seller, the Buyer and the Escrow Agent, in substantially the same form and content as shown on **Exhibit C** attached hereto.

"Escrow Amount" shall have the meaning set forth in **Section 1.3(b)(vi)**.

"Estimated Inventory Purchase Price" shall have the meaning set forth in **Section 1.2(c)**.

"Estimated Proration Adjustment" shall have the meaning set forth in **Section 1.2(d)**.

"Excess" shall mean, with respect to any Inventory item, the amount of such item which exceed a nine (9)-month supply of such item (based on an average monthly supply of such item for the twelve (12) month period immediately preceding the Closing Date) or as otherwise mutually agreed to by the Parties.

"Excluded Assets" shall mean the following assets owned or used by the Seller or Latinoamerica:

(a)     all cash and cash equivalents or similar investments, bank accounts, commercial paper, certificates of deposit, Treasury bills and other marketable securities and all accounts receivable and other receivables; **provided, however** that the Buyer will receive a credit in the Proration Adjustment for any prepaid revenues (that is, any amounts received by the Seller as a pre-payment of a customer order);

(b)     the land and improvements thereon owned by the Seller located in Carrollton, Texas with respect to which the Seller will enter into the Carrollton Lease with the Buyer;

(c)     the JD Edwards operating system software (together with all upgrades and improvements) and all other information technology and related computer software and hardware as described on **Schedule D-2**, which is owned or leased by Wolverine and which is made available to the Seller, Latinoamerica, and WLV Mexico, as Affiliates of Wolverine, for the conduct of the Business;

51

(d)    all corporate records, Tax Returns and records and work papers related thereto, information regarding any audit, investigation, dispute, insurance coverage, premium, Employee Benefit Plan, or claim, completed settlements with third parties, or other similar information, and all information or other materials which are subject to any restriction imposed by applicable Law;

(e)    the Licensed Marks, and any Intellectual Property owned or licensed by Wolverine or any Affiliate of Wolverine other than the Seller or Latinoamerica;

(f)    all assets, properties or rights listed on, or arising under the Mexican Real Estate Lease or any of the Designated Contracts or the Mexican Facility Contracts which are designated as "to be terminated"-or "not to be assumed" on Schedule 2.10 or under any other contracts or agreements listed on Schedule D-2 (including, without limitation, insurance policies);

(g)    all rights which accrue or will accrue to the benefit of the Seller or Latinoamerica under this Agreement or any Ancillary Agreement;

(h)    all rights relating to refunds or recoupment of Taxes (except to the extent such rights result from payment by the Buyer of a Tax that is an Assumed Liability) or insurance premiums or deposits or similar accounts which are not transferred or assigned to the Buyer and for which the Seller does not receive a credit pursuant to the Proration Adjustment;

(i)    all actions, claims, causes of action, rights of recovery, choices in action and rights of setoff of any kind arising before, on or after the Closing relating to any other Excluded Asset or any Excluded Liability; and

(j)    all Employee Benefit Plans.

"Excluded Liabilities" shall mean all liabilities and obligations of the Seller:

(a)    which are not specifically included as an Assumed Liability;

(b)    relating exclusively to the Excluded Assets or to the extent related to an Excluded Asset;

(c)    under this Agreement and the Ancillary Agreements;

(d)    for costs and expenses incurred in connection with this Agreement or the consummation of the transactions contemplated by this Agreement (including, without limitation, fees for financial advisors engaged by or on behalf of the Seller, if any);

(e) relating to all employee compensation and benefit arrangements, plans or programs and any employee and payroll outsourcing agreement, including, without limitation, all Employee Benefit Plans and such other employee benefit plans that are or were maintained or contributed to by the Seller or any ERISA Affiliate or Latinoamerica (even by way of third party outsourcing agreements) or WLV Mexico prior to the Closing Date; or

(f) for all Taxes of the Seller or Latinoamerica.

"FCPA" shall mean the United States Foreign Corrupt Practices Act of 1977, as amended.

"Final Closing Statement" shall mean the Closing Statement as finally determined in accordance with **Section 1.4(c) or Section 1.4(d)**, as applicable.

"Final Inventory Purchase Price" shall mean the Inventory Purchase Price as finally determined in accordance with **Section 1.4(c) or Section 1.4(d)**, as applicable.

"Final Order" shall mean an order of the Bankruptcy Court that has not been stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument, rehearing or relief from judgment is then pending and, in the event that any appeal, writ for certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been upheld by the highest court to which such order was appealed, or from which certiorari, reargument or rehearing was sought and the time to take any further appeal, petition for certiorari, or motion for reargument or rehearing shall have expired; **provided, however,** that merely because Rule 9024 of the Federal Rules of Bankruptcy Procedure provides that a motion under Rule 60 of the Federal Rules of Civil Procedure can be filed after such date shall not prevent such Order from being a Final Order.

"Final Proration Adjustment" shall mean the Proration Adjustment as finally determined in accordance with **Section 1.4(c) or Section 1.4(d)**, as applicable.

"Financial Statements" shall mean (i) the unaudited balance sheet and income statement of the Seller as of and for the fiscal year ended December 31, 2009 and (ii) the unaudited balance sheet and income statement of the Seller as of and for the year-to-date period ended as of October 3, 2010 (the "Interim Financial Statements").

"Finished Goods" shall mean those finished goods as produced by the Seller in the Business comprised of return bends and fabricated assemblies used primarily in the heating, ventilation, air conditioning and refrigeration businesses.

"Fixed Assets" shall mean all computer hardware (other than the computer hardware owned or leased by Wolverine, as described on **Schedule D-2**, and made available to the Seller, Latinoamerica, and WLV Mexico as Affiliates of Wolverine for use in the Business), equipment, furniture, furnishings, fixtures, machinery, vehicles, tools and tooling and other tangible personal property used, held for use, or useful for the continued operation of the Business, but excluding the Inventory and any Excluded Assets.

"Fixed Assets Purchase Price" shall have the meaning set forth in **Section 1.2(b)**.

"GAAP" shall mean the United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Goods in Transit" shall mean all items (i) ordered and owned on the Closing Date by the Seller in the ordinary and customary conduct of the Business (based on historical practice) with respect to the manufacture of any Finished Goods and (ii) which are in transit and due to arrive at a Business Property after the Closing Date.

"Governmental Entity" shall mean any court, arbitrational tribunal, administrative agency or commission or other governmental or regulatory authority or agency, whether federal, local or foreign.

"Governmental Filings" shall mean all registrations, filings and notices with or to Governmental Entities.

"Indemnification Cap" shall have the meaning set forth in Section 6.7(a).

"Indemnified Party" shall mean the party entitled to indemnification under Article VI.

"Indemnifying Party" shall mean the party from whom indemnification is sought by the Indemnified Party pursuant to Article VI.

"Inventory" shall mean all of the following items of inventory which are physically present at any Business Property or otherwise owned by the Seller as of the Closing Date and which will be transferred to the Buyer at Closing:

      (a)      Copper Tube;

      (b)      Component Parts;

      (c)      Work in Process;

      (d)      Finished Goods;

      (e)      Copper Scrap; and

      (f)      Goods in Transit.

"Inventory Purchase Price" shall have the meaning set forth in Section 1.2(c).

"Inventory Inspection" shall have the meaning set forth in Section 1.4(a).

"Intellectual Property" shall mean any or all of the following which are used by Seller or Latinoamerica in the operation of the Business: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, slogans, trade names, and Internet domain names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations,

54

and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets (including ideas, research and development data, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications), (f) all computer software (including source code, executable code, data, databases, and related documentation), except the computer software that is owned or licensed from a third party by Wolverine, as described on **Schedule D-2**, and made available to the Seller, Latinoamerica, and WLV Mexico as Affiliates of Wolverine for use in the Business, (g) all other intellectual property rights, and (h) all copies and tangible embodiments thereof (in whatever form or medium).

"IRS" shall mean the Internal Revenue Service.

"Knowledge" shall mean the actual knowledge, after reasonably diligent inquiry, of the individuals named on **Schedule D-3** in the case of the Seller (and including in the case of Latinoamerica), and the individuals named on **Schedule D-4** in the case of the Buyer.

"L&OH Rate" means the average labor and overhead rate calculated on a per pound of copper basis, which shall be based on the actual costs of production divided by the actual volume of production in pounds of copper for the Business during the 12-month period immediately preceding the Closing Date. For purposes of this definition, "costs of production" shall mean wages, salaries and benefits; utilities; depreciation expense with respect to the facility and equipment; and equipment rental, insurance, tooling, repairs and maintenance expenses, all of the foregoing solely to the extent directly related to the production of the Finished Goods.

"Latinoamerica" shall have the meaning set forth in the first paragraph of this Agreement.

"Law" means any domestic or foreign, federal, state or local law, statute, ordinance, rule, administrative ruling, common law, regulation, order, writ, award, judgment, injunction, directive, decree or other requirement of any Governmental Entity.

"Leases" shall mean any lease or sublease included in the Acquired Assets and pursuant to which the Seller leases or subleases from another party any real property.

"Licensed Marks" shall mean the trade names and trademarks described on **Schedule 9.1**, which are all of the trade names and trademarks used in the operation of the Business.

"Maquila Program" means the program authorized by the Mexican Ministry of Economy for the benefit of Latinoamerica to carry out *maquila* activities pursuant to the *Decreto para el Fomento de la Industria Manufacturera de Exportacion.*

"Materials of Environmental Concern" shall mean any hazardous substance, pollutant or contaminant, as those terms are defined under the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, solid waste and hazardous waste, as those terms are defined in the Federal Resource Conservation and Recovery Act (as in effect on the date of this Agreement) and oil, petroleum and petroleum products, or any other substance as to which liability or standards of conduct may be imposed pursuant to any Environmental Law.

3/242953.6

"Mexican Business Employees" shall mean all employees, workers, exempt employees, and unionized employees of WLV Mexico with respect to the Business conducted at the Business Property located in Mexico who are listed on **Schedule 2.13**.

"Mexican Designated Contracts" shall mean the contracts and agreements to which Latinoamerica is a party and which will be assumed by Mueller Mexican Affiliate as of the Closing Date and are identified on **Schedule D-7**.

"Mexican Facility Contracts" shall have the meaning set forth in the first recital paragraph under the Introduction section of this Agreement.

"Mexican Real Estate Lease" means that certain Lease Agreement entered into on November 2, 2009, by and between WLVN Latinoamerica, S. de R.L. de C.V., and Banco HSBC, S.A., Institución de Banca Multiple, Grupo Financiero HSBC, in its capacity as trustee of trust No. 243280.

"Mueller" shall have the meaning set forth in the first paragraph of this Agreement.

"Mueller Mexican Affiliate" shall have the meaning set forth in the first paragraph of this Agreement.

"Multiemployer Plan" shall mean a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

"Neutral Accountant" shall mean the independent regionally or nationally-recognized certified public accounting firm mutually agreed upon in writing by the Seller and the Buyer, which engagement must be completed promptly in the event that a Neutral Accountant is required pursuant to **Section 1.4(d)**. In the event that the Parties promptly do not engage the Neutral Accountant, an independent regionally or nationally-recognized certified public accounting firm that has no current or prior relationship to any Party or the officers, directors, employees or Affiliates of any Party shall be appointed by the chief judge of the United States District Court for the District of Delaware or the Bankruptcy Court, if the Bankruptcy Case is then pending.

"Non-Solicitation Period" shall have the meaning set forth in **Section 4.1(e)**.

"Non-Surviving Representations" shall mean those representations set forth in **Sections 2.1, 2.2, 2.3, 2.4, 2.5, 2.7(a), 2.8(a), 2.9, 2.12, 2.20, 2.24, 2.25, 3.1, 3.2, 3.3, and 3.4**.

"Noteholders" shall have the meaning set forth in **Section 13.1(b)**.

"Notice Parties" shall have the meaning set forth in **Section 13.6**.

"Obsolete" shall mean, with respect to any Inventory items, such items that are no longer used by the Seller in production or sold by the Seller due to design or customer changes, unless the Parties otherwise mutually agree in writing.

"Party" or "Parties" shall have the meaning set forth in the first paragraph of this Agreement.

"Permits" shall mean all permits, licenses, franchises or authorizations from any Governmental Entity included in the Acquired Assets or held by the Seller or Latinoamerica for the purpose of conducting the Business.

3/242953.6

"**Person**" shall mean an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Entity.

"**Petition Date**" shall have the meaning set forth in the second recital paragraph under the Introduction section of this Agreement.

"**PMA Adjustment**" shall mean an adjustment to the portion of the Inventory Purchase Price based on (i) comparing the pounds of copper priced at PMA as of the Closing Date to actual invoiced pounds of copper priced at PMA for the next full calendar month immediately following the Closing Date and (ii) (A) if the actual invoiced pounds of copper priced at PMA made in the next full calendar month immediately following the Closing Date are less than the pounds of copper priced at PMA as of the Closing Date, repricing such quantity difference at the official COMEX spot closing price of COMEX on the first Business Day immediately preceding the Closing Date, or (B) if the pounds of copper priced at PMA as of the Closing Date are less than the actual invoiced pounds of copper priced at PMA made in the next full calendar month immediately following the Closing Date, repricing such quantity difference at the official COMEX spot closing price for the month ending as of close of business on the first Business Day immediately preceding the Closing Date.

"**Potential Bidder**" shall have the meaning set forth in **Section 13.4(a)**

"**Proration Adjustment**" shall have the meaning set forth in **Section 1.2(d)**.

"**Purchase Price**" shall have the meaning set forth in **Section 1.2(a)**.

"**Qualified Bid**" shall have the meaning set forth in **Section 13.7(a)**.

"**Qualified Bidder**" shall have the meaning set forth in **Section 13.7(b)**.

"**Reimbursable Expenses**" means the reasonable, documented out-of-pocket fees and expenses actually incurred by the Buyer and its Affiliates prior to termination of this Agreement in connection with this Agreement, the Ancillary Agreements, the Bankruptcy Case, the Bidding Procedures Order, the Bankruptcy Sale Order, and the transactions contemplated hereby and thereby, including the reasonable fees and expenses of legal counsel, financial advisors, consultants, and any other advisors that Buyer engages in its reasonable discretion. Reimbursable Expenses shall not exceed One Hundred Thousand Dollars ($100,000) and shall be payable in cash pursuant to **Section 8.3(b)** to the extent applicable.

"**Release**" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the Environment.

"**Required Consents**" shall have the meaning set forth in **Section 1.5**.

"**Required Deposit**" shall have the meaning set forth in **Section 13.7(a)**.

"**Restriction Term**" shall have the meaning set forth in **Section 10.1(a)**.

"**Restricted Territory**" shall have the meaning set forth in **Section 10.1(a)**.

"**Sale Hearing**" shall have the meaning set forth in **Section 13.10(a)**.

3/242953.6

"Security Interest" shall mean any mortgage, deed of trust, pledge, security interest, encumbrance, conditional sales contract, claim, restriction, covenant, easement, right of way, title defect, charge, license or other lien (whether arising by contract or by operation of Law); **provided, however**, the following shall not constitute a Security Interest: (i) mechanic's, materialmen's, landlord's and similar liens arising or incurred in the ordinary course of business for amounts which are not delinquent, (ii) liens arising under worker's compensation, unemployment insurance, social security, retirement and similar legislation for amounts not yet due and payable, (iii) liens on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the ordinary course of business, (iv) liens for Taxes not yet due and payable, (v) liens for Taxes which are being contested in good faith and by appropriate proceedings, (vi) liens relating to capitalized lease financings or purchase money financings that have been entered into in the ordinary course of business, (vii) liens arising solely by action of the Buyer, (viii) recorded easements, covenants and other restrictions which do not materially impair the current uses of any Business Property, or (ix) liens disclosed on **Schedule D-6** in the Disclosure Schedule.

"Seller" shall have the meaning set forth in the first paragraph of this Agreement.

"Seller Certificate" shall mean a certificate to the effect that each of the conditions specified in **Sections 5.1(a) through (c)** (insofar as clause (c) relates to a judgment, order, decree, stipulation or injunction against the Seller) is satisfied.

"Seller Party" shall have the meaning set forth in **Section 6.2**.

"Seller Representatives" shall have the meaning set forth in **Section 4.1(c)**.

"Settlement Statement" shall mean a closing statement signed by both Parties as of the Closing Date reflecting the estimated Purchase Price as of the Closing Date, based on the Fixed Assets Purchase Price, the Estimated Inventory Purchase Price, and the Estimated Proration Adjustment agreed to by the Parties as of the Closing Date.

"SSA" shall have the meaning set forth in **Section 2.13(e)**.

"Starting Auction Bid" shall have the meaning set forth in **Section 13.9(b)**.

"Successful Bid" shall have the meaning set forth in **Section 13.9(f)**.

"Successful Bidder" shall have the meaning set forth in **Section 13.9(f)**.

"Supply Agreement" shall mean that certain Supply Agreement, in the form attached hereto as **Exhibit E**, whereby the Buyer will agree to purchase brazing alloy rings from Wolverine Joinings Technologies, LLC or another Affiliate of the Seller.

"Surviving Representations" shall mean those representations set forth in **Sections 2.6, 2.7(b), 2.7(c), 2.10, 2.11, 2.13, 2.14, 2.15, 2.16, 2.17, 2.18, 2.19, 2.21,2.22, 2.23, 3.5, and 3.6**.

"Tax Allocation" shall have the meaning set forth in **Section 1.2(e)**.

"Taxes" shall mean all taxes, including income, gross receipts, ad valorem, value-added, excise, real property, personal property, sales, use, transfer, withholding, employment, social security charges, franchise taxes, and any other tax of any kind, whether disputed or not, and by whatever Governmental Entity imposed, including the United States of America or any state, local or foreign government, or any

58

agency thereof, or other political subdivision of the United States or of any such government, together with any interest, penalties, assessments or additions to tax resulting from, attributable to, or incurred in connection with any tax or any contest or dispute thereof.

"Taxing Authority" shall mean any applicable Governmental Entity responsible for the imposition of Taxes.

"Tax Returns" shall mean all reports, returns, declarations, statements, forms, claims for refunds or other information (including any related schedules, statements or information, and amended returns) supplied or required to be supplied to a Taxing Authority in connection with Taxes.

"Transition Services Agreement" shall mean the Transition Services Agreement, in a form mutually agreeable to the Seller and the Buyer, to be attached as **Exhibit D**, with respect to Wolverine's (or any of its Affiliates') continuing to (i) provide to the Buyer certain information technology services and other services and certain computer hardware, which are used by the Seller or provided to the Seller by one or more of the Seller's Affiliates on the date of this Agreement, for the Buyer to conduct the Business in substantially the same manner as conducted by the Seller, and (ii) grant to the Buyer a license to use the Licensed Trademarks upon certain terms and conditions. The Seller and the Buyer shall act in good faith and use reasonably diligence efforts to negotiate and agree on the form of the Transition Services Agreement as soon as reasonably possible following the date of this Agreement, but in all events on or before November 19, 2010.

"Unrestricted Claims" shall have the meaning set forth in **Section 6.7(a)**.

"Waiving Party" shall have the meaning set forth in **Section 5.3**.

"WARN" shall mean the Worker Adjustment and Retraining Notification Act.

"WLV Mexico" shall mean WLV Mexico, S. de R.L. de C.V., a Mexican *sociedad de responsabilidad limitada de capital variable*, which is a wholly-owned subsidiary of Wolverine and is the employer of all of the Mexican Business Employees.

"WLVN Maquila Agreement" shall mean the manufacture and assembly agreement dated October 4, 2004, between Latinoamerica and Seller.

"WLV Mexico Contracts" shall mean the contracts to which WLV Mexico is a party and which are set forth on **Schedule 2.10**, but which shall not be assumed by the Buyer or Mueller Mexican Affiliate (or any of their Affiliates) as part of the transaction contemplated by this Agreement.

"Wolverine" shall have the meaning set forth in the first paragraph of this Agreement.

"Work in Process" shall mean all items of work in process in the conduct of the Business, which are owned by the Seller.

**ARTICLE XII**
**GENERAL TERMS**

12.1    <u>Press Releases and Announcements</u>. No Party shall issue (and each Party shall cause its Affiliates not to issue) any press release or public disclosure relating to the subject matter of this

Agreement without the prior written approval of the other Party; **provided, however,** that any Party may make any public disclosure it believes in good faith is required by Law, regulation or stock exchange rule (in which case the disclosing Party shall advise the other Party or Parties and the other Party or Parties shall, to the extent permitted by Law, have the right to review and comment on such press release or announcement, and the disclosing Party shall incorporate all reasonable comments of the other Party, prior to its publication).

12.2    No Third Party Beneficiaries. Except as set forth in **Article VI** with regard to the Buyer Parties and the Seller Parties, this Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns and, to the extent specified herein, their respective Affiliates.

12.3    Entire Agreement. This Agreement (including the Ancillary Agreements and the Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the Buyer and Mueller, on the one hand, and the Seller, Latinoamerica, and Wolverine, on the other hand. This Agreement supersedes any prior agreements, term sheets or understandings among the Buyer, on the one hand, and the Seller, on the other hand.

12.4    Succession and Assignment. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party and such approval as may be required under the Bankruptcy Code or the Bankruptcy Court or any order thereof. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective Affiliates that are also parties to this Agreement, and their respective successors and permitted assigns.

12.5    Notices. All notices, requests, demands, claims and other communications pursuant to this Agreement shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered and effective on the fourth (4th) Business Day after deposit in the U.S. Mail, registered or certified mail, return receipt requested, first class postage prepaid, or one (1) Business Day after it is delivered to a nationally-recognized, private overnight courier service, with all next day delivery charges prepaid, in each case to the intended recipient as set forth below:

| If to the Buyer: | Copies to: |
|---|---|
| Overstreet-Hughes Co., Inc. | Wyatt, Tarrant & Combs |
| c/o Mueller Industries, Inc. | 1715 Aaron Brenner Drive, Suite 800 |
| 8285 Tournament Drive, Suite 150 | Memphis, Tennessee 38120 |
| Memphis, Tennessee 38125 | Telecopy: (901) 537-1010 |
| Telecopy: (901) 753-3254 | Attention: Lee A. Harkavy, Esq. |
| Attention: Office of General Counsel | |

| If to Seller: | Copies to: |
|---|---|
| Wolverine Tube, Inc. | Bradley Arant Boult Cummings, LLP |
| 200 Clinton Avenue West | 200 Clinton Avenue West |
| Suite 1000 | Suite 900 |
| Huntsville, Alabama 35801 | Huntsville, Alabama 35801-4900 |
| Telecopy: (256) 580-3996 | Telecopy: (256) 517-5200 |
| Attention: President | Attention: S. Revelle Gwyn, Esq. |

60

Any Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including, without limitation, personal delivery, expedited courier, messenger service, facsimile, U.S. first class mail, or electronic mail) and any such communication shall be deemed delivered (a) upon machine or server confirmation if given by telecopy or electronic mail or (b) if not given by facsimile or electronic mail, when actually received by the Party for whom it is intended. Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 12.5</u>.

12.6    <u>Amendments and Waivers</u>. The Parties may mutually amend or waive any provision of this Agreement at any time. No amendment or waiver of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all of the Parties. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

12.7    <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making such determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

12.8    <u>Expenses</u>. Except as otherwise specifically provided to the contrary in this Agreement, each of the Parties shall bear its (and its Affiliates) own costs and expenses (including, without limitation, legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

12.9    <u>Specific Performance</u>. Each Party (and each of its Affiliates that is also a party to this Agreement) acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each Party (and each of its Affiliates that is also a party to this Agreement) agrees that the other Party may be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the applicable parties and the matter, including as provided in <u>Section 12.11</u>.

12.10    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflict of laws. The parties to this

61

Agreement hereby declare that it is their intention that this Agreement shall be regarded as made under the laws of the State of Delaware and that the laws of said State shall be applied in interpreting its provisions in all cases where legal interpretation shall be required.

12.11   Submission to Jurisdiction. Each party to this Agreement (a) submits to the exclusive jurisdiction of any state court sitting in Wilmington, Delaware or any federal court (including the Bankruptcy Court) sitting in the State of Delaware, respectively, in any action or proceeding arising out of or relating to this Agreement, (b) agrees that all claims in respect of such action or proceeding may be heard and determined only in any such court, (c) waives any claim of inconvenient forum or other challenge to venue in such court, and (d) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each party to this Agreement agrees to accept service of any summons, complaint or other initial pleading made in the manner provided for the giving of notices in **Section 12.5**.   Nothing in this **Section 12.11** however, shall affect the right of any party to this Agreement to serve such summons, complaint or initial pleading in any other manner permitted by Law.

12.12   Intentionally omitted.

12.13   Construction.

(a)   The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

(b)   Any reference to any federal, state, local, or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(c)   The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(d)   All references herein to "Articles", "Sections", "Exhibits" and "Schedules" shall be deemed to be references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.

(e)   All references to "$", "Dollars" or "US$" refer to currency of the United States of America.

(f)   The defined terms herein shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

62

(g)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(h)     Unless otherwise expressly provided herein, any agreement, exhibit, schedule, instrument or statute defined or referred to (i) in this Agreement or (ii) in any agreement, exhibit, schedule, or instrument that is referred to in this Agreement means such agreement, exhibit, schedule, instrument or statute, as from time to time amended, modified, supplemented or deleted or rendered void and of no effect (including, without limitation, by waiver or consent, the order of a court or other Governmental Entity, or succession of comparable successor statutes), and to references to all attachments thereto and instruments incorporated therein.

(i)     The word "or" shall include the word "and" unless expressly provided to the contrary.

(j)     The word "including" shall not limit the preceding words unless expressly provided to the contrary.

(k)     The words "shall" and "will" shall indicate mandatory requirements.

(l)     The word "day", unless used specifically in the context of "Business Day" shall refer to a calendar day.

12.14   Intentionally omitted.

12.15   Incorporation of Exhibits and Schedules. The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

12.16   Further Representations. The Seller (and its Affiliates), on the one hand, and the Buyer (and its Affiliates), on the other hand, acknowledge and represent that it has been represented by its own legal counsel in connection with the transactions contemplated by this Agreement with opportunity to seek advice as to its legal rights from such counsel. The Seller (and its Affiliates), on the one hand, and the Buyer (and its Affiliates), on the other hand, further represent that it is being independently advised as to the tax consequences of the transactions contemplated by this Agreement and is not relying on any representation or statements made by the other as to such tax consequences.

12.17   Counterparts and Facsimile Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement may be executed by facsimile or pdf signature.

## ARTICLE XIII

## CERTAIN AGREEMENTS RELATING TO SECTION 363 OF THE BANKRUPTCY CODE

Each party to this Agreement expressly acknowledges and agrees that the terms, conditions, requirements, and provisions of this **Article XIII** are material and shall apply to the sale and purchase of the Business contemplated by this Agreement pursuant to Section 363 of the Bankruptcy Code.  Subject

3/242953.6

to the Bankruptcy Court's issuance of the Bidding Procedures Order and entry of the Bankruptcy Sale, which shall become a Final Order (and, *inter alia*, incorporate the terms of this Agreement), the Buyer and Mueller Mexican Affiliate, as applicable, will purchase and assume from the Seller and Latinoamerica, as applicable, and the Seller and Latinoamerica, as applicable, will sell, transfer, convey, assign and deliver to the Buyer and Mueller Mexican Affiliate, as applicable, all of the Acquired Assets and the Assumed Liabilities upon the terms and conditions set forth in this Agreement.

13.1    Bidding Procedures.

(a)    The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to due diligence materials concerning the Acquired Assets, the manner in which bidders and bids become Qualified Bidders and Qualified Bids, respectively, the receipt and negotiation of bids received, the conduct of any Auction, the ultimate selection of the Successful Bidder and Successful Bid, and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").

(b)    Neither the Seller nor any Seller Representatives shall be obligated to furnish any information of any kind whatsoever to any Person who is not a Qualified Bidder. The Seller, after consultation with (i) any statutory committee of unsecured creditors appointed in the Bankruptcy Case (the "Committee"), and (ii) the ad hoc committee of senior secured noteholders (the "Noteholders"), shall have the right to amend the rules set forth herein for the Bidding Process in writing, which, in the Seller's reasonable business judgment, will better promote the goals of the Bidding Process so long as such changes are not inconsistent with this Agreement or any Bankruptcy Court order, including the Bidding Procedures Order.

13.2    "As Is, Where Is". The sale of the Acquired Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Seller, its agents, or estate, except, with respect to the Buyer, to the extent set forth in this Agreement or, with respect to a Successful Bidder, to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

13.3    Free Of Any And All Claims And Interests. All of the Seller's right, title, and interest in and to the Acquired Assets, or any portion thereof, to be acquired will be sold free and clear of all Security Interests, such Security Interests to attach to the net proceeds of the sale of such Acquired Assets, except, with respect to Buyer, to the extent otherwise set forth in this Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder.

13.4    Participation Requirements.

(a)    Unless otherwise ordered by the Bankruptcy Court, for cause shown, in order to participate in the Bidding Process each person (such person or entity, a "Potential Bidder"), must

(i)    deliver, unless previously delivered, to counsel to the Seller at the addresses provided below an executed confidentiality agreement in form and substance satisfactory to the Seller (to be delivered prior to the distribution of any confidential information by the Seller to such person); and

64

(ii)    be deemed by the Seller, after consultation with its legal counsel and financial advisors and the Committee and the Noteholders, to be reasonably likely to be able to fund and complete the consummation of its proposed transaction on terms and conditions substantially similar to the term and conditions in this Agreement if selected as the Successful Bidder.

(b)    .  As promptly as practicable, the Seller will determine and will notify the interested person, the Buyer, the Noteholders, and the Committee if such person is a Potential Bidder.

13.5    Due Diligence.

(a)    The Seller may in its reasonable business judgment, and subject to competitive and other business concerns, afford each Potential Bidder such due diligence access to the Acquired Assets as the Seller deems reasonably appropriate, after consultation with its counsel and financial advisors.  Due diligence access may include management presentations as may be scheduled by the Seller, access to electronic data rooms, onsite inspections, and other matters which a Potential Bidder may reasonably request and as to which the Seller, in its reasonable business judgment, may agree.  The Seller will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  The Seller may, in the exercise of its reasonable business judgment, extend a Qualified Bidders' time to conduct due diligence after the Bid Deadline until the Auction; **provided, however**, the Successful Bidder and Alternative Bidder shall be permitted to continue to conduct due diligence until closing of the sale; **provided, further however**, that the Qualified Bid submitted by any such Qualified Bidder shall not be subject to further due diligence as provided below.  The Seller may, in its reasonable business judgment, coordinate diligence efforts such that multiple Potential Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  The Seller anticipates that it will post substantially all written due diligence provided to any Potential Bidder to the Seller's electronic data room.  Neither the Seller nor any of its Affiliates (or any of its respective representatives) will be obligated to furnish any information related to the Acquired Assets to any Person.  The Seller makes no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in this Agreement or the definitive purchase agreement with any Successful Bidder.

(b)    Each Qualified Bidder shall be deemed to acknowledge and shall represent in any definitive agreement, that it has had an opportunity to inspect and examine the Seller's business and to conduct any and all due diligence prior to making its offer, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents in submitting its Bid, and, that it did not rely upon any written or oral statement, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Seller's business or the completeness of any information provided in connection with the Bidding Process.

13.6    Bid Deadline.

(a)    A Potential Bidder that desires to make a Bid (as defined below) must deliver written copies of its offer, via hand delivery, overnight mail, or email, to the following (collectively, the "Notice Parties") to (i) Tube Forming, L.P., Attn: Harold Karp, President; (ii) Cozen O'Connor ("Cozen"), counsel for the Debtors, 1201 North Market Street, Suite 1400, Wilmington, DE 19801, Attn:

65

Mark E. Felger, Esquire, and Proskauer Rose, special counsel for the Debtors, 1585 Broadway, New York, NY 10036, Attn: Scott K. Rutsky, Esquire; (iii) Sidley Austin LLP; 787 Seventh Avenue, New York, NY 10019, Attn: Matthew A. Clemente, Esquire; and (iv) if a creditor's committee is formed, such committee's counsel so that the offer is actually received by 5:00 p.m. prevailing Eastern Time on December 13, 2010 (or such other date as fixed by the Bankruptcy Court) (the "Bid Deadline"). Cozen shall promptly provide Buyer with a copy of any Bids received by the Seller by electronic mail and by overnight mail to the Buyer notice parties designated in Section 12.5. All provisions of these Bidding Procedures relating to the providing of notice to any party shall be deemed satisfied by providing notice as requested pursuant to any notice of appearance filed in the Seller's Bankruptcy Case. All consultation rights granted under these Bidding Procedures granted to the Buyer, the Committee, and Noteholders shall be deemed satisfied by consultation with the respective attorneys retained by such parties.

(b)    The Seller may extend the Bid Deadline once or successively, but is not obligated to do so. If the Seller extends the Bid Deadline, it shall promptly notify all other Potential Bidders and the Notice Parties of such extension.

13.7    Qualified Bid Requirements.

(a)    A proposal received from a Potential Bidder (including the Buyer) that meets the following requirements is a "Qualified Bid":

(i)    is received by the Bid Deadline (as may be extended, as described below);

(ii)    provides for the purchase of all of the Acquired Assets by the Potential Bidder;

(iii)    provides for payment or assumption of all of the Assumed Liabilities;

(iv)    provides for value of not less than One Hundred Thousand Dollars ($100,000) above the value provided by the Buyer pursuant to this Agreement after taking into account Buyer's Break-Up Fee and Reimbursable Expenses of up to Three Hundred and Fifty Thousand Dollars ($350,000), in the aggregate;

(v)    includes a copy of a definitive purchase agreement in substantially the same form and with substantially the same terms and conditions as this Agreement (other than the amount of the Purchase Price only) signed by an authorized representative of such Potential Bidder in addition to a marked copy of such agreement to reflect the bidder's modifications to Purchase Price contained in this Agreement;

(vi)    is not subject to any due diligence or financing conditions, board or other approval;

(vii)    is accompanied by a cash deposit of not less than Eight Hundred Thousand Dollars ($800,000) (the "Required Deposit");

(viii)    includes written evidence of a commitment for financing (by a credit worthy bank or financial institution that shall provide such financing without alteration of

66

conditions or delays that is not contingent as of the Auction) or other evidence of ability, as determined in the reasonable business judgment of the Seller;

(ix) is reasonably likely (based on availability of financing, antitrust or other regulatory issues, experience, and other considerations) to be consummated if selected as the Successful Bid within a timeframe acceptable to the Seller, and not in excess of the timeframe currently contemplated by this Agreement; and

(x) is irrevocable until the earlier of (x) thirty (30) days after the Bankruptcy Court authorizes and approves the Successful Bid and (y) the closing date of the transaction with the Successful Bidder or Alternative Bidder.

(b) A Potential Bidder that makes a Qualified Bid is referred to herein as a "Qualified Bidder."

(c) Whether the Bid of a Qualified Bidder meets the foregoing requirements to become a Qualified Bidder shall be determined by the Seller, in its reasonable business judgment, after consultation with the Committee and the Noteholders. The Seller shall notify the Buyer, the Committee, and the Noteholders promptly if they determine any Potential Bidder is a Qualified Bidder. The Buyer is a Qualified Bidder.

(d) The Seller, in its reasonable business judgment, after consultation with the Committee and the Noteholders may reject any proposal that is on terms more burdensome or conditional than the terms of this Agreement, entitles the Potential Bidder to any Break-Up Fee, termination fee, expense reimbursement or similar type of payment that is not in conformity with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or the Local Rules of the Bankruptcy Court, or is contrary to the best interests of the Seller.

(e) A Qualified Bid shall be valued based upon various factors including, without limitation, the net value provided by such proposal, timing and amount of any consideration received, and the likelihood and timing of consummating such transaction. This Agreement executed by Buyer is a Qualified Bid for all purposes. Unless otherwise waived by the Seller in writing, the Seller will consider a Bid only if the Bid is accompanied by (i) the Required Deposit; and (ii) written evidence of a commitment for financing or other evidence of ability to consummate the transaction.

(f) In the event that the Seller receives any Qualified Bids other than this Agreement prior to the Bid Deadline, then the Buyer shall deliver the Required Deposit into escrow on or prior to the Bid Deadline.

13.8 No Qualified Bids. If the Seller does not receive any Qualified Bids other than this Agreement received from the Buyer, the Seller shall (i) report the same to the Bankruptcy Court, (ii) declare the Buyer the Successful Bidder, and (iii) proceed with the sale pursuant to the terms of this Agreement without conducting an Auction and without further motion.

3/242953.6

### 13.9 Auction.

(a)    If at least one Qualified Bid, other than the Buyer's Bid represented by this Agreement, has been received, the Seller shall conduct an auction (the "Auction") on Friday, December 17, 2010 (or such other date as fixed by the Bankruptcy Court), at such offices as mutually agreed to by the Buyer and the Seller, at 10:00 a.m. (prevailing Eastern Time), or such later time or other place as the Seller shall notify all Qualified Bidders and Notice Parties. In addition to the professionals retained by the Committee and the Noteholders, only bidders who are either the Buyer or a Qualified Bidder shall be eligible to attend the Auction and only bidders who are either the Buyer or a Qualified Bidder shall be entitled to make any subsequent Qualified Bids at the Auction. No Bids shall be considered by the Seller unless a party submitted a Qualified Bid and participates in the Auction. At least two (2) business days prior to the Auction, each Qualified Bidder who has submitted a Qualified Bid must inform the Seller whether it intends to participate in the Auction.

(b)    The Seller, after consultation with the Committee and the Noteholders, shall evaluate all Qualified Bids received and shall determine which Qualified Bid reflects the highest or best offer for the Acquired Assets (the "Starting Auction Bid"). The Seller shall announce the Starting Auction Bid at the commencement of the Auction.

(c)    The minimum initial overbid and any subsequent overbids must be in increments of at least $100,000 in cash consideration, or such lesser amount as the Seller shall announce from time to time at the Auction, until the Seller declares a winner.

(d)    In the event that a Qualified Bid is received and the Buyer submits an overbid then the Buyer can credit bid the Buyer's Break-Up Fee and Reimbursable Expenses. If the Buyer is the winning bidder, then the Buyer will deduct the Break-Up Fee and Reimbursable Expenses before tendering the accepted bid price.

(e)    The Seller, after consultation with (i) its counsel and financial advisors, (ii) the Committee and (iii) the Noteholders, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with this Agreement, these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or of any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

(f)    At the conclusion of the Auction, the Seller shall, after consultation with (i) its legal and financial advisors, (ii) the Committee, and (iii) the Noteholders, (a) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Qualified Bid and (b) identify the highest and best bid (the "Successful Bid") and the bidder making such Bid (the "Successful Bidder"). In determining the Successful Bidder, the Seller shall include the Bidding Incentives (as applicable) in the Buyer's bid. The Seller shall promptly seek confirmation that such Qualified Bidder is the Successful Bidder and that such proposal is the Successful Bid at a hearing to be held before the Bankruptcy Court promptly after the conclusion of the Auction.

68

13.10   The Sale Hearing.

(a)      A hearing is presently scheduled to take place on Tuesday, December 21, 2010 (or such other date as fixed by the Bankruptcy Court) at 9:30 a.m. (prevailing Eastern Time) (the "Sale Hearing"). At the hearing, the Seller shall seek entry of the Bankruptcy Sale Order, among other things, authorizing and approving the proposed transaction (i) if no other Qualified Bid is received and accepted as the Successful Bid, with the Buyer pursuant to the terms and conditions set forth in this Agreement or (ii) if a Qualified Bid is received and accepted by the Seller after consultation with the Committee and the Noteholders, to the Successful Bidder, as determined by the Seller in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Successful Bid. At the Sale Hearing, the Seller will also seek approval of an Alternative Bidder. The Sale Hearing may be adjourned or rescheduled at the Seller's reasonable business judgment. The Seller shall notify all relevant parties of such adjournment or rescheduling in an appropriate manner, including by an announcement of the adjourned or rescheduled date at the hearing.

(b)      If the Seller receives Qualified Bids in addition to the Buyer's Bid, then, at the Sale Hearing, the Seller will seek approval of the Successful Bid and, at the Seller's election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Seller's presentation to the Bankruptcy Court of the Successful Bid and, if applicable, the Alternate Bid will not constitute the Seller's acceptance of either of such Bids, until such Bids are approved by the Bankruptcy Court at the Sale Hearing. Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Seller will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court. The Alternate Bid shall remain open until the earlier of (a) thirty (30) days following the entry of the Bankruptcy Sale Order or (b) the consummation of the sale to the Successful Bidder (the "Alternate Bid Expiration Date").

(c)      Should the Bankruptcy court approve a Bid other than the Buyer's bid as the Successful Bid, the Bidding Incentives shall be paid to the Buyer within five (5) business days after such sale closes. The Bidding Incentives shall constitute an administrative expense priority claim of the Seller's estate under sections 503(b)(1)(A) and 507(a) of the Bankruptcy Code.

(d)      All deposits, excluding the deposits of the Successful Bidder and the Alternate Bidder (which, in the case of the deposit of the Alternative Bidder, shall be returned within three (3) days of the closing of a sale to the Successful Bidder), shall be returned to Qualified Bidder (unless it is the Successful Bidder or Alternative Bidder) within three (3) days after the date of the Auction. The Seller shall be required to maintain deposits in a non-interest bearing account. Required Deposits may only be used in accordance with the provisions of these bidding Procedures. Neither the Seller nor Buyer shall have any liability with respect to any deposit of others. If a Successful Bidder fails to consummate an approved sale on terms which would allow the Seller to retain such Successful Bidder's deposit under the relevant purchase agreement between the Seller and such Successful Bidder, the Seller will not have any obligation to return the Required Deposit of such Successful Bidder and such Required Deposit will become property of the Seller's estate.

69

13.11   Reservation of Rights.   The Seller reserves its rights, in the exercise of its fiduciary obligations, after consultation with its counsel and financial advisors in its reasonable business judgment and after consultation with the Committee and the Noteholders, to (a) determine which Qualified Bid, if any, is the highest or otherwise best offer, (b) reject, at any time, any bid (other than Buyer's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or any other orders applicable to the Seller, or the terms and conditions of the sale or (iii) contrary to the best interest of the Seller, its estate, and stakeholders as determined by the Seller in its reasonable business judgment, and (c) modify the Bidding Procedures (after consultation with Buyer), including, without limitation, (1) extending any of the deadlines set forth above for the Bidding Process, (2) modifying bidding increments, other than the overbid requirements set forth Section 13.7(a)(iv), (3) with the consent of the Successful Bidder or Buyer, as the case may be, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, (4) withdrawing from the Auction the Acquired Assets at any time prior to or during the Auction or (5) canceling the Auction, and rejecting all Qualified Bids if, in the Seller's business judgment, after consultation with its financial advisors, no such bid is for a fair and adequate price.

[Signature Page Follows]

3/242953.6

**[Signature page to Asset Purchase and Sale Agreement]**

     IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

SELLER:                          Tube Forming, L.P.

                                   By:  Wolverine Tube, Inc.
                                   Its:  General Partner

                                   By: _____
                                   Harold M. Karp, President and COO of
                                   Wolverine Tube, Inc.

BUYER:                         Overstreet-Hughes Co., Inc.

                                   By: _____

                                   Name: _____

                                   Title: _____

**[Signatures continued on next page]**

[Signature page to Asset Purchase and Sale Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

SELLER:                                        Tube Forming, L.P.

                                               By: _____

                                               Name: _____

                                               Title: _____


BUYER:                                         Overstreet-Hughes Co., Inc.

                                               By: _____

                                               Name: _____

                                               Title: _____


[Signatures continued on next page]

[Signature page to Asset Purchase and Sale Agreement]

Solely with respect to agreeing to applicable provisions of this Agreement for which such parties are bound:

Wolverine Tube, Inc.

By: _____
Name: _____
Title: _____

Mueller Industries, Inc.

By: _____
Name: _____
Title: _____

WLVN de Latinoamerica, S. de R.L. de C.V.

By: _____
Name: _____
Title: _____

Mueller Commercial de Mexico, S. de R.L. de C.V.

By: _____
Name: _____
Title: _____

WLV México, S. de R.L. de C.V.

By: _____
Name: Harold M. Karp
Title: Authorized Representative

3/242953.6

[Signature page to Asset Purchase and Sale Agreement]

Solely with respect to agreeing to applicable provisions of this Agreement for which such parties are bound:

Wolverine Tube, Inc.

By: _David M Karp_
Name:  Harold M. Karp
Title: President and COO


Mueller Industries, Inc.

By: _____
Name: _____
Title: _____


Mueller Commercial de Mexico, S. de R.L. de C.V.

By: _____
Name: _____
Title: _____

Solely with respect to agreeing to applicable provisions of this Agreement for which such parties are bound:


WLVN de Latinoamerica, S. de R.L. de C.V.


By: _____

Name:  Harold M. Karp

Title: President and COO of Wolverine Tube, Inc.