# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WOLVERINE TUBE, INC., *et al.*[1] | : | Case No. 10-13522 (PJW) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---

## FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF WOLVERINE TUBE, INC. AND ITS AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED

---

Dated: April 15, 2011

**COZEN O'CONNOR, P.C.**
1201 N. Market Street, Suite 1400
Wilmington, Delaware 19801
Phone: (302) 295-2087
Fax: (302) 295-2013
Mark E. Felger

Counsel for Debtors and
Debtors in Possession

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036-8299
Phone: (212) 969-3000
Fax: (212) 969-2900
Scott K. Rutsky

Special Corporate and Tax Counsel
for Debtors and Debtors in Possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Wolverine Tube, Inc. (0812), Tube Forming, L.P. (3323), Wolverine Joining Technologies, LLC (1600), WT Holdings Company, Inc. (4984), and TF Investor Inc. (8048). The Debtors' corporate headquarters and the mailing address for each Debtor is 200 Clinton Avenue West, 10th Floor, Huntsville, Alabama 35801.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY ....................................................................1

    A.   Overview..........................................................................................1

    B.   Summary Of Classification And Treatment Under The Plan ..................................3

    C.   Voting and Confirmation Procedures ..........................................................6

    D.   Voting Recommendation ........................................................................11

II.  THE DEBTORS' CORPORATE HISTORY, ORGANIZATIONAL
    STRUCTURE, BUSINESS OPERATIONS AND PREPETITION
    CAPITAL STRUCTURE ..........................................................................12

    A.   Corporate History................................................................................12

    B.   The Debtors' Business Operations............................................................12

    C.   The Debtors' Prepetition Capital Structure..................................................18

III. EVENTS LEADING TO THESE CHAPTER 11 CASES ..........................................20

    A.   Rise and Volatility in Copper and Other Metal ..............................................20

         Prices and Slowdown of United States Economy..........................................20

    B.   Increased Obligations Respecting Defined Benefit Pension Plan .........................20

    C.   Cost-Cutting, Restructuring Efforts and Successful Negotiations.........................22

         with Supporting Noteholders and Supporting Preferred Holders .........................22

    D.   The Debtors Commence These Chapter 11 Cases.............................................23

IV.  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES ..................................24

    A.   Overview Of Chapter 11 And Commencement Of Chapter 11
         Cases ............................................................................................24

    B.   First Day Orders................................................................................25

    C.   Retention of Debtors' Professionals .........................................................26

    D.   Use Of Cash Collateral ........................................................................26

    E.   Sale of Certain Assets of Tube Forming, L.P. ...............................................27

    F.   Chapter 11 Schedules...........................................................................27

    G.   Bar Date Order...................................................................................27

    H.   Order Extending Time to Assume or Reject Leases...........................................27

    I.   Settlement Agreement With PBGC ............................................................27

V.   THE PLAN OF REORGANIZATION..............................................................31

    A.   General..........................................................................................31

| | B. | Classification Of Claims And Interests | 32 |
| | C. | Treatment Of Claims And Interests Under The Plan | 33 |
| | D. | Means For Execution And Implementation Of The Plan | 40 |
| | E. | Corporate Governance and Management of the Reorganized Debtors | 44 |
| | F. | Distributions Under the Plan | 45 |
| | G. | Procedures for Disputed Claims | 47 |
| | H. | Executory Contracts And Unexpired Leases | 48 |
| | I. | Releases, Injunctions and Discharge | 52 |
| | J. | Conditions Precedent to Confirmation and Consummation of the Plan | 56 |
| | K. | Retention Of Jurisdiction | 58 |
| | L. | Miscellaneous Provisions | 60 |
| VI. | | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 63 |
| | A. | Acceptance Of The Plan | 63 |
| | B. | Confirmation | 63 |
| VII. | | RISK FACTORS | 69 |
| | A. | General Bankruptcy Law Considerations | 70 |
| | B. | Other Risk Factors Related To The Debtors | 72 |
| | C. | Risks To Creditors Who Will Receive Securities | 81 |
| | D. | Certain Tax Law Considerations | 83 |
| VIII. | | CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS | 83 |
| | A. | U.S. Federal Income Tax Consequences To The Debtors | 84 |
| | B. | U.S. Federal Income Tax Consequences To U.S. Holders | 87 |
| | C. | Importance Of Obtaining Professional Tax Assistance | 95 |
| IX. | | CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS | 95 |
| | A. | Exemption From Registration Requirements | 95 |
| | | For New Securities Issued Pursuant to Plan | 95 |
| | B. | Subsequent Transfers Of New Securities | 96 |
| X. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 97 |
| | A. | Continuation Of The Chapter 11 Cases | 97 |
| | B. | Liquidation Under Chapter 7 Or Chapter 11 | 97 |

XI.   CONCLUSION AND RECOMMENDATION.................................................................98

# EXHIBITS

Exhibit A    First Amended Joint Plan of Reorganization, as Modified

Exhibit B    Disclosure Statement Approval Order

Exhibit C    Prepetition Organizational Chart

Exhibit D    Liquidation Analysis

Exhibit E    Projections

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

YOU ARE RECEIVING THIS DISCLOSURE STATEMENT (AS SAME MAY BE AMENDED FROM TIME TO TIME, THE "DISCLOSURE STATEMENT") TO PROVIDE YOU WITH INFORMATION RELATING TO THE *FIRST AMENDED JOINT PLAN OF REORGANIZATION OF WOLVERINE TUBE, INC. AND CERTAIN OF ITS SUBSIDIARIES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED* (AS SAME MAY BE AMENDED FROM TIME TO TIME, THE "PLAN"). THE DEBTORS HAVE FILED THE PLAN, A COPY OF WHICH IS ATTACHED AS EXHIBIT A HERETO, WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND ARE SEEKING TO HAVE THE PLAN CONFIRMED BY THE BANKRUPTCY COURT. ALL CAPITALIZED TERMS USED BUT NOT OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN. INFORMATION REGARDING THE DEBTORS, THE PLAN AND THE REASONS THE DEBTORS HAVE FILED FOR CHAPTER 11 IS PROVIDED IN THIS DISCLOSURE STATEMENT COMMENCING ON PAGE 1. OTHER IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT AND THE INFORMATION CONTAINED HEREIN IS SET FORTH IMMEDIATELY BELOW.

**THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.**

THIS DISCLOSURE STATEMENT DESCRIBES CERTAIN ASPECTS OF THE PLAN AND THE DEBTORS' OPERATIONS, THE DEBTORS' FINANCIAL FORECASTS AND OTHER RELATED MATTERS. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ CAREFULLY THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, APPENDICES, AND ANY SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

SUBJECT TO APPLICABLE LAW, THE DEBTORS MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN SOLELY FOR PURPOSES OF SOLICITING ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND

REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ENTITLED TO VOTE ARE ADVISED AND ENCOURAGED TO READ CAREFULLY THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND ARE STRONGLY URGED TO CONSULT THEIR OWN LEGAL, TAX AND/OR OTHER PROFESSIONAL ADVISORS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. UNLESS OTHERWISE STATED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THAT DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE TERMS OF ANY DOCUMENT REFERENCED HEREIN ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT. THE MATERIAL TERMS OF CERTAIN DOCUMENTS EVIDENCING THE TRANSACTIONS CONTEMPLATED BY THE PLAN ARE DESCRIBED HEREIN. DEFINITIVE VERSIONS OF SUCH TRANSACTION DOCUMENTS SHALL BE FILED IN ADVANCE OF THE CONFIRMATION HEARING.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND THE ISSUANCE OF ANY SECURITIES PURSUANT TO THE PLAN, SHALL BE IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF FEDERAL AND STATE SECURITES LAWS. ALL PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS THAT THE DEBTORS HAVE AUTHORIZED TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING STATEMENTS, EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN SUCH FORWARD-LOOKING STATEMENTS, EVENTS AND CIRCUMSTANCES. THE DEBTORS HAVE NO OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, EVENTS AND CIRCUMSTANCES, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT. WHILE THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.

THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS, POTENTIAL ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE XI OF THE PLAN. THERE CAN BE NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED. YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, AND THE SECTION HEREIN ENTITLED "RISK FACTORS" PRIOR TO SUBMITTING YOUR BALLOT TO ACCEPT OR REJECT THE PLAN.

### INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS, FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH HOLDERS UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; (B) SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OF THE PLAN; AND (C) EACH HOLDER OF A CLAIM SHOULD SEEK ADVICE BASED ON SUCH HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# I.     INTRODUCTION AND SUMMARY

## A.     Overview

On November 1, 2010 (the "Petition Date"), Wolverine Tube, Inc. ("WTI"), Tube Forming, L.P. ("Tube Forming"), Wolverine Joining Technologies, LLC ("WJT"), WT Holding Company, Inc. ("WTH"), and TF Investor Inc. ("TFI", and together with WTI, Tube Forming, WJT, and WTH, collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are continuing to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

As discussed more fully below, the Debtors (together with their non-debtor affiliates) are global manufacturers of copper and copper alloy tube, and metal joining products. A principal segment of the Debtors' business is supplying components and related technology solutions to equipment manufacturers in the commercial and residential Heating, Ventilating and Air Conditioning ("HVAC") industry. In response to a variety of financial challenges summarized below, the Debtors determined that it was necessary to pursue a restructuring of their capital structure and indebtedness. In that regard, prior to the commencement of these chapter 11 cases, the Debtors undertook extensive efforts to strengthen their balance sheet, reduce expenses, improve profitability and operational efficiencies, and dispose of non-core assets.

In addition, the Debtors engaged in discussions with an informal group of their prepetition secured Noteholders (as defined below) and certain other material creditors and interest holders in an effort to effectuate a consensual out-of-court restructuring. Ultimately, it was determined that the best and most efficient means to accomplish a restructuring of the Debtors' capital structure and principal indebtedness was to commence these chapter 11 cases and seek confirmation of a chapter 11 plan of reorganization. Prior to the Petition Date, the Debtors, Noteholders comprising approximately 71% of the outstanding principal amount of the Notes (as defined below) (the "Supporting Noteholders"), and certain preferred shareholders (the "Supporting Preferred Holders") agreed in principle to the terms of a financial restructuring as reflected in a Plan Support Agreement (as amended subsequent to the Petition Date, the "Plan Support Agreement"). Pursuant to the Plan Support Agreement, the parties thereto have agreed to support confirmation of the Plan subject to compliance with the conditions set forth in the Plan Support Agreement.

Accordingly, concurrently with the filing of this Disclosure Statement, the Debtors have filed the Plan with the Bankruptcy Court. Except as otherwise specified, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan (and a schedule of terms defined in the Plan is contained in Article I of the Plan).

## Why You Are Receiving This Disclosure Statement

Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how it intends to administer or dispose of its assets, and how it intends to treat claims against, and interests in, the debtor. A plan of reorganization typically may provide for a

debtor-in-possession to reorganize by continuing to operate upon emergence from chapter 11 protection, to liquidate by selling assets, or to implement a combination of both. Here, by their proposed Plan, the Debtors seek to implement a financial restructuring that will significantly de-lever their balance sheet, right-size their capital structure in line with the Debtors' enterprise value and financial projections, and enable the Debtors to emerge from bankruptcy as a viable and competitive enterprise.

The Bankruptcy Code requires that a party filing a chapter 11 plan must also prepare and file a document called a "disclosure statement." The purpose of a disclosure statement is to provide creditors and interest holders that are entitled to vote on a chapter 11 plan with "adequate information" in order for such parties to make an informed decision in determining whether to vote to accept or reject the plan.

Accordingly, this Disclosure Statement is being disseminated pursuant to section 1125 of the Bankruptcy Code to provide adequate information to enable holders of claims that are impaired under (and entitled to vote on) the Plan to make an informed judgment in exercising their right to vote to accept or reject the Plan. [The Bankruptcy Court has reviewed this Disclosure Statement and has determined that it contains adequate information and may be circulated to creditors to solicit their votes on the Plan.] At this time, however, the Bankruptcy Court has not passed upon the merits of the Plan or determined that the Plan should be confirmed. That determination will be made at a hearing to consider confirmation of the Plan which is presently scheduled to occur on _____, 2011 (although it is possible that such hearing date could be adjourned to a different date).

This Disclosure Statement summarizes the Plan's content and provides other information relating to the Plan and the processes the Bankruptcy Court will follow in determining whether to confirm the Plan. The Disclosure Statement also discusses the Debtors' corporate history, organizational structure, business operations and prepetition capital structure, describes the events leading to the Debtors' filing of their chapter 11 cases, describes the main events that have occurred during the pendency of the cases, and contains a summary of the terms of the Plan, including the proposed treatment of claims against, and interests in, the Debtors. The Disclosure Statement also describes certain U.S. Federal income tax consequences of the Plan to the Debtors and holders of claims and equity interests, voting procedures, and includes a discussion of the confirmation process. The table of contents to this Disclosure Statement provides an outline of the topics and areas covered in this Disclosure Statement and lists the exhibits that are annexed to and incorporated into this Disclosure Statement.

*All creditors entitled to vote on the Plan should carefully review both the Disclosure Statement and all exhibits hereto (including the Plan and all exhibits attached to the Plan) before voting to accept or reject the Plan. Indeed, creditors should not rely solely on the Disclosure Statement but should also read the Plan in its entirety. Moreover, the provisions of the Plan will govern if there are any inconsistencies between the Plan and the Disclosure Statement.*

## B. Summary Of Classification And Treatment Under The Plan

The Plan (i) divides Claims and Interests into two categories and nine classes, (ii) sets forth the treatment afforded to each category and class, and (iii) provides the means by which the Plan will be implemented. The following table sets forth a summary of the treatment of each class of Claims and Interests under the Plan -- a more detailed description of the Plan is set forth in Section V of this Disclosure Statement entitled "The Plan of Reorganization".[2]

| Class | Type of Claim or Interest | Treatment of Allowed Claims and Interests |
|---|---|---|
| — | Administrative Expense Claims | Except to the extent that a Holder of an Allowed Administrative Expense Claim has been paid by the Debtors prior to the Effective Date, each Holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim), in full and final satisfaction, release, settlement and discharge of such Administrative Expense Claim, shall be paid in full, in Cash, in such amounts as (a) are incurred in the ordinary course of business by the Debtors when and as such Claim becomes due and owing, (b) are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim or any other date specified in such order, or (c) may be agreed upon between the Holder of such Administrative Expense Claim and the Debtors. Notwithstanding anything to the contrary contained in the Plan, any Allowed Administrative Expense Claims in respect of Adequate Protection Obligations shall be deemed discharged, satisfied and released as provided in Section 3.6 of the Plan. |
| — | Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim, in full and final satisfaction, release, settlement and discharge of such Priority Tax Claim, shall receive on account of such Claim, at the option of the Debtors, either payment in full in Cash as soon as reasonably practicable after the Effective Date, or in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash: (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) which total |

---

[2] This summary contains only a brief and simplified description of the classification and treatment of Claims and Interests under the Plan. It does not describe every provision of the Plan. Accordingly, reference should be made to the entire Disclosure Statement (including exhibits) and the Plan for a complete description of the classification and treatment of Claims and Interests.

| Class | Type of Claim or Interest | Treatment of Allowed Claims and Interests |
|---|---|---|
| | | value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code; (iii) over a period ending not later than five (5) years after the Petition Date; and (iv) in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan. Each Holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided in the Plan, and upon such full and final payment, such Lien shall be deemed to have been satisfied and shall be null and void and unenforceable for all purposes. |
| 1 | Non-Tax Priority Claims | Unimpaired. The legal, equitable and contractual rights of the Holders of Allowed Non-Tax Priority Claims are unaltered by the Plan. Each Holder of an Allowed Non-Tax Priority Claim, in full and final satisfaction, release, settlement and discharge of such Allowed Non-Tax Priority Claim, shall be paid in full, in Cash, on the Effective Date or in accordance with the terms of any agreement between the Debtors and the Holder of an Allowed Non-Tax Priority Claim or on such other terms and conditions as are acceptable to the Debtors and the Holder of an Allowed Non-Tax Priority Claim. |
| 2 | Other Secured Claims | Unimpaired. The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan. On the Effective Date, each Allowed Other Secured Claim, in full and final satisfaction, release, settlement and discharge of such Allowed Other Secured Claim, shall be, at the Debtors' option, (a) Reinstated, (b) satisfied by the Debtors' surrender of the collateral securing such Claim, (c) offset against, and to the extent of, the Debtors' claims against the Holder of such Claim, or (d) otherwise rendered Unimpaired, except to the extent the Reorganized Debtors and such Holder agree to a different treatment. |
| 3 | Note Claims | Impaired. On or as soon as practicable after the Effective Date, Holders of Allowed Note Claims, in full and final satisfaction, release, settlement and discharge of such Allowed Note Claims and any Adequate Protection Obligations (other than as set forth in Section 3.6(e) of the Plan), shall receive their Pro Rata share |

|  |  | of (i) ninety-five percent (95%) of the New Common Stock, subject to dilution for additional shares of New Common Stock to be issued pursuant to the New Management Stock Incentive Plan and any future issuance of New Common Stock, (ii) the New First Lien Notes, and (iii) a distribution of Cash in an aggregate amount equal to the Net Distributable Cash, if any; provided, however, that each Holder of an Allowed Note Claim may designate one of its affiliates to receive the shares of New Common Stock to which it would otherwise be entitled. Each Holder of an Allowed Note Claim (or its designated affiliate) shall be required to execute and deliver to the Reorganized Debtors a signature page to the New Stockholders' Agreement as a condition precedent to receiving any distribution of New Common Stock pursuant to the Plan. |
| 4 | General Unsecured Claims | Unimpaired. On or as soon as practicable after the Effective Date, except to the extent a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or has been paid prior to the Effective Date, each Holder of an Allowed General Unsecured Claim, in full and final satisfaction, release, settlement and discharge of such Allowed General Unsecured Claim, shall be paid in full, in Cash, in the ordinary course of business or shall receive such other treatment as shall render it Unimpaired. Any Allowed General Unsecured Claim that is not due and payable on or before the Effective Date shall be paid thereafter (i) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed General Unsecured Claim, or (ii) in accordance with the course of practice between the Debtors and the Holder of such Allowed General Unsecured Claim. Notwithstanding anything to the contrary in the Plan, the Unimpaired Claims and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise. |
| 5 | PBGC Claim | Impaired. On or as soon as practicable after the Effective Date, in full and final satisfaction, release, settlement and discharge of the PBGC Claim, the Holder of the PBGC Claim shall receive the treatment set forth in the PBGC Settlement Agreement |

| Class | Type of Claim or Interest | Treatment of Allowed Claims and Interests |
|---|---|---|
| | | attached as Exhibit A to the Plan.[3] |
| 6 | Old Preferred Stock | Impaired. On the Effective Date, all Old Preferred Stock shall be cancelled, and Holders of Old Preferred Stock Interests shall not receive or retain any Property under the Plan on account of such Old Preferred Stock Interests. |
| 7 | Old Common Stock | Impaired. On the Effective Date, all Old Common Stock shall be cancelled, and Holders of Old Common Stock Interests shall not receive or retain any Property under the Plan on account of such Old Common Stock Interests. |
| 8 | Section 510(b) Claims | Impaired. On the Effective Date, all Section 510(b) Claims shall be cancelled, and Holders of Allowed Section 510(b) Claims shall not receive or retain any Property under the Plan on account of such Allowed Section 510(b) Claims. |
| 9 | Subsidiary Equity Interests | Unimpaired. The legal, equitable and contractual rights of the Holders of Allowed Subsidiary Equity Interests are unaltered by the Plan. All Subsidiary Equity Interests shall be retained by Reorganized WTI. |

## C.    Voting and Confirmation Procedures

Accompanying this Disclosure Statement are copies of the following documents (collectively, the "Solicitation Package"):

(i)      the Plan, which is annexed hereto as Exhibit A; and

(ii)     the Order of the Bankruptcy Court dated _____, 2011 (the "Disclosure Statement Approval Order"), which is annexed hereto as Exhibit B, among other things, (a) approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, (b) establishing a voting record date, voting deadline, and other dates, (c) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan, and (d) approving the manner and forms of notice and other related documents, including the forms of Ballots to be executed by Holders of Claims entitled to vote on the Plan.

---

[3]      A summary of the material terms of the PBGC Settlement Agreement is set forth in Section IV. I. of this Disclosure Statement.

The forms of ballots (the "Ballots") delivered together herewith are approved for purposes of soliciting votes to accept or reject the Plan pursuant to Bankruptcy Rule 3018; provided, however, that the Debtors shall have the right to prepare and distribute other or modified forms of Ballots, substantially conforming with the Ballots and Official Form No. 14, as the Debtors deem necessary due to further refinement of the balloting process or modifications to the Plan.

The Ballots, and the related solicitation materials delivered together herewith, are being furnished for purposes of soliciting votes on the Plan to (i) Holders of the Note Claims (Class 3) and (ii) the Holder of the PBGC Claim (Class 5), which are the only Impaired classes of Claims entitled to vote on the Plan. The Disclosure Statement is also being provided to Holders of Claims in Classes 1, 2 and 4 and Interests in Class 9 (which classes are Unimpaired and therefore deemed to accept the Plan), Holders of Interests in Classes 6 and 7 and Claims in Class 8 (which classes are not receiving or retaining property under the Plan and therefore deemed to reject the Plan), and other entities, solely for informational purposes.

1.    Who May Vote on the Plan

Pursuant to the provisions of the Bankruptcy Code, only impaired classes of claims or equity interests are entitled to vote to accept or reject a plan of reorganization. A class which is not "impaired" (also referred to as "unimpaired") under a plan is deemed to have accepted such plan and is not entitled to vote.

A class is "impaired" under the Bankruptcy Code unless the legal, equitable, and contractual rights of the holders of claims or equity interests in such class are not modified or altered. For purposes of the Plan, the Holders of the Note Claims in Class 3 and the Holder of the PBGC Claim in Class 5 are the only Impaired Classes that are entitled to vote on the Plan. Holders of Non-Tax Priority Claims in Class 1, Other Secured Claims in Class 2, General Unsecured Claims in Class 4, and Subsidiary Equity Interests in Class 9 are Unimpaired and therefore are deemed to accept the Plan and are not entitled to vote. Holders of Old Preferred Stock in Class 6, Old Common Stock in Class 7, and Section 510(b) Claims in Class 8 will not receive or retain any property or interest in property under the Plan, and therefore are deemed to reject the Plan and are not entitled to vote.

2.    Voting Procedures

All votes to accept or reject the Plan must be cast by using the form of Ballot enclosed with this Disclosure Statement. No votes other than ones using such Ballots will be counted except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed 4:00 p.m., prevailing Eastern Time, on _____, 2011 (the "Voting Record Date") as the time and date for the determination of holders of record of Claims and Interests who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) where applicable, vote to accept or reject the Plan.

After carefully reviewing the Plan and this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan on the appropriate Ballot and

return such Ballot in the enclosed envelope to Donlin Recano & Company, Inc., the Debtors' Balloting Agent:

*If by regular mail:*

Donlin Recano & Company, Inc.
Re: WTI, Inc.
Attn: Voting Department
P.O. Box 2034, Murray Hill Station
New York, NY 10156-0701

*If by hand delivery or overnight courier:*

Donlin Recano & Company, Inc.
Re: WTI, Inc.
Attn: Voting Department
419 Park Avenue South, Suite 1206
New York, NY 10016

*Ballots must be actually received by the Balloting Agent by 5:00 p.m., prevailing Eastern Time, on May 23, 2011 (the "Voting Deadline"). The following Ballots will not be counted: any Ballot which (i) is not executed, (ii) is properly completed, executed and timely returned to the Balloting Agent but which does not indicate an acceptance or rejection of the Plan, (iii) has both the acceptance and rejection boxes checked, (iv) is sent by telecopier, facsimile or other electronic communication, (v) does not bear an original signature, or (vi) is not received by the Voting Deadline.*

If a Holder of a Claim casts more than one Ballot voting the same Claim prior to the Voting Deadline, only the last properly executed Ballot received by the Balloting Agent on or prior to the Voting Deadline shall be counted.

If a Holder of a Claim indicates a Claim amount on its Ballot that is different than the amount otherwise calculated in accordance with the procedures set forth herein, such Claim shall be temporarily allowed for voting purposes in the lesser of the two said amounts.

If you have any questions on the procedures for voting on the Plan, please contact the Balloting Agent by phone at (212) 771-1128 or by e-mail at Balloting@DonlinRecano.com.

3.       Special Voting Procedures for Holders of Class 3 Note Claims

Detailed instructions regarding how to vote on the Plan are contained on the Beneficial Holder Ballots distributed to Holders of Class 3 Note Claims and the Master Ballots distributed to Nominees (as defined below). For your vote to be counted, your Beneficial Holder Ballot must be completed, signed, and received by the Voting Deadline; provided, however, that Master Ballots received by the Balloting Agent after the Voting Deadline may be counted only in the sole and absolute discretion of the Debtors.

If you are a beneficial holder ("Beneficial Holder") of a Note held by a broker, dealer, commercial bank, trust company, or other agent or nominee of beneficial holders (each, a "Nominee"), please allow enough time when you return your Beneficial Holder Ballot for your Nominee to cast your vote on a Master Ballot before the Voting Deadline.

Each Holder of a Class 3 Note Claim may cast only one Beneficial Holder Ballot for each Claim held by such Holder. By signing and returning a Beneficial Holder Ballot, each Holder of a Claim in Class 3 will be certifying to the Bankruptcy Court and the Debtors that no other Beneficial Holder Ballots with respect to such Claim have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such Class of Claims, such earlier Beneficial Holder Ballots are superseded and revoked.

All Beneficial Holder Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each Beneficial Holder Ballot. For information regarding voting by Nominees, *see* the Section immediately below entitled "Nominee Voting Instructions."

4.    Nominee Voting Instructions

As noted, the Holders of Class 3 Note Claims are entitled to vote to accept or reject the Plan, and such Holders may do so by completing the appropriate Ballots and returning them in the envelope provided. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting to accept or reject the Plan, and such abstentions will not be counted as votes to accept or reject the Plan. Voting instructions are attached to each Beneficial Holder Ballot.

With respect to Holders of Class 3 Note Claims, a Nominee should deliver the Beneficial Holder Ballot and other documents relating to the Plan, including this Disclosure Statement, to each Beneficial Holder of the eligible Note Claims for which they serve as Nominee.

A Nominee has two options with respect to voting. Under the first option, the Nominee may forward the Solicitation Package, including the Beneficial Holder Ballot, to each Beneficial Holder for voting and include a return envelope provided by and addressed to the Nominee so that the Beneficial Holder may return the completed Beneficial Holder Ballot to the Nominee. Upon receipt of the Beneficial Holder Ballots, the Nominee will summarize the individual votes of its respective Beneficial Holders on the appropriate Master Ballot and then return the Master Ballot to the Balloting Agent before the Voting Deadline.

Under the second option, if the Nominee elects to "pre-validate" Beneficial Holder Ballots: (a) the Nominee shall forward the Solicitation Package or copies thereof (including (i) this Disclosure Statement (together with the Plan attached thereto as Exhibit A, and all other exhibits), (ii) an individual Beneficial Holder Ballot that has been pre-validated, as indicated below, and (iii) a return envelope provided by and addressed to the Balloting Agent) to the Beneficial Holder within five business days of the receipt by such Nominee of the Solicitation Package in a manner customary in the securities industry; (b) to "pre-validate" a Beneficial Holder Ballot, the Nominee shall complete and execute the Beneficial Holder Ballot and indicate on the Beneficial Holder Ballot the name of the registered holder, the amount of securities held

by the Nominee for the Beneficial Holder, and the account number(s) for the account(s) in which such securities are held by the Nominee; and (c) the Beneficial Holder shall return the pre-validated Beneficial Holder Ballot to the Balloting Agent by the Voting Deadline.

If a Master Ballot is received after the Voting Deadline, the votes and elections on such Master Ballot may be counted only in the sole and absolute discretion of the Debtors. The method of delivery of a Master Ballot to be sent to the Balloting Agent is at the election and risk of each Nominee. Except as otherwise provided in this Disclosure Statement, such delivery will be deemed made only when the executed Master Ballot is actually received by the Balloting Agent. Instead of effecting delivery by mail, it is recommended, though not required, that such entities use an overnight or hand delivery service. In all cases, sufficient time should be allowed to assure timely delivery. No Beneficial Holder Ballot should be sent to the Debtors, or the Debtors' financial or legal advisors, but only to the Balloting Agent as set forth above.

Nominees must provide appropriate information for each of the items on the Master Ballot, including identifying the votes to accept or reject the Plan.

By returning a Master Ballot, each Nominee will be certifying to the Debtors and the Bankruptcy Court, among other things, that: (a) it has received a copy of the Disclosure Statement, the Beneficial Holder Ballots, and the Solicitation Package and has delivered the same to the Beneficial Holders listed on the Beneficial Holder Ballots or to any intermediary Nominee, as applicable; (b) it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder for which it is a Nominee or from an intermediary Nominee, as applicable; (c) it is the registered holder of the Note Claims being voted; (d) it has been authorized by each such Beneficial Holder or intermediary Nominee, as applicable, to vote on the Plan and to make applicable elections; (e) it has properly disclosed: (i) the number of Beneficial Holders who completed Beneficial Holder Ballots, (ii) the respective amounts of the Note Claims owned, as the case may be, by each Beneficial Holder who completed a Beneficial Holder Ballot, (iii) each such Beneficial Holder's respective vote concerning the Plan; (iv) each such Beneficial Holder's certification as to the other Note Claims voted; and (v) the customer account or other identification number for each such Beneficial Holder; (f) each such Beneficial Holder has certified to the Nominee or to an intermediary Nominee, as applicable, that it is eligible to vote on the Plan; (g) each such Beneficial Holder has certified to the Nominee that such Beneficial Holder has not submitted any other ballot for such Claims held in other accounts or other names, or, if it has submitted another ballot held in other accounts or names, that the Beneficial Holders has certified to the Nominee that such Beneficial Holder has cast the same vote for such Claims, and the undersigned has identified such other accounts or owner and such other ballots; and (h) it will maintain Beneficial Holder Ballots and evidence of separate transactions returned by Beneficial Holders or by intermediary Nominees (whether properly completed or defective) for at least one year after the Voting Deadline and disclose all such information to the Bankruptcy Court or the Debtors, as the case may be, if so ordered.

Except as otherwise provided herein, each Master Ballot must be returned in sufficient time to allow it to be received by the Balloting Agent by no later than the Voting Deadline.

5. <u>Confirmation Hearing</u>

The Bankruptcy Court has scheduled the hearing to consider confirmation of the **Plan for _____, 2011 at \_\_\_:\_\_\_ \_\_.m., prevailing Eastern Time (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time without further notice except by announcing the adjournment at the Confirmation Hearing or by notice of any adjournment of the Confirmation Hearing filed by the Debtors and posted on their restructuring website at http://www.donlinrecano.com/wti.**

6. <u>Plan Objection Deadline</u>

The deadline for filing objections to the Plan is \_\_\_:\_\_\_ \_\_.m., prevailing Eastern Time, on _____, 2011 (the "**Plan Objection Deadline**").

All objections, if any, to the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Bankruptcy Court; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (d) state with particularity the legal and factual basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed with the Bankruptcy Court, with a copy forwarded directly to the Chambers of the Honorable Peter J. Walsh, United States Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801, together with proof of service thereof, and served so that it is <u>actually received</u> no later than the Plan Objection Deadline by the following parties: (i) counsel for the Debtors, Cozen O' Connor, P.C., Chase Manhattan Centre, 1201 North Market Street, Suite 1400, Wilmington, Delaware 19801, Attn: Mark E. Felger, Esq., e-mail: mfelger@cozen.com; (ii) special corporate and tax counsel for the Debtors, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, Attn: Scott K. Rutsky, Esq., e-mail: srutsky@proskauer.com; (iii) counsel for the Ad Hoc Group, Sidley Austin LLP, One South Dearborn, Chicago, Illinois 60603, Attn: Matthew A. Clemente, Esq., e-mail: mclemente@sidley.com; (iv) counsel for Plainfield, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Douglas H. Mannal, Esq., email: dmannal@kramerlevin.com; and (v) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Richard Schepacarter, Esq.

**D.    Voting Recommendation**

**THE DEBTORS HAVE UNANIMOUSLY APPROVED THE SOLICITATION OF VOTES ON THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY, AND RECOMMEND THAT ALL IMPAIRED CREDITORS SUBMIT BALLOTS ACCEPTING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

## II. THE DEBTORS' CORPORATE HISTORY, ORGANIZATIONAL STRUCTURE, BUSINESS OPERATIONS AND PREPETITION CAPITAL STRUCTURE

### A. Corporate History

WTI is the ultimate parent company of Tube Forming, WJT, WTH, and TFI, the other Debtors in these cases, as well as various other non-debtor domestic and foreign affiliates (collectively, the "Company"). Attached hereto as Exhibit C is a chart that generally depicts the prepetition organizational structure of the Debtors and their active non-Debtor affiliates.

WTI is a Delaware corporation organized in 1987, and is the successor to a business founded in Detroit, Michigan in 1916. WTI owns 100% of WJT, a Delaware limited liability company, 100% of WTH, a Delaware corporation, and 100% of TFI, a Delaware corporation. WTI owns a 1% general partnership interest in Tube Forming, a Delaware limited partnership. TFI owns a 99% limited partnership interest in Tube Forming.[4]

### B. The Debtors' Business Operations

The Company is a global manufacturer and supplier of copper and copper alloy tube, and metal joining products. The Company's focus is on custom-engineered, higher value-added tubular products, including metal joining products, which enhance performance and energy efficiency in many applications, including: commercial and residential HVAC, refrigeration, home appliances, industrial equipment, power generation, and petrochemicals and chemical processing. The Company believes that it produces the most advanced metal surface technology enhancement for heat transfer solutions in the current marketplace. The Company's core business is supplying components for use by major manufacturers of air conditioning equipment.

The Company's corporate headquarters are located in Huntsville, Alabama. The Company operates five facilities in the United States, China and Portugal, as well as a distribution operation in the Netherlands, through various divisions. WTI also has an ownership interest in two joint ventures, one of which (Wolverine China Investments LLC ("WCI")), through its wholly-owned subsidiary Wolverine Tube Shanghai Ltd. ("WTS")) operates out of the Company's leased facility in Shanghai, China. The Company's operations in Canada no longer are substantial.

On the Petition Date, the Debtors employed a total of approximately 850 persons (840 on a full-time basis and 10 on a part-time basis). Of these employees, approximately 671 are hourly employees and approximately 179 are salaried employees. Since 2007, the Debtors have received certain management, strategic, financial and other services from The Alpine Group, Inc.

---

[4] While a certificate of dissolution for TFI has been filed with the Delaware Secretary of State, pursuant to section 278 of the General Corporation Law of the State of Delaware, TFI remains in existence for a period of three years for the purpose of, among other things, winding up its affairs and disposing of any remaining assets.

("Alpine"), an affiliate of the Debtors, pursuant to a management agreement.[5] Alpine continues to provide such services to the Debtors on a month-to-month basis for which Alpine is entitled to a monthly fee of $104,167 and reimbursement of reasonable and customary out-of-pocket expenses.

As of December 31, 2010, the Debtors reported total assets having a consolidated book value of approximately $126 million and aggregate liabilities of approximately $246 million, of which trade debt constituted approximately $4 million. In addition, the Debtors had net revenues from continuous operations of approximately $275 million[6] for the year ending December 31, 2009, which represents a significant decrease in net revenue compared to the prior year due to, among other things, a decrease in shipments because of lower demand as a result of the economic downturn. For the year ending December 31, 2010, the Debtors anticipate net revenues of approximately $303 million.

### 1. Products

Historically, the Company has been at the forefront of new product development, with a number of new introductions to the marketplace, commencing in 1935 with the invention of the first high performance heat transfer tubes, which had a major impact on the HVAC commercial chiller industry. In 1987, the Company was instrumental in introducing surfaces optimized for new replacement refrigerants, as dictated by the Montreal Protocol, an international effort to protect the stratospheric ozone by limiting ozone-harming chemicals. In 1988, the Company became the first North American producer of enhanced ID tubes for the residential air conditioning industry, and during the 1990s, the Company introduced mechanically formed nucleate boiling tubes for the chiller industry.

The Company's current products include industrial tube, technical tube, refrigeration tube, copper alloy tube, and metal joining products. The Company is the primary supplier of one or more commercial products to some of the world's largest and best known Original Equipment Manufacturers ("OEMs"), particularly in the commercial and residential HVAC, refrigeration and home appliance industries. The Company's major customers include Trane Inc., Johnson Controls Inc., Carrier Corporation, Rheem Sales Company, Inc., General Electric, Goodman Manufacturing Company, Lennox, and Luvata. The Company's tube and fabricated products are custom designed and manufactured for specific customer applications and are sold directly to OEMs primarily on a just-in-time basis. Therefore, the Debtors' ability to provide timely and uninterrupted products and solutions is particularly important to preserve their critical customer relationships and maximize the going concern value of their business.

---

[5]     Alpine is both a preferred and common shareholder of WTI. Pursuant to a shareholders' agreement, Alpine has designated two individuals to serve on WTI's board of directors. The other two members of WTI's board of directors were designated by Plainfield Asset Management LLC ("Plainfield"), which also holds WTI common and preferred stock as well as a large percentage of the Notes. In addition to the management agreement, as discussed in further detail below, Alpine and/or its affiliate, Exeon (as defined below), are parties to a day-to-day purchasing arrangement, two tolling agreements, and certain hedging arrangements with the Debtors.

[6]     Restated on a pro-forma basis for comparison to 2010 revenues to account for tolling and agency agreements implemented in 2010 as well as to adjust copper prices to 2010 levels.

2.    Major Markets

The Company's products are sold both domestically and internationally.  The major markets for each of the Company's product lines are set forth below:

| Products | Major Markets |
|----------|---------------|
| Technical Tube | Commercial air conditioning manufacturers, power and process industry, heat exchanger manufacturers, water, swimming pool and spa heater manufacturers and oil cooler manufacturers. |
| Industrial Tube | Residential and light commercial air conditioning manufacturers, appliance manufacturers, automotive manufacturers, industrial equipment manufacturers, refrigeration equipment manufacturers, plumbing fittings and fixture manufacturers, and redraw mills (which further process the tube). |
| Copper Alloy Tube | Utilities and other power generating companies, refining and chemical processing companies and heat exchanger manufacturers. |
| Metal Joining Products | Residential and commercial air conditioning manufacturers, plumbing, electronic, lighting, shipbuilding, aerospace, catalysts, jewelry and other metal joining industries. |

3.    Owned and Leased Real Property

The Debtors, and their non-debtor affiliates, operate out of owned and leased properties throughout the world, including approximately 716,000 square feet of operating manufacturing capacity.  A list of these facilities is set forth below and, except as otherwise noted, all are owned by the Company:

| Domestic Facilities (Debtor Locations) | |
|----------------------------------------|---|
| Location/Debtor Entity | Facility Purpose |
| Huntsville, AL (WTI)* | Corporate headquarters |
| Decatur, AL (WTI) | New product development and corporate functions |
| Shawnee, OK (WTI) | Manufacturing copper tube products, industrial and technical tube, wholesale tube, feedstock tube and fin blanks |
| Carrollton, TX (Tube Forming) | Formerly manufacturing tubular fabricated products[+] |
| Warwick, RI (WJT) | Manufacturing brazing filler metals, fluxes and other specialty alloys |

| | |
|---|---|
| Ardmore, TN (WTI) | Manufacturing capillary tube and specialty fabricated components, and aluminum tubing |

| International Facilities (Non-Debtor Locations) | |
|---|---|
| Shanghai, China*⊕ | Manufacturing technical copper and copper alloy tube and brazed assemblies |
| Esposende, Portugal | Manufacturing technical copper and copper alloy tube and brazed assemblies |
| Monterrey, Mexico* | Packaging and distributing fabricated assemblies[#] |
| Apeldoorn, Netherlands* | Distributing various tubing products to the European market |
| Ontario, Canada* | Distributing various joining alloy products to the Canadian market |

\* Indicates a leased location, except for the Monterrey, Mexico location which indicates a building subject to an expired lease.

⁺ As set forth in Section IV. E. below, subsequent to the Petition Date, the Debtors sold the personal property at this facility and entered into a lease with the purchaser thereof.

⊕ Includes facility of WTI's fifty percent joint venture, WCI, through its wholly-owned subsidiary, WTS.

[#] The Debtors are no longer operating from this facility, as the personal property located thereon was included in the sale discussed in Section IV. E. below.

4.    Manufacturing and Raw Materials

The manufacture of copper, fabricated products and metal joining products consists of manufacturing processes including casting, extruding, drawing, forming, joining and finishing. In most cases, raw material is first cast into a solid cylindrical shape or "billet." The billet is then heated to a high temperature, a hole is pierced through the center of the cylinder, and the cylinder is then extruded under high pressure. Material is then either drawn to smaller sizes, or reduced on a forging machine and then drawn to a smaller size. The outside and/or inside surface may be enhanced to achieve the desired heat transfer qualities. Depending on customer needs, bending, shaping, precision cutting, forming, annealing (heating to restore flexibility), coiling or other operations may be required to finish the product.

WTI's principal raw material is copper. WTI obtains the majority of its copper cathode and scrap through a day-to-day purchasing arrangement with Exeon, Inc. ("Exeon"), an affiliate of Alpine, in order to supply WTI's primary copper tube plant in Shawnee, Oklahoma.[7] In turn, a portion of the copper raw material used in the Company's manufacturing operations in Ardmore, Tennessee is supplied by the Shawnee facility. Consolidating WTI's purchases through Exeon provides more opportunities to purchase copper scrap from secondary markets since Exeon has been in the scrap reclamation business for a number of years. In addition, the arrangement enhances WTI's liquidity because Exeon consigns the raw materials to WTI and, regardless of when the copper is shipped to the Shawnee facility, WTI is not obligated to purchase the copper until it is actually used in the manufacturing process. Among other things, this relationship obviates certain hedging activities that WTI would otherwise need to engage in. For the year ending December 31, 2010, WTI purchased 50.3 million pounds of copper cathode and scrap from Exeon, representing approximately 87% of WTI's North American copper purchases for the period.

Silver is the principal raw material utilized in the WJT operation. Prior to 2008, the majority of WJT's silver requirements were met through a silver consignment facility, which was subsequently retired. Thereafter, WJT entered into a toll manufacturing agreement with Exeon whereby Exeon provides raw materials (principally silver, copper, tin and zinc) to WJT which are used to manufacture and sell products directly to customers of Exeon, for which WJT receives a monthly toll services fee. Under the tolling agreement, title remains with Exeon until it passes directly to Exeon's customer, who then pays Exeon directly. WTI entered into a similar toll manufacturing agreement with Alpine in August, 2010 for its Ardmore facility. These tolling arrangements have benefited the Debtors, including by generating approximately $30-35 million and $4-5 million of incremental liquidity for the WJT and Ardmore operations, respectively.

The Debtors believe that their commercial agreements with Exeon and Alpine were negotiated at arm's-length, contain fair and reasonable terms and conditions, and are essential to their current operations. Thus, the Debtors intend to continue to maintain and honor these agreements in the ordinary course of business during the pendency of these cases.[8] In that regard, pursuant to the Plan Support Agreement, the Supporting Noteholders have required, and Alpine has agreed, that prior to any termination of the Plan Support Agreement, Alpine will not exercise any right it may have to terminate these agreements with the Debtors unless such right is based upon a material breach thereof by the Debtors.[9]

---

[7]    The current purchasing arrangement with Exeon replaced a supply arrangement between the parties which expired by its terms on November 28, 2009 and thereafter continued on a month to month basis until the current arrangement was put in place.

[8]    The Debtors reserve all rights with respect to such agreements. Nothing herein shall be deemed to constitute an assumption by the Debtors of any agreements with Alpine, Exeon or any other person or entity.

[9]    Pursuant to the Plan, all agreements between Alpine and/or Exeon, and the Debtors (as modified to the extent set forth in the Plan) are to be assumed on the Effective Date. In connection therewith, Alpine has agreed to waive any cure payments that would be due under those agreements (except for cure payments, if any, relating to hedging arrangements described in section 5 below, which shall be paid pursuant to the Plan).

5.    <u>Customer Pricing and Hedging</u>

One of the key elements of the Debtors' business is the ability to obtain a stable supply of the metals used in their manufacturing processes while avoiding, where possible, the effects of metal price fluctuations. Since metal prices fluctuate daily, WTI enters into commodity forward contracts on its own behalf in order to mitigate any impact that price changes could have on the value of its inventory.

Also, because of the volatility of the metals markets, metal prices are taken into account when considering customer pricing. The Company establishes customer pricing using one of the following methodologies: (a) a metal charge based on the average market value of metal in the month prior to shipment to the customer plus a fixed fabrication charge, (b) a metal charge based on the market value of metal as of the date of product shipment to the customer plus a fixed fabrication charge, or (c) a firm future price to a customer based on the customer's request, which covers both the cost of metal and fabrication charges. In the case of (a), WTI believes that this pricing policy provides a natural hedge against changes in the price of metal. In the case of (b) and (c), WTI works to minimize its exposure to metal price fluctuations through a variety of hedging strategies. Certain of WTI's largest customers require that they be quoted firm prices and, in certain instances, each further requires WTI to purchase forward contracts as a hedge against significant market fluctuations. The ability to provide firm pricing and implement required hedging transactions is an integral component to retaining the Company's market share. However, because of WTI's financial circumstances, WTI has an extremely limited capacity to engage in hedging transactions with traditional market participants. Accordingly, to accommodate its customers' hedging requirements, WTI relies on Exeon to arrange the majority of these hedges with traditional market participants and WTI concurrently enters into back-to-back hedges with Exeon.[10] From time to time, WTI may need to post additional collateral pursuant to these arrangements, which are memorialized in two master agreements, without which WTI would be unable to continue providing hedging for its customers when required.

6.    <u>Strategic Sourcing Program</u>

Until December 2010, WTI had a strategic sourcing agreement with one of the largest China-based copper tube manufacturers to provide products to WTI for resale to WTI's customers in North America. As part of the agreement, WTI was the sole representative of the China-based copper tube manufacturer in North America. WTI's responsibilities under this agreement included providing sales services, technical support and various administrative support activities. An agency fee was paid to WTI for the services it provided. The agreement expired on December 31, 2010. WTI continues to seek and evaluate similar sourcing alternatives.

7.    <u>Research and Development</u>

WTI's research and development efforts, both independently and in connection with its joint venture with Wieland-Werke AG, a German metals manufacturing company, are primarily

---

[10]    WTI maintains a limited number of customer-requested hedging arrangements directly with traditional market participants on its own account.

conducted in the Company's technology centers located in Decatur, Alabama and Shanghai, China. WTI utilizes both research and development facilities for new product development, manufacturing process improvements and new product applications. While developing new products, WTI often works in connection with certain major customers in order to develop specific new products required for such customers' applications.

WTI continues to participate in several industry, university and governmental research projects relating to more efficient heat transfer tubes for industrial, commercial and residential heating and cooling applications, as well as refrigeration, power generation, electrical cooling, chemical and petrochemical industries. Expenditures relating to the development of new products and processes, including significant improvements and refinements to existing products, are expensed as incurred.

### 8. Intellectual Property

WTI owns a number of trademarks and patents within the United States (and in other jurisdictions) on certain products and related manufacturing processes. WTI also has granted licenses with respect to some of these trademarks and patents. The Company has secured protection of its rights in the United States, Canada, Mexico, the European Union, Asia, South America, and Africa; holds over 80 issued patents and over 50 registered trademarks, in over 32 countries; and has over 60 patent applications pending.

### 9. Prepetition Litigation

As of the Petition Date, with the exception of various pending workers' compensation claims, the Debtors were not parties (as plaintiffs or defendants) to any litigation.

## C. The Debtors' Prepetition Capital Structure

### 1. 15% Senior Secured Notes Due 2012

WTI, as issuer, Tube Forming, TFI and WJT, as guarantors, and U.S. Bank National Association, as trustee and collateral agent (the "Indenture Trustee" or the "Collateral Agent"), are parties to that certain Indenture, dated as of April 28, 2009 (as amended, the "Note Indenture"), pursuant to which WTI issued a total of $121.6 million in 15% Senior Secured Notes Due 2012 (the "Notes") to various holders (the "Noteholders"). The Notes were issued in connection with an offer launched by WTI on February 26, 2009 to holders of their then-existing 10½% senior notes due 2009 and their then-existing 10½% senior exchange notes due 2009 to exchange such notes for the Notes and a cash payment. This transaction was consummated on April 28, 2009, whereby $83.3 million in aggregate principal amount of the 10½% senior notes and $38.3 million in aggregate principal amount of the 10½% senior exchange notes were exchanged for $121.6 million in aggregate principal amount of the Notes. The remaining $16.1 million of the 10½% senior notes (plus accrued and unpaid interest) was repaid on the closing date of the exchange offer. The Notes initially carried an interest rate of 15% (10% payable in cash, semiannually, and 5% payable in-kind ("PIK")),[11] which increased to 16% (10% payable in

---

[11] Net interest expense under the Notes for 2009 was $12.3 million, of which $8.2 million was payable in cash and $4.1 million was PIK interest.

cash, semiannually, and 6% PIK) beginning in April 2010. As of the Petition Date, approximately $131 million in principal, inclusive of PIK interest, plus approximately $7.5 million of accrued and unpaid cash interest on the Notes was outstanding.

Pursuant to that certain Guarantee and Collateral Agreement dated as of April 28, 2009 (the "Security Agreement"), as security for the payment, performance and other obligations of WTI under the Notes and the Note Indenture (the "Obligations"),[12] (a) Tube Forming, TFI and WJT guaranteed the Obligations,[12] (b) certain of the Debtors pledged to the Collateral Agent certain of the stock and other equity interests owned by the Debtors in certain subsidiaries, and (c) certain of the Debtors granted to the Collateral Agent a security interest in: (i) all accounts, (ii) all chattel paper, (iii) all cash and deposit accounts, (iv) all documents, (v) all equipment, (vi) all General Intangibles (as defined in the Security Agreement), (vii) all instruments, (viii) all inventory, (ix) all investment property, (x) all letter of credit rights, (xi) all commercial tort claims, (xii) all books and records, and (xiii) to the extent not otherwise included, all Proceeds (as defined in the Security Agreement) and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing. The Collateral Agent and the Ad Hoc Group assert that WTH, a Debtor herein, also is a guarantor of the Obligations and that WTH's assets serve as collateral for such Obligations. The PBGC disputes that WTH is a guarantor of the Obligations or that its assets constitute collateral therefor. All such disputes have been resolved pursuant to the PBGC Settlement Agreement discussed in Section IV. I. below.

Pursuant to a Trademark Assignment of Security Agreement and a Patent Assignment of Security Agreement, each dated as of April 28, 2009, as security for the Obligations, certain of the Debtors granted to the Collateral Agent a security interest in their trademarks and patents.

As further security for the Obligations, pursuant to five separate mortgage instruments, certain of the Debtors granted and conveyed to the Collateral Agent a security interest in, among other things, certain of the Debtor's real property located in: Pottawatomie County, Shawnee, Oklahoma; Dallas County, Carrollton, Texas; Kent County, Warwick, Rhode Island; Giles County, Ardmore, Tennessee; and Morgan County, Decatur, Alabama.

2.    Preferred Stock and Common Stock of WTI

As of the Petition Date, WTI had outstanding 54,494 shares of Series A Convertible Preferred Stock and 10,000 shares of Series B Convertible Preferred Stock, each of which affords holders thereof certain voting rights, including the ability to vote cumulatively with the holders of the WTI common stock. Dividend payments on all preferred stock were discontinued in 2008. As of the Petition Date, accrued but unpaid stock dividends total approximately $19 million. The aggregate purchase price paid by the initial purchasers of such preferred stock was approximately $65 million as follows: Plainfield -- $40 million for 40,000 shares of Series A Convertible Preferred Stock, and Alpine -- $14.49 million for 14,494 shares of Series A

---

[12]    Certificates of dissolution were filed for certain guarantors other than Tube Forming, TFI and WJT subsequent to the date of the Note Indenture and the Security Agreement.

Convertible Preferred Stock and $10 million for 10,000 shares of Series B Convertible Preferred Stock.[13]

As of the Petition Date, 40,623,736 shares of WTI common stock were outstanding and held by a number of institutions and individual investors. WTI's common stock was listed on the New York Stock Exchange until it was delisted on March 19, 2007, and currently trades on the Over-The-Counter Pink Sheets.

## III.    EVENTS LEADING TO THESE CHAPTER 11 CASES

Although the Debtors' business is operationally sound, over the course of the last several years a convergence of factors led to the instant chapter 11 filings. The Debtors' liquidity became increasingly constrained due to the steep rise and significant volatility in the prices of copper and other metals that are at the core of the Debtors' business, the precipitous year-over-year increase in the funding obligations associated with WTI's pension plan, and the high level of interest expense relating to the Notes. At the same time, the Debtors' operating revenues declined due to the global economic downturn in the industries served by the Debtors. As a result, the Debtors could not pay their non-trade expenses, such as interest on the Notes and their obligations under the pension plan (discussed in detail below), in the ordinary course. Ultimately, the timing of the filing of these chapter 11 cases was driven by the Debtors' default under the Note Indenture and the Notes, and the Debtors' successful negotiations with the Supporting Noteholders and the Supporting Preferred Holders on the terms of a prearranged Plan as outlined in the Plan Support Agreement and the Plan Term Sheet. Certain of the factors contributing to the commencement of the chapter 11 cases are discussed in greater detail immediately below.

### A.    Rise and Volatility in Copper and Other Metal Prices and Slowdown of United States Economy

The steep rise and volatility of the prices of copper and other metals -- which are the principal raw materials used in the Debtors' manufacturing processes -- have led to a significant increase in the Debtors' working capital requirements. This increase, in turn, has adversely affected the Debtors' liquidity. In addition, a decline in the Debtors' core HVAC markets, which the Debtors believe was precipitated by the financial crisis and the recession, has resulted in lower revenues. These factors reduced cash available to fund the Debtors' expenses and working capital needs, including the Debtors' ability to pay interest on the Notes and their funding requirements under the WTI pension plan.

### B.    Increased Obligations Respecting Defined Benefit Pension Plan

WTI is the contributing sponsor of the Wolverine Tube Inc. Retirement Plan (the "Pension Plan"), a defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and regulated by the applicable provisions

---

[13]    As detailed below, pursuant to the Plan, all such Old Preferred Stock Interests will be cancelled and the holders of such Old Preferred Stock will not receive or retain under the Plan any Property on account of such Old Preferred Stock Interests.

of the Internal Revenue Code of 1986, as amended (the "IRC"). As a result of recent adverse economic conditions and the large losses suffered in the U.S. financial markets, the Pension Plan's investment experience has suffered. Moreover, the Debtors' funding obligations for the Pension Plan have increased significantly from historical levels as a result of recently implemented funding rules and low interest rates.[14] The Debtors' increased funding obligations for the Pension Plan have had an adverse effect on their liquidity, and their liquidity will be further affected as the contribution requirements accelerate going forward.

Using the regulatory termination assumptions of the Pension Benefit Guaranty Corporation (the "PBGC"), as of August 31, 2010, the Pension Plan was approximately 58% funded, with approximately $107 million in assets and approximately $186 million in benefit liabilities, resulting in approximately $78.5 million in unfunded benefit liabilities. The PBGC has filed identical proofs of claim against each of WTI, Tube Forming, WJT, WTH and TFI. The PBGC Claim includes the following Claims: (i) an estimated claim in the amount of $89,640,000 for statutory liability under 29 U.S.C. § 1362 and 1368 for unfunded benefit liabilities of the Pension Plan, of which the PBGC asserts a portion may be secured and an unliquidated portion is entitled to administrative or other priority; (ii) an unliquidated claim for statutory liability under 29 U.S.C. § 1307 on account of the Pension Plan for flat and variable rate premiums and the special termination premium, a portion of which the PBGC asserts may be entitled to administrative priority, and depending on the circumstances, the PBGC also asserts may not be dischargeable; (iii) an estimated general unsecured claim in the amount of $38,144,000 for statutory liability to the Pension Plan for shortfall and waiver amortization charges under 29 U.S.C. § 1362(c); and (iv) an estimated claim in the amount of $4,022,000 for statutory liability to the Pension Plan for unpaid minimum funding contributions under 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082, of which the PBGC asserts (a) $2,019,250 is secured by virtue of statutory liens arising under 26 U.S.C. § 412(n)(3) and/or § 430(k)(3) against all of the assets of the Debtors, and (b) an unliquidated portion is entitled to administrative or other priority (in the case of the proofs of claim filed by the PBGC against WTH and TFI, the claims described in clause (iv) are asserted only as general unsecured claims). In discussions relating to the PBGC Claim, the PBGC has asserted that certain of the Debtors' non-Debtor affiliates are jointly and severally liable for certain components of the PBGC Claim (including, but not limited to, the underfunding claim), and that the PBGC holds liens against certain non-Debtor affiliates securing the claim for unpaid minimum funding contributions. The Debtors dispute the amount, extent and priority of certain aspects of the PBGC Claim, including the validity of claims and liens asserted against non-Debtor affiliates.[15]

WTI has attempted to address its Pension Plan funding issues in a proactive and transparent manner commencing with a meeting with the staff of the PBGC and in a number of

---

[14] In a defined-benefit pension plan, benefits are specified by a fixed formula unrelated to the value of the pension fund. The sponsor of the pension plan is generally responsible for financing the benefits and must therefore make larger contributions when the value of the assets held by the pension fund declines. Because of the way the obligations of the pension plan are calculated, its funding position (that is, the relationship between its assets and liabilities) is also affected by the level of interest rates. Because payments will extend far in the future, the amount of funding today necessary to make those payments is adjusted for the time value of money by "discounting" them using certain interest rates. Therefore, low interest rates further add to the current obligations to the fund.

[15] The Debtors reserve all rights and defenses with respect to any and all claims and positions of the PBGC.

telephone conferences and other dialogue. On or about June 17, 2010, following the Debtors' decision to terminate the Pension Plan in a distress termination, the Plan Administrator for the Pension Plan filed Form 600 (Distress Termination Notice of Intent to Terminate) with the PBGC, seeking the termination and trusteeship of the Pension Plan by the PBGC. The decision to seek a distress termination was not made lightly. Rather, the Debtors viewed it as the only alternative available under the circumstances. Thereafter, the Debtors continued their contacts with the PBGC in order to progress towards a consensual termination of the Pension Plan and a resolution of liabilities associated therewith. However, negotiations with the PBGC could not materially progress until the Plan discussions with the Supporting Noteholders and the Supporting Preferred Holders concluded and an agreement was reached. As discussed in further detail below, because the Debtors only reached agreement with the Supporting Noteholders and the Supporting Preferred Holders shortly before the Petition Date, and because of an impending actionable event of default arising under the Note Indenture, the Debtors determined that the prudent course of action was to commence these chapter 11 cases and then continue negotiations with the PBGC.[16] As discussed in more detail in Section IV. I. below, following extensive negotiations with the PBGC and the Supporting Noteholders, the parties reached agreement on the treatment of the PBGC's claims under the Plan.

### C. Cost-Cutting, Restructuring Efforts and Successful Negotiations with Supporting Noteholders and Supporting Preferred Holders

Given their financial situation, the Debtors implemented extensive cost cutting and restructuring initiatives over the last several years. Starting in 2007, the Debtors embarked on an aggressive recapitalization plan. By 2009, the Debtors successfully raised approximately $92.5 million in gross equity proceeds, retired more than $100 million in outstanding debt, and refinanced their remaining outstanding debt through the issuance of the Notes. In connection with these efforts, in or about May of 2008, WTI also ceased payments of all dividends on its preferred stock resulting in savings of approximately $19 million.

The Company also undertook extensive cost cutting measures throughout its global operations. For example, the Company reduced its global headcount by more than 1,400 employees, sold several non-core business lines and facilities for aggregate proceeds of more than $80 million (the proceeds of which were used to retire debt and for working capital), closely monitored and limited capital expenditures, and reduced its corporate selling, general and administrative costs from $21 million to $14.5 million between 2007 and 2009.[17]

Importantly, however, these measures have not come at the cost of market share in the Company's core businesses. For example, despite continued global market softness, the Company improved by 3% and 8%, respectively, its market share in the industrial/residential HVAC and refrigeration markets for the period of 2009 through 2010. Also, the Company

---

[16]    The agreement reached with the Supporting Noteholders and the Supporting Preferred Holders is contingent upon satisfactory resolution of the Pension Plan issues either by reaching an agreement with the PBGC or by such other acceptable treatment of the Pension Plan liabilities.

[17]    These amounts exclude non-cash pension and stock option expenses and some one-time non-recurring expenses.

experienced approximately 10% volume growth in the technical tube market over the same period, which had a positive impact on profitability.

Notwithstanding these efforts (which are ongoing), the Debtors' current financial condition and their ongoing obligations render them unable to satisfy the current interest expense with respect to the Notes and their obligations in connection with the Pension Plan. Moreover, given the Debtors' general state of affairs and the state of the capital markets, the Debtors do not expect to be in a position to pay the principal on the Notes at maturity in 2012, through a refinancing or otherwise.

Accordingly, the Debtors have explored various refinancing alternatives, including the possibility of obtaining asset-based refinancing for all or a portion of the Notes. However, given the past and present state of the credit markets, and the Debtors' financial circumstances, there is no viable market for such a transaction or any other lending transaction. Nor is there any prospect for obtaining additional equity capital for the Debtors under their current capital structure. In addition, the Debtors considered and continue to explore various strategic alternatives, including asset sales.

Having considered and explored these alternatives, prior to the Petition Date the Debtors engaged an informal group of the Noteholders and Plainfield, which collectively hold in excess of 71% of the Notes, in good faith, arm's-length negotiations with respect to a consensual restructuring of the Debtors' capital structure. During the course of these negotiations, the Debtors considered a number of non-bankruptcy restructuring options, including a possible out-of-court exchange offer for the Notes. Ultimately, the parties determined that a financial restructuring could best be accomplished through a prearranged chapter 11 filing for the Debtors.

To maintain maximum liquidity while the Debtors continued to negotiate with the Supporting Noteholders and the Supporting Preferred Holders, the Debtors elected not to make the interest payment due under the Note Indenture and the Notes on September 30, 2010 (the "Interest Payment Default"). The Note Indenture provides for a 30-day grace period before the Interest Payment Default becomes an actionable event of default. Prior to the expiration of the 30-day grace period, the Debtors, the Supporting Noteholders and the Supporting Preferred Holders reached an agreement on a restructuring which was formalized in the Plan Term Sheet. Pursuant to the Plan Support Agreement, the Supporting Noteholders and the Supporting Preferred Holders, among other things, have agreed to vote in favor of, and to otherwise support a restructuring of the Debtors' capital structure and financial obligations pursuant to, the Plan (which contains the terms and conditions set forth in the Plan Term Sheet). An express condition to the Supporting Noteholders' support is a resolution of the Debtors' Pension Plan liabilities on terms and conditions acceptable to the Supporting Noteholders. As noted, following months of extensive negotiations, the Debtors, the PBGC and the Supporting Noteholders have reached a consensual agreement respecting the Debtors' Pension Plan liabilities as discussed in Section IV. I. below.

**D.   The Debtors Commence These Chapter 11 Cases**

As noted earlier, the Debtors filed these chapter 11 cases to effectuate the terms of the Term Sheet and the Plan Support Agreement. Because the Plan is based on a consensual

agreement with the Debtors' key stakeholders and contemplates a significant deleveraging of the Debtors' balance sheet -- including conversion of more than $100 million of the Notes to equity and reaching a settlement with the PBGC -- and a full recovery to holders of other general unsecured claims, the Debtors' goal always has been to have as short a stay as possible in chapter 11 while continuing negotiations with the PBGC and preserving the Debtors' business, including assuring the Debtors' large OEM customers of the Debtors' prospects for future success and viability, thereby maximizing the going concern value of the Debtors' business and assets.

## IV.  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

### A.  Overview Of Chapter 11 And Commencement Of Chapter 11 Cases

-    Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its finances, business and/or operations for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote the optimization of a debtor's assets and equality of treatment of similarly-situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of the debtor's bankruptcy petition. The Bankruptcy Code provides that a Chapter 11 debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The Debtors filed their Chapter 11 Cases with the Bankruptcy Court on November 1, 2010. The Debtors' cases were assigned to the Honorable Peter J. Walsh, United States Bankruptcy Judge for the District of Delaware. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Confirmation and consummation of a plan of reorganization are the principal objectives of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. In general, confirmation of a plan of reorganization by the bankruptcy court makes the plan binding, subject to the occurrence of the effective date, upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

Before soliciting acceptances of a proposed plan, section 1125(a) of the Bankruptcy Code requires a plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are transmitting this Disclosure Statement to, and soliciting votes from, Holders of Impaired Claims against them who are entitled to vote on the Plan in order to satisfy the requirements of section 1125(a) of the Bankruptcy Code.

The following is a brief description of some of the major events that have occurred during the Chapter 11 Cases.

## B. First Day Orders

On or shortly after the Petition Date, the Bankruptcy Court entered various orders designed to facilitate the orderly administration of the Debtors' chapter 11 cases and to minimize the disruption of the Debtors' business affairs, which are summarized below.

### 1. Wage Order

On November 2, 2010, the Bankruptcy Court entered an order, among other things, authorizing the Debtors to pay prepetition wages, salaries, commissions and other compensation, reimbursable employee expenses, contributions to prepetition employee benefit programs (and authorizing the Debtors to continue such programs), and workers' compensation obligations [Docket No. 33]. A portion of the relief in this order was deferred for consideration at a later hearing. On November 23, 2010, the Bankruptcy Court entered an order granting the remainder of the relief requested by the Debtors [Docket No. 129].

### 2. Order Authorizing Payment of General Unsecured Trade Claims

On November 2, 2010, the Bankruptcy Court entered an order authorizing the Debtors to pay, in their discretion, prepetition claims of general unsecured trade creditors in the ordinary course of business [Docket No. 37]. A portion of the relief in this order was deferred for consideration at a later hearing. On November 23, 2010, the Bankruptcy Court entered an order granting the remainder of the relief requested by the Debtors [Docket No. 131].

### 3. Order Authorizing Payment of Taxes and Fees

On November 2, 2010, the Bankruptcy Court entered an order authorizing the Debtors to pay certain pre-petition sales, use, franchise and property taxes, licensing fees and similar obligations [Docket No. 31].

### 4. Utilities Order

On November 2, 2010, the Bankruptcy Court entered an interim order prohibiting utility providers from altering, refusing or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts due, authorizing the Debtors to establish an adequate assurance deposit account, and establishing procedures for determining requests for additional adequate assurance [Docket No. 34]. On November 23, 2010, the Bankruptcy Court entered an order granting the relief in the interim utilities order on a final basis [Docket No. 130].

### 5. Customer Programs Order

On November 2, 2010, the Bankruptcy Court entered an order authorizing the Debtors to honor certain prepetition obligations to customers and to otherwise continue prepetition customer programs and practices (including hedging arrangements) [Docket No. 36].

6.    Other First Day Orders

In addition, the Bankruptcy Court entered the following orders on November 2, 2010: (a) authorizing the joint administration of the Debtors' chapter 11 cases [Docket No. 27]; (b) approving the Debtors' use of their existing cash management system and prepetition bank accounts and business forms [Docket No. 29]; (c) authorizing the Debtors to pay prepetition claims of shippers, warehousemen, and other lien claimants [Docket No. 35]; (d) authorizing the Debtors to continue their prepetition insurance coverage and to maintain existing financing of insurance premiums [Docket No. 32]; and (e) extending the Debtors' time to file their schedules and statement of financial affairs [Docket No. 28].

## C.    Retention of Debtors' Professionals

On November 23, 2010, the Bankruptcy Court entered orders authorizing the Debtors to retain and employ the law firms of Cozen O'Connor, P.C. as bankruptcy counsel [Docket No. 128] and Proskauer Rose LLP as special corporate and tax counsel [Docket No. 134]. In addition, on November 23, 2010, the Bankruptcy Court entered an order approving the retention of Deloitte Financial Advisory Services LLP as financial advisor to the Debtors [Docket No. 136]. Moreover, on November 23, 2010, the Bankruptcy Court entered (a) an order authorizing the retention and compensation of certain professionals in the ordinary course of business [Docket No. 132][18] and (b) an administrative order establishing procedures for the interim compensation and reimbursement of expenses for professionals and members of official committees [Docket No. 127].

The Debtors have retained Donlin, Recano & Company, Inc. as claims, noticing and balloting agent [Docket No. 38].

## D.    Use Of Cash Collateral

On November 2, 2010, the Bankruptcy Court entered an interim order, among other things, (i) authorizing the Debtors to use cash collateral, (ii) granting adequate protection to prepetition secured parties, and (iii) scheduling a hearing to consider entry of a final cash collateral order [Docket No. 30]. On November 23, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to use cash collateral and granting adequate protection to prepetition secured parties [Docket No. 133]. On March 24, 2011, the Debtors filed a first stipulation amending and extending the final cash collateral order [Docket No. 322].

The PBGC has filed an adversary proceeding complaint [Docket No. 307] (as well as a motion to correct the final cash collateral order [Docket No. 306]) challenging certain stipulations and admissions in the final cash collateral order and requesting that such order be corrected to exclude WTH from the scope of the security interests and other relief granted in

---

[18]    In accordance with such order, the Debtors have retained Keightly & Ashner LLP to provide legal services in connection with the Pension Plan and other matters relating to employee benefits.

such order.[19] All of the PBGC's claims set forth in its complaint and motion will be resolved pursuant to the PBGC Settlement Agreement discussed in Section IV. I. below.

### E. Sale of Certain Assets of Tube Forming, L.P.

On November 8, 2010, the Debtors filed a motion [Docket No. 60] for entry of (i) an order, among other things, (a) approving bidding procedures in connection with the sale of certain assets by Tube Forming and certain non-Debtor affiliates to Overstreet-Hughes Co., Inc., an affiliate of Mueller Industries, Inc., (b) approving a break-up fee and expense reimbursement, (c) scheduling an auction and hearing to consider the proposed sale, and (d) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases; and (ii) an order (a) approving the proposed sale, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (c) granting certain related relief.

On November 12, 2010, the Bankruptcy Court entered an order, among other things, approving bidding procedures in connection with the sale [Docket No. 88]. On December 20, 2010, the Bankruptcy Court entered an order approving the sale, without objection [Docket No. 206]. The sale was consummated on or about December 28, 2010, resulting in gross sale proceeds to the Debtors of approximately $6.9 million.

### F. Chapter 11 Schedules

On December 1, 2010, each of the Debtors filed its chapter 11 schedules of assets and liabilities and statements of financial affairs [Docket Nos. 160-169].

### G. Bar Date Order

On November 23, 2010, the Bankruptcy Court entered an order establishing (i) January 14, 2011 as the bar date for filing proofs of prepetition unsecured, secured, priority and section 503(b)(9) administrative expense claims (for all creditors other than governmental units) and (ii) May 2, 2011 as the bar date for governmental units to file prepetition proofs of claim [Docket No. 135].

### H. Order Extending Time to Assume or Reject Leases

On March 28, 2011, the Bankruptcy Court entered an order extending the Debtors' time to assume or reject any unexpired leases of nonresidential real property through and including May 30, 2011 [Docket No. 332].

### I. Settlement Agreement With PBGC

As discussed above, prior to the Petition Date, the Debtors, the Supporting Noteholders and the Supporting Preferred Holders entered into the Plan Support Agreement pursuant to which the parties agreed to support a consensual restructuring for the Debtors as provided in the

---

[19]     The rights, claims and defenses of the Debtors, the PBGC and the Noteholders with respect to the PBGC's adversary proceeding and motion are reserved.

Plan. However, an express condition precedent to the parties' agreement under the Plan Support Agreement is the resolution by the Debtors of all claims asserted by the PBGC relating to the Debtors' Pension Plan on terms acceptable to the Debtors and the Requisite Supporting Noteholders. Simply stated, the Debtors can no longer afford to maintain the Pension Plan or the tens of millions of dollars in projected annual contributions that would be necessary to fund the Pension Plan in the absence of a termination of the Pension Plan. Moreover, the Supporting Noteholders will not agree to the conversion of more than $100 million of their claims to equity, as contemplated by the Plan, absent a termination of the Pension Plan and an agreed upon resolution of the more than $131 million of claims asserted by the PBGC in connection with the Pension Plan.

As detailed in Section III. B. above, the PBGC has asserted various claims against each of the Debtors exceeding $131 million in the aggregate, of which the PBGC asserts that (a) approximately $2.019 million (relating to missed Pension Plan contributions) is secured by statutory liens on certain of the Debtors' assets, and (b) an unspecified portion thereof is entitled to priority or administrative expense claim status. The PBGC also has asserted that certain of the Debtors' non-Debtor affiliates are members of the "controlled group" under ERISA and, therefore, are jointly and severally liable for the PBGC's claims relating to the Pension Plan and that, pursuant to ERISA, the PBGC holds or will hold statutory liens against the assets of such non-Debtor affiliates to the extent of the PBGC's claims for unpaid contributions. The Debtors and the Ad Hoc Group dispute, among other things, (i) the amount, priority and extent of certain of the PBGC's claims, and (ii) the amount, nature and extent of claims or liens asserted by the PBGC against the Debtors' non-debtor affiliates.[20]

Commencing shortly after the Petition Date, the Debtors continued the settlement discussions with the PBGC and engaged in intensive negotiations with the PBGC and the Supporting Noteholders in efforts to reach consensual resolution of the PBGC's claims. In connection therewith, the Debtors provided the PBGC with extensive documentation and other information relating to, among other things, the Debtors' business operations, projections, and asset valuations. The Debtors and the PBGC also had numerous conferences and exchanged several settlement proposals. Certain of the Supporting Noteholders also were actively involved in the parties' settlement discussions. Ultimately, following almost 4 months of diligence and negotiations, the parties agreed to the terms of a comprehensive settlement of all claims asserted by the PBGC against the Debtors and their non-Debtor affiliates. The material terms of the settlement are contained in a Memorandum of Understanding ("MOU") that is attached as Exhibit A to the Plan. The Debtors and the PBGC are in the process of documenting a definitive agreement that will incorporate the terms contained in the MOU. Subject to and upon its execution by the parties, such definitive agreement will supersede the MOU and will be filed with the Bankruptcy Court (and upon such filing shall be deemed to constitute the PBGC Settlement Agreement discussed in the Plan and this Disclosure Statement).[21] The definitive PBGC Settlement Agreement must be satisfactory to the Requisite Supporting Noteholders (and,

---

[20]    Additionally, as noted in Section II. C. 1 above, the PBGC has disputed whether the claims asserted by the Noteholders are guaranteed by WTH or secured by WTH's assets.

[21]    Although the Debtors do not anticipate any difficulty in reaching agreement with the PBGC on the definitive agreement, there can be no assurances that the parties will ultimately agree to or execute such definitive agreement.

as noted above, representatives of certain of the Supporting Noteholders played an active role in negotiations leading up to the execution of the MOU).

The following is a summary of the material terms of the settlement terms contained in the MOU. Parties in interest are referred to the MOU for a complete description of its terms. In the event of a discrepancy between the summary contained herein and the actual terms of the MOU (or, upon its execution, the definitive agreement), the terms of the MOU (or, upon its execution, the definitive agreement) shall control.

(a) <u>Payments to PBGC</u>. Subject to earlier pre-payment as provided in subparagraph (b) below, the PBGC shall receive the following payments from Reorganized WTI:

(i) $4 million to be paid on the 12 month anniversary of the Effective Date. Reorganized WTI shall use its best efforts to sell Wolverine Tube Europe NV (the "<u>Netherlands Entity</u>") within 12 months from the Effective Date and, if the Netherlands Entity is sold within that time, the PBGC shall instead receive $3.75 million of the foregoing $4 million upon closing of such sale, with the balance (<u>i.e.</u>, $250,000) to be paid on the 12 month anniversary of the Effective Date;

(ii) $1.5 million to be paid on the 21 month anniversary of the Effective Date;

(iii) $1.5 million to be paid on the 33 month anniversary of the Effective Date;

(iv) $1.75 million to be paid on the 45 month anniversary of the Effective Date;

(v) $1.75 million to be paid on the 57 month anniversary of the Effective Date;

(vi) $1.75 million to be paid on the 69 month anniversary of the Effective Date;

(vii) $1.75 million to be paid on the 84 month anniversary of the Effective Date;

(viii) $1.75 million to be paid on the 96 month anniversary of the Effective Date;

(ix) $1.75 million to be paid on the 108 month anniversary of the Effective Date;

(x) $1.75 million to be paid on the 120 month anniversary of the Effective Date; and

(xi) $0.75 million to be paid on the 132 month anniversary of the Effective Date.

(b) <u>Prepayment</u>. Reorganized WTI may prepay its obligations at any time and from time to time without penalty or premium provided that any prepayment to the PBGC shall be calculated, as of such prepayment date, on a net present value basis using a discount rate of 8.50% (<u>i.e.</u>, the then remaining payment stream discounted to such prepayment date at 8.50%). Notwithstanding the foregoing, if Reorganized WTI prepays the entire remaining balance on or before the 57 month anniversary of the Effective Date, the payment set forth in item (a) (xi) above shall be eliminated and the PBGC shall instead receive the equivalent of the then remaining payment stream discounted to such date of payment at 8.50%. In the event of a partial prepayment by Reorganized WTI, the back end payments set forth in subparagraph (a) above (commencing in inverse order from item (a)(xi) above), shall be automatically adjusted to maintain the net present value of the payments to the PBGC as contemplated in the MOU.

(c) <u>Liquidity Event Payment</u>. If a Liquidity Event (as defined in the Plan) occurs, Reorganized WTI shall prepay all remaining amounts then owing to the PBGC in accordance with the prepayment provisions set forth in subparagraph (b) above.

(d) <u>Release of Liens; New Equity Pledge</u>. As soon as practicable after the Effective Date, the PBGC shall release all present liens and lien rights relating to the Pension Plan. The PBGC shall be granted a direct pledge of the 49.9% equity interest in the Netherlands Entity owned by Wolverine Tube Canada Limited Partnership, such pledge to be superior to any and all other pledges thereon and to be released upon the earlier of (i) the closing of the sale of the Netherlands Entity and concurrent payment to the PBGC of $3.75 million pursuant to subparagraph (a)(i) above, or (ii) absent a sale of the Netherlands Entity, the payment to the PBGC of $4.0 million pursuant to subparagraph (a)(i) above.

(e) <u>Grant of New Common Stock</u>. In addition to the payments described above, the PBGC shall receive five percent (5%) of the New Common Stock issued pursuant to the Plan, subject to dilution for additional shares of New Common Stock to be issued pursuant to the New Management Stock Incentive Plan and any future issuance of New Common Stock.

(f) <u>Dividends</u>. Until the PBGC obligation set forth in subparagraph (a) above is either fully prepaid or repaid, Reorganized WTI shall not be permitted to pay cash dividends to stockholders to the extent that, as of any dividend payment date, such dividends would exceed the aggregate of the payments made as of such date to the PBGC, provided that, after the third anniversary of the Effective Date, Reorganized WTI may pay cash dividends to stockholders, in the aggregate of up to $2 million in excess of the aggregate of the payments made to the PBGC as of that date.

(g) <u>Secured Indebtedness</u>. In addition to indebtedness contemplated by the Plan, Reorganized WTI shall be permitted to incur other secured indebtedness following the Effective Date to fund Reorganized WTI's business operations including, but not

limited to, indebtedness required for working capital purposes, secured credit facilities, capital expenses and leases, hedging, investment in business operations, and growth of operations. To be clear, Reorganized WTI cannot incur indebtedness if the proceeds thereof are to be used to pay dividends to its shareholders or repurchase stock.

(h) <u>Financial Information</u>. Reorganized WTI shall provide quarterly financial statements to the PBGC within 45 days after the end of each fiscal quarter, and annual financial statements within 120 days after the end of each fiscal year, or as soon as practicable thereafter as such financial statements become available. In addition, Reorganized WTI shall provide other customary reporting to the PBGC including, but not limited to, notice of default under any debt obligations of Reorganized WTI or its subsidiaries.

(i) <u>Releases</u>. Subject to mutually acceptable language in the Definitive Agreement, the PBGC, on its own behalf, and in every other capacity in which it may now or in the future act, shall grant releases to WTI, the members of the Wolverine Controlled Group (as defined in the MOU), the Noteholders, and their respective officers, directors, shareholders, managing agents, members, successors and assigns, from any claims, liability or obligations relating to the Pension Plan except for any liability arising as a result of a violation of fiduciary obligations to the Pension Plan.

(j) <u>Cross-Acceleration to New First Lien Notes</u>. The obligations to the PBGC set forth in the MOU shall be cross-accelerated to any acceleration of the New First Lien Notes.

The parties' obligations under the PBGC Settlement Agreement are expressly contingent on (i) the occurrence of the Effective Date of the Plan, and (ii) a distress or involuntary termination of the Pension Plan, with an agreed termination date established under ERISA, and the appointment of the PBGC as a statutory trustee of the Pension Plan. To date, the Pension Plan has not been terminated. The Debtors intend to continue to pursue an expeditious termination of their Pension Plan (which the Debtors believe will be achieved) through all available means which may include seeking judicial authorization to terminate the Pension Plan in the Bankruptcy Court.

## V.     THE PLAN OF REORGANIZATION

## A.     General

The following is a summary intended as a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan, a copy of which is annexed hereto as <u>Exhibit A</u>. Holders of Claims and Interests are respectfully referred to the relevant provisions of the Bankruptcy Code and are encouraged to review the Plan and this Disclosure Statement with their counsel.

In general, a Chapter 11 plan of reorganization must (i) divide claims and interests into separate categories and classes, (ii) specify the treatment that each category and class is to

receive under such plan, and (iii) contain other provisions necessary to implement the plan. A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of claims or interests in certain classes are to remain unchanged by the restructuring effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to vote to accept the plan. Accordingly, it is not necessary to solicit votes from holders of claims or interests in such "unimpaired" classes. Pursuant to section 1124(1) of the Bankruptcy Code, a class of claims or interests is "impaired," and entitled to vote on a plan, unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. §1124(1).

## B. Classification Of Claims And Interests

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

In compliance with section 1122 of the Bankruptcy Code, the Plan divides the Holders of Claims and Interests into two categories and nine Classes, and sets forth the treatment offered to each Class. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5). A "claim" against the Debtors also includes a claim against property of the Debtors, as provided in section 102(2) of the Bankruptcy Code. 11 U.S.C. § 102(2). An "interest" is an equity interest in a debtor.

For the holder of a claim to participate in a plan of reorganization and receive the treatment offered to the class in which it is classified, its claim must be "allowed." Under the Plan, *Allowed* is defined as: with respect to any Claim or Interest, except as otherwise specified herein, any of the following: (a) a Claim or Interest that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which (i) the Debtors or any other party in interest have not filed an objection, and (ii) no contrary Proof of Claim has been filed; (b) a Claim or Interest that is not a Disputed Claim or Disputed Interest, except to the extent that any such Disputed Claim or Disputed Interest has been allowed by a Final Order; or (c) a Claim or Interest that is expressly allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors or the Reorganized Debtors, or (iii) pursuant to the terms of the Plan.

**C.**     **Treatment Of Claims And Interests Under The Plan**

The Plan segregates the various Claims against, and Interests in, the Debtors into Administrative Expense Claims, Priority Tax Claims, Class 1 consisting of Non-Tax Priority Claims, Class 2 consisting of Other Secured Claims, Class 3 consisting of Note Claims, Class 4 consisting of General Unsecured Claims, Class 5 consisting of the PBGC Claim, Class 6 consisting of Old Preferred Stock Interests, Class 7 consisting of Old Common Stock Interests, Class 8 consisting of Section 510(b) Claims, and Class 9 consisting of Subsidiary Equity Interests.

Under the Plan, Claims in Classes 1, 2 and 4 and Interests in Class 9 are Unimpaired, and Claims in Classes 3, 5 and 8 and Interests in Classes 6 and 7 are Impaired. The treatment accorded to the Impaired Classes of Claims under the Plan represents the best treatment that can be provided to such Classes pursuant to the priority provisions of the Bankruptcy Code. Set forth below is a summary of the Plan's treatment of the various categories and Classes of Claims and Interests. This summary is qualified in its entirety by the full text of the Plan. In the event of an inconsistency between the Plan and the description contained herein, the terms of the Plan shall govern. The Plan is complicated and substantial. Time should be allowed for its analysis; consultation with a legal and/or financial advisor is recommended and should be considered.

    1.    Unclassified Categories of Claims

        (a)    Category 1 -- Administrative Expense Claims

In General. Except to the extent that a Holder of an Allowed Administrative Expense Claim has been paid by the Debtors prior to the Effective Date, each Holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim), in full and final satisfaction, release, settlement and discharge of such Administrative Expense Claim, shall be paid in full, in Cash, in such amounts as (a) are incurred in the ordinary course of business by the Debtors when and as such Claim becomes due and owing, (b) are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim or any other date specified in such order, or (c) may be agreed upon between the Holder of such Administrative Expense Claim and the Debtors. Notwithstanding anything to the contrary contained in the Plan, any Allowed Administrative Expense Claims in respect of Adequate Protection Obligations shall be deemed discharged, satisfied and released as provided in Section 3.6 of the Plan.

The Debtors believe that there will be no Allowed Administrative Expense Claims as of the Effective Date to be paid under the Plan other than day-to-day trade claims and other post-petition expenses incurred in the ordinary course (such as taxes) and amounts payable to Professional Persons.

Professional Compensation.

(a) Final Fee Applications. All final requests for payment of Professional Fee Claims, including the Holdback Amount and Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date, must be filed with the Bankruptcy Court and served on the Reorganized Debtors no later than thirty (30) days after the Confirmation Date.

After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any applicable orders of the Bankruptcy Court, the Allowed amounts of such Professional Fee Claims shall be determined and paid as directed by the Bankruptcy Court.

(b)   Post-Confirmation Date Fees and Expenses.   Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Reorganized Debtors. Upon the Confirmation Date, any requirement that Professional Persons comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional Person in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)   Category 2 -- Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim, in full and final satisfaction, release, settlement and discharge of such Priority Tax Claim, shall receive on account of such Claim, at the option of the Debtors, either payment in full in Cash as soon as reasonably practicable after the Effective Date, or in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash: (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code; (iii) over a period ending not later than five (5) years after the Petition Date; and (iv) in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan. Each Holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided in the Plan, and upon such full and final payment, such Lien shall be deemed to have been satisfied and shall be null and void and unenforceable for all purposes.

The Debtors believe that the estimated amount of Allowed Priority Tax Claims as of the Effective Date to be paid under the Plan will be approximately $150,000.

2.   Unimpaired Classes of Claims and Interests

A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of claims or interests in certain classes are to remain unchanged by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to vote to accept the plan. Accordingly, it is not necessary to solicit votes from holders of claims or interests in such "unimpaired" classes. Under the Plan, Non-Tax Priority Claims (Class 1), Other Secured Claims (Class 2), General Unsecured Claims (Class 4), and Subsidiary Equity Interests (Class 9) are Unimpaired and, therefore, are deemed to have accepted the Plan.

(a)      Class 1 -- Non-Tax Priority Claims

**Non-Impairment.** Class 1 consists of all Non-Tax Priority Claims. Class 1 is Unimpaired, and pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

**Treatment.** The legal, equitable and contractual rights of the Holders of Allowed Non-Tax Priority Claims are unaltered by the Plan. Each Holder of an Allowed Non-Tax Priority Claim, in full and final satisfaction, release, settlement and discharge of such Allowed Non-Tax Priority Claim, shall be paid in full, in Cash, on the Effective Date or in accordance with the terms of any agreement between the Debtors and the Holder of an Allowed Non-Tax Priority Claim or on such other terms and conditions as are acceptable to the Debtors and the Holder of an Allowed Non-Tax Priority Claim.

The Debtors believe that there will be no Allowed Non-Tax Priority Claims as of the Effective Date to be paid under the Plan other than accrued employee benefit claims that will be paid in the ordinary course of business.

(b)      Class 2 -- Other Secured Claims

**Non-Impairment.** Class 2 consists of all Other Secured Claims. Class 2 is Unimpaired, and pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

**Treatment.** The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan. On the Effective Date, each Allowed Other Secured Claim, in full and final satisfaction, release, settlement and discharge of such Allowed Other Secured Claim, shall be, at the Debtors' option, (a) Reinstated, (b) satisfied by the Debtors' surrender of the collateral securing such Claim, (c) offset against, and to the extent of, the Debtors' claims against the Holder of such Claim, or (d) otherwise rendered Unimpaired, except to the extent the Reorganized Debtors and such Holder agree to a different treatment.

The Debtors do not believe there are any Allowed Other Secured Claims.

(c)      Class 4 -- General Unsecured Claims

**Non-Impairment.** Class 4 consists of all General Unsecured Claims. Class 4 is Unimpaired, and pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims in Class 4 are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

**Treatment.** On or as soon as practicable after the Effective Date, except to the extent a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or has been paid prior to the Effective Date, each Holder of an Allowed General Unsecured Claim, in full and final satisfaction, release, settlement and discharge of such Allowed General Unsecured Claim, shall be paid in full, in Cash, in the ordinary course of business or shall receive such other

treatment as shall render it Unimpaired. Any Allowed General Unsecured Claim that is not due and payable on or before the Effective Date shall be paid thereafter (i) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed General Unsecured Claim, or (ii) in accordance with the course of practice between the Debtors and the Holder of such Allowed General Unsecured Claim. Notwithstanding anything to the contrary in the Plan, the Unimpaired Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

The Debtors believe that the estimated amount of Allowed General Unsecured Claims as of the Effective Date to be paid under the Plan will be approximately $900,000.[22]

(d)     Class 9 -- Subsidiary Equity Interests

Non-Impairment. Class 9 consists of Subsidiary Equity Interests. Class 9 is Unimpaired, and pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Subsidiary Equity Interests in Class 9 are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Treatment. The legal, equitable and contractual rights of the Holders of Allowed Subsidiary Equity Interests are unaltered by the Plan. All Subsidiary Equity Interests shall be retained by Reorganized WTI.

3.     Impaired Classes of Claims and Interests

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is impaired unless the legal, equitable, and contractual rights of the holders of claims or interests in such class are not modified or altered by a plan. Holders of allowed claims and equity interests in impaired classes that receive or retain property under a plan of reorganization are entitled to vote on such plan. Under the Plan, the Note Claims (Class 3) and the PBGC Claim (Class 5) are Impaired and, therefore, entitled to vote on the Plan. Holders of Old Preferred Stock Interests (Class 6), Old Common Stock Interests (Class 7), and Section 510(b) Claims (Class 8) are not entitled to vote on the Plan because they are not receiving or retaining any property thereunder, and therefore are deemed to reject the Plan.

(a)     Class 3 -- Note Claims

Impairment. Class 3 consists of the Note Claims. Class 3 is Impaired, and the Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

Allowance. For purposes of voting to accept or reject the Plan and receiving distributions under the Plan, the Note Claims shall be deemed Allowed in the aggregate principal amount of approximately $131.3 million plus approximately $6.4 million of accrued and unpaid Cash

---

[22]     This amount excludes certain estimated accrued liabilities which will not be payable as of the Effective Date including, without limitation, accrued environmental, medical, vacation/holiday and workers' compensation liabilities, and current and long-term post-retirement benefits.

interest through September 30, 2010 plus any thereafter accrued and unpaid Cash and paid-in-kind interest for the period up to and including the Petition Date.

Treatment. On or as soon as practicable after the Effective Date, Holders of Allowed Note Claims, in full and final satisfaction, release, settlement and discharge of such Allowed Note Claims and any Adequate Protection Obligations (other than as set forth in Section 3.6(e) of the Plan), shall receive their Pro Rata share of (i) ninety-five percent (95%) of the New Common Stock, subject to dilution for additional shares of New Common Stock to be issued pursuant to the New Management Stock Incentive Plan and any future issuance of New Common Stock, (ii) the New First Lien Notes, and (iii) a distribution of Cash in an aggregate amount equal to the Net Distributable Cash, if any; provided, however, that each Holder of an Allowed Note Claim may designate one of its affiliates to receive the shares of New Common Stock to which it would otherwise be entitled. Each Holder of an Allowed Note Claim (or its designated affiliate) shall be required to execute and deliver to the Reorganized Debtors a signature page to the New Stockholders' Agreement as a condition precedent to receiving any distribution of New Common Stock pursuant to the Plan.

Principal Terms of New First Lien Notes. The New First Lien Notes shall be issued by Reorganized WTI in the aggregate principal amount of $30 million less, on a dollar for dollar basis, the amount of any Net Distributable Cash distributed on the Effective Date to the Holders of Allowed Note Claims under the Plan. The New First Lien Notes shall mature on the third anniversary of the Effective Date. The First Lien Notes shall be callable at any time at par plus accrued interest and shall bear interest at a rate per annum equal to 6.0% in year 1, 12.0% in year 2 (of which a portion equal to 6.0% per annum shall be payable-in-kind) and 16.0% in year 3 (of which a portion equal to 10.0% per annum shall be payable-in-kind). Notwithstanding the foregoing, subject to the written consent of the Requisite Supporting Noteholders, the foregoing terms of the New First Lien Notes may be modified to extend the maturity date and/or to adjust the interest rate. The final terms of the New First Lien Notes, including any such agreed modifications thereto, shall be contained in the form of the New First Lien Notes and/or New First Lien Notes Indenture to be filed with the Bankruptcy Court as part of the Plan Supplement. Interest shall be due and payable semi-annually in arrears, beginning on the last day of the calendar month immediately following the 6 month anniversary of the Effective Date. The New First Lien Notes shall be subject to mandatory redemption in an amount equal to 100% of the net Cash proceeds of all asset sales consummated after the Effective Date (including, without limitation, any asset sale consummated after the Effective Date but as to which a motion to approve such sale was pending in the Bankruptcy Court prior to the Effective Date) and proceeds from insurance and casualty receipts received after the Effective Date (subject to exceptions and reinvestment rights that are mutually acceptable to the Debtors and the Requisite Supporting Noteholders); provided, however, that any such asset sale as to which a motion to approve such sale was pending in the Bankruptcy Court prior to the Effective Date shall be subject to the prior written consent of the Requisite Supporting Noteholders. The New First Lien Notes shall be eligible for resale under Rule 144A of the Securities Act. The New First Lien Notes Indenture shall have covenants, representations, defaults and other provisions substantially similar to those contained in the Note Indenture (subject to modifications to reflect the relevant terms set forth in the Plan, to include customary and mutually acceptable information rights provisions and other modifications that are mutually acceptable to the Debtors and the Requisite Supporting Noteholders). Notwithstanding anything to the contrary contained in the Plan (including,

without limitation, the definition of Net Distributable Cash), if initial Unrestricted Cash and cash equivalents available to the Reorganized Debtors on the Effective Date is less than $10 million, then the net proceeds payable from assets sales after the Effective Date shall be reduced by an amount sufficient to make up the shortfall in the amount of the opening Unrestricted Cash and cash equivalents available to the Reorganized Debtors on the Effective Date.

Except as provided below, the New First Lien Notes shall be guaranteed by each domestic subsidiary of Reorganized WTI and secured by a first priority, properly perfected lien on substantially all assets (including real property) of Reorganized WTI and its domestic subsidiaries (subject to permitted liens as set forth in the New First Lien Notes Indenture). The collateral shall include a pledge of all of the issued and outstanding stock of all subsidiaries of Reorganized WTI and its domestic subsidiaries; provided that in the case of any foreign subsidiary such pledge shall be limited to 100% of nonvoting stock and 65% of voting stock. For purposes of the New First Lien Notes, "subsidiary" shall have the meaning ascribed to such term under the Note Indenture. No joint venture shall be required to guaranty, or grant liens on its assets to secure, the New First Lien Notes. The equity interests of Reorganized WTI or its subsidiaries in any joint venture shall not constitute collateral for the New First Lien Notes if such pledge is prohibited pursuant to a bona fide agreement with the applicable joint venture partner. For purposes of clarity, Wolverine China Investments LLC and Wolverine Wieland Heat Transfer Technology LLC will not guaranty the New First Lien Notes or pledge any assets to secure the New First Lien Notes, and the equity interests therein shall not constitute collateral for the New First Lien Notes.

Fees and Expenses of Professionals of the Supporting Noteholders. All unpaid reasonable fees and expenses of the professionals retained by the Ad Hoc Group and Plainfield, including lead and local counsel to the Ad Hoc Group and Plainfield, in accordance with the terms of the Cash Collateral Order, shall be paid in full in Cash as Administrative Expense Claims of the Debtors' Estates by the Reorganized Debtors on the Effective Date.

Cancellation of Notes and Related Instruments. As of the Effective Date, all Notes, the Note Indenture and all agreements, Instruments and other documents evidencing the Note Claims and the rights of the Holders thereof, shall be cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), other than as evidence of any right to receive distributions under the Plan, and all obligations of any Person (including, without limitation, the Note Trustee) under such Instruments and agreements (including, without limitation, any Note Trustee Charging Lien and any Lien securing any Adequate Protection Obligations) shall be fully and finally satisfied and released and the Note Trustee shall be discharged and released of all liabilities and obligations with respect to the foregoing without any further act or order of the Bankruptcy Court or any other Person. Without limiting the foregoing, each Holder of a Note Claim shall be deemed to consent to the cancellation and release of any guarantee, Instrument, agreement or other documents respecting payment of the Notes and the release of any and all Claims it may have with respect to any Property or assets of the Debtors and/or the Reorganized Debtors. Notwithstanding the termination of the Note Indenture and the Notes, the provisions of such documents shall govern the relationships of the Note Trustee and the Holders of the Notes. Notwithstanding the foregoing and anything contained in the Plan, the Note Indenture shall continue in effect to the extent necessary to allow the Debtors, the

Reorganized Debtors or the Note Trustee to make distributions pursuant to the Plan on or about the Effective Date on account of the Note Claims.

Note Trustee Charging Lien. On the Effective Date, the Reorganized Debtors shall pay, in Cash, the reasonable fees, costs and expenses of the Note Trustee, in an amount to be agreed upon between the Debtors and the Note Trustee or in the event the parties cannot reach agreement on the amount thereof, such amount as shall be determined by the Bankruptcy Court. Upon receipt of such payment, any Note Trustee Charging Lien shall automatically be deemed released. Such payment shall be in full and final satisfaction of all pre- and post-petition Claims of the Note Trustee. Distributions to Holders of Notes pursuant to the Plan will not be reduced on account of payments made to the Note Trustee for fees and expenses secured by any Note Trustee Charging Lien.

(b)    Class 5 -- PBGC Claim

Impairment. Class 5 consists of the PBGC Claim. Class 5 is Impaired, and the Holder of the Class 5 Claim is entitled to vote on the Plan.

Treatment. On or as soon as practicable after the Effective Date, in full and final satisfaction, release, settlement and discharge of the PBGC Claim, the Holder of the PBGC Claim shall receive the treatment set forth in the PBGC Settlement Agreement attached as Exhibit A to the Plan. A summary of the terms of the PBGC Settlement Agreement is set forth in Section IV. I. of this Disclosure Statement.

(c)    Class 6 -- Old Preferred Stock

Impairment. Class 6 consists of all Old Preferred Stock Interests. Class 6 is Impaired, and pursuant to section 1126(g) of the Bankruptcy Code, the Holders of Old Preferred Stock Interests in Class 6 are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

Treatment. On the Effective Date, all Old Preferred Stock shall be cancelled, and Holders of Old Preferred Stock Interests shall not receive or retain any Property under the Plan on account of such Old Preferred Stock Interests.

(d)    Class 7 -- Old Common Stock

Impairment. Class 7 consists of all Old Common Stock Interests. Class 7 is Impaired, and pursuant to section 1126(g) of the Bankruptcy Code, the Holders of Old Common Stock Interests in Class 7 are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

Treatment. On the Effective Date, all Old Common Stock shall be cancelled, and Holders of Old Common Stock Interests shall not receive or retain any Property under the Plan on account of such Old Common Stock Interests.

(e)    Class 8 -- Section 510(b) Claims

Impairment. Class 8 consists of all Section 510(b) Claims. Class 8 is Impaired, and pursuant to section 1126(g) of the Bankruptcy Code, Holders of Section 510(b) Claims in Class 8 are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

Treatment. On the Effective Date, all Section 510(b) Claims shall be cancelled, and Holders of Allowed Section 510(b) Claims shall not receive or retain any Property under the Plan on account of such Allowed Section 510(b) Claims.

The Debtors do not believe there are any Allowed Section 510(b) Claims.

## D.  Means For Execution And Implementation Of The Plan

Plan Funding. The funds utilized to make Cash payments under the Plan have been and/or will be generated from, among other things, Cash available from the operation of the Debtors' business and/or asset dispositions.

Authorization and Issuance of New Common Stock. On the Effective Date, Reorganized WTI shall have authorized shares of a single class of New Common Stock in such amount as shall be necessary or appropriate in connection with consummation of the Plan (subject to adjustment pursuant to Section 7.7 of the Plan). On or as soon as practicable after the Effective Date, Reorganized WTI shall issue, in accordance with the terms of the Plan, a sufficient number of shares of New Common Stock as is necessary to consummate the Plan (and subject to adjustment pursuant to Section 7.7 of the Plan). All shares of New Common Stock to be issued pursuant to the Plan shall be, upon issuance, fully paid and non-assessable, and shall be subject to dilution for shares of New Common Stock issued pursuant to the New Management Stock Incentive Plan and future issuances as authorized by the board of directors of Reorganized WTI. In the period pending distribution of the New Common Stock to any Holder of an Allowed Note Claim (or its designated affiliate) entitled to receive such distribution, such Holder (or its designated affiliate) shall be bound by, have the benefit of and be entitled to enforce the terms and conditions of, the New Stockholders' Agreement and shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of the New Common Stock to be distributed to it (including receiving any proceeds of any permitted transfer of such New Common Stock) and to exercise all other rights in respect of the New Common Stock (so that such Holder (or its designated affiliate) shall be deemed for tax purposes to be the owner, as of the Effective Date, of the New Common Stock to be distributed to it).

New Stockholders' Agreement. The holders of the New Common Stock shall be party to the New Stockholders' Agreement, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Supporting Noteholders and the PBGC and which shall be included in the Plan Supplement. The New Stockholders' Agreement shall be binding on all holders of New Common Stock and shall include, as may be agreed upon between the Debtors and the Requisite Supporting Noteholders, (i) tag-along rights that allow holders of New Common Stock to participate in any sale transaction that results in a majority of the New Common Stock being held by a single stockholder or group of stockholders (other than, in each case, the stockholders on the Effective Date and their affiliates), (ii) drag-along rights for any sale of the Debtors or the Reorganized Debtors, as applicable, that is approved by the board of directors and the holders of a majority of the New Common Stock, provided that any purchaser in a drag-along sale must

acquire 100% of the New Common Stock held by Plainfield and if the board of directors' approval of the drag-along sale is not unanimous, there shall be delivered a fairness opinion from a nationally recognized investment bank as to the fairness to the stockholders of the transaction from a financial point of view, (iii) preemptive rights for holders of New Common Stock who are accredited investors (and not competitors of the business), (iv) piggyback registration rights, (v) demand registration rights that can be exercised by holders of New Common Stock that meet minimum ownership requirements six months after an initial public offering or after 3 years after the Effective Date, (vi) restrictions on transfers to competitors by stockholders, (vii) information rights for holders of New Common Stock (other than competitors or management shareholders who are no longer employed), (viii) inspection rights for holders of New Common Stock (other than competitors of the business) that meet minimum ownership requirements, and (ix) a requirement that transactions with affiliates be approved by a majority of disinterested directors. Each Holder of an Allowed Note Claim (or its designated affiliate) and the Holder of the PBGC Claim shall be required to execute and deliver to the Reorganized Debtors a signature page to the New Stockholders' Agreement as a condition precedent to receiving any distribution of New Common Stock pursuant to the Plan.

Issuance of New First Lien Notes. On the Effective Date, Reorganized WTI shall enter into the New First Lien Notes Indenture and issue the New First Lien Notes pursuant to the terms thereof.

Cancellation and Surrender of Existing Securities and Agreements.

(a) Except as may otherwise be provided in the Plan, on the date distributions are made, the promissory notes, share certificates, bonds and other Instruments evidencing any Claim or Interest shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors (and, as applicable, any non-Debtor subsidiaries and affiliates of the Debtors) under the agreements, indentures and certificates of designations governing such Claims and Interests, as the case may be, shall be discharged and released.

(b) Except as otherwise provided in the Plan or agreed by Reorganized WTI, each holder of a promissory note, share certificate, bond or other Instrument evidencing a Claim shall surrender such promissory note, share certificate, bond or Instrument to Reorganized WTI (or the Disbursing Agent). No distribution of Property under the Plan shall be made to or on behalf of any such holders unless and until such promissory note, share certificate, bond or Instrument is received by Reorganized WTI (or the Disbursing Agent), or the unavailability of such promissory note, share certificate, bond or Instrument is established to the reasonable satisfaction of Reorganized WTI (or the Disbursing Agent), or such requirement is waived by Reorganized WTI. Reorganized WTI may require any holder that is unable to surrender or cause to be surrendered any such promissory notes, share certificates, bonds or Instruments to deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized WTI. Any holder that fails within the later of six months after the Effective Date and the date of allowance of its Claim (i) to surrender or cause to be surrendered such promissory note, share certificate, bond or Instrument and (ii) if requested, to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized WTI (or the Disbursing Agent), shall be deemed to have forfeited all rights, Claims and Causes of Action against the Debtors and Reorganized Debtors

and shall not participate in any distribution under the Plan; provided, however, any Holder of a Note for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof shall be deemed to have surrendered its Note upon the surrender of such global security by DTC or such other securities depository or custodian thereof.

Revesting of Assets and Operation of Businesses. Except as otherwise set forth in the Plan or in the Confirmation Order, as of the Effective Date, all Property of the respective Debtors' Estates shall revest in the respective Reorganized Debtors free and clear of all Claims, Liens, encumbrances and other Interests of the Holders of Claims or Interests. Subsidiary Equity Interests shall be retained, and the legal, equitable and contractual rights to which the Holders of such Allowed Subsidiary Equity Interests are entitled shall remain unaltered.

Retention of Causes of Action. Except as otherwise provided in the Plan, the Confirmation Order, or in any settlement agreement approved during the Chapter 11 Cases: (1) any and all rights, Claims, Causes of Action, defenses, and counterclaims of or accruing to the Debtors or their Estates shall remain assets of and vest in the Reorganized Debtors, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, Causes of Action, defenses, and counterclaims have been listed or referred to in the Plan, the Schedules, or any other document filed with the Bankruptcy Court, and (2) neither the Debtors nor the Reorganized Debtors waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes Property of the Estates: (a) whether or not such right, Claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Plan or the Schedules, or any other document filed with the Bankruptcy Court, (b) whether or not such right, Claim, Cause of Action, defense, or counterclaim is currently known to the Debtors, and (c) whether or not a defendant in any litigation relating to such right, Claim, Cause of Action, defense, or counterclaim filed a Proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan. Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, Cause of Action, defense, or counterclaim, or potential right, Claim, Cause of Action, defense, or counterclaim, in the Plan, the Schedules, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Reorganized Debtors' right to commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, or counterclaims that the Debtors or the Reorganized Debtors has, or may have, as of the Confirmation Date. The Reorganized Debtors may commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, and counterclaims in their sole discretion, in accordance with what is in the best interests, and for the benefit, of the Reorganized Debtors.

Waiver of Avoidance Actions. Notwithstanding anything to the contrary contained in the Plan, as of and subject to the occurrence of the Effective Date, the Debtors and the Reorganized Debtors, for and on behalf of themselves and their Estates, hereby waive and release any of the Causes of Action under sections 510, 542, 544, 547, 548, 549, 550, 551 and 553 of the

Bankruptcy Code; provided, however, that the foregoing waiver and release shall not apply to any such Causes of Action that are pending on the Effective Date.

Satisfaction of Claims or Interests. Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims shall be in full and final satisfaction, release, settlement and discharge of such Allowed Claims.

Continuation of Bankruptcy Injunction or Stays. All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Administration Pending Effective Date. Prior to the Effective Date, the Debtors shall continue to operate their businesses as debtors-in-possession, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules. After the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article XII of the Plan.

Exemption From Securities Laws. The issuance of the New Common Stock, the New First Lien Notes and any other security that may be deemed to be issued pursuant to the Plan shall be exempt from any federal, state or local laws requiring registration for the offer and sale of such securities or registration or licensing of an issuer of, underwriters of, or broker or dealer in, such securities, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

"Change of Control" Provisions. Notwithstanding anything to the contrary contained in the Plan, the Note Indenture, or any executory contract to which any of the Debtors is a party, the transactions to be consummated in accordance with the Plan shall not create, or be deemed to create, (a) any right on the part of a Noteholder to require that any of the Debtors or the Reorganized Debtors repurchase such Holder's Note or (b) any other claim in connection therewith, upon a "Change of Control," as such term may be defined in the Note Indenture or in any executory contract being assumed pursuant to the Plan.

Substantive Consolidation of the Debtors for Voting and Distribution Purposes Only. On and after the Effective Date, except for Other Secured Claims in Class 2, and solely for purposes of voting on, and making distributions under, the Plan, each and every Claim in the Debtors' Chapter 11 Cases against any of the Debtors shall be deemed filed against the consolidated Debtors, and shall be deemed a single consolidated Claim against and obligation of the consolidated Debtors. Such limited consolidation shall in no manner affect or alter (other than for Plan voting and distribution purposes) (i) the legal and corporate structures of the Reorganized Debtors, or (ii) pre- and post-Petition Date Liens, guarantees and security interests that are required to be maintained (x) in connection with contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code and/or the Plan, (y) in connection with the terms of the New First Lien Notes, and (z) pursuant to the terms and conditions contained in the Plan. From and after the Effective Date, each of the Reorganized Debtors will be deemed a separate and distinct entity, properly capitalized, vested with all of the assets of such Debtor as they existed prior to the Effective Date and having the liabilities and obligations provided for under the Plan.

Notwithstanding anything in Section 4.15 of the Plan to the contrary, all post-Effective Date fees payable to the United States Trustee pursuant to 28 U.S.C. §1930, if any, shall be calculated on a separate legal entity basis for each Debtor.

## E.     Corporate Governance and Management of the Reorganized Debtors

Corporate Existence.  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to its certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

Management of Reorganized Debtors.  On the Effective Date, the management, control and operation of the Reorganized Debtors shall become the general responsibility of the board of directors of Reorganized WTI, which shall, thereafter, have responsibility for the management, control and operation of Reorganized WTI and its direct and indirect subsidiaries in accordance with applicable law.

New Management Stock Incentive Plan.  On the Effective Date, the New Management Stock Incentive Plan shall be (and shall be deemed to be) adopted by the Reorganized Debtors, and by voting to accept the Plan, all Holders of Claims shall be deemed to have ratified and approved the New Management Stock Incentive Plan.  The New Management Stock Incentive Plan shall be effective immediately on the Effective Date, and shall be deemed to replace and supersede all prior stock incentive plans (or components of other incentive plans governing stock incentives, but not any other components of such incentive plans) of WTI in effect on and as of the Effective Date.  Pursuant to the New Management Stock Incentive Plan, eight percent (8%) of the New Common Stock, on a fully diluted basis, shall be reserved for issuance to eligible employees, directors, officers or consultants and advisors of Reorganized WTI in the form of restricted stock (50%) and options (50%).  The allocation and vesting schedule for issuances under the New Management Stock Incentive Plan shall be determined by the board of directors of Reorganized WTI.  All options governed by the New Management Stock Incentive Plan shall have an exercise price based upon an equity value of Reorganized WTI of $70 million and shall expire on the tenth anniversary of the Effective Date.

Board Of Directors of Reorganized Debtors.  On the Effective Date, the board of directors of Reorganized WTI shall be composed of a newly-organized five member board of directors which shall consist of (i) one director nominated by Plainfield, (ii) one director nominated by the Ad Hoc Group, (iii) Steven S. Elbaum, who will serve as initial Chairman, and (iv) two other individuals to be mutually agreed upon by the Ad Hoc Group and Plainfield prior to Confirmation.  From and after the eighteen month anniversary of the Effective Date, all directors of Reorganized WTI shall be elected by a vote of a majority of the shares of New

Common Stock represented in person or by proxy at a stockholders' meeting. The Debtors shall disclose on or before the Confirmation Date the names of the Persons to be appointed to the board of directors of Reorganized WTI pursuant to section 5.4 of the Plan. The board of directors of each Reorganized Debtor (other than Reorganized WTI) shall be identified and selected by the board of directors of Reorganized WTI and consist of some or all of the members of the board of directors of Reorganized WTI. In accordance with Section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose on or before the Confirmation Date the identity and affiliations of any Person proposed to serve on the initial board of directors of the Reorganized Debtors.

Officers of Reorganized Debtors. On the Effective Date, the officers of the respective Debtors immediately prior to the Effective Date shall serve as the officers of the Reorganized Debtors. After the Effective Date, the officers of the Reorganized Debtors shall be determined by the board of directors of the Reorganized Debtors.

Indemnification of Post-Effective Date Directors and Officers. The amended certificates of incorporation and articles of organization or formation of the Reorganized Debtors shall authorize the Reorganized Debtors to indemnify and exculpate their respective officers, directors, managers and agents to the fullest extent permitted under applicable law.

## F.   Distributions Under the Plan

Distributions to Holders of Allowed Claims Only. Until a Disputed Claim becomes an Allowed Claim, distributions of Cash, New Common Stock and/or other Instruments or Property otherwise available to the Holder of such Claim shall not be made. Prior to the Effective Date, Holders of Note Claims shall be required to provide the Disbursing Agent an Internal Revenue Service Form W-9 (or, if applicable, an appropriate Internal Revenue Service Form W-8).

Distribution Record Date. As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed. The Debtors shall have no obligation to recognize, but may, in their sole and absolute discretion, recognize any transfer of any such Claims occurring on or after the Distribution Record Date. The Debtors or the Reorganized Debtors, as applicable, will be entitled to recognize only those record holders of such Claims stated on the transfer ledgers as of the close of business on the Distribution Record Date. Subject to the foregoing, the Distribution Record Date shall be the record date for purposes of making distributions under the Plan.

Disbursing Agent. The Reorganized Debtors, as Disbursing Agent, or such other Entity designated by the Reorganized Debtors as a Disbursing Agent, shall make all distributions under the Plan when required by the Plan. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

Rights and Powers of Disbursing Agent. The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, Instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated by the Plan, and (c)

exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

Delivery of Distributions.

In General. Subject to Bankruptcy Rule 9010 and except as otherwise provided in Section 7.5.2 of the Plan, all distributions to any Holder of an Allowed Claim including, without limitation, distributions of New Common Stock and, to the extent applicable, Cash, to Holders of Allowed Note Claims, shall be made at the address of such Holder as set forth in the Debtors' books and records and/or on the Schedules filed with the Bankruptcy Court unless the Debtors or their Disbursing Agent have been notified in writing of a change of address including, without limitation, by the filing of a Proof of Claim by such Holder that contains an address for such Holder different from the address reflected on such books and records or Schedules for such Holder.

Distributions of New First Lien Notes. Distributions of New First Lien Notes to Holders of Allowed Note Claims shall be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the DTC shall be instructed to effect such distributions on a Pro Rata basis as provided under the Plan. The New First Lien Notes will be issued in denominations of $1,000 principal amount or integral multiples thereof, and the Pro Rata principal amount of New First Lien Notes to be distributed to each Holder of an Allowed Note Claim as provided in the Plan will be rounded up or down, as applicable, in accordance with the customary practices of the DTC (and no Cash shall be payable with respect to any portion of the Pro Rata principal amount that was subtracted to effect such rounding).

Timing of Distributions. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and if so completed shall be deemed to have been completed as of the required date.

Distributions of Unclaimed Property. In the event that any distribution to any Holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest or accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the six month anniversary of the Effective Date. After that date, all unclaimed property or interest in property shall revert to the Reorganized Debtors and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

Time Bar to Cash Payments. Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Holders of Allowed Claims shall make all requests for reissuance of checks to the Reorganized Debtors. Any Claim in respect of a voided check must be made on or before the six month anniversary of the date of issuance. After such date, all Claims and

respective voided checks shall be discharged and forever barred and the Reorganized Debtors shall retain all monies related thereto.

Fractional Shares. No fractional shares of New Common Stock shall be issued or distributed under the Plan. The actual distribution of shares of New Common Stock shall be rounded to the next higher or lower number as follows: (a) fractions of one-half (1/2) or less shall be rounded to the next lower whole number, and (b) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number. The total number of shares of New Common Stock to be distributed under the Plan shall be adjusted as necessary to account for such rounding. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Debtors, the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one share of New Common Stock.

Setoffs. The Debtors or the Reorganized Debtors may, but shall not be required to, set off or recoup against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Allowed Claim, any claims, rights or Causes of Action of any nature whatsoever that the Debtors or Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, rights or Causes of Action.

## G.  Procedures for Disputed Claims

Resolution of Disputed Claims. Except as set forth in any order of the Bankruptcy Court, any Holder of a Claim against the Debtors shall file a Proof of Claim with the Bankruptcy Court or with the agent designated by the Debtors for this purpose on or before the Claims Bar Date. The Debtors prior to the Effective Date, and thereafter the Reorganized Debtors, shall have the exclusive authority to file objections to Proofs of Claim on or before the Claims Objection Bar Date, and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether classified or otherwise. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

Estimation of Claims. Any Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

No Partial Distributions Pending Allowance. Notwithstanding any other provision in the Plan, except as otherwise agreed by the Debtors or the Reorganized Debtors, no partial payments or distributions shall be made with respect to a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order.

Distributions After Allowance. To the extent a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Plan. Any such distributions shall be made in accordance with and at the time mandated by the Plan. No interest shall be paid on any Disputed Claim that later becomes an Allowed Claim.

## H.    Executory Contracts And Unexpired Leases

Assumption of Executory Contracts and Unexpired Leases. As of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party and which are listed on a schedule to be filed with the Plan Supplement (the "Rejected Contracts Schedule") shall be and shall be deemed to be rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. All executory contracts and unexpired leases not listed on the Rejected Contracts Schedule and not rejected prior to the Confirmation Date or otherwise the subject of a motion to reject filed on or before the Confirmation Date shall be assumed as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365 and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

(a) Except as otherwise specifically provided in the Plan, any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree. In the event of a dispute regarding: (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided, however, that based on the Bankruptcy Court's resolution of any such dispute, the applicable Debtor or Reorganized Debtor shall have the right, within 30 days after the entry of such Final Order and subject to approval of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, to reject the applicable executory contract or unexpired lease.

(b) Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

<u>Assumption of Alpine Agreements</u>.

(a) Effective upon the Effective Date, the Reorganized Debtors, as applicable, shall assume the Alpine Agreements, which agreements shall be on the same terms and conditions as in effect on the Petition Date, except that the Alpine Management Agreement shall be amended to provide for (i) a 3 year term and (ii) payment of a management fee to Alpine equal to $1.25 million per annum <u>plus</u> reimbursement of reasonable fees and expenses <u>plus</u> the right to receive, at the same time as any Cash is received by holders of New Common Stock in connection with a Liquidity Event consummated prior to the third anniversary of the Effective Date or signed prior to the third anniversary of the Effective Date and consummated thereafter, a payment/distribution equal to (a) 20% of the aggregate Cash consideration received by holders of New Common Stock in excess of $70 million but less than $120 million and (b) 25% of the aggregate Cash consideration received by holders of New Common Stock in excess of $120 million (it being understood that the foregoing thresholds shall be reduced on a dollar for dollar basis to take into account any payments or distributions made to holders of New Common Stock (in their capacity as such) from time to time after the Effective Date and prior to any such Liquidity Event). For clarification, if any Cash consideration, including contingent Cash consideration, is paid or distributed to the holders of New Common Stock in connection with a Liquidity Event consummated prior to the third anniversary of the Effective Date or signed prior to such third anniversary and consummated thereafter, then Alpine shall be entitled to receive its allocable portion of such consideration (<u>i.e.</u>, 0%, 20% or 25%, as applicable, depending on the amount of the aggregate Cash consideration received by holders of New Common Stock as of such time), including contingent Cash consideration, at the same time as any such payment or distribution is made to holders of New Common Stock.

(b) On the Effective Date, the Alpine Management Agreement also shall be modified to provide as follows: (i) in addition to the current termination rights set forth in the Alpine Management Agreement, the Debtors or Reorganized Debtors, as applicable, shall have the right to terminate the Alpine Management Agreement for any reason upon at least 3 months written notice, provided such termination shall not terminate or in any manner affect the right of Alpine to receive all accrued and unpaid management fees and expenses as of such termination date; (ii) Alpine's termination rights will be limited to those currently contained in the Alpine Management Agreement (<u>i.e.</u>, due to willful misconduct, gross negligence or material breach by the Debtors); (iii) if the Reorganized Debtors terminate the Alpine Management Agreement pursuant to the current termination rights set forth in the Alpine Management Agreement (<u>i.e.</u>, due to willful misconduct, gross negligence or material breach by Alpine, which would include a wrongful termination by Alpine or a refusal by Alpine to continue to provide services under the Alpine Management Agreement), such termination will eliminate the right to receive the

Liquidity Event payments/distributions described above (the "Liquidity Event Rights"); (iv) if the Reorganized Debtors terminate the Alpine Management Agreement because Steven S. Elbaum resigns from the board of directors or is otherwise not available to provide services on behalf of Alpine pursuant to the Alpine Management Agreement, then (x) Alpine shall be entitled to retain a prorated share of the Liquidity Event Rights based on the portion of the three-year term that has elapsed prior to termination and (y) the remainder of the Liquidity Event Rights shall be eliminated; and (v) if the Reorganized Debtors terminate the Alpine Management Agreement for any reason other than pursuant to clauses (iii) and (iv) of Section 9.3(b) of the Plan, or if Alpine terminates the Alpine Management Agreement pursuant to the current termination rights set forth in the Alpine Management Agreement, then Alpine shall be entitled to retain all of the Liquidity Event Rights.

(c) On the Effective Date, no further cure as described in section 365 of the Bankruptcy Code shall be required to be made by WTI in connection with the assumption by the Reorganized Debtors of the Alpine Agreements (except with respect to any cure required to be paid by the Debtors to Alpine relating to any hedging arrangements identified in the Alpine Agreements, which obligations shall be assumed and be rendered unimpaired).

(d) For the avoidance of doubt, the amendments to the Alpine Management Agreement described in Section 9.3 of the Plan shall be effective only upon the Effective Date and such amended terms and provisions shall be of no force or effect prior to Confirmation of the Plan.

Assumption of Compensation and Benefit Programs. With the exception of the Pension Plan (which shall be terminated), the Debtors shall file with the Plan Supplement a schedule, which shall be in form and substance reasonably acceptable to the Debtors and the Requisite Supporting Noteholders, listing all employment, retirement, indemnification, and other agreements or arrangements in place as of the Effective Date with the Debtors' officers or employees, or retirement income plans and welfare benefit plans for such persons, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees identified as key leaders, top level managers, or sales leaders, including, but not limited to, the Annual Performance Incentive Plan (APIP), the New Path Incentive Plan (NPIP), the Sales Incentive Plan, the Merit Bonus Plan, the 2009 Discretionary Bonus Plan, and the 2009 Retention Plan (each as previously identified to the Ad Hoc Group), to be assumed by the Reorganized Debtors and to remain in place after the Effective Date; provided, however, that the foregoing shall not apply to any equity-based compensation or incentive-based plan, agreement, or arrangement existing as of the Petition Date, which such plan, agreement or arrangement shall be deemed terminated, superseded and replaced by the New Management Stock Incentive Plan. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law (subject to any and all rights of the Debtors or Reorganized Debtors under applicable law, including, without limitation, the right to amend or terminate such benefits).

<u>Pass-Through</u>. Any rights or arrangements necessary or useful to the operation of the Debtors' business but not otherwise addressed as a Claim or Interest, including non-exclusive or exclusive patent, trademark, copyright, maskwork or other intellectual property licenses and other executory contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment, be passed through the bankruptcy proceedings for the Debtors and the Debtors' counterparty's benefit, unaltered and unaffected by the bankruptcy filings or the Chapter 11 Cases.

<u>Survival of Indemnification and Corporation Contribution</u>. The obligations of the Debtors, if any, to indemnify and/or provide contribution to its current and former directors, officers, employees, managing agents, and attorneys, and such current and former directors' and officers' respective affiliates, pursuant to the Corporate Documents and/or any employment contracts, applicable statutes or other contractual obligations, in respect of all past, present and future actions, suits and proceedings against any of such directors, officers, employees, managing agents, and attorneys, based on any act or omission related to the service with, for or on behalf of the Debtors, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification and contribution obligations will not be discharged, but will instead survive and be unaffected by entry of the Confirmation Order.

<u>Insurance Policies</u>. Each of the Debtors' insurance policies and any agreements, documents, or Instruments relating thereto, are treated as executory contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and Instruments relating to coverage of all insured Claims.

<u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>.

(a) Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

(b) Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

<u>Bar Date for Filing Claims for Rejection Damages</u>. If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim, a Proof of Claim must be served upon the Debtors and the Debtors' counsel within 30 days after the later of: (a) notice of entry of the Confirmation Order; or (b) such other notice that the executory contract or unexpired lease has been rejected.