## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WOLVERINE TUBE, INC., *et al.*,[1] | ) | Case No. 10-13522 (PJW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: May 24, 2011 at 1:30 p.m.** |
| | ) | **Objection Deadline: May 17, 2011 at 4:00 p.m.** |
| | ) | |

## DEBTORS' MOTION FOR AN ORDER DETERMINING THAT THE DEBTORS SATISFY THE FINANCIAL REQUIREMENTS FOR A DISTRESS TERMINATION OF PENSION PLAN AND APPROVING THE TERMINATION OF PENSION PLAN

Wolverine Tube, Inc., Tube Forming, L.P., Wolverine Joining Technologies, LLC, WT Holding Company, Inc. and TF Investor Inc. Inc. (collectively, the "Debtors"), by and through their undersigned counsel, hereby move (the "Motion") the Court for an Order: (i) determining that the Debtors satisfy the financial requirements for a "distress termination" of the Wolverine Tube, Inc. Retirement Plan (the "Pension Plan") under Section 4041 (c)(2)(B)(ii)(IV) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1341(c)(2)(B)(ii)(VI) ("ERISA"), and (ii) approving the termination of the Pension Plan. In support of this Motion, the Debtors rely upon the declarations of Mark E. Chesen (the "Chesen Declaration"), attached hereto as Exhibit "A" and incorporated herein by reference, Nancy T. Stuart (the "Stuart Declaration"), attached hereto as Exhibit "B" and incorporated herein by reference, and Michael J. Grenier (the "Grenier Declaration"), attached hereto as Exhibit "C" and incorporated herein by reference.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Wolverine Tube, Inc. (0812), Tube Forming, L.P. (3323), Wolverine Joining Technologies, LLC (1600), WT Holding Company, Inc. (4984) and TF Investor Inc. (8048). The Debtors' corporate headquarters and the mailing address for each Debtor is 200 Clinton Avenue West, 10th Floor, Huntsville, Alabama 35801.

## BACKGROUND

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334 and this matter is a core matter pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     On November 1, 2010 (the "Petition Date"), each of the Debtors filed voluntary petitions with the Court for reorganization under chapter 11 of the Bankruptcy Code.  No trustee has been appointed, and the Debtors continue to manage and operate their businesses as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code.

3.     A number of factors led to the Debtors' chapter 11 filings.  Such factors include the Debtors' increasingly constrained liquidity due to the steep rise and significant volatility in the prices of copper and silver that are at the core of the Debtors' business, the precipitous year-over-year increase in the funding obligations associated with the Pension Plan, and the high level of interest expense relating to the Debtors' approximately $131 million of senior secured notes. At the same time, the Debtors' operating revenues declined as a result of the global economic downturn in the industries served by the Debtors.  A combination of these factors rendered the Debtors unable to satisfy their non-trade obligations as they came due.

4.     On November 15, 2010, the Debtors filed the Joint Plan of Reorganization of Wolverine Tube, Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") and its accompanying disclosure statement.  The Plan was the product of extensive negotiations with an informal group of senior secured noteholders (the "Ad Hoc Committee") and Plainfield Asset Management, LLC ("Plainfield") (collectively the "Supporting Noteholders"), which together hold over seventy one percent (71%) of the outstanding principle amount of the senior secured notes (the "Secured Notes").

5.     The Plan provided for a significant deleveraging of the Debtors' balance sheet – including the conversion of almost $110 million of the senior secured notes to equity – and the payment of all general unsecured claims in full in the ordinary course of business. The Plan further provides for the cancellation of all existing preferred and common shares in the Debtors. The Plan, and the underlying agreement with the Supporting Noteholders, was expressly conditioned by the Supporting Noteholders upon reaching an agreement with the Pension Benefit Guaranty Corporation ("PBGC") with respect to the termination of Wolverine Tube, Inc.'s ("WTI") Pension Plan and the treatment of PBGC's claims against the Debtors and members of their "controlled group" (defined below).

6.     WTI is the contributing sponsor of the Pension Plan which is a defined benefit pension plan covered by ERISA. As a result of recent adverse economic conditions and the large losses suffered in the U.S. financial markets, the Pension Plan's investments have suffered a significant reduction in value, leaving the Pension Plan approximately 55% funded (on a PBGC plan termination basis), with approximately $115 million in assets and approximately $208 million in benefit liabilities, resulting in approximately $93 million in unfunded benefit liabilities as of the proposed termination date of July 15, 2011. Moreover, the Debtors' funding obligations for the Pension Plan have increased significantly from historical levels as a result of recently implemented funding rules and low interest rates.[2]

7.     Shortly after the filing of the Plan, the Debtors renewed discussions with PBGC to attempt to negotiate the termination of the Pension Plan and the treatment of PBGC's claims

---

[2] In a defined-benefit pension plan, benefits are specified by a fixed formula unrelated to the value of the pension fund. The sponsor of the pension plan is generally responsible for financing the benefits and must therefore make larger contributions when the value of the assets held by the pension fund declines. Because of the way the obligations of the pension plan are calculated, its funding position (that is, the relationship between its assets and liabilities) is also affected by the level of interest rates. Because payments will extend far in the future, the amount of funding today necessary to make those payments is adjusted for the time value of money by "discounting" them using certain interest rates. Therefore, low interest rates further add to the current obligations to the fund.

against the Debtors and controlled group members. The Debtors had begun the process to terminate the Pension Plan pre-petition in early 2010. They made a detailed presentation to PBGC in April of 2010 that was followed up with the submission of the PBGC Form 600 in July 2010, which is the form used to request a "distress termination" and PBGC trusteeship of the Pension Plan. At the time of this submission, the Debtors provided a notice of intent to terminate the Pension Plan to plan participants with a proposed termination date of August 16, 2010 (later changed to August 31, 2010). The PBGC did not act upon the Debtors' prior request for a distress termination prior to the commencement of these Chapter 11 cases.

8.     Negotiations continued after the Petition Date, during which time voluminous documents, including financial projections and a valuation report were provided to PBGC, and offers and counter-offers were exchanged by the parties. The Supporting Noteholders were actively involved in the negotiation process. The discussions were well informed, protracted and at arms-length, and involved numerous conference calls and "face to face" meetings with PBGC in Washington, D.C. Ultimately, after months of intense negotiations, an agreement was reached, which is memorialized in the memorandum of understanding (the "MOU") that was signed on April 8, 2011. The principal economic terms of the agreement are that PBGC will receive an approximately $20 million payment stream paid in annual installments over an eleven (11) year period and five percent (5%) of the common stock in the reorganized Debtors (subject to dilution as set forth in the Plan), in full satisfaction and release of all of its claims against the Debtors, members of the controlled group and other parties.

9.     While the settlement with PBGC contemplates the termination of the Pension Plan, the settlement does not, in fact, provide for its termination. Rather, the settlement is expressly conditioned upon the termination of the Pension Plan.

10.    On April 15, 2011, the Debtors filed the *First Amended Joint Plan of Reorganization of Wolverine Tube, Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code, as Modified* (the "Amended Plan"). A copy of the executed MOU is attached to the Amended Plan as Exhibit "A."

11.    On April 15, 2011, the Court approved the *First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the First Amended Joint Plan of Reorganization of Wolverine Tube, Inc. and Its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code, as Modified* (the "Amended Disclosure Statement") and authorized the Amended Plan to be circulated to creditors for a vote. The Court has scheduled a hearing to consider confirmation of the Amended Plan for June 2, 2011 at 2:00 p.m.

12.    As set forth above, the Amended Plan is the product of protracted, arms length negotiations with the Debtors' principal creditor constituencies – PBGC and the Supporting Noteholders – and is consensual with these constituencies, which are the only creditors impaired under the Amended Plan. Together, PBGC and the Supporting Noteholders hold over $220 million of claims against these estates and represent over ninety five percent (95%) of the total indebtedness against the Debtors. Approval of the settlement with PBGC is a condition to confirmation of the Amended Plan and termination of the Pension Plan is a condition to the Amended Plan going effective.

## RELIEF REQUESTED

13.    Under the Internal Revenue Code (the "IRC") and ERISA, WTI incurs certain minimum funding obligations to the Pension Plan each year. IRC § 412, 29 U.S.C. § 1082. WTI and each member of its "controlled group" are jointly and severally liable for minimum funding contributions to the Pension Plan. IRC § 412(c)(11). In general, WTI's "controlled group"

consists of all businesses related by 80 percent common ownership with WTI and includes all of

the Debtors as well as the non-debtor affiliates identified in paragraph 30 below.[3] IRC § 414(b);

ERISA § 4001(a)(14); 29 U.S.C. § 1301(a)(14).

14.    ERISA does not allow an employer to voluntarily terminate an underfunded

defined benefit pension plan, like the Pension Plan, unless the plan qualifies for a "distress

termination" under Section 4041(c) of ERISA, 29 U.S.C. § 1341(c). In order to meet the

requirements for a "distress termination," one of the following tests must be met for each

controlled group member: (1) the debtor must establish that it is liquidating through bankruptcy

or an insolvency proceeding; (2) the debtor must establish that it is reorganizing in bankruptcy or

under a similar law, and the court has found that the reorganization cannot succeed unless the

pension plan is terminated; or (3) the PBGC must determine either that there is an inability to

pay debts when due and an inability to continue in business unless the pension plan is

terminated, or that pension costs have become unreasonably burdensome solely as a result of a

declining workforce.

15.    To qualify for a distress termination, the plan administrator (here, WTI's Pension

Committee comprised of five individuals, each of whom is an officer or director of the Debtors)

must provide each plan participant and other affected parties, including PBGC, at least 60 days

advance, written notice of the termination and satisfy certain disclosure requirements. 29 U.S.C.

§ 1341(c)(1)(A), (B).

16.    The plan administrator for the Pension Plan issued a supplemental notice to plan

participants to initiate a distress termination on May 6, 2011 and will submit shortly a

---

[3] Solely for purposes of this Motion and in light of the settlement reached with the PBGC, the Debtors are not contesting the PBGC's position that foreign members of the "controlled group" are liable to the Pension Plan or to PBGC.

supplemental PBGC Form 600 for a distress termination of the Pension Plan with a proposed termination date of July 15, 2011.

17.    In the case of a debtor in Chapter 11 seeking to meet test (2) set forth in paragraph 14 above, the Court must determine that the debtor satisfies certain financial requirements (the "Reorganization Distress Test"). 29 U.S.C. § 1341(c)(2)(B)(ii). The test commonly used by debtors reorganizing their affairs under Chapter 11 is the Reorganization Distress Test.

18.    Pursuant to 29 U.S.C. § 1341(c)(2)(B)(ii) and 29 C.F.R. §4041.41(c)(2), a member of the controlled group in chapter 11 must satisfy the following requirements to meet the Reorganization Distress Test:

> (a)    on the proposed termination date, the debtor in question must have filed petition for relief under Chapter 11 of the Bankruptcy Code;
>
> (b)    on the proposed termination date, the Chapter 11 case must not have been dismissed;
>
> (c)    the debtor must timely submit to PBGC and request to the Bankruptcy Court to terminate the Pension Plan; and
>
> (d)    the Bankruptcy Court must (1) find that unless the plan is terminated, the debtor will be unable to pay its debts pursuant to a plan of reorganization, and (2) approve the termination.

19.    Bankruptcy courts are not, however, responsible for evaluating each of the four requirements. "It is not for the court to determine whether the debtor satisfied or will satisfy, as of the termination date, the first three criteria of § 1341(c)(2)(B)(ii). Those are determinations made by the PBGC." In re Wire Rope Corp. of America, Inc., 287 B.R. 771 (Bankr. W.D. Mo. 2002). The Reorganization Distress Test is met when the Bankruptcy Court determines that each

debtor will be unable to continue in business outside of Chapter 11 unless the pension plan is terminated. See In re Kaiser Aluminum Corp., 456 F.3d 328 at 335 (3d Cir. 2006). As such, through the Motion, and for the reasons set forth below, the Debtors request the Court to make the determination, described in 18(d) above, that, unless the Pension Plan is terminated, each of the Debtors will be unable to pay its debts pursuant to a plan of reorganization and will be unable to continue in business outside the reorganization process, and approve the termination. ERISA § 4041(c)(2)(13)(ii)(F); 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

## BASIS FOR RELIEF

### The Pension Plan and Projected Plan Funding Obligations

20.     The Pension Plan is the continuation of and successor to The Henley Group, Inc. Retirement Plan, which became effective March 19, 1987. The Pension Plan was amended and restated effective January 1, 1989, January 1, 1994, January 1, 2000, and most recently, January 1, 2008. The Pension Plan is the only pension plan covered by Title IV of ERISA of which WTI or any member of its controlled group is a contributing sponsor. In 2000, the STP Plan (Altoona, PA) was merged into the Pension Plan. The Pension Plan was frozen for participation and benefit accruals effective February 28, 2006, which saved WTI $24 million over the ensuing five years. The IRS most recently issued a favorable determination letter for the Pension Plan dated July 24, 2009.

21.     Generally, until the Pension Plan was frozen, employees of the members of the Wolverine Controlled Group who were residents or citizens of the United States other than the majority of those employed at the Carrollton, Texas and Jackson, Tennessee facilities, were eligible to participate in the Pension Plan upon meeting the Pension Plan's age and service requirements. Participants vested after five years of covered service, and were not partially

vested with less than five years of service. Normal retirement age is 65, and the Pension Plan has provisions for early and deferred retirement, disability, and death benefits.

22.     The Pension Plan's actuary has determined that with the exception of three plan participants, the monthly amount of pension benefits at normal retirement age will not be affected by termination of the Pension Plan. In the case of a fourth participant, although the monthly amount of pension benefits at normal retirement age would be fully guaranteed by PBGC, the PBGC's maximum guaranteed limitation may apply if the participant chooses to retire at an earlier age. However, the Pension Plan provides for subsidized early retirement for participants who retire at or after age 55, with the normal retirement benefit unreduced at age 60 and only partially reduced at ages 55 to 60. Should this Motion be granted, these subsidized benefits will not be guaranteed for participants who will not have reached age 55 by the date of plan termination. This limitation will affect approximately 330 vested participants who are not yet 55 years of age. In addition, although lump sums are available for employees with a benefit of less than $10,000, PBGC will generally pay benefits only in annuity form unless the value of the benefit (based upon PBGC actuarial assumptions) does not exceed $5,000.

23.     As of the date of this Motion, there were 423 fully vested active participants, one non-vested active participant, 897 deferred vested participants, and 1009 retirees or beneficiaries receiving benefits. The Pension Plan's population thus is heavily weighted towards former employees who now represent legacy liabilities.

24.     The Pension Plan's enrolled actuary has provided updated estimated actuarial information for the Pension Plan through the year 2020, showing minimum funding projections both "in" a calendar year and "for" a plan year, with minimum funding waivers, and with sensitivity to adverse changes to two underlying assumptions. In particular, they reflect how the

projected contributions would change if there were either or both of: (1) a change in the return on assets from 7.5% per year to 4% per year; or (2) a change in prevailing interest rates to 4%, starting in 2012, rather than no significant change in prevailing interest rates. See the Grenier Declaration.

25.     Current and projected estimated contributions under Pension Protection Act of 2006 funding rules, without funding waivers, are considerably greater than the average for prior years. For the 2011 calendar year, which includes catch up payments due or overdue for the 2009 and 2010 plan years, contributions are $8.33 million. The corresponding estimated contributions for subsequent calendar years are as follows: 2012, $9.84 million; 2013, $9.46 million; 2014, $8.39 million; 2015, $6.75 million; 2016, $5.68 million; and 2017, $5.28 million. For these eight calendar years (2011 through 2018), required minimum funding contributions total approximately $55.54 million, averaging approximately $7 million per calendar year. These required contributions are for a Pension Plan that was frozen during early 2006. By contrast, contributions for the years 2003 through 2009 were dramatically lower averaging approximately $1.4 million. Projected estimated annual calendar contributions going forward for the current and next seven years thus are five times more than those for the prior seven years.

**Debtors' Business Operations**

26.     Collectively, the Debtors are a global leader in manufacturing proprietary custom-engineered components that provide thermal management solutions in multiple industrial and consumer markets, including HVAC, refrigeration and appliance, electronics, cooling, power generation, and petrochemical and chemical processing. The Debtors produce the most advanced metal surface technology enhancement for heat transfer solutions in the current

marketplace. The core of the Debtors' business is supplying components for use by major manufacturers of air conditioning equipment.

27.     Over the course of its existence, the Debtors have utilized their proprietary tooling and process technology to enhance surface geometry for tubular and flat metal surfaces so as to expand their product lines and meet their customers' demand for increasingly effective heat transfer performance. The Debtors create tailored solutions for many original equipment manufacturing (OEM) customers whose brand names have global recognition, and have earned the reputation for having the broadest engineered product offering in the non-ferrous metals market. With a global customer base, the Debtors are one of the largest manufacturers and suppliers of surface-enhanced copper and copper alloy tube, high tech brazing and joining compounds, and special alloy tubes.

28.     Following the downsizing, rightsizing, sale and closure of certain of their operations during the last several years, the Debtors now employ approximately 830 people in the United States. The Debtors' international operations in Canada, China, The Netherlands and Portugal currently employ approximately 300 people. The Debtors' operations in Canada and Mexico no longer are substantial. The operation in Mexico was sold earlier in the chapter 11 case.

29.     WTI's stock is publicly traded on the pink sheets, with no group of shareholders owning or controlling eighty percent or more of the value or voting control of WTI's stock, including when measured by a combination of common and preferred stock on a fully diluted and as converted basis. The controlled group consists of WTI, as parent, and WTI's wholly-owned subsidiaries. A more detailed description of the corporate structure and ownership interests is set forth immediately below.

**Wolverine Controlled Group**

30. WTI has 16 subsidiaries that are wholly-owned, by WTI directly or indirectly through or in combination with another of WTI's wholly-owned subsidiaries (the "Wolverine Controlled Group"). Several of these entities are being wound down or are inactive entities that will be dissolved. The following is a current listing of the members of the Wolverine Controlled Group.

Parent

- Wolverine Tube, Inc. (Delaware corporation, Parent) ("WTI")

First Tier Subsidiaries

- WT Holding Company, Inc. (Delaware corporation) (100 percent owned by WTI)

- Wolverine Joining Technologies, LLC (Delaware limited liability company) (100 percent owned by WTI)

- WLVN de Latinoamerica S. de R.L. de C.V. (Mexico limited liability company) (99 percent owned by WTI; one percent owned by Wolverine Joining Technologies, LLC)

- Wolverine Metal Shanghai Co., Ltd. (China corporation) (100 percent owned by WTI)

- WLV Mexico de R.L. de C.V. (Mexico limited liability company) (99 percent owned by WTI; one percent owned by Wolverine Joining Technologies, LLC)

- TF Investor, Inc. (100 percent owned by WTI)

Second Tier Subsidiaries

- 3072452 Nova Scotia Company Nova Scotia ULC #2 (Nova Scotia unlimited liability company) (100 percent owned by WT Holding Company, Inc.)

- 3072453 Nova Scotia Company Nova Scotia ULC #3 (Nova Scotia unlimited liability company) (100 percent owned by WT Holding Company, Inc.)

- Wolverine Joining Technologies Canada, Inc. (Ontario corporation) (100 percent owned by Wolverine Joining Technologies, LLC)

- Tube Forming LP (Delaware limited partnership) (99 percent owned by TF Investor, Inc.; 1 percent owned by WTI)

Third Tier Subsidiary

- Wolverine Tube Canada Limited Partnership (New Brunswick limited partnership) (99 percent owned by 3072452 Nova Scotia Company Nova Scotia ULC #2; one percent owned by 3072453 Nova Scotia Company Nova Scotia ULC #3)

Fourth Tier Subsidiaries

- Wolverine Tube, V.C. (Netherlands company) (100 percent owned by Wolverine Tube Canada Limited Partnership)

- Wolverine European Holding, B.V. (Netherlands company) (49.9 percent owned by Wolverine Tube Canada Limited Partnership; 50.1 percent owned by WTI)

- 3226522 Nova Scotia, Ltd. (a/k/a "NewCo") (100 percent owned by Wolverine Tube Canada Limited Partnership)

Fifth Tier Subsidiaries

- Wolverine Tubagem (Portugal) LDA (Portugal Company) (99.98 percent owned by Wolverine Tube, B.V.; 0.02 percent owned by Wolverine European Holding, B.V.)

- Wolverine Tube Europe, B.V. (Netherlands company) (100 percent owned by Wolverine European Holding, B.V.)

31.     The Debtors also own 50% interests in two joint ventures (the "Joint Ventures") with the other 50% interests being owned by Weiland-Werke AG, an unrelated German corporation that otherwise competes with the Debtors. One of the Joint Ventures is Wolverine China Investments, LLC, a Delaware limited liability company that owns 100 percent of Wolverine Tube Shanghai, Ltd., a China corporation, which performs the Joint Venture's manufacturing. The other Joint Venture is Wolverine Weiland Heat Transfer Technology, LLC, a Delaware limited liability company, which has a non-exclusive license agreement with respect to WTI's intellectual property. The Joint Ventures are not members of the Wolverine Controlled Group.

**The Liquidity Crisis**

32.     During the months leading up to the Chapter 11 filing, the Debtors were operating in a crisis liquidity mode.  Cash and cash equivalents were $63.3 million at December 31, 2007, $33.5 million at December 31, 2008, $22.8 million at December 31, 2009, and $18.0 million at November 1, 2010.  The liquidity crisis was particularly acute, since the Debtors do not have access to a line of credit or other resources for tapping additional cash to meet their liquidity requirements.

33.     There are several factors that contributed to the Debtors' pre-petition liquidity crisis:

- *Economic and Industry Conditions*.  The genesis for the Debtors' distressed state was the steep decline in their core air conditioning component business, brought on by the financial crisis and the recession.  Recent national and global economic events, unprecedented in scope since the onset of the Great Depression some 80 years ago, have significantly impacted the commercial and residential construction, power generation, chemical and petrochemical, refrigeration, cooling, appliance, and electronics industries, nationally and globally.  In particular, the commercial and residential construction business were especially hard hit, and the effects still are being felt.  With reduced levels of construction came reduced levels of orders for cooling equipment, which directly impacted the Debtors' core business.

- *Metals Price Increases*.  The Debtors' liquidity also has been adversely affected by the continuing steep rise and volatility of the prices of copper and silver to all time highs, which are the principal raw materials used in the Debtors' manufacturing processes.

- *Secured Notes*.  Another significant factor impacting the Debtors' viability was the interest on the Secured Notes.  The Secured Notes were issued during 2009 in exchange for other maturing debt.  The Secured Notes initially carried an interest rate of 15 percent, which increased to 16 percent beginning in April 2010.  Based on their financial condition and obligations, the Debtors were unable to meet debt service on the Secured Notes beyond September 30, 2010 due to the significant debt level and interest, which eclipsed $16 million in 2009.

- *Pension Plan Costs*.  A key factor that led to the liquidity crises and, if the Pension Plan is not terminated, will cause the financial collapse of the Debtors and place at risk over 800 jobs located in the United States, is the ongoing cost of

maintaining the Pension Plan. Clearly, the Debtors' increased funding obligations for the Pension Plan have had a negative effect on the Debtors' liquidity, and that effect will heighten as the contribution requirements accelerate going forward. The Debtors' funding obligations for the Pension Plan have increased significantly from historical levels in part as a result of the accelerated funding rules implemented under the Pension Protection Act of 2006, and have been exacerbated by declines in equity values and the low interest rate environment. Since the onset of the financial crises and the recession, equity values have declined steeply and have recovered only partially,[4] and interest rates remain low.

## Restructuring Steps and Austerity Measures

34.     Both before and after the Petition Date, the Debtors have been proactive and constructive in dealing with the issues that they are facing. Since 2007, there have been substantial additional equity investments in the Debtors by new and existing investors totaling approximately $92.5 million. In 2008, the Debtors ceased payment of *all* dividends on their Series A and Series B preferred stock (held by Alpine and Plainfield and affiliates) resulting in a savings to date of approximately $24 million. There have been changes in executive management. The Debtors have downsized and right-sized their operations and workforce and have sold certain assets in an effort to restructure on an ongoing basis, generating in excess of $107 million. Not counting the China joint venture, the world-wide workforce has been reduced from approximately 2,400 to under 1000, of which approximately 830 are located in the United States. These efforts have included the Debtors' eliminating their more peripheral operations, focusing on their core competencies and new and developing technologies, and producing products that carry a higher margin.

35.     In particular, the Debtors have taken the following steps in an effect to reduce expense, improve liquidity and operating performance and avoid the termination of the Pension Plan:

---

[4] From year end 2007 to year end 2008, the value of the Pension Plan's assets decreased from $136.5 million to $100.3 million. Prior to this decrease, the Pension Plan was reasonably well funded. As of December 31, 2010, the value of the Pension Plan's assets was approximately $116 million.

- *Plan Freeze.* The Debtors froze the Pension Plan during 2006 for future benefit accruals and participation. This has resulted in substantial savings, an estimated $24 million over five years.

- *2007 Recapitalization Plan; Equity Infusions by Alpine, Plainfield and Common Stockholders.* During 2007, the Debtors began a recapitalization plan that generated significant cash flow through equity investments by current and new shareholders, asset sales, and working capital reductions that resulted in a significant reduction in debt. During February 2007, the Debtors completed the first phase of the recapitalization through an equity investment of $50 million by Alpine and Plainfield, which purchased a total of 50,000 shares of Series A Convertible Preferred Stock. In October 2007, the Debtors' existing common stockholders infused additional equity by purchasing 25,444,592 shares of common stock, resulting in gross proceeds of approximately $28 million. Despite adverse conditions, in January 2008 Alpine made another capital investment by purchasing an additional 4,994 shares of Series A Convertible Preferred Stock for $4.5 million. During March 2008, Alpine injected another $10 million in cash by purchasing the Debtors' Series B Convertible Preferred Stock. The Debtors raised approximately $92.5 million in gross equity proceeds during 2007 and 2008 from these transactions, of which $64.5 million came from Alpine and Plainfield. Without this equity capital, the Debtors would not have survived to the present.

- *2008 Financial Restructuring Plan.* The Debtors also pursued a financial restructuring plan with respect to their 10.5 percent and 7.375 percent senior notes, their secured revolving credit facility, and their receivables sale facility. In light of market conditions during 2008, which negatively affected the Debtors' ability to execute a comprehensive refinancing strategy, the Debtors took actions, described below, to position themselves to retire or refinance $136.8 million of 7.375 percent senior notes. The Debtors supplemented their available cash with the sale of certain assets and the purchase of additional preferred stock by Alpine (as noted in the bullet point immediately above). In early 2008, the Debtors repurchased $37 million in face amount of the 7.375 percent senior notes at a discount, and, on March 20, 2008, Plainfield agreed to rollover and refinance $38.3 million of the 7.375 percent senior notes due on March 28, 2009. The remaining outstanding 7.375 percent senior notes of $61.5 million were repaid on their maturity in August 2008.

- *2009 Refinancing.* During 2009, the Debtors refinanced their remaining outstanding debt, extending maturity to March 2012, albeit at a significantly higher interest rate, and continued efforts to stabilize their business through cost reductions and restructuring efforts. The Debtors extended the maturity of their secured revolving credit facility and their receivables sale facility through February 19, 2009, and then terminated both these facilities. On February 26, 2009, the Debtors launched an exchange offer to the holders of the Debtors 10.5 percent senior exchange notes and 10.5 percent senior notes, to exchange them for

senior secured notes. The exchange offer was successfully consummated on April 28, 2009. In this transaction, $83.3 million of the 10.5 percent senior notes and $38.3 million of the 10.5 percent senior exchange notes were exchanged for $121.6 million of senior secured notes. The remaining $16.1 million of the 10.5 percent senior secured notes were repaid in April 28, 2009. The principal and unpaid interest of the senior secured notes was $131.6 million at the filing date. The holders of the senior secured notes have agreed to reduce the debt to $30 million in the Debtors' plan of reorganization in exchange for 95% of the equity in the Debtors. This will substantially reduce interest expense in the future from the levels in 2008, 2009 and 2010 of $17.36 million, $16.82 million and $16.27 million, respectively.

- *2010 Restructuring Efforts*. The Debtors considered all restructuring financial tools and exhausted all non-bankruptcy restructuring options that did not include termination of the Pension Plan. The Debtors explored the possibility of obtaining replacement asset based lending refinancing for the senior secured notes but were unsuccessful. Nor, given the Debtors dire financial condition, was there any prospect for obtaining additional equity capital.

- *Preferred Stock Dividends*. Dividend payments on all preferred stock, which continues to be owned by Alpine and Plainfield and other affiliates, were discontinued in 2008. Accrued but unpaid preferred stock dividends were approximately $24 million at December 31, 2010. The preferred stock and any unpaid dividends will be eliminated upon confirmation of the Amended Plan, as proposed.

- *Downsizing and Rightsizing*. Assets have been sold, operations have been downsized, right sized and closed, the workforce has been reduced, and expenses have been pared to the bone:

  - *STP Sale*. In February 2008, the Debtors sold substantially all of the assets of their Small Tube Products ("STP") business for net proceeds of $22.1 million plus a working capital payment to the Debtors of approximately $2.8 million;

  - *WTS Sale*. In March 2008, the Debtors sold 30 percent of their Wolverine Tube Shanghai Co, Ltd ("WTS") subsidiary to Wieland-Werke AG for $9.5 million. On September 15, 2008, the Debtors sold an additional 20 percent of WTS to Wieland-Werke AG for $10 million;

  - *Booneville Sale*. In April 2008, the Debtors sold their Booneville, Mississippi facility, which was closed during January 2008, for $1.4 million;

- *London, Ontario Tube Business Sale.* During July 2008, the Debtors sold their London, Ontario wholesale and commercial tube business for net proceeds of approximately $41.2 million; and

- *Tube Forming Inc. ("TFI") Sale.* In December 2010, the Debtors sold their TFI business for net proceeds of approximately $6 million, excluding collection of accounts receivable.

- *Tolling Manufacturing and Agency Agreements.* During 2009, the Debtors entered into two separate agreements designed to increase their available cash and liquidity. The tolling agreement was implemented as a last alternative given the absence of available commercial credit from a third party and the Debtors' increased liquidity needs, which were negatively impacted by a sharp rise in cooper and silver prices and other cash demands. The tolling agreement was critical to maintaining the Debtors' liquidity and commercial viability, including satisfying the interest payments on the senior secured notes and contribution to the Pension Plan. The Debtors also entered into an agency agreement with GD Copper (USA), Inc., whereby the Debtors act as an agent for sales of GD USA products. The tolling and agency agreements generated incremental cash availability of about $20 million during the first quarter of 2010 due to the reductions in working capital, thereby enhancing the Debtors' liquidity, albeit not enough to avoid this chapter 11 filing.

- *Austerity Measures.* The Debtors have also imposed austerity measures.

  - *Compensation.* Compensation of the Debtors' officers and employees has been and continues to be subject to austerity measures. The salaries of four of the top five executive officers have not increased above 2008 amounts, and for the fifth, there was a modest increase only from 2008 to 2009 of $15,000 per year (amounting to less than 4.5 percent in a one time increase with no other increase over several years). For 2009, no merit increases were provided to any United States based employee, and no performance bonuses were paid based on the 2008 year. Some minor merit bonuses were paid during the second half of 2010 based on achieving certain performance targets. Since 2007, global headcount has decreased from approximately 2,400 employees to under 1,000 employees, not counting the employees of the joint venture operating company in Shanghai, China, reflecting the Debtors' efforts to strengthen their balance sheet through consolidation, plant closures, and pursuit of joint ventures.

  - *Capital Expenditures.* Capital expenditures have been closely monitored over the past three years. For the Debtors' domestic operations, the following amounts have been spent on capital put into service (i.e., capitalized) during the years 2008, 2009 and 2010: $1.3 million, $4.7 million and $2.7 million, respectively. The annual depreciation for these

operations is approximately $5.5 million. The Debtors thus have limited their capital expenditures to approximately 52 percent of depreciation, generally a modest amount for a business engaged in heavy industry. The majority of capital expenditures have been for equipment upgrades, process and quality improvements, and consolidation of its Mexican tubing operations into the Shawnee, Oklahoma facility. Further reduction in capital expenditures would not be prudent, because in order to maintain the Debtors' competitive advantage, the Debtors continually need to invest in technology and research and development to stay ahead of competition, advance technology and respond to customers needs.

- *SG&A Costs.* The Debtors have reduced their corporate selling, general and administrative ("<u>SG&A</u>") cost significantly. The Debtors constantly are exploring additional ways to operate in a more cost effective manner. Corporate SG&A expense was reduced from $21 million to $11.4 million between 2007 and 2010, excluding non-cash pension and stock option expense and one time non-recurring costs, primarily legal and other professional fees. Additionally, on March 31, 2011, the Debtors implemented a further corporate SG&A reduction which is planned to reduce the ongoing corporate SG&A from $11.4 million in 2010 to less than $8 million in 2012.

36.     Also, as more fully set out in the Grenier Declaration, on January 31, 2011, the Debtors elected "2 plus 7" funding relief for the 2009 and 2010 Pension Plan years, which extended the shortfall amortization for the Debtors' pension obligations for a seven (7) year period to a nine (9) year period with interest only over the first two (2) years.

37.     The foregoing summarizes the Debtors' extensive and continuing actions to downsize, right size and turnaround their business in an effort to avoid a chapter 11 filing and this request to terminate the Pension Plan. Unfortunately, despite all of their efforts, these efforts were not enough to avoid the commencement of these cases and the filing of this Motion.

### The Factors For Termination Of The Pension Plan
### Under The Reorganization Distress Test Are Satisfied

38.     The Debtors cannot pay their debts pursuant to a plan of reorganization unless the Pension Plan is terminated for the simple reason that *there will be no plan of reorganization unless they are able to terminate the Pension Plan.* Courts have recognized that the first

analytical step in applying the financial necessity test is whether confirmation of a plan can be obtained if the debtor's pension plan is not terminated. *See, In re Wire Rope Corp. of Am.*, 287 B.R. 771-778 (Bankr. W.D. Mo. 2002) ("In order to pay its debts pursuant to a plan of reorganization [as required by the financial necessity test], a debtor must first be able to obtain confirmation of such a plan"). As set forth above, the Supporting Noteholders will not support a plan that provides for the continuation of the Pension Plan and the payment in full of all Pension Plan liabilities, and there are no realistic options available to the Debtors to confirm any other plan that does not have the support of the Supporting Noteholders.

39. First, the Amended Plan, as proposed, provides for the termination of the Pension Plan, and has the consent of PBGC. The Amended Plan, as proposed, is feasible only because it has the support of both the Supporting Noteholders and PBGC. Without this support from both of these creditor constituencies, the Amended Plan, as proposed, would not be confirmable under the rigors of Section 1129(b) of the Bankruptcy Code. The Amended Plan enables the Debtors to emerge as a viable, competitive enterprise – preserving over 800 domestic jobs.

40. In light of the intensity of the negotiations with the Supporting Noteholders and their unwavering requirement that the Pension Plan be terminated in order to reach any consensual arrangement with them, the Debtors must assume that if they were to pursue a plan that leaves the Pension Plan in place, it would be met with an objection from the Supporting Noteholders. Thus, the inquiry must focus upon whether there is another reorganization plan that could be confirmed over the Supporting Noteholders' objection that leaves the Pension Plan in place. In order to confirm a plan that the Supporting Noteholders reject, the Debtors would need to satisfy the cramdown requirements of Section 1129(b)(2)(A) of the Bankruptcy Code.

41.     Section 1129(b)(2)(A) (the "Secured Claim Cramdown Provision") sets forth the

conditions that must be met in order to confirm a plan over the rejection of the plan by a class of

secured claims.  It provides as follows:

> "(2)     For the purpose of this subsection, the condition that a plan be fair and
> equitable with respect to a class includes the following requirements:
>
>> (A)     With respect to a class of secured claims, the plan provides --
>
>> (i)(I)     that the holders of such claims retain the liens securing such
>> claims, whether the property subject to such liens is retained by the debtor or
>> transferred to another entity, to the extent of the allowed amount of such claims;
>> and
>
>> (II)     that each holder of a claim of such class receive on account of such
>> claim deferred cash payments totaling at least the allowed amount of such claim,
>> of a value, as of the effective date of the plan, of at least the value of such holder's
>> interest in the estate's interest in such property;
>
>> (ii)     for the sale, subject to section 363(k) of this title, of any property
>> that is subject to the liens securing such claims, free and clear of such liens, with
>> such liens to attach to the proceeds of such sale, and the treatment of such liens on
>> proceeds under clause (i) or (iii) of this subparagraph; or
>
>> (iii)     for the realization by such holders of the indubitable equivalent of
>> such claims."

42.     In order to satisfy the Secured Claim Cramdown Provision over the rejection of a

class of secured claims (here the holders of the Secured Notes (the "Noteholders")), the Debtors

would need to satisfy subsections (i), (ii) or (iii) of the Secured Claim Cramdown Provision.

43.     First, subsection (i) provides that the holders of the secured claims must retain

their liens securing their claims and receive the present value of their allowed secured claims in

deferred cash payments.  Courts generally look to the market interest rate for loans with similar

terms and/or the prepetition contract rate in determining whether the cramdown rate is sufficient.

*See In re TCI 2 Holdings LLC*, 428 B.R. 117 at 163 (Bank. D. N.J. 2010) (market rate of interest

should be applied where an efficient market exists for chapter 11 cramdown purposes, otherwise

the Court should employ the formula approach endorsed by the Supreme Court's plurality in Till).

44.    If the Debtors were to pursue a cramdown plan, then perhaps the first issue that would need to be decided by the Court is the extent of the Noteholders' liens and security interests.  The indenture trustee (on behalf of the Noteholders) filed proofs of claim in the approximate amount of $139 million against each of the Debtors alleging that the Noteholders' claim was secured by all assets of the Debtors' businesses, except the Joint Ventures.  The PBGC has asserted in pleadings filed with the Court[5] that the Noteholders' claim is not secured against the assets of WT Holding company, Inc. ("WTH") (or that the Noteholders even hold a claim against WTH).

45.    The determination of this issue is critical to another issue that must be determined by the Court, i.e., the amount of the Noteholders' secured claim.  Pursuant to Section 506(a) of the Bankruptcy Code, the Noteholders' secured claim equals the value of their interest in the Debtor's interest in the assets that serve as their collateral.

46.    As such, the ultimate issue the Court would need to determine is the amount of the Noteholders' secured claim.  According to the valuation report ("SSG's Valuation") prepared by SSG Capital Advisors, LLC ("SSG"), the enterprise value of the Debtors' consolidated business is $52.6 million - $58.4 million (midpoint of $55.49 million); the enterprise value of the Debtors' consolidated business without the Joint Ventures is $43.3 million - $48.2 million (midpoint of $45.75 million); and the enterprise value of the Debtors' consolidated business without WTH's assets or the Joint Ventures is $32.3 million - $35.9 million (midpoint of $34.06 million).

---

[5] These pleadings will be withdrawn once the Amended Plan is confirmed and the settlement with PBGC is approved by the Court.

47.    If the Supporting Noteholders are correct in their view that they hold a secured claim against all assets, except those of the Joint Ventures, then the Noteholders' secured claim would be $11.7 million higher based upon SSG's Valuation.  The higher secured claim would require considerably more cash flow to service the debt, than if the PBGC's position were correct.  As such, if PBGC is correct, and the Debtors could not service the payments required under the reduced secured claim, then clearly the Debtors could not service the debt if the Supporting Noteholders are correct.  In the event that the PBGC's position is correct, then the Noteholders' secured claim would total $34.06 million if we take the midpoint under SSG's Valuation.

48.    The next issue that would need to be decided by the Court is the terms for payment of the Noteholders' secured claim, specifically the appropriate cramdown interest and the length of time for payment of the secured claim.  The Debtors believe that they would need to provide a rate of interest between 6.5% (market rate) and 16% (contract rate) with a ten year amortization and a balloon payment due at the end of five (5) years in order to satisfy the cramdown standards for a forced loan under the Secured Claim Cramdown Provision.  This range is consistent with the case cited in paragraph 43 above as well as another recent case out of the Southern District of New York, in which Judge Gerber confirmed the debtors' plan that utilized the rate of interest in the prepetition contract (Court agreed that contract rate was appropriate where prepetition rate was set at a time when the debtors were significantly more leveraged and the new rate contains a larger margin over the prime rate than the prepetition interest rate).  *In re DBSD North America, Inc., et al.*, 419 B.R. 179 at 209 (S.D.N.Y. October 26, 2009).

49.     SSG has prepared models based upon the Debtors' projections for years 2011-2018 layering in the amount that would be required to service both the Noteholders' secured claim (under the assumed cramdown terms) and the minimum funding requirements under the Pension Plan.   The models utilize projections for the consolidated group,[5] comprising all members of the Wolverine Controlled Group, and are presented in four versions as follows:  two showing the cash required to meet the minimum funding requirements under the Pension Plan (with and without any IRS funding waivers[6]) if the Supporting Noteholders are correct with respect to the amount of their secured claim - one using a 6.5% cramdown interest rate and a second using the 16% cramdown interest rate; and two showing the cash required to meet the minimum funding requirement under the Pension Plan (with and without IRS funding waivers) if the PBGC's position is correct with respect to the amount of the Noteholders' secured claim - one using a 7.6% cramdown interest rate and a second using a 16% cramdown interest rate.  See the Chesen Declaration.

50.     All of these models show that the Debtors will run out of cash in 2012.  Based upon these models, it is clear that the Debtors will not have adequate cash available to service both the Noteholders' secured claims and the minimum funding requirements of the Pension Plan if the Pension Plan were to remain in place even under the scenario using the lower secured

---

[5] The projections include the operations of the non-debtor members of the Wolverine Controlled Group, none of which individually or collectively can fund the minimum contributions for the Pension Plan.  The Debtors have foreign controlled group operations in five countries:  Canada, China, Mexico, the Netherlands and Portugal.  The operations in Canada are *de minimus*.  Operations in China (other than the Joint Ventures) reported a loss of $300,000 for 2010.  Operations in Mexico were sold at the end of 2010.  Operations in the Netherlands reported net income of approximately $900,000 for 2010.  Operations in Portugal reported net income of approximately $1.2 million in 2010.  The liquidity of the international entities is very small.  The operations in Portugal and China (other than the Joint Ventures) do not have lines of credit and use their cash to fund their operations.  The operation in the Netherlands has a small line of credit used to fund its operation.

[6] Such waivers require the consent of the IRS, in consultation with the PBGC, and waivers of $1 million or more require the posting of security.  It is highly unlikely that the Debtors would be granted any waivers since the models show an inability to pay the deferred payments in later years and it is unlikely that the Debtors could post adequate collateral to secure almost $25 million in deferred payments.

claim, the lower cramdown interest rate and the IRS funding waiver. As such, under the models prepared by SSG based upon the Debtors' current, reasonable projections, the Debtors would be unable to meet the feasibility test under Section 1129(a)(11) of the Bankruptcy Code under any reasonably conceivable cramdown plan.

51.     Further, these models assume the Supporting Noteholders do not make an election under Section 1111(b) of the Bankruptcy Code. In this event, the Debtors' cash requirements to service the full amount of the Noteholders' allowed claim over time would be significantly higher than that which is reflected in the models. Since the models demonstrate that the Debtors cannot service both the Noteholders' claim and the minimum funding requirements under the Pension Plan under the "best case" cramdown scenario for the Debtors, the Debtors have not created a separate model for the Section 1111(b) election scenario.

52.     Second, Section 1129(b)(2)(A)(ii) of the Secured Claim Cramdown Provision is unavailable, because the Debtors have not located a buyer for the Debtors' business at a level that would satisfy the Noteholders' secured claim in full and permit the Debtors to fund the obligations of the Pension Plan, which is borne out by the SSG Valuation and the Chesen Declaration.

53.     Lastly, the Debtors are not aware of any other confirmable treatment option that would provide for the "indubitable equivalent" of the Noteholders' secured claim. The scenario in which courts have confirmed plans under the "indubitable equivalent" prong of the Secured Claim Cramdown Provision are limited.

54.     In addition to their inability to satisfy the cramdown requirements for the Noteholders' secured claim, the Debtors would be further challenged by having to satisfy each of the elements of Section 1129(a) of the Bankruptcy Code (other than (a)(8)). For example, the

Supporting Noteholders would hold an allowed unsecured deficiency claim (if they did not make a Section 1111(b) election) in excess of $80 million (perhaps over $100 million), the single largest unsecured claim against the estates. This allowed unsecured claim would dominate and control the class of allowed unsecured claims. If the Debtors could not identify and obtain acceptance by another impaired class of creditors, the Debtors could not satisfy Section 1129(a)(10) of the Bankruptcy Code and the plan would not be confirmable.

55. Further, the Debtors retained SSG to perform a valuation during the summer of 2010. SSG's valuation report issued last summer reflected a higher enterprise value for the Debtors than SSG's Valuation of last month. In light of the reduction in value of the Debtors' business between the SSG valuation report during the summer of 2010 and SSG's Valuation of last month, it is likely that the Supporting Noteholders would assert a diminution in value of their collateral during the six (6) month period in Chapter 11, which could give rise to a multi-million dollar administrative expense claim that would need to be paid at the time of confirmation of any plan. This potentially significant claim is not reflected in the models, but would present a further impediment to the Debtors' ability to confirm an alternative non-consensual plan.

56. Moreover, in the event that the Debtors were required to seek confirmation of a plan over the objection of the Supporting Noteholders, the resulting litigation would be both contentious and expensive, and would delay the Debtors' emergence from chapter 11 by several months. The resulting strain on the Debtors' already tenuous business enterprise due to the potential loss of customers and need for additional financing would likely be enough to force the company into a tailspin resulting in either a distressed sale or liquidation of the Debtors' assets.

57.     Based upon the legal and practical impediments to confirming a cramdown plan over the objection of the Supporting Noteholders, the Debtors believe that there is no viable non-consensual plan that could be confirmed that allows the Pension Plan to remain in place.

58.     Several courts have found financial necessity under similar facts. For example, in *In re Sewell Manufacturing Co.*, 195 B.R. (Bankr. N.D. Ga. 1996), the court noted that the debtor's near term financial picture was "tenuous at best," that "the debtor's pension plan threatens to saddle another $2.3 million of near term debt upon this already precarious financial position," that "the lender that has provided post-petition financing in this case will not agree to subsidize the [pension] plan obligations by financing these upcoming contributions," and that "a sale of the company to a buyer who might assume the pension obligations does not appear to be an option." *Id.* At 186. Given these findings, the court had no difficulty in making a further finding of financial necessity. *Id.*

59.     Similarly, in *Wire Rope Corporation of America*, the court noted that no lender was willing to offer financing to the debtor unless its pension plans were terminated, commenting that "it is certainly understandable that lenders and investors would be reluctant to extend credit to the Debtor and take an equity position in the Debtor when the Debtor has such an imposing contribution requirement in its immediate future." 287 B.R. at 778. The court concluded that unless the debtor's pension plan was terminated, the debtor would not be able to pay its debt service and continue in business. *Id.* At 781.

60.     In *Pension Ben. Guar. Corp. v. Falcon Prods. (In re Falcon Prods.)*, 354 B.R. 889 (E.D. Mo. 2006), the district court affirmed the bankruptcy court's determination that the requirements for a distress termination were satisfied where the bankruptcy court had found that (1) the debtors would be forced to liquidate unless they could obtain a $50 million cash infusion

within a few weeks; (2) they had only found one group of investors willing to make that investment in spite of seeking financing from the market; (3) the willing investors conditioned their investment on the termination of the debtor's pension plans; and (4) that condition was reasonable under the facts and circumstances of the case. *Id.* at 898 fn.8.

61.     Also, in *In re US Airways Group, Inc.*, 296 B.R. 734 (Bankr. E.D. Va. 2003), the debtor airlines' pilot pension plan was severely underfunded. The debtors' financial advisor testified that unless the debtors could resolve their pension funding issue such that the reorganized debtors could meet the projections in their business plan, it was unlikely that the debtors would be able to obtain exit financing under a loan approved and guaranteed by the Air Transportation Stabilization Board. *Id.* at 740. Recognizing that the debtors had explored other sources of exit financing but had not been able to find any willing lenders or investors, the court determined that the debtors had made a showing of financial necessity. *Id.* at 745. The only realistic plan of reorganization that had been proposed was dependent on exit financing that would only be available if the pension benefit plan was terminated. *Id.* at 745-46.

62.     The Debtors' cases fit squarely within the precedent cited above. The Debtors have an urgent need to exit from bankruptcy and reduce their debt load, needs that can only be met under the Amended Plan, and only on the condition that the Pension Plan is terminated. No other financing is available to support an alternative plan that would allow the preservation of the Pension Plan. Unless the Amended Plan is confirmed, the Debtors will certainly be forced into a sale process[7] or worse, liquidation. Thus, without termination of the Pension Plan, the Debtors, individually or collectively with all members of the Wolverine Controlled Group, will be unable

---

[7] As the Court is aware, the Debtors were poised to  proceed down a Section 363 sale path, when negotiations previously broke down with the PBGC and they filed (and later modified) their motion to retain SSG as an investment banker and responsible person.

to pay all their debts pursuant to a plan of reorganization and will be unable to continue in business outside of chapter 11.

63.     Certain Courts also have required a showing that all possible savings have been sought and implemented and that other parties have made meaningful sacrifices before resorting to termination of a pension plan covered by ERISA, generally, if not exclusively, in the context in which a collective bargaining agreement is involved and Section 1113 of the Bankruptcy Code is implicated.  As set out *infra*, the Debtors have already dramatically reduced expenses to the maximum extent possible, and taken other steps to improve operating performance.  Holders of preferred stock and common stock will receive no distributions and their equity interests will be extinguished.  Unsecured creditors, which are out of the money, and modest in comparison to the Noteholders' claim and PBGC's claims, will receive payment in full.  However, they receive this only because the Supporting Noteholders agreed to allow a portion of their collateral to be used during these proceedings to fund the claims of unsecured creditors.  Secured creditors are not only receiving less than payment in full, but are diverting part of the value of their collateral to fund payments to junior creditors, and are taking on substantial risk by converting about $110 million of their debt into equity.

64.     In conclusion, the Debtors have pursued and exhausted all realistic measures to enable them to pay their debts under a plan of reorganization and continue in business outside of chapter 11.  The fact of the matter, based upon the grim financial reality the Debtors face, is that the only plan that is confirmable is the Amended Plan, which is consensual among the Supporting Noteholders and PBGC and provides for the termination of the Pension Plan.

## Notice

65.      Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (ii) the Indenture Trustee; (iv) counsel to the Ad Hoc Noteholders' Group; (v) the Pension Benefit Guaranty Corporation; and (vi) all parties that have requested such notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that this Court enter the Order in the form annexed hereto finding that the Debtors meet the Reorganization Distress Test and approving the termination of the Pension Plan, and grant such other and further relief as is just and proper.

Dated: May 6, 2011

COZEN O'CONNOR

_____
Mark E. Felger (No. 3919)
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2087
Facsimile: (302) 295-2013

*Counsel to the Debtors and*
*Debtors- in-Possession*