IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) <br> ) <br> WOLVERINE TUBE, INC., *et al.*, ) <br> ) <br> Debtors. ) <br> ) <br> ) | Case No. 10-13522 (PJW) <br> (Jointly Administered) <br><br> Hearing Date: May 24 @ 1:30 p.m. <br> Responses Due: May 17 @ 4:00 p.m. |

**RESPONSE OF THE PENSION BENEFIT GUARANTY
CORPORATION TO DEBTORS' MOTION FOR APPROVAL
OF DISTRESS TERMINATION OF PENSION PLAN**

**PRELIMINARY STATEMENT**

The Pension Benefit Guaranty Corporation ("PBGC"), the federal agency charged with administering the pension plan termination provisions of Title IV of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. §§ 1301-1461 (2006 & Supp. III 2009), responds to the Debtors' motion asking this Court to determine that Wolverine Tube, Inc. ("WTI") and its debtor affiliates (collectively the "Debtors")[1] meet the requirements for a "distress termination" of the Wolverine Tube Inc. Retirement Plan (the "Pension Plan") under the "reorganization in bankruptcy" test set forth in 29 U.S.C. § 1341(c)(2)(B)(ii)(IV), and approve the termination of the Pension Plan (the "Distress Motion").

PBGC, a party in interest and creditor in this proceeding, files this Response to advise the Court of the agency's views on the proper legal standards for determining whether the Debtors meet the "reorganization in bankruptcy" distress test for the Pension Plan, and to urge the Court to carefully review the evidence the Debtors present in support

---
[1] The Debtors in these chapter 11 cases are: Wolverine Tube, Inc., Tube Forming, L.P., Wolverine Joining Technologies, LLC, WT Holding Company, Inc., and TF Investor Inc.

of their Motion.  As the agency charged with administering the distress termination provisions of Title IV of ERISA, PBGC believes its views on the correct interpretation of the statute are entitled to considerable weight and will help inform the Court's consideration of this critically important issue.  Courts consistently accord deference to agency interpretations that do not involve regulations.  In *Beck v. Pace Int'l Union*, the Supreme Court, addressing a PBGC statutory interpretation that was not contained in a regulation, held:

> We have traditionally deferred to the PBGC when interpreting ERISA, for "to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to embar[k] upon a voyage without a compass." Mead Corp. v. Tilley, 490 U.S. 714, 722, 725-726 (1989) (internal quotation marks omitted); see also LTV Corp., 496 U.S., at 648, 651.

*Beck v. PACE Intl. Union*, 127 S. Ct. 2310, 2317 (2007)

Under ERISA, a bankruptcy court's role in the distress termination process under the "reorganization in bankruptcy" test is limited to determining whether a debtor "will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process" unless a pension plan is terminated.  29 U.S.C. § 1341(c)(2)(B)(ii)(IV); 29 C.F.R. § 4041.41(c)(2)(iv) (2004); *In re Philip Servs. Corp.*, 310 B.R. 802, 807 (Bankr. S.D. Tex. 2004)*; In re Wire Rope Corp. of Am., Inc.*, 287 B.R. 771, 777 (Bankr. W.D. Mo. 2002).  This is a rigorous test that requires a debtor to prove that termination is necessary to avoid a liquidation of its business.  *In re US Airways Group, Inc.*, 296 B.R. 734, 743 (Bankr. E.D. Va. 2003).  Thus, an employer must demonstrate that it has pursued and exhausted *all* realistic measures short of termination that would make funding and maintaining the pension plan affordable, such as obtaining minimum funding waivers or freezing future accruals of benefits under the

pension plan, cutting non-pension expenditures such as payroll, capital acquisitions and overhead so that more cash flow will be available to satisfy pension funding requirements, or finding an investor or lender who will finance the employer while it continues to fund and maintain the pension plan. The rigorous nature of the distress test makes it especially important that this motion be decided on a fully developed record.

## THE PBGC AND THE PENSION PLAN

PBGC is a wholly-owned United States government corporation that administers the defined benefit pension plan termination insurance program established under Title IV of ERISA. When an underfunded plan is terminated, PBGC generally becomes trustee of the plan and, subject to certain statutory limitations, pays the plan's unfunded benefits from PBGC's insurance funds. *See* 29 U.S.C. § 1322.

The Pension Plan is a tax-qualified, defined benefit pension plan that is covered by Title IV of ERISA. The Pension Plan provides pension benefits to approximately 2,300 current and former employees and beneficiaries. WTI is the contributing sponsor of the Pension Plan. The other debtors are members of WTI's controlled group.

If the Pension Plan terminates, WTI and all members of its controlled group, including the other debtors, are liable for the Pension Plan's unfunded benefit liabilities, for any unpaid minimum funding contributions, waiver-amortization charges, and unpaid premiums. *See* 29 U.S.C. §§ 1301(a)(18), 1307(e), 1362; 26 U.S.C. § 412(c)(11). PBGC currently estimates that the Pension Plan's unfunded benefit liability is approximately $89,640,000. PBGC has, therefore, filed claims in this amount in addition to claims associated with unpaid minimum funding contributions ($4,022,000), waiver amortization charges ($38,144,00), and unpaid premiums (unliquidated). In addition, PBGC perfected

3

liens under 26 U.S.C. §§ 412(n) and/or § 430(k) against certain debtors in the amount of $2,019,250, for past due unpaid minimum funding contributions and interest as of September 15, 2010.

On or about On June 15, 2010, the ERISA Administrator of the Pension Plan filed an application for a distress termination pursuant to 29 U.S.C. § 1341(c)(2)(B)(iii)(I).[2] On May 6, 2011, Debtors filed the current motion with the Court asking it to determine that each of the Debtors meets the "reorganization in bankruptcy" distress test, 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

## THE DISTRESS TERMINATION TESTS UNDER ERISA

Title IV of ERISA provides the exclusive means for terminating a defined benefit pension plan. *See* 29 U.S.C. § 1341(a)(1); *Hughes Aircraft Co. v. Jacobsen*, 525 U.S. 432, 446 (1999); *see also Philip Servs.*, 310 B.R. at 806, 808-09. To proceed with a distress termination, WTI, as the sponsor of the Pension Plan, and each member of its controlled group must satisfy one of the four statutory distress termination tests under 29 U.S.C. § 1341(c)(2)(B). These tests are: (a) liquidation in bankruptcy; (b) reorganization in bankruptcy; (c) inability to pay debts when due; and (d) unreasonably burdensome pension costs. *Id. See also,* 29 C.F.R. Part 4041, Subpart e.

Under the distress termination provisions, a pension plan may terminate only if: (1) the plan administrator provides affected parties, including PBGC and plan participants, at least 60-day advance written notice of its intent to voluntarily terminate the pension plan, as required under 29 U.S.C. § 1341(a)(2); (2) the plan administrator provides PBGC with

---

[2] On May 9, 2011, WTI filed with PBGC documents to supplement the June 15, 2010 distress termination filings in order to amend its initial distress filing under 29 U.S.C. § 1341(c)(2)(B)(iii)(I) to 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

the information set forth in 29 U.S.C. § 1341(c)(2)(A); and (3) PBGC makes certain determinations based upon the required disclosures.³ 29 U.S.C. §§ 1341(c)(1)(A), (B).

Congress carefully considered how these ERISA provisions should operate in a Chapter 11 bankruptcy proceeding. Congress intended the "reorganization in bankruptcy" distress test to be a test of last resort that would apply only in those cases of severe business hardship. As one court has observed, the purpose of the statute is to "limit to cases of severe business hardship the ability of plan sponsors to terminate their pension plans and thereby shift liability for guaranteed benefits onto other insurance premium payers in the PBGC programs." *US Airways*, 296 B.R. at 743, *quoting Wire Rope*, 287 B.R. at 777.⁴ Thus, in a distress termination, "[t]he appropriate standard of review . . . pursuant to [29 U.S.C.] Section 1341(c)(2)(B)(ii), is whether but for the termination of the pension plan, the [D]ebtor will not be able to pay its debts when due and will not be able to continue in business." *In re Resol Mfg. Co.*, 110 B.R. 858, 862 (Bankr. N.D. Ill. 1990); *see also Wire Rope*, 287 B.R. at 777.

Congress first enacted the distress termination provisions as part of the Single-Employer Pension Plan Amendments Act of 1986 ("SEPPAA"), Pub. L. No. 99-272, 100 Stat. 237 (1986). SEPPAA did not set an explicit standard under the "reorganization in bankruptcy" test; it merely required the bankruptcy court to "approve[] the termination." Pub. L. 99-272, § 11009, 100 Stat. 237, 249-250. Congress adopted an

---

³ PBGC reviews the notice of intent to terminate to determine whether it complies with ERISA's requirements. PBGC must notify the plan administrator of its determination in this regard. 29 C.F.R. §§ 4041.44(a) and (b). PBGC must also make a determination regarding the plan's sufficiency for guaranteed benefits or benefit liabilities. 29 U.S.C. § 1341(c)(3)(A); 29 C.F.R. § 4041.47.

⁴ The legislative history shows that "[t]he basic policy of the legislation is to limit the ability of plan sponsors to shift liability for guaranteed benefits onto other PBGC premium payers and to avoid responsibility for the payment of certain nonguaranteed benefits, to cases of severe business hardship." H.R. Rep. No. 300, 99th Cong., 1st Sess. 278, 279 (1985), *reprinted in* 1986 U.S.C.C.A.N. 929-930.

5

explicit standard in 1987 when it enacted the Pension Protection Act ("PPA"), Pub. L. 100-203, 101 Stat. 1330-333.  The PPA amendments specifically required a debtor in chapter 11 to show that it "will be unable to pay all of its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization."  Pub. L. 100-203, 101 Stat. 1330-333.  As explained by Rep. Schultz, a PPA conferee:

> The conference agreement narrowed the ability of a pension plan sponsor to transfer his pension plan obligations to the PBGC by the mere filing of a bankruptcy petition under chapter 11.  Under the conference agreement a bankruptcy court judge will not allow a distress termination of a pension plan unless he determines that the company is unable to pay its debts pursuant to a plan of reorganization and continue in business outside of chapter 11.
>
> Furthermore, a pension plan termination would be allowed *only if it otherwise would force the sponsor into liquidation*; and where, for example, the court had found that the sponsor had made meaningful sacrifices, such as in its pay package agreements.

133 Cong. Rec. H11970, Dec. 21, 1987 (emphasis added).

"The reference to 'a' plan of reorganization does not permit a distress termination simply because a particular plan requires it; rather the test is whether the debtor can obtain confirmation of *any* plan of reorganization without termination of the retirement plan."  *US Airways*, 296 B.R. at 743-744; *Philip Servs.,* 310 B.R. at 808, *quoting US Airways*, 296 B.R. at 743-744; *Wire Rope,* 287 B.R. at 777*; In re Sewell Mfg. Co.*, 195 B.R. 180, 185 (Bankr. N.D. Ga. 1996).  Importantly, ERISA requires that the distress test must be met by *each* debtor that is a plan sponsor or controlled group member and with respect to *each* pension plan sought to be terminated.  *See, e.g.*, *Sewell*, 195 B.R. at 184.

## COMPLETION OF A DISTRESS TERMINATION

The statute gives the bankruptcy court an important and clearly defined role – to determine whether the Debtors meet the "reorganization in bankruptcy" test. However, it is important to note that the ultimate determination of whether the Pension Plan may be terminated in a distress termination rests with PBGC. *See Wire Rope*, 287 B.R. at 777. As one court explained:

> [T]he Court does not find itself faced with the ultimate question of the Debtor's entitlement to the termination of its pension plan. Instead, the Court simply must perform one narrow factual determination, the satisfaction of which will compose a single element in the Debtor's individual case for reorganizational "distress." The ultimate sufficiency of that distress showing, as well as the adequacy of the Debtor's required disclosures and the qualification of any "controlled group" parties, then will become a collective matter for the PBGC's consideration as it makes a final determination of the Debtor's right to a distressed termination.

*Sewell*, 195 B.R. at 185.

## CONSIDERATION OF DEBTORS' DISTRESS MOTION

The Debtors' Distress Motion asserts that "the Debtors cannot pay their debts pursuant to a plan of reorganization unless the Pension Plan is terminated for the simple reason that there will be no plan of reorganization unless they are able to terminate the Pension Plan." The Debtors also note the Supporting Noteholders' "unwavering requirement that the Pension Plan be terminated." Such statements alone are not sufficient for this Court to determine that the Debtors are entitled to a distress termination of the Pension Plan.[5] As one court has observed:

---

[5] The Debtors' motion correctly recognizes this requirement. The Debtors point to a variety of facts and circumstances involving the Debtors' business and economic conditions and the Pension Plan that support the requested termination of the Pension Plan. More importantly, Debtors describe in detail the process through which they concluded that there is no confirmable plan of reorganization which would permit the Debtors to afford to keep the Pension Plan and pay their other debts.

7

> The essence of the Debtor's argument in the instant case was that the plans must be terminated because the Investor said they must be terminated: *ipse dixit*. Accepting *that* argument would be tantamount to allowing the Investor to make the decision reserved to the bankruptcy court under ERISA. This court concludes that in determining whether a pension plan must be terminated as a distress termination, the bankruptcy judge should consider the provisions of a proposed chapter 11 plan (if one has been proposed at the time of the decision) [and] that the bankruptcy judge must also look to existential financial reality and try to judge whether the plan provisions are necessary or whether they are merely desired by the entities that would benefit from the termination.

*In re Philip Servs. Corp.*, 310 B.R. at 808.

Thus, the Court must closely scrutinize the "existential financial reality" of the Debtors' financial circumstances, including the Debtors' financial projections and the projected costs of maintaining the Pension Plan. It is only if this Court then finds that unless the Pension Plan is terminated, the Debtors "would be unable to pay all of [their]…debts…and will be unable to continue in business outside the Chapter 11 reorganization process," that the Court should make the required statutory determination.

# CONCLUSION

The Debtors must make the factual and legal showings required by ERISA before this Court may determine that the strict criteria for a distress termination of the Pension Plan under 29 U.S.C. § 1341(c)(2)(B)(ii)(IV) is met.

Dated: May 17, 2011
       Washington, D.C.

Respectfully submitted,

/s/ Jon M. Chatalian
ISRAEL GOLDOWITZ
Chief Counsel
CHARLES L. FINKE
Deputy Chief Counsel
STEPHEN D. SCHREIBER
Assistant Chief Counsel
JON M. CHATALIAN
Attorney

PENSION BENEFIT GUARANTY CORPORATION
Office of the General Counsel
1200 K Street, N.W., Suite 340
Washington, D.C. 20005-4026
Telephone: (202) 326-4020, ext. 3045
Facsimile: (202) 326-4112