## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WOLVERINE TUBE, INC., *et al.*,[1] | ) | Case No. 10-13522 (PJW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## OBJECTION OF PLAINFIELD ASSET MANAGEMENT LLC
## TO THE DEBTORS' FIRST AMENDED JOINT PLAN
## OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Plainfield Asset Management LLC, on behalf of itself and its managed funds ("**Plainfield**"), a holder of 38,000 shares of Series A Preferred[2] stock of Wolverine Tube, Inc. ("**Wolverine**," and together with its debtor affiliates, the "**Debtors**"), 1,548,589 shares of Old Common Stock of Wolverine, and $51,921,545 (or approximately 40%) of the 15% Senior Secured Notes due 2012 issued by Wolverine (the "**Secured Notes**"), by and through its undersigned counsel, hereby submits this objection (the "**Objection**") to the First Amended Joint Plan of Reorganization of Wolverine Tube, Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code (the "**Plan**"). In support of the Objection, Plainfield respectfully states as follows:

### PRELIMINARY STATEMENT

1.     Concurrently with the filing of this Objection to the Plan, Plainfield is responding to a motion by the Debtors for a preliminary injunction to prohibit Plainfield from voting against the Plan in an adversary proceeding that was commenced this weekend on a shortened notice. As discussed in greater detail in Plainfield's objection to that motion, the Plan

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Wolverine Tube, Inc. (0812), Tube Forming, L.P. (3323), Wolverine Joining Technologies, LLC (1600), WT Holding Company, Inc. (4984) and TF Investor Inc. (8048).

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Support Agreement the Debtors seek to enforce against Plainfield terminated by its own terms because certain documents filed as a supplement to the Plan (the Stockholders' Agreement, the Management Incentive Plan and the Indenture) are inconsistent with the Plan Term Sheet that accompanied the Plan Support Agreement.

2.     Plainfield remains hopeful that the Debtors and the Minority Noteholders will not sacrifice the progress made in these cases to date, and work with Plainfield in negotiating consensual Definitive Documents. However, absent a further extension of the voting deadline to allow the negotiation of acceptable Definitive Documents, Plainfield will vote against the Plan, making it virtually impossible for the Debtors to confirm the Plan under either section 1129(a) or (b) of Bankruptcy Code.

3.     Further, the express terms of the Plan condition confirmation on the Definitive Documents being acceptable to the Requisite Supporting Noteholders. As such, if the Debtors persist in their efforts to force unacceptable agreements on Plainfield, the terms of the Plan itself will prevent confirmation, regardless of whether Plainfield votes for or against the Plan.

4.     Finally, while Plainfield and the Minority Noteholders have interviewed potential candidates to serve in the two outside director slots for the reorganized Debtors, there is far from any agreement on who should be appointed. Thus, the Debtors are seeking to confirm a plan that does not identify the directors of the reorganized Debtors as required by section 1129(a)(5) of the Bankruptcy Code. For these reasons, as detailed herein, the Court should deny confirmation.

**BACKGROUND**

5.     Before the Debtors' bankruptcy filings, Plainfield was presented with

terms of a restructuring plan largely negotiated between the Debtors, Alpine and a group of holders of the Secured Notes (the "**Minority Noteholders**") that would significantly reduce the Debtors' financial obligations. In an effort to achieve an orderly and relatively brief chapter 11 case, Plainfield entered into expedited and good faith negotiations with the Debtors and the Minority Noteholders on the terms of a restructuring plan, culminating in the parties execution of a plan support agreement (the "**Plan Support Agreement**") with an attached plan term sheet (the "**Plan Term Sheet**") on October 31, 2010.[3]

6.      The Plan Term Sheet calls for a significant deleveraging of the Debtors' balance sheet through a chapter 11 plan. Among other things, it contemplates (i) the cancelation of the Secured Notes in exchange for 100% of the equity of the reorganized Debtors and $30 million of new first lien notes,[4] (ii) the cancellation of the existing Old Preferred Stock and Old Common Stock, and (iii) the payment of all general unsecured claims in full in the ordinary course of business.

7.      The Plan Term Sheet, however, did not – and could not – conclusively resolve all issues implicated in this reorganization. Rather, it expressly required that the parties negotiate definitive documentation (the "**Definitive Documents**") to implement the restructuring in good faith and on terms consistent with the Plan Term Sheet. Among the Definitive Documents contemplated to be negotiated are a chapter 11 plan, a management incentive plan (the "**Management Incentive Plan**"), a new secured note indenture (the "**Indenture**") and a stockholders' agreement (the "**Stockholders' Agreement**").

8.      While the Plan Term Sheet clearly provides for the negotiation of

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan Support Agreement or the Plan Term Sheet, as applicable.

[4] The percentage of equity to be received by holders of the Secured Notes has been reduced to 95% as a result of the PGBC Settlement.

substantial additional governing documents, nowhere does it allow the Debtors or anyone else to force terms on Plainfield without its agreement. Rather, at least four provisions of the Plan Term Sheet provide that the form and substance of Definitive Documents must be acceptable to the Debtors <u>and</u> the Requisite Supporting Noteholders.[5] <u>See</u> Plan Term Sheet at p. 1, 7 and 12 as <u>Exhibit A</u> attached hereto. Likewise, the Plan Support Agreement repeatedly requires that the form and substance of the Definitive Documents be acceptable to the Debtors and the Requisite Supporting Noteholders. <u>See</u> Plan Support Agreement at p. 2, 6, and 14 as <u>Exhibit B</u> attached hereto.

9.      On November 1, 2010, the Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). Two weeks later, on November 15, 2010, the Debtors filed a proposed chapter 11 plan [Docket No. 93] and an accompanying disclosure statement [Docket No. 94].

10.      Consistent with the Plan Term Sheet, section 11.1(d) of the Plan provides that a condition to confirmation of the Plan is that "the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed with the Bankruptcy Court and the same shall be in form and substance reasonably acceptable to the Debtors and the Requisite Supporting Noteholders."

11.      Shortly after the filing of the Plan, the Debtors, Alpine, and the Minority Lenders began discussions with PBGC concerning the termination of the pension plan and the treatment of PBGC's claims against the Debtors and controlled group members.

12.      Initially, Plainfield was not involved in the negotiations with the PBGC,

---

[5] 1The term "**Requisite Supporting Noteholders**" is defined under both the Plan Support Agreement and the Plan Term Sheet as Supporting Noteholders owning more than 66 2/3% in aggregate principal amount of the Secured Notes held by all Supporting Noteholders and constituting more than ½ in number of all Supporting Noteholders. See Plan Support Agreement at p. 2; Plan Term Sheet at p. 14.

but after four and a half months of unsuccessful negotiations among the parties, Plainfield demanded to be included in the negotiations with the PBGC. After additional extensive negotiations partially facilitated by Plainfield, the parties reached an agreement with the PBGC, memorialized in the memorandum of understanding that was signed on April 8, 2011 (the **"PBGC Settlement"**).

13. On April 15, 2011, the Debtors filed the current Plan to incorporate the PBGC Settlement and an accompanying disclosure statement [Docket No. 367]. Later that day, the Bankruptcy Court approved the disclosure statement [Docket No. 368]. Pursuant to the disclosure statement approval order, the Court scheduled May 23, 2011 as the voting deadline and June 2, 2011 as the hearing to consider confirmation of the Plan. See Order Approving Disclosure Statement at p. 3-4 (April 15, 2010) [Docket No. 368]. Given the Plan voting deadline scheduled by the Bankruptcy Court, the deadline under Article IV of the Plan Term Sheet for the Debtors to file the Definitive Documents with the Bankruptcy Court was May 13, 2011.

14. Consistent with the Plan Term Sheet, Section 11.1(d) of the Plan conditions confirmation of the Plan on the terms of the Definitive Documents being acceptable to the Requisite Supporting Noteholders:

> the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed with the Bankruptcy Court and the same shall be in form and substance reasonably acceptable to the Debtors and the Requisite Supporting Noteholders.

15. In the weeks after approval of the disclosure statement, Plainfield, Alpine, the Debtors and the Minority Noteholders negotiated extensively and in good faith over the terms of the Definitive Documents to be filed as a supplement to the Plan (the "**Plan Supplement**").

However, the parties have not yet reached full agreement on certain provisions in the Stockholders' Agreement, the Management Incentive Plan and the Indenture.

16.     Although the Stockholders' Agreement, Management Incentive Plan and Indenture were not in a form acceptable to Plainfield or consistent with the Plan Term Sheet, on May 17, 2011, the Debtors filed such documents with the Bankruptcy Court. The Stockholders' Agreement and Management Incentive Plan were filed with material terms omitted. Leaving these material provisions out of the documents just days before the voting deadline was not acceptable to Plainfield because these provisions could later be inserted by the Debtors in a manner detrimental to Plainfield.

17.     Given Plainfield's ownership of approximately 40% of the Secured Notes, these documents did not have acceptance of the Requisite Supporting Noteholders, and, accordingly, violated at least five provisions of the Plan Term Sheet. Further, by filing these documents in form and substance that is inconsistent with the Plan Term Sheet, the Plan Support Agreement automatically terminated in accordance with Section 15.d. therein.

18.     Immediately after the filing of the Plan Supplement, Plainfield contacted counsel to the Minority Noteholders and the Debtors to notify them that (i) the Plan Supplement was materially inconsistent with the Plan Term Sheet, and (ii) that pursuant to Section 15.d. of the Plan Support Agreement, the Plan Support Agreement automatically terminated.

19.     After further negotiations with the Debtors and the Minority Noteholders on Plainfield's issues with the Plan Supplement, Plainfield was left with no alternative, but to send notice to the Debtors on May 23, 2011, notifying them that the Plan Support Agreement automatically terminated in accordance with Section 15.d. therein on May 17, 2011 because the Definitive Documents were filed in a form not acceptable to Plainfield and thus inconsistent with

the Plan Term Sheet.

20.     After additional unsuccessful negotiations among the parties, on May 25, 2011, the Debtors filed amended versions of the Stockholders' Agreement, the Management Incentive Plan and the Indenture with the Bankruptcy Court, again in a form inconsistent with the Plan Term Sheet and unacceptable to Plainfield and thus, by definition, unacceptable to the Requisite Supporting Noteholders.

21.     On May 26, 2011, Plainfield sent a notice to the Debtors notifying them that the Stockholders' Agreement, the Management Incentive Plan and the Indenture remained in form and substance unacceptable to Plainfield and thus unacceptable to the Requisite Supporting Noteholders. In addition, Plainfield pointed out that certain of the revised Definitive Documents filed with the Bankruptcy Court were inconsistent with the Plan Term Sheet because they were contrary to the express provisions of the Plan Term Sheet in addition to being unacceptable to Plainfield. In particular, while the Plan Term Sheet purported to restrict transfers of the reorganized Debtors' stock after emergence to a "competitor" of the Debtors, the Stockholders' Agreement filed with the Bankruptcy Court expanded the restriction to also include "affiliates" of competitors. Further, while the Plan Term Sheet provides that "the allocation and vesting schedule [under the Management Incentive Plan] shall be determined by the board of directors of reorganized [Wolverine]", the Management Incentive Plan filed with the Bankruptcy Court provided that certain stock and option awards will automatically vest upon a "Change in Control."

22.     On May 27, 2011, the Debtors filed a complaint against Plainfield disputing Plainfield's view that the Plan Support Agreement had terminated automatically in accordance with its terms. Along with the complaint, the Debtors filed a motion seeking entry of

a preliminary and/or permanent injunction and/or a decree of specific performance compelling Plainfield to comply with the Plan Support Agreement (the "**Motion**"). The Debtors argue that the Definitive Documents are consistent with the Plan Term Sheet, and that they are therefore entitled to a mandatory injunction compelling Plainfield to vote to accept the Plan.

23.     Plainfield's deadline to vote on the Plan has been extended by the Debtors to after a hearing on the Motion or such other time as agreed among the parties. Absent a further extension of the voting deadline to allow the negotiation of acceptable Definitive Documents, Plainfield will vote against the Plan, making it virtually impossible for the Debtors to confirm the Plan under either section 1129(a) or (b) of Bankruptcy Code.

24.     Contemporaneously with the filing of this Objection, Plainfield filed an objection to the Motion. The hearing on the Motion is currently scheduled to be heard by the Bankruptcy Court on June 8, 2011.

## OBJECTION TO CONFIRMATION

25.     The Plan should not be confirmed because the Debtors cannot meet the requirements of section 1129 of the Bankruptcy Code. First, because Plainfield will vote against the Plan if no acceptable agreement can be reached prior to its voting deadline[6] and Plainfield holds approximately 40% of the Secured Note Claims in Class 3 of the Plan, Class 3 will not accept the Plan. The Debtors, moreover, cannot satisfy the requirements of section 1129(b) of the Bankruptcy Code and therefore cannot cram down Class 3. Second, the Plan cannot be confirmed under its own terms because it is conditioned on the consent of the Requisite Supporting Noteholders for the Definitive Documents given Plainfield's opposition to certain of those documents and ownership of approximately 40% of the Secured Notes. Third, the Plan

---

[6] Plainfield's deadline to vote on the Plan has been extended by the Debtors to June 2, 2011, following the hearing on the Motion.

cannot be confirmed under 1129(a)(5) of Bankruptcy Code because the Debtors have failed to identify the directors of the reorganized Debtors.

**I.     The Plan Cannot be Confirmed Under Section 1129(a)(8) and (b)**

26.     Section 1129(a)(8) of the Bankruptcy Code requires that a plan must be supported by each class of impaired creditors. To accept a plan, a class of impaired creditors must vote in favor of the plan by more than half in number and by at least two-thirds in amount. See 11 U.S.C. § 1126(c).

27.     Here, the Plan and Disclosure Statement make clear that Class 3 (Note Claims) is impaired and entitled to vote on the Plan. Plainfield, a holder of approximately 40% of the Secured Notes in Class 3, intends to vote its Secured Note claims against the Plan. Given that Plainfield owns 40% of the Secured Notes in Class 3, there is no way Class 3 will vote to accept the Plan. Accordingly, the Plan is not confirmable under section 1129(a) of the Bankruptcy Code because the requirement of section 1129(a)(8) will not been met.

28.     In addition, the Plan is not confirmable under section 1129(b) of the Bankruptcy Code. Pursuant to section 1129(b) of the Bankruptcy Code, a plan of reorganization may be confirmed over the objection of a dissenting class of impaired claims only if the debtor demonstrates that (i) all of the requirements of section 1129(a) other than section 1129(a)(8) are satisfied, (ii) the plan does not discriminate unfairly, and (iii) the plan is fair and equitable with respect to impaired dissenting classes. See 11 U.S.C. § 1129(b). The Debtors, as the plan proponents, have the burden of proving each element of section 1129(b). See, e.g., In re Exide Technologies, 303 B.R. 48, 58 (Bankr. D. Del. 2003) ("The plan proponent bears the burden of establishing the plan's compliance with each of the requirements set forth in § 1129(a), while the objecting parties bear the burden of producing evidence to support their objections.")

29.     Even if the Plan satisfied – and it does not satisfy – all the elements of

section 1129(a), the Plan still cannot be confirmed because it is not fair and equitable as to the holders of the Secured Notes. Under section 1129(b)(2)(A) of the Bankruptcy Code, "the condition that a plan be fair and equitable with respect to a class [of secured claims]" includes the requirements that the plan provide such class of creditors with one of the following:

    i. The secured creditor retains its liens and receives a payment stream equal to the present value of the creditor's claim;

    ii. Replacement liens on the proceeds from the sale of its property that is the secured creditors' collateral; or

    iii. The realization by the secured creditor of its "indubitable equivalent" of its claim.

See 11 U.S.C. § 1129(b)(2)(A)(i)-(iii).

    30.    The treatment of the Secured Notes claims does not satisfy any of the alternatives in section 1129(b)(2)(A) of the Bankruptcy Code. First, section 1129(b)(2)(A)(i) of the Bankruptcy Code is not satisfied because the holders of the Secured Notes are not retaining their liens and receiving a stream of payments equal to the present value of their claims. The Debtors' own valuation of the replacement notes, the equity and the net distributable cash to be provided to Class 3 claims is well below the allowed amount of the Secured Note claims. See Declaration of Mark E. Chesen in Support of Confirmation of the Debtors' Plan of Reorganization with Respect to Valuation Matters and Satisfaction of the Best Interest of Creditors Test, at ¶ 8-11 [Docket No. 483] (citing the SSG Valuation Report). Second, section 1129(b)(2)(A)(ii) of the Bankruptcy Code is not satisfied because the Plan does not contemplate a sale of the Debtors and replacement liens for the holders of the Secured Notes on the proceeds. Third, section 1129(b)(2)(A)(ii) of the Bankruptcy Code is not satisfied because part of the distribution to the holders of the Secured Notes on account of their claims is equity in the reorganized Debtors. It is well established that shares in a reorganized debtor can never be indubitably equivalent to a secured creditor's claim. As noted by the legislative history of

section 1129: "Unsecured notes as to the secured claim or equity securities of the debtor would not be the indubitable equivalent." See 124 Cong. Rec. H. 11, 104 (Sept. 28, 1978); S. 17, 421 (Oct. 6, 1978); see also Metropolitan Life Insurance Company v. San Felipe @ Voss, Ltd. (In re San Felipe @ Voss, Ltd.), 115 B.R. 526, 529 (S.D. Tex. 1990) (stating that stock in reorganized debtor cannot be indubitable equivalent for cramdown purposes). Accordingly, because Class 3 will vote to reject the Plan and cannot be crammed down under Section 1129(b) of the Bankruptcy Code, the Plan cannot be confirmed.

## II.    The Plan Cannot be Confirmed Because The Debtors Cannot Satisfy Its Express Conditions

31.    Section 11.1 of the Plan expressly provides that a condition precedent to confirmation of the Plan is that "the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein . . . . shall be in form and substance reasonably acceptable to the Debtors and the Requisite Supporting Noteholders." Similarly, Section 4.4 of the Plan provides that "[t]he holders of the New Common Stock shall be party to the Stockholders' Agreement, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Supporting Noteholders and the PBGC and which shall be included in the Plan Supplement." Thus, the terms of the Plan itself require that before it may be confirmed, the Stockholders' Agreement and the other documents in the Plan Supplement including the Management Incentive Plan and the Indenture must be acceptable to the Requisite Supporting Noteholders.

32.    As noted above, after lengthy good faith negotiations and multiple revisions of the documents, Plainfield, as a holder of approximately 40% of the Secured Notes, still has numerous unresolved objections to the forms of the Stockholders' Agreement, Management Incentive Plan and Indenture that were filed with the Bankruptcy Court on May 17,

2011 and subsequently amended on May 25, 2011. Specifically, the provisions in these documents for which the parties have yet to reach an agreement acceptable to Plainfield and the reasons for Plainfield's objections are as follows:

### (a) The Stockholders' Agreement

33. The Plan Term Sheet requires that the parties enter into a Stockholders' Agreement and specifies certain terms that it should contain. Among these, the Plan Term Sheet states that "[i]t is anticipated that such Stockholders' Agreement will include... restrictions on transfers to **competitors** by individual shareholders (***but no other transfer restrictions other than to comply with securities laws***) . . . ." See Plan Term Sheet at p.13 (emphasis added). Plainfield was careful to limit this restriction on transfer to only competitors and specified that there would be no other restrictions on transfer. Plainfield was naturally concerned about the fact that overbroad stock transfer restrictions could unnecessarily limit the universe of likely purchasers and thereby depress the value and liquidity of the stock of the reorganized Debtors.

34. Despite this clear language, section 2.2 of the Stockholders' Agreement filed by the Debtors not only limits transfers to competitors, but also provides that stock in the reorganized Debtors cannot be transferred to an Affiliate of a competitor of the Debtors without the consent of a majority of the disinterested directors. [7] Expanding the definition of "competitor" to include an affiliate of a competitor is unsupported by any provision of the Plan Term Sheet and therefore inconsistent with it.

35. Plainfield's objection to the expansion of the stock transfer restriction by the Debtors is eminently reasonable. Under Delaware corporate law, a shareholder is free to transfer its stock to any party, even a competitor of the company, with the only caveat being that

---

[7] Under the Stockholders' Agreement, an "**Affiliate**" of a Person means any other Person Controlling, Controlled by or under common Control with such Person. An "Affiliate" of the Company includes each of the Company's direct or indirect Subsidiaries, whether or not in existence on the date hereof.

the shareholder does not have actual knowledge that the transferee seeks to harm the company. See Harris v. Carter, 582 A.2d 222, 234-35 (Del. Ch. 1990) ("[A] shareholder has a right to sell his or her stock and in the ordinary case owes no duty in that connection to other shareholders when acting in good faith").

36.    Nor can the term "competitor" in the Plan Term Sheet be read to include affiliates. As a matter of black letter law, restraints on the ability to sell equity are viewed with disfavor and must be narrowly construed. See 17 Williston on Contracts § 51:69 (4th ed. 2011) ("Courts do not view with favor restraints on the right of alienation, and will not enlarge the restrictive provisions by implications. . . . The share transfer restrictions must be specific and the rights of the parties must be clear.").

37.    Under New York law, restraints on transfer are to be narrowly construed and in particular restrictions on stock transfers are viewed with skepticism.[8] See, e.g., Lawrence v. Cohn, 325 F.3d 141, 150 (2d Cir. 2003) (holding that under New York law restriction on the transfer of equity must be narrowly construed in construing limited partnership agreement); Rockowitz v. Raab, 132 A.D.2d 916, 918 (N.Y. App. Div. 1987) (holding transfer restriction in shareholders' agreement must be strictly construed).

38.    For example, in Rockowitz, the shareholders in a closely held corporation entered into a shareholders' agreement that provided that in the event a "third party exclusive of a spouse or children of a shareholder makes a bona-fide offer" to buyout a shareholder, a shareholder could not sell without first giving the other shareholders the right to match the offer. Rockowitz, 132 A.D.2d at 917. After one shareholder sold his shares to the children of a second shareholder, the third shareholder sued for injunctive relief. The plaintiff shareholder argued that

---

[8] The Plan Support Agreement contains a New York choice of law provision. See Plan Support Agreement, § 26 at p. 13.

the phrase "third party exclusive of a spouse or children of a shareholder" should be interpreted as to refer to only the spouse or children of the *selling* shareholder and therefore sales to children of *other* shareholders are subject to the right to match the offer. The Appellate Division held "[a]greements restraining the alienability of corporate shares are to be strictly construed." Id. at 918. Thus, the use of the term "a shareholder" in the shareholders' agreement could not be properly altered to mean "a selling shareholder."

39.    Likewise, here the term "competitor" in the Plan Term Sheet is unambiguous. The Debtors' attempt to expand the meaning of the term to include affiliates operates to restrict the transfer of the shares of the reorganized Debtors beyond that contemplated by the Plan Term Sheet, a result that is presumptively inappropriate. Either a stock transferee is a competitor of the Debtors or it is not, and the addition of arbitrary definitions to expand what was negotiated is unreasonable.

40.    The Debtors are wrong when they suggest that Plainfield is intent on creating loopholes in the transfer restriction set forth in the Plan Term Sheet. Plainfield has made repeated attempts to resolve its objection to the Stockholders' Agreement, proposing various formulations that would address the "loophole" concerns. Plainfield has made clear that it is not looking to preserve its ability to sell to a wholly owned subsidiary of a competitor that was formed simply to circumvent the agreed upon transfer restriction, and is amenable to language to address this concern. In particular, Plainfield has offered to condition any sale of stock in the reorganized Debtors to an affiliate of a competitor on any of the following alternatives:

> •    The purchaser/Affiliate must agree to implement an ethical barrier to protect proprietary information between the Affiliate and the competitor. If the ethical wall between competitor and Affiliate is not satisfactory to the reorganized Debtors' outside legal counsel, any sale will not include the Plainfield's right to

appoint a member of the Debtors' board of directors. As part of this agreement, Plainfield will agree not to sell to an Affiliate of a competitor for 30 days following the confirmation hearing;

- Plainfield and the Minority Noteholders will each select a director to fill the two outside director slots. Prior to a transfer to an Affiliate, the selling shareholder must notify the new board. The board has the right to prevent the transfer to an Affiliate of a Competitor if both outside directors determine in their reasonable discretion that such transfer would have a material adverse impact on the value of the shares held by the non-transferring shareholders. As part of this agreement, Plainfield will agree not to sell to an Affiliate of a competitor for 30 days following the confirmation hearing;

- Plainfield and the Minority Noteholders will select the two independent outside board members from a list provided from an independent search firm. Prior to a transfer to an Affiliate of a competitor, the selling shareholder must notify the new board. The board will have the right to prevent the transfer to an Affiliate of a Competitor, if both independent outside directors determine, in their reasonable discretion, that such transfer would have a material adverse impact on the value of the shares held by the non-transferring shareholders; or

- As part of any sale to an Affiliate/purchaser described above, any Affiliate/purchaser must represent that its ownership of the competitor is not more than 30% of the Affiliate/purchaser's entire portfolio of holdings.

41.     Despite these proposals by Plainfield, the Debtors, Alpine, and the Minority Noteholders not only refused to compromise, but also are now seeking to force their terms on Plainfield by seeking confirmation of the Plan with a Stockholders' Agreement opposed by Plainfield.[9]

42.     It should be noted that under the Debtors' proposed draft of the Stockholders' Agreement the decision to allow a sale of stock to an affiliate of a competitor will be made by the "disinterested" directors, certain of whom are appointed by other shareholders.

---

[9] The imposition of an ethical barrier to protect proprietary information between a competitor and an affiliate, without more, was acceptable to future stockholders in a stockholders agreement that was negotiated in the bankruptcy case of In re Appleseed's Intermediate Holdings LLC. See In re Appleseed's Intermediate Holdings LLC, Case No. 11-10160 (KG) (Bankr. D. Del. April 2, 2011), Exhibit E: New Stockholders Agreement at § 3.4 [Docket No. 533]. It defies logic for the Debtors and the Minority Noteholders to characterize Plainfield's proposed resolution as unreasonable when it was adopted in a recent case in this district. Plainfield further notes that counsel to the Minority Noteholders served as counsel to one of the parties in that case.

Because these other shareholders would be natural purchasers of the reorganized Debtors' shares, they have a clear economic interest in restricting the transfer of shares and thereby depressing their price. As a result, although the Stockholders' Agreement currently provides that a majority of "disinterested directors" may permit the sale of stock to an affiliate of a competitor, the directors making the decision are clearly not disinterested in making these determinations. Furthermore, the approval of the majority of the entire board of directors, rather than disinterested or independent directors, would be required to permit a stockholder to provide confidential information to a potential acquirer of shares who is an affiliate of a competitor purchaser. Under Plainfield's proposed language, such transactions would be subject to approval by an independent director who would actually be disinterested.

43. For each of these reasons, it is clear that the insertion of "Affiliates" in the Shareholder's Agreement is inconsistent with the clear transfer restriction contained in the Plan Term Sheet. The Debtors' expressed concerns about circumvention of the transfer restriction are red herrings that do not warrant the inclusion of the term, and in any event are belied by the Debtors' unwillingness to accept any of the numerous fixes proposed by Plainfield. It is the Debtors, Alpine and the Minority Noteholders who are acting unreasonably in refusing to compromise on this issue.

### (b) The Indenture

44. Sections 4.03(a)(1) and 4.11(c) of the Indenture permit secured indebtedness of the lesser of $75 million and 90% of the value of the Debtors' current assets as determined in accordance with GAAP. In addition, sections 4.03(a)(13) and 4.11(d) of the Indenture permit capital lease obligations of up to $5 million. Both of these provisions are inappropriate in relation to the Debtors' business plan and provide disproportionately large

leeway for additional debt given the amount of New First Lien Notes being offered under the Plan, the short term maturity of the New First Lien Notes, and the contemplated first priority of the liens securing the Credit Agreement (as defined in the Indenture) on current assets.

45.     The Indenture includes only a 50% majority consent right in certain critical provisions, such as those allowing (i) certain future documents, including intercreditor agreements in connection with permitted senior financings (see definitions of "Credit Agreement" and "Permitted Partial Refinancing" of the Indenture), (ii) amendments to the "Management Agreement" and "PBGC Settlement Agreement" to the extent that the amendment is materially adverse to the Noteholders (see definition of "Management Agreement" and § 4.16(b) of the Indenture), and (iii) the release of Liens on inventory, receivables and other current assets in connection with any senior credit facility (see § 9.02 of the Indenture). Given that the parties agreed that the approval of the Definitive Documents should be subject to a 66 2/3% consent threshold, such a threshold should naturally govern critical provisions of the Indenture regarding future documents.

**46.**     The Indenture contemplates Permitted Investments (as defined in the Indenture) in Foreign Subsidiaries of up to $2 million and Permitted Joint Ventures of up to $4 million.  See subparts (1) and (14) of definition of "Permitted Investments" under the Indenture. Further, sections 6.01(6)(A) and (B) of the Indenture provide that there will be a crosspayment default and cross-acceleration to any indebtedness of the Debtors or any Subsidiary of at least $2.5 million, but no corresponding cross default/acceleration to the indebtedness of Permitted Joint Ventures. These provisions are unreasonable because there should not be Permitted Investments in Foreign Subsidiaries and Joint Ventures when those entities are not providing credit support for the New First Lien Notes and if there are Permitted Investments in these

entities they should be subject to the cross payment defaults and cross acceleration provisions.

### (c) The Management Incentive Plan

47.     Plainfield objects to Section 12.7 of the Management Incentive Plan, which provides for the automatic vesting of certain stock and option awards upon a "Change in Control." The Plan Term Sheet provides that "the allocation and vesting schedule [under the Management Incentive Plan] shall be determined by the board of directors of reorganized WTI." See Plan Term Sheet at p.6. The Management Incentive Plan filed with Bankruptcy Court takes that determination away from the board of directors of the reorganized Debtors by providing that certain stock and option awards will automatically vest upon a "Change in Control." In addition, the Change in Control provision provides that a Change in Control could be triggered even if there is not a change in majority ownership of the stock in the reorganized Company. If there is to be a Change in Control provision in the Management Incentive Plan, it should be conditioned upon a true sale of the Company in which a majority of the shares is being transferred.

48.     Further, the Debtors' argument in the Motion that this provision is not inconsistent with the Plan Term Sheet because the board of the reorganized debtor will have the power to revisit and revise the vesting rules is misleading. Although the Debtors revised the Management Incentive Plan to delete a footnote providing that all initial grants under the Management Incentive Plan would be subject to full vesting and a lapse of all restrictions upon a Change in Control, the revised definition of Change in Control indicates that Alpine's awards may still be subject to full automatic vesting on a Change in Control, subject only two certain additional restrictions on transfer of the shares underlying such awards. The Management Incentive Plan should be modified to make it clear that all vesting schedules of awards under the Management Incentive Plan will be subject to the discretion of the new board, including awards

to Alpine.

*(d) Without Rectifying Plainfield's Objections to the Plan Supplement, the Debtors Cannot Satisfy the Conditions to Confirmation of the Plan*

49.     As explained above, the Plan defines "Requisite Supporting Noteholder" as holders of the Secured Notes holding more than 66 2/3% in the aggregate principal amount of the Secured Notes. Given that Plainfield, the owner of approximately 40% of the Secured Notes, does not accept the Stockholders' Agreement, the Management Incentive Plan and the Indenture, these documents have not been accepted by the Requisite Supporting Noteholders and thus the conditions precedent in Sections 4.4 and 11.1 of the Plan will never be satisfied.

50.     Each of Plainfield's objections to the Plan Supplement is reasonable. Plainfield has consistently taken every effort to negotiate the Definitive Documents in good faith and has made compromises to ensure an orderly and efficient administration of these cases. Plainfield's objections are based on two basic types of deficiencies: (i) provisions that contradict, ignore, or enlarge upon the bargained-for provisions of the Plan Term Sheet, or (ii) provisions that adversely impact Plainfield without any business justification on the part of the Debtors. Regrettably, the Debtors have chosen the eve of confirmation to deviate from the Plan Term Sheet and propose unacceptable Definitive Documents.

## III.     The Plan Cannot be Confirmed Because the Debtors Have Not Identified All the New Directors

51.     Section 1129(a)(5)(A) of the Bankruptcy Code provides that the court may only confirm a plan if the plan proponent has disclosed the identity of the post-confirmation officers and "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A).  Section 1129(a)(5)'s purpose is to "insure that the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from

conflicts and the potential of post-reorganization litigation so as to serve *all* creditors and interested parties on an even and loyal basis." See In re W.E. Parks Lumber Co., 19 B.R. 285, 287, 292 (Bankr. W.D. La. 1982).

52.     Here, the Debtors have failed to satisfy section 1129(a)(5) of the Bankruptcy Code. All the Debtors have disclosed is that one director will be appointed by Plainfield, one by the Minority Noteholders, one director will be Steven S. Elbaum and that there will be two outside directors "mutually agreed upon" by the Minority Noteholders and Plainfield. The actual identities of three out of the five directors have not been disclosed despite requests by Plainfield for disclosure. Without the identity of all the directors, confirmation cannot go forward.

53.     While Plainfield will continue to work and negotiate with the members of the Minority Noteholders, based on past experience, there can be no assurances that the parties will ever reach agreement on the identity of the two outside directors.

## CONCLUSION

For all of the reasons set forth above, the Bankruptcy Court should deny confirmation of the Plan.

Dated: May 31, 2011

KLEHR | HARRISON | HARVEY | BRANZBURG LLP

BY

Domenic E. Pacitti (DE Bar No. 3989)
919 N. Market St., Ste. 1000
Wilmington, Delaware 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Douglas H. Mannal
P. Bradley O'Neill
Stephen D. Zide
Joseph A. Shifer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

Counsel to Plainfield Asset Management LLC